```
UNITED STATES  DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
---------------------------x          20-CR-29(RJA-HKS)
UNITED STATES OF AMERICA,

vs.
                                      Buffalo, New York
DEVANTE NANCE,                        August 13, 2021
              Defendant.
---------------------------x
```

**SUPPRESSION HEARING**


                    TRANSCRIPT OF PROCEEDINGS
        BEFORE MAGISTRATE JUDGE H. KENNETH SCHROEDER, JR.
              UNITED STATES MAGISTRATE JUDGE



                        JAMES P. KENNEDY JR., ESQ.
                        United States Attorney
                        BY:  LAURA A. HIGGINS, AUSA
                        BY:  EVAN K. GLABERSON, AUSA
                        Federal Centre
                        138 Delaware Avenue
                        Buffalo, New York 14202

FOR DEFENDANT:          MEYERS BUTH LAW GROUP PLLC
                        BY:  CHERYL MEYERS BUTH, ESQ.
                        21 Princeton Place
                        Orchard Park, New York 14127




TRANSCRIBER:            Diane S. Martens
                        dimartens55@gmail.com


(Proceedings recorded electronic audio recording,
 transcript produced by computer.)

1

**I N D E X**

2

3

**Jake Giarrano**

Direct Examination by Mr. Glaberson         4 —   27
4    Redirect Examination by Mr. Glaberson        58 —   63
Redirect Examination by Mr. Glaberson        78 —   81

5

Examination by Ms. Higgins                   65 —   78

6

Cross-Examination by Ms. Meyers Buth         27 —   58
7    Recross-Examination by Ms. Meyers Buth       81 —   84

8    Examination by Judge Schroeder               63 —   65
Examination by Judge Schroeder               84 —   86

9

10   **Ronald Ammerman**

11   Direct Examination by Mr. Glaberson          87 —   96

12   Cross-Examination by Ms. Meyers Buth         96 — 116

13   Examination by Judge Schroeder              116 — 120

14

15

16   **EXHIBITS**                                    **RECEIVED**

17   Government Exhibit 3                              78
Government Exhibit 4                              17
18   Government Exhibit 5                             121
Government Exhibit 9A and 9B                      94

19

Defendant's Exhibit A                            78
20

21

22

23

24

25

U.S. vs. Nance - 20-CR-29

1                    **P R O C E E D I N G S**

2                    *            *            *

3

4         (**WHEREUPON,** the defendant is present.)

5         **THE CLERK:**  This is United States vs. Devante Nance,

6    docket number 20-CR-29-A.

7         This is a suppression hearing.

8         Assistant United States Attorneys Laura Higgins and Evan

9    Glaberson appearing on behalf of the government.

10        And Cheryl Meyers Buth appearing with defendant.

11        **MAGISTRATE JUDGE SCHROEDER:**  Good morning.

12        **MS. MEYERS BUTH:**  Your Honor, good morning.

13        **MAGISTRATE JUDGE SCHROEDER:**  We're here for a

14   suppression hearing.  Are we ready to proceed?

15        **MR. GLABERSON:**  We are.

16        **MS. MEYERS BUTH:**  Yes, Judge.

17        **MAGISTRATE JUDGE SCHROEDER:**  All right.

18        **MR. GLABERSON:**  Judge, just one point of clarification.

19        From the text order of August 11th, am I to understand

20   that after the review of the materials requested by defense

21   under Rule 17 that your finding that those two

22   investigations, are neither material or relevant to these

23   proceedings means we cannot -- we will not expect any

24   cross-examination about those matters?

25        **MAGISTRATE JUDGE SCHROEDER:**  Well, I didn't say anything

U.S. vs. Nance – 20-CR-29

1    about cross-examination.  I merely said that there would be

2    no requirement to produce those materials in the personnel

3    file.

4         **MR. GLABERSON:**  Understood.

5         Absent those materials, I believe the only basis for

6    questions on cross-examination for those incidents about a

7    use of force don't bear on the witness' credibility in any

8    way and also would be a Buffalo news article that is based on

9    information that only the writer knows, so.

10        **MAGISTRATE JUDGE SCHROEDER:**  Well, under the rules of

11   evidence, you have remedy.

12        **MR. GLABERSON:**  Understood.

13        **MAGISTRATE JUDGE SCHROEDER:**  For your edification,

14   Ms. Meyers Buth, the government did produce in-camera

15   materials to me regarding the contents of personnel files of

16   the two officers involved in this matter, which I reviewed

17   and after having so reviewed the materials, I concluded that

18   the events or incidents described in those materials, in my

19   opinion, provided nothing of a material or relevant

20   relationship to the issue at hand in this case.

21        **MS. MEYERS BUTH:**  Thank you, Judge.

22        **MAGISTRATE JUDGE SCHROEDER:**  And, therefore, I found

23   that the government was not required to turn it over as

24   Giglio or Jencks materials.

25        **MS. MEYERS BUTH:**  Understood, thank you.

U.S. vs. Nance - 20-CR-29

1        **MAGISTRATE JUDGE SCHROEDER:**  All right.

2        **MR. GLABERSON:**  So our first witness is going to be

3    police officer Jake Giarrano.

4        **MAGISTRATE JUDGE SCHROEDER:**  All right.

5        **MR. GLABERSON:**  I can get him from the haul way.

6        **MAGISTRATE JUDGE SCHROEDER:**  Yes.

7

8        **JAKE GIARRANO,** called as a witness, being duly sworn,

9    testifies as follows:

10       **MR. GLABERSON:**  May I inquire.

11       **MAGISTRATE JUDGE SCHROEDER:**  Yes.

12   **DIRECT EXAMINATION BY MR. GLABERSON:**

13       **Q**     Good morning, Officer Giarrano.

14       A     Good morning.

15       **Q**     Can you tell us what you do for a living?

16       A     I'm a patrol officer with the Buffalo department.

17       **Q**     Did you also slide your microphone?

18       A     I'm a patrol officer with the Buffalo Police

19   Department.

20       **Q**     And how long have you done that job?

21       A     Coming up on five years.

22       **Q**     And how far did you go in school?

23       A     I have a Bachelor's degree.

24       **Q**     And when you finished college, what process did you

25   follow to join the police department?

U.S. vs. Nance - 20-CR-29

1    A    I took a civil service exam and when my name was

2  selected, I went through a series of tests, physical, a psych

3  exam and a personality interview and then I went through six

4  months at the police academy.

5    Q    Could you just briefly summarize what it means to

6  go through six months at the police academy?

7    A    It's just a general academy that covers topics and

8  how the Penal Law, the V and T, narcotics recognition of

9  driving and defensive tactics, gun range, et cetera.

10    Q    And you passed and graduated from the academy?

11    A    I did.

12    Q    And what was your sign -- could you just tell us

13  what your assignments were after you finished the academy and

14  became a police officer?

15    A    I was trained in A District for, I believe it's

16  three months and then I transferred to E district for a year

17  which is Bailey Langfield and then C District where I've been

18  the past three and a half years.

19    Q    And when, approximately, did you get to C District?

20    A    I believe in 2018 at some time.

21    Q    Now, you said you were trained in A district for

22  three months, what is that?

23    A    It's FTO training so you're assigned to a senior

24  officer and you just -- you're his partner for three months.

25    Q    And FTO means what?

U.S. vs. Nance - 20-CR-29

1     A     Field training officer.

2     Q     I think before you mentioned you were trained on V

3  and T.  What is V and T?

4     A     Vehicle and traffic laws.

5     Q     Now, could you just tell us what, in general, your

6  duties are as a patrol officer in C District?

7     A     I'm a detail car which is not a sector car so we

8  only respond to violent calls, robberies, shots fired,

9  shootings gun calls and we handle a lot of 311 complaints and

10  we also look for suspects for the detectives and we assist

11  specialty units, intelligence, narcotics.

12     Q     Now, in February of 2019, you were working in C

13  District doing that job at that time?

14     A     I was.

15     Q     And just a little bit more specifically what's the

16  difference between a regular patrol and a detail car?

17     A     Regular patrol car is assigned to a sector.

18  There's four sectors in every district.  Your dispatched

19  calls in those sectors and sometimes other sectors as an

20  80 (phonetic) car or a detail car.  You are sometimes

21  dispatched to calls, the high priority ones, like I said,

22  shootings, shots fired, robberies, et cetera but you assist

23  narcotics and intelligence.  You ride around.  You do mostly

24  proactive police work.

25     Q     And did you have a partner in February of 2019?

U.S. vs. Nance - 20-CR-29

1    A    I did.

2    **Q**    And who was that?

3    A    Ronnie Ammerman.

4    **Q**    And about how long during that period did you work

5    with him?

6    A    Ron and I started riding together right when I got

7    to C District so from 2018 until now we're still partners.

8    **Q**    Okay.  Now, what tour, in other words, what hours

9    were you working in -- on February 5th, 2019?

10   A    We work 3:30 p.m. to 1:30 a.m.

11   **Q**    Every day that you work?

12   A    Yes.

13   **Q**    And how does your schedule in terms of days on and

14   days off work?

15   A    We work four days on, four days off, four days on,

16   three days off.

17   **Q**    Okay.  And leading up to February 5th, do you

18   remember how many days off you had prior to February 5th?

19   A    It was three or four.

20   **Q**    So you had been, February 5th was your first day

21   back?

22   A    Yes.

23   **Q**    Can you tell us and take us through when you got to

24   work that day, what you did, what you remember?

25   A    Usually when I arrive at work on the first day, I

U.S. vs. Nance - 20-CR-29

1    go through the reports of crimes that occurred on our days

2    off, shots fireds, shootings, et cetera, open cases.

3        Q    And how do you do that?

4        A    Through our computer.

5        Q    And explain what the setup is when you get into the

6    office, your C District office, what's the first thing you

7    do, I mean, do you arrive in uniform?

8        A    I do.

9        Q    And you're a uniformed police officer?

10       A    Yes.

11       Q    And on that day you were wearing a uniform?

12       A    Yes.

13       Q    So you show up.  Just take us through where you go,

14   where the computers are and what kind of meeting you have

15   before you go on the street?

16       A    You enter the station house.  You go into the

17   locker room.  You get your gear on, your belt, your vest.

18   From there -- we have a briefing at sometime between roughly

19   3:30 and 4, depends on the day when it starts.  From there,

20   you're kind of free to do as you want until your car returns

21   to the station house, if it's not there.

22            I usually log on to the computer, check my work

23   emails, look at open reports and cases from the days prior,

24   shootings, weapons recovered, shots fired for information to

25   help me with my work week.

U.S. vs. Nance - 20-CR-29

1    **Q**    And on February 5th, on that specific day, can you

2    remember any specific reports you looked at and what

3    happened?

4    A    I clicked on an assault report from 28 Norway.

5    **Q**    And why did you do that?

6    A    Because our shootings, if they're nonfatal, they

7    show up as assaults.

8    **Q**    So, you got to click on the assault to figure out

9    what it's about?

10    A    Yes.

11    **Q**    There's no way to tell a shooting from something

12    else?

13    A    No.

14    **Q**    And --

15    A    Not until you click.

16    **Q**    And -- all right.  I'm going to show you what's

17    marked Government Exhibit 3 for identification.  I'm also

18    showing a copy of the exhibit to counsel.  If I may approach

19    the witness?

20    **MAGISTRATE JUDGE SCHROEDER:**  Yes.

21    Do I have an exhibit book?

22    (Indiscernible audio.)

23    **MAGISTRATE JUDGE SCHROEDER:**  Okay.

24    **Q**    So could you tell us what we're looking at in

25    Government Exhibit 3 for identification?

U.S. vs. Nance - 20-CR-29

1    A    This is a Buffalo police assault report that would

2  be printed from the computer.

3    Q    How does that relate to what we were just talking

4  about?

5    A    If -- as I'm looking up the reports, if I were to

6  click on a report and hit print, this is what would come out.

7    Q    Well, I'm sorry, you were just mentioning that you

8  clicked on a report for 28 Norway Park, is that the report in

9  substance of what you were looking at?

10   A    It is.

11   Q    What you were just talking about?

12   A    It is.

13   Q    Okay.  Now, is that -- how do you view it on the

14  screen, could you explain that to us?

15   A    It's very similar to this but it is tabbed.  So you

16  click on a persons involved and it would give you the

17  offender and the complaint.  Then there's a separate tab for

18  like the incident, where it occurred, the address, street,

19  and it would elaborate on some of that information and then

20  there's the charges and the narrative.

21   Q    And as of 3:30 or so that afternoon on

22  February 5th, 2019, when you were reviewing that report, had

23  there been an arrest made?

24   A    No.

25   Q    So is that information updated after the fact?

U.S. vs. Nance - 20-CR-29

1     A    Yes.  So, on the report here where it says cleared

2  by arrest, it would have said that day "investigation

3  pending".

4     Q    In fact, is that what it said when you viewed it?

5     A    Yes.

6     Q    And --

7     **MAGISTRATE JUDGE SCHROEDER:**  Wait.  I'm sorry.  I'm not

8  following.

9     You asked him if he was arrested.  He said no.  And then

10  you asked if there was an arrest and he said, well, it shows

11  that it was cleared by arrest that day.  Which is it?

12     Q    Could you just explain what you're talking about,

13  Officer Giarrano?

14     **MAGISTRATE JUDGE SCHROEDER:**  Was he arrested on

15  January 30th or not?

16     **THE WITNESS:**  If that was the day of this arrest -- yes

17  -- or no, he was not arrested on January 30th, I'm sorry.

18     **MAGISTRATE JUDGE SCHROEDER:**  All right.  Does it show

19  when he was arrested?

20     **THE WITNESS:**  It, he was arrested on the 5th of

21  February.

22     **MAGISTRATE JUDGE SCHROEDER:**  Where?

23     **THE WITNESS:**  On January 30th, the report was done and

24  it was inputted into the computer.

25     **MAGISTRATE JUDGE SCHROEDER:**  Okay.  Just for my

U.S. vs. Nance - 20-CR-29

1   edification, where does it show on Exhibit 3 that he was

2   arrested on February 5th?

3       THE WITNESS:  It, it does not on this report.  Once a

4   report is entered, it's entered on the occurrence day which

5   is January 30th, and where it says status, which is two lines

6   under the Buffalo police logo.  The day I would have looked

7   at the report, February 5th, he was not arrested for this

8   incident so it would have said "investigation pending".

9   After my arrest on the 5th, it gets updated by central

10  booking to "cleared by arrest".

11      MAGISTRATE JUDGE SCHROEDER:  So you're arresting him on

12  the 5th of February?

13      THE WITNESS:  Yes.

14      MAGISTRATE JUDGE SCHROEDER:  For what?

15      THE WITNESS:  For the report from January 30th for the

16  assault report.

17      MR. GLABERSON:  Well, if we could -- I'm sorry --

18      MAGISTRATE JUDGE SCHROEDER:  No.  I'm confused by all of

19  this and it's not making sense to me and I'm the one that has

20  to decide.

21      MR. GLABERSON:  I understand.

22      MAGISTRATE JUDGE SCHROEDER:  I have a police report,

23  Government Exhibit 3, that indicates that there was an

24  incident that occurred allegedly on January 30th, 2019, at

25  1930 hours, was a Wednesday and an investigation was made,

U.S. vs. Nance - 20-CR-29

1  apparently on that date and then there's an entry that

2  appears as having been cleared by arrest.  When I look in the

3  upper right-hand corner of Government Exhibit 3, I see this

4  report, the one I'm holding in my hand, Government Exhibit 3

5  as having a transport date and time of January 30th, 2019,

6  21:18 hours which would indicate to me that Exhibit 3 was

7  prepared on January 30th, 2019, at 21:18 hours.

8      **THE WITNESS:**  So --

9      **MAGISTRATE JUDGE SCHROEDER:**  Am I right or not?

10      **THE WITNESS:**  The report that was inputted --

11      **MAGISTRATE JUDGE SCHROEDER:**  No.  Just look at the upper

12  right-hand corner.

13      **THE WITNESS:**  Yes, that's the report time and date when

14  the report was entered.

15      **MAGISTRATE JUDGE SCHROEDER:**  Now, the entry "cleared by

16  arrest", when was that entry made?

17      **THE WITNESS:**  That entry would have been added -- the

18  "cleared by arrest" would have been added after the arrest

19  was made which was on 2/5/2019.

20      **MAGISTRATE JUDGE SCHROEDER:**  Then why wouldn't there be

21  a report date and time of 2/5/2019?

22      **THE WITNESS:**  Because the arrest is made on the original

23  report.

24      **MR. GLABERSON:**  And if I could clarify something, your

25  Honor.

U.S. vs. Nance - 20-CR-29

1      **MAGISTRATE JUDGE SCHROEDER:**  Please do.

2      **Q**    At the bottom of Exhibit 3, is there a printed

3   date?

4      **MAGISTRATE JUDGE SCHROEDER:**  Yeah, I see a date of

5   April 8th, 2019.  It still isn't February 5th.

6      **Q**    When you were reading the report before your tour

7   started before you hit the street February 5th, 2019, that

8   line --

9      **MAGISTRATE JUDGE SCHROEDER:**  Which line?

10     **Q**    That line at the top of the report status.

11         What did you see before you went out on to the

12  Street?

13     A    "Investigation pending".

14     **Q**    And --

15     **MAGISTRATE JUDGE SCHROEDER:**  Do we have a copy of that

16  report?

17     **MR. GLABERSON:**  We do not.

18     **Q**    And, Officer, your computer system, how do the

19  entries get updated over time?

20     A    Upon making the arrest on February 5th, when we

21  brought him to central booking, the report technicians at

22  central booking change it to "cleared by arrest" because it

23  was "investigation pending" prior to the arrest being made.

24     **MS. MEYERS BUTH:**  Judge, I object unless we have a

25  different exhibit to tell about who changed it, why it was

U.S. vs. Nance - 20-CR-29

1  changed, how it was changed, if this officer didn't do it.

2       **MAGISTRATE JUDGE SCHROEDER:**  Did he?

3       **MR. GLABERSON:**  The officer is testifying about how

4  he -- the system he uses every day --

5       **MAGISTRATE JUDGE SCHROEDER:**  No, did this officer make

6  any changes?

7       **MR. GLABERSON:**  I mean --

8       **MAGISTRATE JUDGE SCHROEDER:**  It's a simple question.

9       **MR. GLABERSON:**  I can ask it.

10      **MAGISTRATE JUDGE SCHROEDER:**  That's what I'm asking you

11 to do.

12      **Q**    So, Officer, could you explain, do you

13 physically --

14      **MAGISTRATE JUDGE SCHROEDER:**  No, no.  Just ask him if he

15 was the officer that made the changes.

16      **Q**    Did you make changes to this report yourself?

17      **A**    No, a report technician does.

18      **MAGISTRATE JUDGE SCHROEDER:**  Objection sustained.

19      **Q**    So explain what information you had after reviewing

20 what you reviewed on February 5th at around 3:30 or shortly

21 thereafter on February 5th, 2019, what was the next step

22 after you reviewed the investigation pending report in your

23 system?

24      **A**    I read the report and it stated that the

25 complainant identified Mr. Nance as the suspect and an

U.S. vs. Nance – 20–CR–29

1  assault, a felony assault.

2       Q     Were you –– did you know where that had happened?

3       A     I did.  28 Norway.

4       Q     And what did you do after you learned the name of

5  the suspect was Mr. Devante Nance?

6       A     I pulled up his mugshot on a program called Web

7  RCKE (phonetic) and I showed it to my partner and asked him

8  if he recognized Mr. Nance.

9       Q     And who's your partner?

10      A     Ron Ammerman.

11      Q     Before that day had you ever heard of or met

12  Mr. Nance before?

13      A     I had not.

14      Q     I'm going to show you what's marked as Government's

15  Exhibit 4 for identification.

16            Can you tell me what that is?

17      A     This is the printout of a Web RCKE mugshot program.

18      Q     Now is that exactly what you saw that day?

19      A     Yes.

20      Q     Or is that a screen shot you took more recently?

21      A     I took this more recently but this is what I would

22  have looked at that day.

23      Q     Is that ––

24      **MS. MEYERS BUTH:**  I object.

25      Q     That ––

U.S. vs. Nance - 20-CR-29

1    **MS. MEYERS BUTH:**  Same objection as to Government

2    Exhibit 3.

3    **MAGISTRATE JUDGE SCHROEDER:**  Yeah, what he would have --

4    sustained.

5    **Q**    The question is:  Are those the photos that you

6    looked at before you went on to the street --

7    **A**    Yes.

8    **Q**    -- that night?

9    **MR. GLABERSON:**  So I would offer Government Exhibit 4

10   into evidence.

11   **MS. MEYERS BUTH:**  Judge, I object unless Government 4 is

12   what the officer actually looked at.

13   **MAGISTRATE JUDGE SCHROEDER:**  Sustained.

14   **Q**    Officer, is that a fair and accurate representation

15   of the photos depicted on that exhibit, is that a fair and

16   accurate depiction of the photos you looked at prior to you

17   going out into the field on February 5th, 2019?

18   **A**    Yes.

19   **MAGISTRATE JUDGE SCHROEDER:**  Overruled.

20   **MS. MEYERS BUTH:**  I --

21   **MAGISTRATE JUDGE SCHROEDER:**  Your objection is noted.

22   **MS. MEYERS BUTH:**  Thank you.

23   **MAGISTRATE JUDGE SCHROEDER:**  Government Exhibit 4 is

24   received in evidence over objection.

25   **Q**    Now, after you reviewed these reports and these

U.S. vs. Nance – 20-CR-29

1    mugshots, what did you do next?

2        A    My partner and I went on patrol.

3        Q    And about what time did you leave C District

4    station?

5        A    Roughly 4 p.m.

6        Q    And what happened next?

7        A    We drove out on patrol and we were traveling

8    northbound on Norway and we saw the suspect, Mr. Nance,

9    walking towards 28 Norway.

10       Q    Now, when you say we, I want you to talk about what

11   you personally observed.

12       A    Yes.

13       Q    First off, who was driving and who was the

14   passenger?

15       A    Ron was driving.  I was the passenger.

16       Q    And how did you get from C District to Norway Park?

17       A    It's very close to the station house.  There's a

18   variety of ways we could have gotten there that day.

19       Q    And to the best of your memory is that the first

20   place you went after you left the station?

21       A    Yes.

22       Q    And describe what you saw -- where you were when

23   you first saw Mr. Nance?

24       A    We turned on to Norway from Best Street and we

25   traveled northbound on Norway and we saw Mr. Nance walking.

U.S. vs. Nance – 20-CR-29

1    **Q**    You –– I'm sorry.

2    A    Myself, I saw Mr. Nance walking southbound on the

3    west side of the street towards 28 Norway.

4    **Q**    Now, what was the lighting like at about shortly

5    after 4 p.m. on February 5th, 2019?

6    A    It was still light out.

7    **Q**    And what was the traffic on Norway Park like in

8    terms of vehicle traffic?

9    A    It's light.

10   **Q**    And were there other people on the street walking

11   around?

12   A    I don't believe so.

13   **Q**    Now, what did you see Mr. Nance do?

14   A    Mr. Nance looked at our marked patrol vehicle and

15   they know as we drove by, he continued to look back at us.

16   **Q**    Where did you –– where did your vehicle travel

17   after he looked back at you?

18   A    There's a median on Norway so we traveled,

19   continued to travel northbound until we hit Dodge, which is

20   the next street, and we did a U turn to come back on the

21   other side of the street.

22   **Q**    What did you see as you were traveling now –– well,

23   what direction were you traveling at that point?

24   A    We were traveling southbound on Norway towards

25   Best.

U.S. vs. Nance - 20-CR-29

1      Q      And what did you see as you came down the Norway

2  Park at that time?

3      A      Mr. Nance was walking out or from 28 Norway and he

4  entered -- he walked I would say maybe three houses away and

5  then entered a parked vehicle.

6      Q      And where was the parked vehicle, in which

7  direction was it facing?

8      A      It was facing southbound and it was parked on the

9  right side of the road.

10     Q      Okay.  And what happened next?

11     A      My partner and I pulled up next to the car.  I

12  exited and walked around the vehicle to the passenger side.

13  And my partner exited and walked to the driver's side.

14     Q      Where was your vehicle parked in relation to the

15  vehicle Devante Nance got into?

16     A      Directly next to it facing southbound.

17     Q      Were both vehicles facing southbound?

18     A      Yes.

19     Q      And about how much room was in between your vehicle

20  and the vehicle Mr. Nance got into?

21     A      Maybe 3 feet.

22     Q      What happened when you approached the vehicle,

23  could you describe the vehicle for us, also?

24     A      It was, I believe it was a golden color, a

25  Volkswagen wagon and it had heavy tints.

U.S. vs. Nance - 20-CR-29

1     Q     And what happened when you approached?  What door

2     did you approach personally?

3     A     The front passenger door.

4     Q     And who was -- tell us what happened there?

5     A     Mr. Nance was seated in the front passenger seat

6     and I asked him for identification.

7     Q     Can you tell us what he was wearing and what you

8     remember him -- what was his reaction to you?

9     A     I don't recall his exact clothing but he did have a

10    satchel on.

11    Q     Explain what a satchel is?

12    A     It's a single strap small bag that you wear over

13    your shoulder.

14    Q     And would you -- what was the first thing you said

15    when you approached the vehicle?

16    A     I asked him for his identification.

17    Q     And was the window up or down?

18    A     It would have been down at that point.  I

19    approached and he rolled it down.

20    Q     And what happened next?

21    A     I asked him for his ID.  At that point he became

22    fidgety and he kind of bladed himself away from me.  He put

23    his hand over his satchel and reached in and pulled out his

24    ID so I couldn't see what was inside of it (indicating).

25    Q     And just for the record, as you were just

U.S. vs. Nance - 20-CR-29

1   testifying, your left hand went up flat against your chest

2   and your right hand reached over the top of your left hand?

3       A    Yes.

4       Q    And what happened after he did that action?

5       A    He handed me his ID and I confirmed that it was

6   Devante Nance from the assault report.  I looked at my

7   partner and kind of gave him a head nod.  And I read his ID

8   out loud so he could acknowledge that it was the person that

9   was wanted.

10      Q    And what happened next?

11      A    I asked Mr. Nance to step out of the vehicle, which

12  he complied with and I walked him around the front of the

13  parked car he was in to our car, which was a Tahoe.  I had

14  him place his hands on the hood of the car and I went to pat

15  him down and I explained he was wanted for an assault.

16      Q    And how did he react to that?

17      A    At that point of the patdown, I was to the satchel

18  and I patted down the satchel and went to take it off him.

19  At that point he pushed off the patrol vehicle and attempted

20  to flee northbound between the car he was in and our marked

21  patrol car.

22      Q    Where were you and where was Officer Ammerman when

23  you were patting Devante Nance down at your vehicle?

24      A    I was behind him and Officer Ammerman was to the

25  left of me which would be southbound.  So he was roughly

U.S. vs. Nance – 20-CR-29

1    between the rear tire of the Tahoe and the rear tire of the

2    Volkswagen so he's about 3 feet away.

3         Q     And what happened next?

4         A     Mr. Nance attempted to push off the car and flee

5    southbound towards my partner.  My partner was able to

6    apprehend him 5 feet away and his satchel came off on the

7    ground.  But as it came off, both of our hands were able to

8    kind of go into it and I was able to grab a vacuum sealed bag

9    out of it.

10        Q     Now, explain -- just back up here.  When this

11   interaction with the satchel was happening, where were your

12   hands physically when Devante Nance started to flee?

13        A     I believe my left hand was trying to grab him and

14   my right hand kind of came around over the top of him and

15   that's how I was able to get near the bag.

16        Q     And what was -- what were Nance's hands doing at

17   that time?

18        A     He was trying to get to the bag while fleeing.

19        Q     Meaning what?

20        A     While running, he was trying to get to whatever was

21   in the bag.

22        Q     If you could just explain what were his hands doing

23   at that time?

24        A     His, it would be possibly his -- his right hand was

25   attempting to reach into the bag to grab whatever was in

U.S. vs. Nance - 20-CR-29

1   there.

2        Q     And what happened next?

3        A     Mr. Nance and my hand kind of entered or were near

4   the bag at the same time and I'm unsure if he grabbed it and

5   threw it or I was able to grab it first, the narcotics ended

6   up in my right hand.  My passenger window of my patrol

7   vehicle was open so I quickly dropped it through the window

8   on to my passenger seat, front passenger seat and I assisted

9   my partner with apprehending him who was already putting him

10  in the cuffing position and cuffing him up.

11       Q     Now, at the time that you originally patted him

12  down, did you pat him down for any weapons?

13       A     I did.

14       Q     And did you find or feel anything that resembled a

15  weapon at any point?

16       A     I did not.

17       Q     Now when you say narcotics, at the time you grabbed

18  this package, explain what you at that moment believed or

19  thought or knew about what you had, what the substance was

20  that you had grabbed?

21       A     When I first grabbed it and got the vacuum sealed

22  bag, I thought it was possibly marijuana for -- I didn't

23  really get a look at it, like I say I dropped it right in.

24  But I have never seen fentanyl or heroin or whatever it was

25  vacuum sealed like that.

U.S. vs. Nance – 20-CR-29

1   **Q**    So at the time you grabbed it, you did not know

2   what it was?

3   A    No.

4   **Q**    And after you dropped that package into your

5   vehicle, what did you do?

6   A    I assisted Ron with, you know, he, he kind of took

7   the suspect to the ground and was cuffing him and I kind of

8   just helped out.  But we were in a tight space so he kind of

9   did the cuffing.

10   **Q**    Tight space meaning where?

11   A    Between the two -- or between our patrol car and

12   the parked car.

13   **Q**    What happened next?

14   A    Once we cuffed him, we placed him in the back of

15   our patrol car and we -- at some point I radioed for some

16   more, for some assistance and another car showed up, we took

17   the driver out and placed him in that car and the driver was

18   compliant.

19   **Q**    The driver of the Volkswagen?

20   A    Yes.

21   **Q**    Was that person ever arrested or detained --

22   A    No.

23   **Q**    -- beyond that?

24   A    No.

25   **Q**    What happened to that person?

U.S. vs. Nance – 20–CR–29

1     A    He was released.

2     **Q**    And drove away in his car?

3     A    Yes.

4     **Q**    And what about Mr. Nance, what happened with him?

5     A    He was brought back to the station house to speak

6 with a detective and he was eventually arrested.

7     **Q**    Did you recover at any point any currency?

8     A    Yes.

9     **Q**    Where and when did that happen?

10    A    It was on Mr. Nance's person and we recovered it

11 and seized it while at 121 West Eagle which is our central

12 booking location.

13    **Q**    And explain that process or procedure.

14    A    You go into central booking and it's a secure

15 facility.  There's some cameras and you count the money in

16 front of the defendant and then you also count the money at

17 the counter underneath the camera which then the Lieutenant

18 takes the money, counts it underneath their camera on the

19 back and then it's seized and there's about three or four

20 paperwork forms that you have to fill out.

21    **Q**    Now, backing up to before you, before you went out

22 into the street, what was your understanding after reading

23 the complaint assault, pending complaint assault for assault

24 and viewing the mugshots, what was your understanding and

25 your plan if you encountered this suspect?

Giarrano – Cross – Meyers Buth

1      A    He would have been arrested –– or detained and

2  brought back to the detectives and then arrested.

3      **MR. GLABERSON:**  All right.  I have no more questions for

4  Officer Giarrano.

5      **MAGISTRATE JUDGE SCHROEDER:**  Ms. Meyers Buth.

6  **CROSS–EXAMINATION BY MS. MEYERS BUTH:**

7      **Q**    Morning, Officer Giarrano.

8      A    Good morning.

9      **Q**    You initially indicated that you were coming up on

10  five years with BPD, correct?

11      A    Yes, this January.

12      **Q**    As of February 2019, you would have had three

13  years?

14      A    I would have, I would have been working towards my

15  three year –– completed my second.

16      **Q**    And part of your responsibilities, you indicated,

17  were to help narcotics detectives, correct?

18      A    Yes.

19      **Q**    You were familiar with a narcotics, right?

20      A    Yes.

21      **Q**    And you were in C District at the time that you saw

22  Mr. Nance, correct?

23      A    Yes.

24      **Q**    You had made narcotics arrests prior to

25  February 5th, 2019, correct?

Giarrano – Cross – Meyers Buth

1    A    Yes.

2    Q    And that was one of your primary duties, right?

3    A    To, to make narcotics arrests?  Yes, that's part of

4    what the detail car does, narcotics, weapons.

5    Q    Serious crimes?

6    A    Yes.

7    Q    Okay.  Not vehicle and traffic offenses usually?

8    A    We would conduct 10 if not 20 vehicle traffic stops

9    a day to answer 311 complaints which are community complaints

10   at intersections for stop signs and so forth.  That's part of

11   our duties as the detail car as well.

12   Q    But there were no vehicle and traffic complaints

13   about the gold VW that you observed on February 5th, right?

14   A    I don't believe so.

15   Q    It was legally idling in front of an address,

16   right?

17   A    Yes.

18   Q    And so you'll agree with me that the primary

19   motivation for your investigation of that vehicle was not

20   that it had heavy tints?

21   A    Yes.

22   Q    The primary motivation for your investigation of

23   that vehicle was because you wanted to speak to Mr. Nance?

24   A    Yes.

25   Q    And it was your intent, if you could confirm his

Giarrano - Cross - Meyers Buth

1    ID, that you were going to arrest him based on the assault

2    complaint, correct?

3         A    Yes.

4         Q    Okay.  And you were aware at that time that there

5    was no warrant issued for Mr. Nance, correct?

6         A    No, there was no active warrant.

7         Q    Okay.  There was no warrant of any kind for

8    Mr. Nance for that assault, right?

9         A    Yes, it was a pending case, not a warrant.

10        Q    Okay.  And there were no criminal charges that had

11   been filed against Mr. Nance as a result of that assault; is

12   that correct?

13        A    I'm unsure.

14        Q    Well, do you need to look at Exhibit Number 3

15   again?  Does it indicate on there whether criminal charges

16   were actually filed against Mr. Nance?

17        A    It states that assault second and harassment in the

18   second were cleared by the arrest so this assault call was

19   cleared with the arrest on these charges.

20        Q    On which charges?

21        A    It says in this report that Mr. Nance was charged

22   with assault second and harassment second.

23        Q    So, so based on your reading of this report, you

24   believe Mr. Nance was arrested for felony assault and charged

25   with it?

Giarrano - Cross - Meyers Buth


1      A    The, the report would indicate that it was cleared

2   by an arrest.

3      Q    Was that the arrest that you made?

4      A    Yes.

5      Q    So, when you arrested him on February 5th, it was

6   your understanding you were arresting him for this felony

7   assault?

8      A    Yes.

9      Q    Did you ever go to court for that felony assault

10  arrest?

11     A    I may have.  I'm unsure.  I'm in court a lot for

12  city court and county court.

13     Q    Well this is a felony assault with a hammer.

14  Certainly you'd remember it if you went to court for it,

15  right?

16     A    I, I don't remember the exact court proceedings.

17     Q    Do you remember speaking to an Assistant District

18  Attorney about Mr. Nance being prosecuted for felony assault?

19     A    I do not.

20     Q    Do you remember filing any police reports charge

21  withing Mr. Nance with felony assault?

22     A    I believe we did if, if this was cleared by an

23  arrest on these charges.

24     Q    Do you know or have you reviewed any reports for

25  the arrest of Mr. Nance on a felony assault?

Giarrano - Cross - Meyers Buth

1     A    This would be that report.

2     Q    So your testimony before this court is that

3 Mr. Nance was arrested on a felony assault and this is --

4 Exhibit 3 is the only paperwork that you're familiar with

5 that would have been filed?

6     A    Yes, this report would indicate that he would --

7 these assault charges were cleared by an arrest.

8     Q    And you have no recollection of filing a supporting

9 deposition?

10    A    No.

11    Q    And certainly you know, even though you'd only been

12 on the force for a couple years, that in order to charge

13 somebody, you would have filled out a supporting deposition,

14 right?

15    A    At this time in 2019, I believe we could make the

16 arrest on information and belief.

17    Q    Okay.  But who did the paperwork for the assault?

18    A    The report technician -- oh, the original report

19 was done by police officer Kevin Quinn and Mike Goodseed and

20 now Lieutenant Quinn.

21    Q    Okay.  But I'm not asking about Exhibit 3.  I'm

22 asking about the criminal complaint or whatever it is that

23 was signed on information and belief who did that paperwork?

24    A    It would have been typed by a report technician and

25 then signed by myself or my partner.

Giarrano - Cross - Meyers Buth

1    **Q**    Okay.  And where is that paperwork?

2    **A**    I do not know.

3    **Q**    Did you speak to the prosecutor here about whether

4    that paperwork should be produced?

5    **A**    I did not.

6    **Q**    Do you know what the outcome of the felony assault

7    charge that you remember Mr. Nance being charged with?

8    **A**    I do not.

9    **Q**    Do you -- did you ever have to testify in court

10   about a felony assault charge?

11   **A**    I, I did not.

12   **Q**    But it's your testimony today that you were

13   arresting Mr. Nance on February 5th for felony assault?

14   **A**    Yes.

15   **Q**    Who asked you to go look for Mr. Nance?

16   **A**    No one.

17   **Q**    Who was the complainant on the assault charge?

18   **MR. GLABERSON:**  Objection.

19   **MAGISTRATE JUDGE SCHROEDER:**  Basis?

20   **MR. GLABERSON:**  Relevance.

21   **MAGISTRATE JUDGE SCHROEDER:**  No.  These records leave a

22   lot to be desired and so the more we can flesh out, the

23   better it will be.  Overruled.

24   **A**    Mr. Watson.

25   **Q**    You knew Mr. Watson prior to February 5th of 2019?

Giarrano - Cross - Meyers Buth

1      A     I did not.

2      Q     Did you interview Mr. Watson prior to February 5th

3  2019?

4      A     I did not.

5      Q     Did you read any statement that Mr. Watson gave to

6  another police officer prior to February 5th, 2019?

7      A     I did not I did not.

8      Q     What did you know about the basis of the assault

9  report involving Mr. Nance?

10     A     Exactly what's in this report that the complainant

11 states he was shoveling snow for an older woman at 28 Norway

12 and a young black man grandson of the woman he was shoveling

13 for did come out of the house with a hammer and did attack

14 him hitting him with said hammer and the left shoulder and

15 lower left leg causing pain and discomfort.

16     Q     How old was Mr. Watson?

17     A     He was born in 1956 so he was 62 at the time of

18 this report.

19     Q     And the part you just read, it doesn't mention

20 Devante Nance's name, correct?

21     A     In the narrative it does not but he was identified

22 as the suspect --

23     Q     How --

24     A     -- by name.

25     Q     How do you know that?

Giarrano – Cross – Meyers Buth

1      A    It was listed in the report under suspect.

2      Q    You weren't present when Mr. Watson gave his

3  accounts of this assault, were you?

4      A    I was not.

5      Q    And how Mr. Nance came to be identified as a

6  suspect, you can't say, right?

7      A    I can't.

8      Q    Because you never read anything, for example, a

9  statement that Mr. Watson may have given, correct?

10     A    No.

11     **MAGISTRATE JUDGE SCHROEDER:**  Wait a minute.  No, it's

12  not correct?

13     **THE WITNESS:**  No, that is correct.  I'm sorry.

14     Q    And so your intention on February 5th when you saw

15  Mr. Nance was to arrest him and the only basis for the arrest

16  was Exhibit 3, is that your testimony?

17     A    Yes, a pending complaint.

18     Q    So the arrest had nothing to do with tinted

19  windows.  That was just part of the observation you made that

20  day --

21     A    Yes.

22     Q    -- right?  Regardless whether the vehicle had

23  tinted windows, you were going to arrest Mr. Nance on the

24  assault report, correct?

25     A    Yes.

Giarrano - Cross - Meyers Buth

1    **Q**    And you now know that this is simply a report of an

2    incident, not a criminal charge, right?

3    A    Yes, this is a police report for an assault.

4    **Q**    Okay.  And sometimes people will come into the

5    station and make reports about crimes that are never

6    followed --

7    **MR. GLABERSON:**  Objection.

8    **Q**    -- through on, right?

9    **MAGISTRATE JUDGE SCHROEDER:**  Let her finish the

10   question.  You want to repeat the question.

11   **Q**    Sure.  Sometimes, based on your experience, you

12   know people will come in and file a police report about an

13   incident but that doesn't lead to them being charged with a

14   crime?

15   **MAGISTRATE JUDGE SCHROEDER:**  Okay, hold on.

16   **MR. GLABERSON:**  Objection.

17   **MAGISTRATE JUDGE SCHROEDER:**  Basis?

18   **MR. GLABERSON:**  Speculation and relevance.

19   **MAGISTRATE JUDGE SCHROEDER:**  No.  She's asking him based

20   on his experience.  Overruled.

21   A    Yes, some police reports are made where charges are

22   not a result of it.

23   **Q**    And if somebody came in and made a report and said

24   they had been attacked with a hammer and sustained serious

25   injuries, would you expect, based on your experience, that a

Giarrano - Cross - Meyers Buth

1 criminal charge would be brought?

2     **MR. GLABERSON:** Objection.

3     **MAGISTRATE JUDGE SCHROEDER:** Basis.

4     **MR. GLABERSON:** Speculation.

5     **MAGISTRATE JUDGE SCHROEDER:** Based on his experience.

6 Overruled.

7     A    If -- yes, some police reports where a felony

8 assault is reported result in an arrest, some do not.

9     Q    Do you know whether any pictures were taken of

10 Mr. Watson when he made this report?

11     A    I do not.

12     Q    What else besides this report would exist that

13 would help us flesh out what he actually said about this

14 incident?

15     A    Could you repeat the question.

16     Q    Sure.  Right now we have a one-page exhibit,

17 one-page police report.

18     **MAGISTRATE JUDGE SCHROEDER:** Government Exhibit 3.

19     Q    Government Exhibit 3.  What other documents or

20 information would exist regarding the complaint about the

21 assault?

22     A    About this assault?  A detective interview.

23     Q    Have you reviewed an interview statement that was

24 taken by a detective from Mr. Watson?

25     A    I briefly watched a interview of Mr. Nance for the

Giarrano - Cross - Meyers Buth

1    pending assault charges.

2        Q    Well, the interview was after you had arrested him?

3        A    Yes.

4        Q    Okay.  I'm asking do you -- are you familiar with

5    any sort of statement or notes that may have been taken by a

6    detective if Mr. Watson was interviewed?

7        A    I'm not.

8        Q    Do you know for a fact as you sit here whether he

9    was ever interviewed by a detective?

10       A    I do not.

11       Q    Do you know whether Mr. Watson was a local drug

12   addict that C District officers were familiar with?

13       A    I, I do not.

14       Q    I understand that on February 5th, you had reviewed

15   some information similar to Exhibit Number 3, some report,

16   did you talk to anybody before you went out on patrol looking

17   for Mr. Nance?

18       A    I don't believe so.

19       Q    Was there a detective assigned to investigate this

20   assault?

21       A    It would have been assigned to a detective.

22       Q    Okay.  Did you know before you left for patrol on

23   February 5th, who that detective was?

24       A    I did not.

25       Q    You didn't check with any detective or any other

Giarrano - Cross - Meyers Buth

1    personnel to find out who was assigned to investigate this

2    incident, if anyone?

3         A    I did not.

4         Q    And in your preparation to testify today, the

5    prosecutor did not show you a criminal complaint or

6    supporting deposition or other felony accusatory instrument

7    from Buffalo city court, did he?

8         A    No.

9         Q    And you're not aware of any, right?

10        A    No.

11        Q    But your testimony prior to my cross-examination

12   was that Mr. Nance was arrested for a felony assault, you're

13   sure of that?

14        A    Yes, that's why this report was cleared by an

15   arrest.

16        Q    Okay.  Where would we find paperwork that could

17   verify your testimony?

18        A    I'm unsure.  Somewhere in the Buffalo city court

19   building.

20        Q    And that's not something that you brought with you

21   or ever showed to the prosecutor, right?

22        A    No.  Once I sign those, they go into a court file.

23        Q    And you told the prosecutor in preparation for this

24   hearing the same thing that you're testifying to, right, that

25   there was a felony assault charge that you arrested Mr. Nance

Giarrano – Cross – Meyers Buth

1    on?

2         A    I believe so.

3         Q    Fair to say that when you saw Mr. Nance get in the

4    vehicle, was your intention, Officer Giarrano, that you were

5    going to ask him to exit the vehicle so that you could

6    undertake the detention?

7         A    Yes.

8         Q    And from the time that you walked up to the vehicle

9    to the -- went around to the passenger side and asked

10   Mr. Nance for identification and got him out of the vehicle,

11   how much time elapsed?

12        A    Under 30 seconds, maybe a minute, at most.

13        Q    And when you told him to get out of the vehicle, he

14   did that, right?

15        A    He did.

16        Q    Did you open the door or did he?

17        A    I don't recall.

18        Q    Do you recall you said on direct you do not recall

19   what he was wearing, correct?

20        A    I do not.

21        Q    If I asked you whether you recalled him wearing a

22   track suit, would that refresh your recollection?

23        A    He could have been.  I, I just don't recall.

24        Q    And certainly if, when Mr. Nance got out of the

25   vehicle, you saw any bulge, you know, or anything else you

Giarrano - Cross - Meyers Buth

1   could have frisked him right there at his vehicle, correct?

2       A    Yes.

3       Q    And you would have noted that somewhere in a report

4   that you saw a bulge or some other indication that he could

5   have possibly been armed, right?

6       A    Yes.

7       Q    And ultimately he had no weapons on him?

8       A    No.

9       Q    And when he was still seated in the vehicle, there

10  was nothing about the vehicle itself that was suspicious, for

11  example, no odor of marijuana?

12      A    I don't believe so.

13      Q    There certainly weren't any weapons visible to you

14  in the vehicle, right?

15      A    No.

16      Q    He wasn't acting in a threatening manner?

17      A    He was -- he was nervous and did blade himself and

18  attempt to hide what was in the satchel when he took his ID

19  out.

20      Q    Okay.  Did he -- did he hand you the ID that he

21  took out of the satchel?

22      A    Yes.

23      Q    And other than that, he wasn't, didn't use abusive

24  language or fail to cooperate with you, right?

25      A    Not until I explained to him that he was under

Giarrano - Cross - Meyers Buth

1    arrest for an assault charge.

2        Q    Okay.  And up until -- well, strike that.

3            When he was still seated in the vehicle, other than

4    asking him for identification, did you have any other

5    conversation with him?

6        A    I may have.  I may have, you know, asked if he had

7    any weapons on him or anything that would cause us concern.

8        Q    And then you got him out of the vehicle and you

9    walked him over to your vehicle, correct?

10       A    Yes.

11       Q    And at that point did you tell him to put his hands

12   up on your vehicle and spread his legs to be frisked?

13       A    I did say put your hands on the vehicle and frisked

14   him -- started frisking him.

15       Q    And he followed those instructions, correct?

16       A    He did.

17       Q    And certainly if you felt that there might be

18   something in his satchel that could put you in danger, you

19   would have frisked the outside of the satchel, right?

20       A    Yes.

21       Q    And I assume that you did that, right, as part of

22   your pat frisk?

23       A    As I was getting to that, that is when he pushed

24   off the car and began to flee.

25       Q    Okay.  When, when -- prior to when you were getting

Giarrano - Cross - Meyers Buth

1    to that, what else had you done to consummate the pat frisk?

2         A    Prior to touching the satchel?

3         Q    Mm-hmm.

4         A    I probably would have, you know, checked his

5    waistband, if he had, like you said, a track suit on, any of

6    the pockets on the suit where maybe possibly a weapon could

7    be.

8         Q    Had you at any point asked him to take the satchel

9    off before you made him exit the vehicle?

10        A    No.

11        Q    You could have done that, right, if you were

12   concerned there was something in the satchel, correct?

13        A    If there possibly is something in the satchel, I

14   prefer him to touch it less for officer safety.  I wouldn't

15   want him taking it off, putting it down in the car.  I'd

16   rather just have him keep it on and we'll deal with it when

17   he steps out.

18        Q    And what did it look like?  You're calling it a

19   satchel.  What did it look like?

20        A    I believe it was -- I'm unsure of the color.  It

21   may have been black but it's just a satchel with a pocket or

22   two in it and it goes from, you know, shoulder to hip area

23   around somebody.

24        Q    So approximately how big?  3-by-5 inches,

25   2-by-3 inches?  Enough to hold an ID?

Giarrano – Cross – Meyers Buth

1      A    It was, it was big enough to store a weapon in it.

2  We commonly recover weapons and other things out of satchels.

3      Q    Except you didn't see any bulge in the satchel that

4  would indicate there was a gun or anything else in there,

5  right?

6      A    There's very small guns out there.

7      Q    Yeah, but you didn't see any sort of bulge or

8  anything else that would indicate to you, upon your

9  observation of him in the vehicle, that he was armed?

10      A    No.  But in my past experiences, I've recovered

11  very small guns that don't create bulges, especially in a

12  larger satchel.

13      Q    And you had no past experience with Mr. Nance,

14  correct?

15      A    I do not believe so.

16      Q    You didn't know anything about him other than what

17  you read on Exhibit 3?

18      A    Yes.

19      Q    So you were going to pat frisk him and search the

20  satchel regardless before you put him in the patrol car,

21  true?

22      A    He was going to be patted down for weapons and I

23  don't allow anything in the back of the patrol vehicle,

24  phones, a bag, anything that could possibly hurt themselves.

25  I've seen suspects swallow narcotics and overdose.  So I'm

Giarrano – Cross – Meyers Buth

1    pretty thorough with my patdown to make sure that's not an

2    option.

3        **Q**    And when you put him in the patrol car, that was to

4    detain him so you could take him back to the station and he

5    could talk to a detective, correct?

6        A    Yes.

7        **Q**    In your mind he was going to be under arrest for

8    the assault?

9        A    Yes.

10       **Q**    And you told him that as you were patting him down?

11       A    Yes.

12       **Q**    And you said, Mr. Nance, I'm patting you down and

13   I'm going to put you in the patrol car because you're under

14   arrest for assault, right?

15       A    Something -- not the exact words but yes.

16       **Q**    And at some point you reached for his satchel and

17   that's when you claim that he moved away from you, right?

18       A    Yes.

19       **Q**    And your partner was standing 3 feet from where

20   this was going on?

21       A    Yes.

22       **Q**    Okay.  So where was Mr. Nance going to go?

23       A    He tried to get through my partner and flee on

24   foot.

25       **Q**    After you had told him he was under arrest for an

Giarrano - Cross - Meyers Buth

1    assault, right?

2         A    Yes.

3         Q    Did you wind up charging him with blocking traffic?

4         A    I believe so.

5         Q    So how was he blocking traffic if he was between

6    your car and his car?

7         A    He was -- fled from us in a roadway and because of

8    his actions, we were both park -- well, our car was parked

9    blocking traffic and we had to -- my partner had to roll

10   around and apprehend him on the ground in the street.

11        Q    Okay.  But you were still between the two cars when

12   you apprehended him on the street, right?

13        A    Yes.

14        Q    Because you told us it was a tight space?

15        A    Yes.

16        Q    So he hadn't really not gotten more than a foot or

17   two away from where you were pat frisking him, true?

18        A    Yes.

19        Q    And yet you charged him with obstructing

20   governmental administration, disorderly conduct based on

21   that, right?

22        A    Yes, the fact that he fleed after I told him he was

23   under arrest and would not give us his hands to be cuffed

24   while we were trying to apprehend him and the fact that

25   because of his actions, you know, he was fleeing causing, I

Giarrano – Cross – Meyers Buth

1    mean, rolling around in the street trying to make an arrest

2    and our car was blocking the traffic between the median in

3    the southbound lane.

4         **Q**    Your car was blocking traffic?

5         A    Our car parked there rolling around with him.

6         **Q**    And you'd agree with me that if Mr. Nance didn't

7    know anything about the assault complaint, that he would

8    have –– he may have been shocked when you told him he was

9    being arrested for an assault, right?

10        A    Could you repeat that.

11        **Q**    Sure.  Let me ask it a different way.  Did you tell

12   Mr. Nance that there was a warrant out for his arrest for

13   assault?

14        A    No, I believe I said do you have, you know, a

15   pending assault case.

16        **Q**    Did you tell him anything about it?

17        A    No.

18        **Q**    Did he say to you anything about an assault?

19        A    I don't recall.

20        **Q**    But you could have said that, you just don't

21   remember?

22        A    Yeah, he could have said that.

23        **Q**    And if he didn't know anything about an assault,

24   and you were putting him under arrest, you can understand

25   somebody may say, wait a minute, let's talk about it and you

Giarrano – Cross – Meyers Buth

1    were, you were just going to arrest him any way, right?

2        A    I mean, yeah, I told him he was under arrest and

3    that he should comply with a lawful command to, you know,

4    cooperate.

5        Q    And I'm, I'm not asking you this to embarrass you

6    but you've testified before in courts of law, right?

7        A    Yes.

8        Q    Specifically in state Supreme Court, right?

9        A    Yes.

10       Q    And have there been occasions when your testimony

11   has been found not credible by a judge?

12       A    There was a ruling that a judge made that I

13   disagree with.

14       Q    And that was Judge Wojtaszek in Demario Robbins,

15   right?

16       A    Yes.

17       Q    *People vs. Demario Robbins*, indictment number

18   016812019, right?

19       A    Yes.

20       Q    That arrest occurred shortly after Mr. Nance's

21   arrest in this case, right?

22       A    Yes.

23       Q    And Mr. Robbins was a black individual who was in a

24   car that you were investigating for heavy tints, right?

25       A    It was a car with tints and it was a traffic stop.

Giarrano - Cross - Meyers Buth

1      **Q**     And ultimately Judge Wojtaszek issued a decision in
2   this case saying that you and Officer Ammerman were not
3   credible witnesses, did he not?
4      A     Yes.
5      **Q**     And have you viewed Judge Wojtaszek's decision?
6      **MR. GLABERSON:**   Objection.
7      **MAGISTRATE JUDGE SCHROEDER:**   Basis?
8      **MR. GLABERSON:**   It's working far afield from the matters
9   before the court.
10      **MAGISTRATE JUDGE SCHROEDER:**   No.   We're going right to
11   the heart of credibility and he said he didn't agree with the
12   judge's decision so I guess I want to find out if he read it,
13   so overruled.
14      A     Could you repeat the question.
15      **Q**     Have you had an opportunity to read Judge
16   Wojtaszek's decision?
17      A     Yes.
18      **Q**     And that was on a felony gun case, correct?
19      A     Yes.
20      **Q**     And Judge Wojtaszek basically threw out the
21   evidence in that case against Mr. Robbins, didn't he?
22      A     Yes.
23      **Q**     And that was because he didn't believe you and
24   Officer Ammerman, right?
25      A     Yes.

Giarrano - Cross - Meyers Buth

1    **Q**    He said it was, at best, inconsistent on important

2    details, and, at worst, apparently tailored to overcome

3    Constitutional objections.  Do you remember reading that?

4    A    I do.

5    **Q**    And in that case, just like this one, you were

6    sworn to testify under oath and you gave some testimony,

7    right?

8    A    I did.

9    **Q**    Okay.  And, again, not meaning to embarrass you but

10   you've been on the force for less than five years and you

11   already have seven disciplinary actions against you?

12   **MR. GLABERSON:**  Objection.

13   **MAGISTRATE JUDGE SCHROEDER:**  Basis?

14   **MR. GLABERSON:**  Nothing about the civilian complaint

15   is -- has any relevance to whether somebody files a complaint

16   about somebody is not relevant to.

17   **MAGISTRATE JUDGE SCHROEDER:**  She didn't ask about

18   civilian complaints.  She just said whether there were any

19   disciplinary actions.  Overruled.

20   A    I've taken no disciplinary actions in my career.

21   **Q**    You haven't been brought up on internal charges?

22   **MR. GLABERSON:**  Objection.

23   **MAGISTRATE JUDGE SCHROEDER:**  Basis?

24   **MR. GLABERSON:**  There's a difference between being

25   brought up on charges and actual findings.

Giarrano - Cross - Meyers Buth

1      **MAGISTRATE JUDGE SCHROEDER:**  Well, first of all, we'll

2   have to find out if he's been brought up on charges.

3   Overruled.

4      A    Yes, one of my cases which is in a formal hearing.

5      **Q**    And that's also you're the subject of a civil

6   lawsuit in that case, right?

7      A    Yes.

8      **Q**    And that involved another black man who said you

9   arrested him and you claim he struggled to get away from you

10   during the arrest, right?

11      A    Yes.

12      **Q**    And in addition to that one, you had some

13   violations of procedures and actual -- Lieutenant Alberti

14   requested a formal hearing at one point on you, right?

15      A    Yes, that is the current case that's going to a

16   formal hearing that I was offered a departmental charge on.

17      **Q**    And there were --

18      A    Since then the offer has been reduced from a

19   departmental charge to a conference which I, again, will be

20   going to the formal hearing on.

21      **Q**    Okay.  And that's part of the protocol when an

22   officer has a complaint that he didn't follow through on his

23   duties or something, right?

24      A    Yes.

25      **Q**    And in addition to that one, all in the six months

Giarrano – Cross – Meyers Buth

1  before and after this particular incident, you had violations

2  for failing to follow proper procedures, use of force, two

3  conduct citations, another procedures problem, and a report

4  entry problem, is that not true?

5      A    Yes.

6      Q    And in terms of the report entries, without getting

7  into specifics, that has to do with some of the reports that

8  we're talking about that you're able to view and input on a

9  computer system?

10     A    I was exonerated on that report entry.  It was not

11  my report.

12     Q    Exonerated or it was found not sustained?

13     A    I believe I was exonerated on that.

14     Q    And there's a difference between not sustained and

15  exonerated, right?

16     A    There is.

17     Q    Now, in terms of, in terms of this case, did you or

18  Officer Ammerman put lights and sirens on when you pulled up

19  next to the vehicle that my client was a passenger in?

20     A    I don't believe so.

21     Q    Was there a reason why you did not?

22     A    I don't -- I wasn't driving the vehicle so I

23  couldn't speculate as to why or why not.

24     Q    If lights and sirens go on, does the dash cam

25  automatically go on in your vehicle?

Giarrano - Cross - Meyers Buth

1    A    We do not have dash cams at the BPD.

2    **Q**    None at all?

3    A    No.

4    **Q**    And you don't -- in none of the cars in Buffalo are

5    there dash cams, is that your testimony?

6    A    To my knowledge, no.

7    **Q**    And you weren't wearing body cams yet in February

8    of '19?

9    A    No, we got them, I believe, shortly after.

10    **Q**    So there's no video out there about this arrest,

11    right?

12    A    No.

13    **Q**    And you never took it upon yourself or were told to

14    go back and canvas the area where the arrest occurred for any

15    video from any of the homeowners or anything like that?

16    A    No.

17    **Q**    And other than reviewing the complaint of the

18    assault when you started your tour on February 5th, how many

19    other complaints did you review?

20    A    So that day, January --

21    **Q**    Yeah.

22    A    -- or February 5th?

23    **Q**    Yes.

24    A    Like I said, I would log on to the computer and I

25    would review any real major incidents.  But as I said, you

Giarrano – Cross – Meyers Buth

1    know, a felony assault to get to our shootings, our nonfatal

2    shootings, they show up as assaults so I have to click on

3    them.  So I would review maybe 10 or 15 reports.

4        **Q**    Okay.  So 10 or 15 reports with 10 or 15 different

5    suspects but you decided when you saw Mr. Nance you were

6    going to arrest him, right?

7        A    Yes.

8        **Q**    Even though this had nothing to do with shooting,

9    this assault, right?

10       A    It's a felony assault, but, yes.

11       **Q**    And even though you didn't have any other

12   information other than what's on Exhibit 3, correct?

13       A    Yes.

14       **Q**    And if it turned out, Officer Giarrano, that there

15   was never a criminal charge filed or the case was simply not

16   followed through on, that would be reflected how?

17       A    Could you repeat the question?

18       **Q**    Sure.  Sure.  Hypothetically, if you're wrong and

19   there was never a criminal charge and there was never a

20   warrant and the assault case was never followed through on,

21   that would be reflected in what kind of document?

22       A    I, I have no idea.

23       **Q**    Would that be reflected on the same computer system

24   that you've been testifying about?

25       A    No.  If a complainant fails to show up to court,

Giarrano - Cross - Meyers Buth

1  that's not reflected in our police computer system.

2      **Q**     What if the case never goes to court and the

3  complainant doesn't come in for a photo array and no charges

4  are ever filed, would that be reflected in the computer

5  system?

6      A     I -- there is like I think it's called case

7  management that the detectives use where they may note

8  something like that.

9      **Q**     Okay.

10     A     But we don't have access to that always.

11     **Q**     I want to show you what's been marked by the

12  government as Exhibit 5D and ask you just to take a look at

13  it and tell me if you've seen it before, okay.

14     A     Okay.

15     **MAGISTRATE JUDGE SCHROEDER:**  5D, as in Donald?

16     **MS. MEYERS BUTH:**  5D, as in Donald.

17     A     Thank you.  Yes, so this would be case management

18  at the top.

19     **Q**     Do you recall ever reviewing this particular entry

20  prior to your testimony today?

21     A     No.

22     **Q**     Did the prosecutor show you this exhibit before you

23  testified?

24     A     I don't believe so.

25     **Q**     Did you discuss with him the fact that the

Giarrano - Cross - Meyers Buth

1    complainant never came in and the case was closed without

2    ever being charged?

3        A    No.

4        Q    But that's what's indicated on Exhibit 5D that I

5    just showed you, right?

6        A    Yes, that would be the case management notes that

7    the detectives used.

8        Q    In other words, the case was closed, nobody was

9    ever charged, Mr. Nance or anybody else because the

10   complainant never came back, right?

11       A    Yes, the complainant failed to cooperate.

12       Q    So you never went to court for Mr. Nance, he was

13   never charged with assault and you arrested him based on a

14   report that was never followed through on, right?

15       A    Yes.  At the time of the arrest, he had a pending

16   case for a felony assault.

17       Q    And -- well, he didn't have a pending case.  There

18   had been a police report made by a complainant who failed to

19   ever follow through with filing charges, right?

20       A    Yes.

21       Q    Okay.  And so you arrested a guy who had never been

22   charged in the first place with anything for a crime that had

23   never been followed through on?

24       A    Well, the police report indicates that it was

25   cleared by an arrest.

Giarrano - Cross - Meyers Buth

1    **Q**    But, but forget about what you're reading there.

2    Do you know whether he was ever prosecuted for assault?

3    A    I do not know if he was prosecuted at the state or

4    city court level.

5    **Q**    And he wasn't prosecuted by you because you'd

6    recall that --

7    A    Well, it's not --

8    **Q**    -- I'm sure?

9    A    I mean, we could sign on the charges but once it

10   goes to the court, we have no control on these over.

11   **Q**    You don't follow through on your cases after you

12   file a felony assault case with the DA?

13   A    We can be brought into court, depending on what the

14   case is.

15   **Q**    Oh.  Well, something like this where someone was

16   assaulted with a hammer and evidently injured, you'd remember

17   if you talked to a DA about it, right?

18   **MR. GLABERSON:**  Objection.

19   **MAGISTRATE JUDGE SCHROEDER:**  Basis.

20   **MR. GLABERSON:**  The hearing's about the incident on

21   February 5th not what happened in court or didn't happen in

22   court months or weeks later.

23   **MAGISTRATE JUDGE SCHROEDER:**  No.  She's merely asking

24   the witness whether he recalls something or not.  Overruled.

25   A    I, I make hundreds of arrests a year, so I'm in

Giarrano – Cross – Meyers Buth

1   court all the time.  I just don't recall if I ever went to

2   court on this.

3        Q     But just to be clear, and I'm done, based on

4   Exhibit 3, you're telling us that that was an active assault

5   warrant that you went and arrested Mr. Nance on?

6        A     It wasn't a warrant.  It was a pending case.

7        Q     And you, without having all the background or

8   knowing anything else other than what you're reading, decided

9   you were going to arrest him on that assault case, right?

10       A     Yes.

11       Q     Because that was important as a young officer to

12   get a felony assault case under your belt, right?

13       A     Yes, it was an arrest to make.

14       Q     It would make you look good with your superiors if

15   you went out and found somebody that they had identified as a

16   potential suspect, right?

17       A     It's just a felony arrest to make.

18       Q     And you --

19       A     I wouldn't know how it would reflect on my

20   superiors.

21       Q     Sure you do, Officer Giarrano, don't ya?  You're

22   telling us that you didn't think that arresting a suspect on

23   a felony assault with a hammer was going to make you look

24   good with your superiors?

25       A     I, I don't know.

Giarrano – Redirect – Glaberson

1      **MS. MEYERS BUTH:**  That's all I have.

2      **MAGISTRATE JUDGE SCHROEDER:**  Mr. Glaberson.

3      **MR. GLABERSON:**  Yes.

4   **REDIRECT EXAMINATION BY MR. GLABERSON:**

5      **Q**    Officer Giarrano, you were asked about several

6   complaints that were filed, disciplinary complaints that were

7   filed against you?

8      **A**    Yes.

9      **Q**    Other than the pending one that you just mentioned,

10  the remaining, what was the end result of all of those?

11     **A**    Exonerated or not sustained or unfounded.

12     **Q**    Meaning there was insufficient evidence to proceed

13  with them?

14     **A**    Yes.

15     **Q**    And you were asked about a civil lawsuit?

16     **A**    Yes.

17     **Q**    That also is a complaint somebody filed against

18  you?

19     **A**    I believe the civil lawsuit generates a complaint,

20  yes.

21     **Q**    It's just a complaint alleged.  No final

22  disposition or any fact finding has happened in that?

23     **A**    Yes.

24     **Q**    Now, getting back to what's marked as Government

25  Exhibit 3, prior to you going out into the street on

Giarrano – Redirect – Glaberson

1  February 5th, 2019, what was the information that you

2  possessed about this assault from six days earlier?

3      A    I possessed a report that stated the victim was

4  assaulted with a hammer while shoveling and he named the

5  suspect that assaulted him as Devante Nance.

6      Q    And what did that -- what was your understanding of

7  the import of that information?

8      A    He was able to ID Devante Nance to whatever officer

9  did the report.

10     **MS. MEYERS BUTH:**  Objection, Judge.  He wasn't there.

11     **MAGISTRATE JUDGE SCHROEDER:**  Sustained.

12     **MR. GLABERSON:**  Judge, I'm asking what the officer's

13  understanding was not --

14     **MAGISTRATE JUDGE SCHROEDER:**  Yeah but he's trying to now

15  tell us what somebody else was thinking.

16     **MR. GLABERSON:**  I believe it's important for --

17     **MAGISTRATE JUDGE SCHROEDER:**  He's trying to tell us what

18  the alleged complainant was thinking.

19     **MR. GLABERSON:**  The question to the officer is:  What

20  was his understanding before he went into the field that day?

21     **MAGISTRATE JUDGE SCHROEDER:**  He already answered.  He

22  said that somebody said they were assaulted by another person

23  with a hammer, period.

24     Q    And what action, well, about how many -- what was,

25  based on the information that you possessed from this report

Giarrano - Redirect - Glaberson

1    and the viewing of Exhibit 4, what of the pictures depicted

2    in Exhibit 4, what did you believe -- what action did you,

3    would you understand you could take and what were the results

4    of that action related to that assault?

5         A    Devante Nance was wanted for a felony assault.

6         Q    Meaning what?

7         A    That he was -- he's wanted.  He was listed in the

8    report as the suspect so he was known and IDed.

9         Q    Meaning that if you encountered him, what was your

10   intention and what would you have done to him?

11        A    To detain, arrest and bring him to the detective.

12        Q    And in this case, after the encounter that you

13   described on Norway Park, what did you and Officer Ammerman

14   do with Mr. Nance after you left Norway Park with him.

15        A    We brought him to the station house to speak with

16   the detective.

17        Q    And in your mind, what was your understanding of,

18   at that point who was going to make a decision about what

19   happened next in the case?

20        A    The detectives.

21        Q    And why is that?

22        A    Because it's now their case.

23        **MR. GLABERSON:**  And I'm going to offer Government

24   Exhibit 3 into evidence again.

25        **MS. MEYERS BUTH:**  I object to it.

Giarrano – Redirect – Glaberson

1    **MAGISTRATE JUDGE SCHROEDER:**  Based on what I've heard in

2    the testimony, it appears to me that Government Exhibit 3 is

3    not a reliable exhibit in the sense of apparently there were

4    different changes made over a period of time that don't

5    accurately reflect when they were made and by whom they were

6    made.

7        **MR. GLABERSON:**  I believe the officer's explained how

8    the changes get made to the report.

9        **MAGISTRATE JUDGE SCHROEDER:**  Well, he attempted to

10   explain but, quite frankly, beyond the explanation as

11   establishing anything other than there was some pretty sloppy

12   record production in this matter.

13       We start off with an official police report dated

14   January 30th, 2019, where a complainant comes to the police

15   and makes a complaint.  And that report states that this was

16   done on January 30th, 2019, at apparently 19:30 hours, on a

17   Wednesday.  And that the officers involved were officers

18   Quinn and Goodspeed.

19       In the upper right-hand corner, it says this report,

20   Government Exhibit 3, is dated in time as having been done on

21   January 30th, 2019, at 21:18 hours.  Presumably by either

22   Quinn or Goodspeed or both.

23       And then supposedly there's an entry that says at some

24   time or other, this charge is cleared by arrest but I don't

25   know when that entry was actually made.  As I have it,

Giarrano – Redirect – Glaberson

1    officer Giarrano says he made the entry but it's all

2    reflected on one document which I find, quite frankly, in

3    this day and age of technology could be somewhat mind

4    boggling, I would think there would be a second report

5    generated.

6        **Q**    Officer Giarrano, is there an arrest noted on

7    Exhibit 3, three-quarters of the way down the page?

8        A    Yes.

9        **Q**    And when was that arrest dated?

10       A    2/5/2019 at 34 Norway Park.

11       **Q**    And --

12       **MAGISTRATE JUDGE SCHROEDER:**  But that doesn't seem to be

13   reflected on the report.  What is reflected as far as the

14   change of date was when this report was printed, namely

15   April 4th, 2019, at 10:17 a.m.

16       **Q**    Can you see the screen in front of you, Officer?

17       A    I cannot.

18       **MAGISTRATE JUDGE SCHROEDER:**  Hold on one second,

19   Officer.

20       A    Yes, I can now but it's zoomed in pretty far.

21       **MAGISTRATE JUDGE SCHROEDER:**  All right.  Let the record

22   reflect we've now put Government Exhibit 3 on the ELMO and we

23   enlarged it to make it a little bit easier to try and find

24   things.

25       **Q**    So --

                    Giarrano – Redirect – Glaberson

1          A     If you could zoom, yeah.

2          Q     To begin with at the top, we're talking about,

3     about three lines under the Buffalo police insignia, there's

4     a status line, could you explain what that means?

5          A     That is the current status of the case.

6          Q     As of the printing of the report?

7          A     Yes.

8          Q     And when you -- before you went into the field on

9     February 5th, what did you -- in that line what did you read?

10         A     "Investigation pending".

11         Q     Now --

12         **MAGISTRATE JUDGE SCHROEDER:**  Let me interrupt.  When I

13    look at that line, "cleared by arrest", there's a column says

14    entry date but we have no entry date.  Why is that?

15         **THE WITNESS:**  I have, I have no idea the -- down the

16    report farther --

17         **MAGISTRATE JUDGE SCHROEDER:**  No.  I'm talking about that

18    line.  "Status:  Cleared by arrest".  And then if you move

19    over along that line, you see there's a column entitled

20    "entry date", which I would assume means when this "cleared

21    by arrest" entry was made --

22         **THE WITNESS:**  Yes, I --

23         **MAGISTRATE JUDGE SCHROEDER:**  -- is that correct?

24         **THE WITNESS:**  I would not enter that so --

25         **MAGISTRATE JUDGE SCHROEDER:**  Isn't that what that column

Giarrano – Redirect – Glaberson


1   is for?

2       **THE WITNESS:**  Yes.

3       **MAGISTRATE JUDGE SCHROEDER:**  And so no entry was made

4   when cleared by arrest was entered.  Why?

5       **THE WITNESS:**  I have no idea.  The report technicians at

6   CB update the case.

7       **MAGISTRATE JUDGE SCHROEDER:**  But you're the one that

8   said cleared by arrest, weren't you?

9       **THE WITNESS:**  Yes, we did arrest the suspect.

10      **MAGISTRATE JUDGE SCHROEDER:**  When did you tell the

11  technician?

12      **THE WITNESS:**  It would have been on February 5th, 2019

13  that the arrest was made so that would -- the status would

14  update on that date.

15      **MAGISTRATE JUDGE SCHROEDER:**  Did you review this report

16  to make sure it was accurate --

17      **THE WITNESS:**  With --

18      **MAGISTRATE JUDGE SCHROEDER:**  -- after you made the

19  report with the technician?

20      **THE WITNESS:**  No.  This is --

21      **MAGISTRATE JUDGE SCHROEDER:**  You didn't?

22      **THE WITNESS:**  We don't review this report after the

23  arrest.

24      **MAGISTRATE JUDGE SCHROEDER:**  So you don't know how

25  accurate it is?

Giarrano – Redirect – Glaberson


1    **THE WITNESS:**  (No response.)

2    **MAGISTRATE JUDGE SCHROEDER:**  Is that correct?

3    **THE WITNESS:**  I mean, I don't know what the report

4  technicians do.

5    **MAGISTRATE JUDGE SCHROEDER:**  Objection sustained.

6    **MS. HIGGINS:**  Your Honor, if I may, there's another item

7  of information on this report that --

8    **MAGISTRATE JUDGE SCHROEDER:**  Please speak into a

9  microphone.

10    **MS. HIGGINS:**  Thank you, Judge.

11    There's another item of evidence on this piece of --

12  this report that nobody's attention has been drawn to, I

13  don't think, yet.

14    **MAGISTRATE JUDGE SCHROEDER:**  I'm sorry, you're speaking

15  too quickly and through the mask I can't understand you.

16    **MS. HIGGINS:**  My apologies, Judge.

17    At this point there is an item of evidence on this

18  report or item of information on this report that I don't

19  think anybody's attention has been drawn to yet.

20    **MAGISTRATE JUDGE SCHROEDER:**  Well, that isn't my job, is

21  it?

22    **MS. HIGGINS:**  No, it is not, Judge.

23  **EXAMINATION BY MS. HIGGINS:**

24    **Q**    I want to direct the witness' attention to this

25  header that says arrest and below it it says arrest number,

Giarrano - Redirect - Higgins

1    is that correct, Officer Giarrano?

2        A    Yes.

3        Q    And then there's a six digit number below that,

4    correct?

5        A    Yes.

6        Q    Can you explain to the judge what that number is?

7        A    That would have been the arrest number assigned to

8    the case.

9        Q    And when does that arrest number get assigned?

10       A    At central booking when he is charged.

11       Q    When he's physically in custody?

12       A    Yes.

13       Q    So would this number exist at the time a

14   complainant makes a report about a crime that occurred?

15       A    No.

16       Q    That arrest number is assigned after a person

17   accused of a crime is actually physically in custody?

18       A    Yes.

19       Q    So I want to continue along that line.  Whose name

20   do we see there?

21       A    Devante Nance.

22       Q    And what do we know about the fact that there's an

23   arrest number assigned to Devante Nance?

24       A    It would mean that he was arrested on this report.

25       Q    And the date next to his name, is that his date of

Giarrano – Redirect – Higgins

1    birth?

2         A    Yes.  12/21/1995.

3         Q    And then along continuing we see the date

4    February 5th, 2019, what should we discern from that date?

5         A    That is the date the arrest was made.

6         Q    And what is this address?

7         A    That's the address that the arrest was made at.

8         Q    So is this the arrest that you've testified you

9    executed on February 5th through the course of the events

10   that you've now testified to today?

11        A    Yes, I was a part of that.

12        Q    And this arrest obviously did not exist on the

13   report you reviewed before you went out for your shift that

14   day?

15        A    Yes.

16        Q    And aside from the line here -- I'm sorry, aside

17   from the line here at the top that says "cleared by arrest",

18   and the entry of the arrest number and the details of the

19   arrest, is there anything else about this report -- I'm

20   sorry, actually and below that part, the status and the

21   arresting officers, aside from that information, is there any

22   other information that is different than what you reviewed at

23   the beginning of your shift?

24        A    No.

25        Q    So --

Giarrano - Redirect - Higgins

1    **MAGISTRATE JUDGE SCHROEDER:**  Wait a minute.  This would

2    indicate to me, unless I'm misreading it, that the arrest was

3    made by Officers States (phonetic) and Sterlis (phonetic).

4    It's underneath the heading arresting officers on that line.

5         A    Ah.

6    **MAGISTRATE JUDGE SCHROEDER:**  It says 174212 States,

7    ROBE001195, Sterlis, Christopher.

8         A    They may --

9    **MAGISTRATE JUDGE SCHROEDER:**  And this is all under the

10   heading of arrest.

11        **Q**    So, Officer, why doesn't your name appear there,

12   why do their names appear there?

13        A    They may have signed on the arrest but there may be

14   an error because Christopher Sterlis is a detective.  So

15   sometimes the names just get messed up but they may have

16   signed on the arrest because we were processing the narcotics

17   arrest.

18        **MAGISTRATE JUDGE SCHROEDER:**  So now I'm told that there

19   is an error or it may be messed up --

20        **THE WITNESS:**  It would --

21        **MAGISTRATE JUDGE SCHROEDER:**  -- this exhibit --

22        **THE WITNESS:**  The report --

23        **MAGISTRATE JUDGE SCHROEDER:**  -- is that correct?

24        **THE WITNESS:**  The report technicians at central booking

25   are the ones who enter this information.

Giarrano - Redirect - Higgins

1     **MAGISTRATE JUDGE SCHROEDER:**  Well, the report technician

2  wouldn't make up these names, would he or she?

3     **THE WITNESS:**  Ah.

4     **MAGISTRATE JUDGE SCHROEDER:**  There are Officers States

5  and Detective Sterlis, are there not?

6     **THE WITNESS:**  There are.

7     **MS. HIGGINS:**  So, Judge, the government's going to offer

8  this exhibit with the following caveats:  That there is

9  something messed up about the arresting officers listed on

10 the arrest, that the "cleared by arrest" at the top appeared

11 differently on that day and that there is an arrest noted

12 that's different than what Officer Giarrano reviewed that

13 morning.

14    However, the reason the government's trying to offer

15 this into evidence -- and I think it's important it be

16 received in evidence with whatever caveats the Court wants to

17 make and whatever arguments the defense wants to make about

18 it -- is to make a record.  Because when the parties are

19 going to argue about the legality of the stop and what

20 Officer Giarrano knew at the time he actually physically

21 encountered the defendant, it's important for this Court to

22 know and for the record to be clear, what, what he reviewed.

23    **MAGISTRATE JUDGE SCHROEDER:**  I don't think there's any

24 question that the defendant Nance was arrested on

25 February 5th, 2019.

Giarrano - Redirect - Higgins

1      **MS. HIGGINS:**  But, but the point of the -- the point I'm

2  trying to make, Judge, is that what Officer Giarrano knew and

3  what the government will argue about the basis in justifying

4  his encounter of Devante Nance and his pursuit of him

5  separate and apart from --

6      **MAGISTRATE JUDGE SCHROEDER:**  His pursuit?  He didn't

7  pursue him.

8      **MS. HIGGINS:**  Well, he encountered him.

9      **MAGISTRATE JUDGE SCHROEDER:**  His partner did.

10      **MS. HIGGINS:**  He encountered him.

11      **MAGISTRATE JUDGE SCHROEDER:**  Yeah.

12      **MS. HIGGINS:**  That was the wrong word.

13      **MAGISTRATE JUDGE SCHROEDER:**  He was sitting in a parked

14  vehicle.

15      **MS. HIGGINS:**  But what the point is what Officer

16  Giarrano knew, this narrative and the name and that the

17  nature of the crime that this, that Devante Nance had been

18  accused of by another person and that this record existed in

19  whatever sloppy form the Court concludes it is, that it did

20  exist and that Officer Giarrano knew certain pieces of

21  information about it.

22      **MAGISTRATE JUDGE SCHROEDER:**  I don't deny the existence

23  of the report.  What I'm questioning is is the accuracy and

24  the validity of the report.

25      **MS. HIGGINS:**  And if the --

Giarrano - Redirect - Higgins

1      **MAGISTRATE JUDGE SCHROEDER:**  They are two different
2  things.
3      **MS. HIGGINS:**  And if --
4      **MAGISTRATE JUDGE SCHROEDER:**  If I look at things as I'm
5  supposed to:  In the total context.  I start off with what
6  apparently began at least in one of the other documents and
7  in the government's papers about a stop involving tinted car
8  windows.
9      **MS. HIGGINS:**  Well, we've just heard --
10     **MAGISTRATE JUDGE SCHROEDER:**  But this witness testified,
11 no, he was not doing anything about tinted car windows which
12 immediately causes a flag to go up, as far as I'm concerned,
13 as well what's going on here, is it "tinted car windows" or
14 is it "I read a report when I reported for duty on
15 February 5th, 2019"?
16     The next question I ask myself is if this was such a
17 serious assault on January 30th, 2019, why was nothing done
18 between that date and February 5th?
19     **MS. HIGGINS:**  So, Judge, if I may, about the tints,
20 this -- Officer Giarrano testified that it was --
21     **MAGISTRATE JUDGE SCHROEDER:**  He said --
22     **MS. HIGGINS:**  He said it was a heavily --
23     **MAGISTRATE JUDGE SCHROEDER:**  -- tint in
24 cross-examination.  And let me get my notes.
25     **MS. HIGGINS:**  Judge, he testified that it was a heavily

Giarrano - Redirect - Higgins

1    tinted car.  It does involve a heavily tinted car.  And

2    whatever --

3         **MAGISTRATE JUDGE SCHROEDER:**  Wait, Ms. Higgins.

4         **MS. HIGGINS:**  And whatever --

5         **MAGISTRATE JUDGE SCHROEDER:**  Please.

6         Officer testified on direct that while on patrol

7    traveling north on Norway he saw the defendant walking on

8    Norway toward 28 Norway.  The defendant looked at the police

9    car.  As they continued in their travels, the defendant

10   continued looking.

11        The car, the patrol car then went up, made a U turn and

12   then traveled south on Norway and saw the defendant get into

13   a parked car.  They pulled up along side the car and he went

14   to the passenger side within a matter of 30 seconds or less.

15        The defendant was seated in the right front seat.  He

16   asked the defendant for identification because the -- they

17   hope the defendant became fidgety.  The defendant handed the

18   ID to him.  He gave a nod to his partner, told defendant to

19   step out of the car.  Put the defendant down, told him he was

20   wanted for assault.  Defendant asked for case on him and then

21   tried to run away.

22        On cross-examination, the primary motive was not tint of

23   a parked car windows.  There was no question or issue about

24   tinted windows.

25        **MS. HIGGINS:**  And, Judge, I --

Giarrano - Redirect - Higgins

1     **MAGISTRATE JUDGE SCHROEDER:**  And yet I have these

2  written reports talking about tinted windows as a

3  justification for the action.  I have the government

4  representing tinted windows were involved.  Then I hear the

5  witness testify that was not the case.  I have all of these

6  inconsistencies.

7     **MS. HIGGINS:**  Judge, if I may --

8     **MAGISTRATE JUDGE SCHROEDER:**  And this whole case depends

9  on credibility.

10     **MS. HIGGINS:**  If I --

11     **MAGISTRATE JUDGE SCHROEDER:**  And I have to consider all

12  of this in its totality.

13     **MS. HIGGINS:**  Judge, if I may and I, I, I want to be

14  conscious of the propriety of conducting legal argument in

15  front of a testifying witness but I will say this:  The

16  officer testified that the windows were heavily tinted.

17  Whether or not that --

18     **MAGISTRATE JUDGE SCHROEDER:**  Well, we're going to get a

19  transcript.

20     **MS. HIGGINS:**  If I may, Judge.

21     **MAGISTRATE JUDGE SCHROEDER:**  We're going to get a

22  transcript.

23     **MS. HIGGINS:**  I understand.

24     **MAGISTRATE JUDGE SCHROEDER:**  I will rely on the

25  transcript, Ms. Higgins.

Giarrano - Redirect - Higgins

1      **MS. HIGGINS:**  Okay.  And I want -- and of course you

2  should, Judge.  And I, I know -- the government's going to

3  argue and I think the record's going to reflect that Officer

4  Giarrano described heavily tinted windows when he was

5  describing this encounter.  I don't know if they're reflected

6  in your notes, Judge, but I know the record's going to

7  reflect that.

8      What I'm saying is the stop involved heavily tinted

9  windows, whether or not that was a subjective motivation of

10 the officer in having an encounter with Devante Nance or not,

11 that shouldn't that doesn't -- there was nothing legally

12 improper about his observation of tinted windows, and then

13 his subsequent observation of Devante Nance and recognition

14 of Devante Nance -- or prior observation of Devante Nance in

15 connection to this assault.

16     **MAGISTRATE JUDGE SCHROEDER:**  I didn't say there was.

17     **MS. HIGGINS:**  And I think it's going to be important,

18 Judge.

19     **MAGISTRATE JUDGE SCHROEDER:**  You're missing the point.

20 It has nothing to do on the issue of the legality of arrest.

21 What it does relate to is the issue of credibility.

22     **MS. HIGGINS:**  Judge, I think it's going to be important

23 that this document, for whatever weight the Court wants to

24 give it, be in the record and be received as an item of

25 evidence and the defense is going to be free to argue

Giarrano - Redirect - Higgins

1   whatever about it she feels is unreliable.  And your Honor's
2   going to be able to conclude whatever about it is unreliable.
3   But I think it's important for it to exist so the parties can
4   discuss it in their filings and we can deal with it in the
5   post-hearing submissions and that the district court judge,
6   upon review of this litigation, can have it in the record.
7       **MAGISTRATE JUDGE SCHROEDER:**  You know what I also would
8   like in the record as an exhibit, either you or the defense
9   can supply it, and that's that decision from the Supreme
10  Court justice that Ms. Meyers Buth brought on on
11  cross-examination.
12      **MS. MEYERS BUTH:**  I have an extra copy, Judge.  I can
13  mark it.
14      **MS. HIGGINS:**  So the government's --
15      **MAGISTRATE JUDGE SCHROEDER:**  Does the government --
16      **MS. HIGGINS:**  The government --
17      **MAGISTRATE JUDGE SCHROEDER:**  Does the government have
18  any objection to that?
19      **MS. HIGGINS:**  I haven't reviewed it, Judge.  We were not
20  supplied with a copy.
21      **MR. GLABERSON:**  We do have an objection.
22      **MAGISTRATE JUDGE SCHROEDER:**  What's the objection?  It's
23  an official court record.
24      **MR. GLABERSON:**  It's --
25      **MAGISTRATE JUDGE SCHROEDER:**  I can take judicial notice

Giarrano - Redirect - Higgins

1    of it, can't I?

2        **MR. GLABERSON:** Of course.

3        **MAGISTRATE JUDGE SCHROEDER:** What's your objection for

4    my seeing a decision by a Supreme Court justice of the State

5    of New York?

6        **MR. GLABERSON:** It was asked about in cross-examination.

7    It is extrinsic.

8        **MAGISTRATE JUDGE SCHROEDER:** It goes to the heart of

9    credibility, doesn't it?

10       **MR. GLABERSON:** It is an individual, a judge's opinion

11   about a specific case.

12       **MAGISTRATE JUDGE SCHROEDER:** All decisions are those of

13   an individual judge or a panel of judges. My decision is

14   going to be of an individual judge, is it not? The trial

15   judge to whom this case is assigned will make an individual

16   decision if he receives my R and R.

17       **MR. GLABERSON:** Yes.

18       **MAGISTRATE JUDGE SCHROEDER:** So that tells me nothing.

19   Of course it's an individual decision.

20       **MR. GLABERSON:** Relating to --

21       **MAGISTRATE JUDGE SCHROEDER:** I'm having a hard time

22   understanding why the government, the U.S. Attorney's Office

23   representative, is concerned about the Court receiving a copy

24   of a Supreme Court Justice, State of New York decision in a

25   case involving this witness. What's the government afraid

Giarrano – Redirect – Higgins

1    of?

2        **MR. GLABERSON:**  Nothing.

3        **MAGISTRATE JUDGE SCHROEDER:**  All right.  So does the

4    government agree to the admission of the judge's decision, if

5    you have a copy of it Ms. Meyers Buth.

6        **MS. MEYERS BUTH:**  I do, judge.

7        **MR. GLABERSON:**  My, my, my position --

8        **MAGISTRATE JUDGE SCHROEDER:**  Are you objecting to the

9    offer of the judge's decision?

10       **MR. GLABERSON:**  Separate and apart from it being an

11   extrinsic matter related to cross-examination, no.

12       **MAGISTRATE JUDGE SCHROEDER:**  It's not an extrinsic

13   matter as far as this Court is concerned.  In fact, it would

14   fall under the category of Giglio.  Or Brady maybe -- maybe

15   not Brady, maybe actually Brady.

16       **MR. GLABERSON:**  I -- one, it very clearly was not.

17       **MAGISTRATE JUDGE SCHROEDER:**  What exhibit number have

18   you attached, Ms. Meyers Buth?

19       **MS. MEYERS BUTH:**  Judge, I don't have any exhibit

20   stickers.

21       **MAGISTRATE JUDGE SCHROEDER:**  Lane, do you have any

22   stickers?

23       Use Defendant's Exhibit A.

24       All right.  Let the record reflect that the defense has

25   offered Defendant's Exhibit A, which is a copy of a decision

Giarrano – Glaberson – Redirect

1    in the State of New York Supreme Court, County of Erie, in

2    the matter of the *People of the State of New York vs. Demario*

3    *Robbins*.  And it's a decision of the Honorable Paul B.

4    Wojtaszek, W-O-J-T-A-S-Z-E-K, dated August 4, 2020.

5         Government object?

6         **MR. GLABERSON:**  No.

7         **MAGISTRATE JUDGE SCHROEDER:**  All right.  Defendant's

8    Exhibit A is received in evidence.

9         **MS. HIGGINS:**  Judge could we just have a ruling on

10   Government Exhibit 3 as well.

11        **MAGISTRATE JUDGE SCHROEDER:**  I'll let it in for what

12   it's worth.

13        **MS. HIGGINS:**  Thank you.

14   **CONTINUED REDIRECT EXAMINATION BY MR. GLABERSON:**

15        **Q**   Officer Giarrano, could you explain in what way you

16   rely on the reports you read on the computer prior to your

17   tour every day?

18        A    For information on what occurred on the days or

19   hours I wasn't working.

20        **Q**   And what -- I mean, what do you take that

21   information that you obtain, what do you take it to be?

22        A    It depends on the type of report but a crime was

23   committed and sometimes suspects are IDed in it, sometimes

24   they aren't.

25        **Q**   And have you personally taken reports from

Giarrano - Glaberson - Redirect

1  complainants of assaults of other crimes?

2      A    Yes.

3      Q    What do you do with them when you take those

4  reports as a patrol officer?

5      A    You take the report, you input it in the computer

6  and you forward it to a lieutenant for approval.

7      Q    Did you follow up on any of the reports that you

8  take in the field as a patrol officer?

9      A    Some, yes.

10     Q    In general where does the complaint, once a

11 complaint is taken by a patrol officer, where does it get

12 forwarded to?

13     A    If it's not closed by arrest during the time of the

14 incident, it is forwarded on to a detective to be reviewed.

15 Depending on the case, it depends what or where it goes, what

16 detective it goes to.

17     Q    And depending on what detective it goes to, does

18 that determine potentially how much follow up is done on a

19 complaint?

20     A    Absolutely.

21     Q    And over the course of a week -- withdrawn.

22          So you said on cross-examination how, on

23 information and belief could you explain what that means and

24 what it means to you and what it meant on February 5th, 2019?

25     A    It meant that -- it meant that when I read the

Giarrano - Glaberson - Redirect

1    report, I believed and knew that Devante Nance was wanted as

2    a suspect for this crime.

3        Q    When you say arrest on information and belief, what

4    does that mean?

5        A    The information that I believe was that he

6    committed assault with a hammer.

7        Q    But what does the term "information and belief",

8    what does that mean to you?

9        A    It's how we can sign on charges.  It's information

10   and belief or direct knowledge.

11       Q    Those are two different things:  "Information and

12   belief" and "direct knowledge"?

13       A    Yes.

14       Q    And so could you just explain to us in more detail

15   what you mean by information and belief?

16       A    It's information that I have that I believe to be

17   true so I'm signing on it for the complaint.

18       Q    And in this particular case, the information you

19   had is included in Exhibit 3?

20       A    Yes.

21       Q    And the reason that you believed it to be true was

22   what?

23       A    Because the suspect was IDed in the crime.

24       Q    And was this at the time you were reviewing it an

25   official Buffalo police report that you regularly rely on in

Giarrano – Recross – Meyers Buth

1    your job?

2        A    Yes.

3        **MR. GLABERSON:**  Just one moment.

4        No further questions.

5        **MAGISTRATE JUDGE SCHROEDER:**  Ms. Meyers Buth.

6        **MS. MEYERS BUTH:**  Yes, please.

7    **RECROSS–EXAMINATION BY MS. MEYERS BUTH:**

8        **Q**    On cross-examination, Officer Giarrano, you said

9    that your understanding was that Mr. Nance was wanted for

10   felony assault?

11       A    Yes.

12       **Q**    What did you mean by "wanted"?

13       A    He was a named suspect in an assault that occurred.

14       **Q**    But you also said that there was no warrant out for

15   him, right?

16       A    No.

17       **Q**    So if someone is a suspect in a crime and there's

18   no warrant, can you simply get him out of a parked car and

19   arrest him?

20       A    Yes.

21       **Q**    Did the government review with you the other

22   screenshots relating to the assault from the computer system

23   before you testified today?

24       A    Like the tabs of the incident?

25       **Q**    Yes.

Giarrano - Recross - Meyers Buth

1      A    No.

2      Q    I want to show you what the government's marked as

3   5A, 5B, and 5C, and I'd like you to look at those and then

4   tell me when you're done, okay?

5      **MAGISTRATE JUDGE SCHROEDER:**  Put it on the ELMO so it

6   will be easier to read, please.

7      Q    Here's 5A.  And let me know when you can read that

8   okay.

9      (WHEREUPON, a discussion was held off the record.)

10     Q    Can you read this?

11     A    Yes, I can see.  Can I -- can I ask just a question

12  if you can see the words better than I can for the one that's

13  blue, I just have a hard time seeing the end part of it.

14     Q    Can I approach, Judge, and show him the...

15     A    Okay.

16     Q    Before I ask you any questions about that, let me

17  show you 5B and 5C, okay.  Here's 5B.  Okay.

18     A    Yes.

19     Q    Now I'm going to show you 5C.

20     A    Yes.

21     Q    And those are, those are all screenshots of the

22  same computer system you had testified about, right?

23     A    Yes.  Some of them were from case management which

24  I do not have the ability to see.

25     Q    Did prosecutors show you these before you

Giarrano - Recross - Meyers Buth

1    testified?

2        A    I don't believe so.

3        Q    And they seem to indicate that the reason that it

4    indicates "cleared arrest" on the assault report is because

5    Mr. Nance was arrested on a different charge, being the

6    narcotics that you found him in possession of; would you

7    agree with that?

8        A    That is what a detective wrote.  I have no input on

9    what he types in.

10       Q    And so on Exhibit 5B when it indicates suspect was

11   arrested on a different incident and brought back to C

12   District, the different incident they're referring to is the

13   possession of narcotics --

14       A    I believe --

15       Q    -- not assault, right?

16       A    I believe so but that's a detective's notes.

17       Q    And you're not familiar with these particular

18   formats, is that your testimony?

19       A    I understand how they work but I don't use them.

20       Q    Okay.  Fair enough.  And would you take issue with

21   the fact that someone wrote in there that Mr. Nance was

22   arrested on a different charge, not the assault and was

23   brought back to C District on that other charge?

24       A    I would.  I would say that's incorrect.

25       Q    And in terms of your recollection, as you sit here

Giarrano – Recross – Meyers Buth

1    today, you're unclear whether there were charges placed on

2    him for assault and also narcotics, correct?

3         A    Yes, I believe he was charged with the assault and

4    then he was charged with the narcotics, as well, so it was

5    two separate cases.

6         Q    And he was charged after you arrested him?

7         A    Yes.

8         Q    And so if that's true, there would be Buffalo city

9    court paperwork, is that your testimony?

10        A    I believe it would be.

11        Q    And you've not seen that, you've not been shown

12   that, right?

13        A    No.

14        Q    And if it turns out there's no Buffalo city court

15   paperwork and he was never arrested on the assault, then our

16   conclusion is that you're just mistaken about that?

17        A    Yes, I wouldn't, like I said, I wouldn't know.

18        **MS. MEYERS BUTH:**  Thank you, Judge.

19   **EXAMINATION BY MAGISTRATE JUDGE SCHROEDER:**

20        Q    Officer, I want you to clarify something for me.

21             You testified that your routine is that when you

22   report for duty, one of the first things you do is review

23   reports that have been filed the prior day or that day?

24        A    Yes.

25        Q    And what was the workweek you were working in

Giarrano – Examination by Judge Schroeder

1    February, at the beginning of February.

2         A    February 5th was my first day back at work after

3    being off.

4         Q    And so would you review all the reports that were

5    generated from the last day worked until the first day worked

6    in February?

7         A    Yes.

8         Q    And is that what you did?

9         A    Yes, I would have probably done, like, five or

10   seven days prior.

11        Q    And how would this review take place?

12        A    So through the system you can search by district

13   and dates.  There's a couple different searching options.

14        Q    So you would look at all of the reports filed for

15   the district for that time period?

16        A    They would -- all the reports would show on a list

17   and I could click on the ones I'd like to look at.

18        Q    And these would be C District reports?

19        A    I usually look at C and then E district because a

20   lot of the crime that occurs connects the two.

21        Q    I was going to say C District is probably one of

22   the busiest districts, isn't it?

23        A    It's the most violent but almost the least busy.

24        Q    I'm sorry?

25        A    It's, I believe, statistically it's the most

Giarrano - Examination by Judge Schroeder

1   violent but it's the least -- second least busiest in the

2   city.

3        Q    Is that the Bailey Langfield?

4        A    Bailey Langfield I believe is the busiest.

5        Q    That's D?

6        A    That's E.  Ferry Fillmore is C.

7        Q    Bailey Langfield is E?

8        A    E.

9        Q    C is?

10       A    Ferry Fillmore.  So it covers all the way from

11   Ferry all the way to roughly William.

12       Q    Okay.  And so you would scroll through all those

13   reports?

14       A    Yes, I scroll through them and then the ones I'd

15   like to read or get more information on, I click on them and

16   open them up.

17       Q    And how do you determine which ones are the ones

18   you think you should read more about?

19       A    Shots fired, any homicides, weapons possession

20   arrests.  So our nonfatal shootings show up as assaults, so I

21   usually click on most of the assaults to see if a shooting

22   did occur.

23       **MAGISTRATE JUDGE SCHROEDER:**  All right.  You're excused

24   officer.  Thank you.

25       **MR. GLABERSON:**  Judge, if it's okay, if we could take

Ammerman - Direct - Glaberson

1   just a two-minute recess.

2       **MAGISTRATE JUDGE SCHROEDER:**  Sure.  We'll recess until

3   12:00.

4       **MR. GLABERSON:**  Thank you, Judge.

5       (WHEREUPON, witness excused and recess taken.)

6       (Open court, defendant present:)

7       **THE CLERK:**  Back on the record in United States vs.

8   Devante Nance.

9       **MR. GLABERSON:**  Government calls Ronald, police officer

10  Ronald Ammerman.

11      **MAGISTRATE JUDGE SCHROEDER:**  All right.

12

13      **RONALD AMMERMAN**, called as a witness, being duly sworn,

14  testifies as follows:

15      **MR. GLABERSON:**  May I inquire.

16      **MAGISTRATE JUDGE SCHROEDER:**  Yes.

17  **DIRECT EXAMINATION BY MR. GLABERSON:**

18      **Q**    Good afternoon, Officer.

19      A    Good afternoon.

20      **Q**    Could you tell us what you do for living?

21      A    Police officer for the city of Buffalo.

22      **Q**    And how far did you go in school?

23      A    I'm sorry.

24      **Q**    How far did you go in school?

25      A    In school, I have an Associates in criminal

Ammerman – Direct – Glaberson

1   justice.

2      Q    How long have you been with the Buffalo Police

3   Department?

4      A    Just under five years.

5      Q    Could you explain how you got entry to the police

6   force and what your different duties have been since you

7   gained entry?

8      A    I gained entry by completing the Buffalo police

9   academy and my duties are patrol, respond to calls and serve

10   the community.

11      Q    In February of 2019, were you working with Jake

12   Giarrano?

13      A    I was.

14      Q    And specifically on February 5th, 2019, were you

15   and he partners for that tour?

16      A    We were.

17      Q    And what hours were you working?

18      A    We were working 3:30 p.m. to 1:30 a.m.

19      Q    Now, could you tell us on that day what happened in

20   the beginning of your tour before you left -- well, what

21   district were you assigned to at that time?

22      A    C District.

23      Q    What are the general geographical limitations in C

24   District?

25      A    So C District is from East Ferry south to a little

Ammerman - Direct - Glaberson

1    past William as east almost Cheektowaga and then as west to

2    Jefferson.

3        **Q**    Now do you work a particular geographic sector or

4    do you have a more general responsibility?

5        A    No, we were -- we can go through the whole

6    district.  We don't have a geographical sector.

7        **Q**    Now prior to you going out on the street on

8    February 5th, 2019, was Officer Giarrano reviewing computer

9    records?

10       A    He was.

11       **Q**    And what happened -- what discussions did you have

12   with him while that was happening?

13       A    He regularly, if not every day, will go through

14   past reports or violent crimes and high priority crimes and

15   he showed me a report for an assault that happened on Norway.

16       **Q**    Norway Park?

17       A    Yes.

18       **Q**    Is that a street within C District?

19       A    It is.

20       **Q**    And then what happened after your meeting and after

21   you went into the field?

22       A    We have a program on our computer that we can look

23   up past mugshots and records of people.  So we ran the name

24   and then I reviewed a photo of the suspect involved in the

25   case.

Ammerman – Direct – Glaberson

1       Q    Who was the suspect?

2       A    Devante Nance.

3       Q    Had you, prior to that day at least, ever

4  encountered him before or recognized the name or photo?

5       A    I'd never dealt with him or seen him before.

6       Q    Before that day?

7       A    Yes.

8       Q    Now, shortly after 4 p.m. who was –– you were in

9  your vehicle, correct?

10      A    Yes.

11      Q    And where were you going in general at that time?

12      A    We were –– like when we entered the vehicle and

13  were going?

14      Q    When you got into your police car.

15      A    Yeah, we were headed towards Norway.

16      Q    And you were in uniform?

17      A    I was.

18      Q    And it was a marked police vehicle?

19      A    Yes.

20      Q    What kind of vehicle was it?

21      A    I believe it was a Tahoe.

22      Q    When you got on to Norway who was driving and who

23  was the passenger?

24      A    I was driving and Jake was the passenger.

25      Q    What happened when you were driving –– when you got

Ammerman - Direct - Glaberson

1    to Norway, what direction were you going?

2       A    We were traveling north on Norway.

3       Q    Tell us what was going on when you were driving

4    north on Norway.

5       A    As we were driving north on Norway, my partner saw

6    who he believed the suspect was in the assault that we

7    reviewed earlier.  We kind of turned around and noticed him

8    walking.  He was walking south, we were driving north and the

9    whole time he was kind of looking at our patrol car.  We then

10   turned around the median and came back south on Norway.  And,

11   as we were doing that, the suspect entered into a vehicle

12   that was parked on Norway.

13      Q    Can you tell us anything about the windows of that

14   vehicle?

15      A    Yeah, it was tinted past the legal limit.

16      Q    Did you say past the legal limit?

17      A    Yes, sir.

18      Q    How do you know, how did you gauge -- well, have

19   you made stops for tinted windows in the past?

20      A    Mm-hmm.

21      Q    And how do you gauge when you're just driving by,

22   how do you make that determination that you believe it to be

23   past the legal limit of tint?

24      A    Lots of experience, and our patrol vehicles have

25   the maximum allowed tint on them.  So if they're darker than

1   your patrol vehicle windows, then they're not legal.

2        Q     Then they're too dark?

3        A     Yes, sir.

4        Q     That particular patrol vehicle had those same tints

5   on them --

6        A     Yes, sir.

7        Q     -- that you were driving that day?

8        A     Yes.

9        Q     We've got to the tinted vehicle.  Where did you go

10  and where did Officer Giarrano go?

11       A     I approached the driver's side and Officer Giarrano

12  approached the passenger side.

13       Q     Now, did you have a conversation with the driver?

14       A     I did.

15       Q     In substance, what did you say to him, what did he

16  say to you?

17       A     The regular:  License, registration.  And just told

18  him, you know, we're here because your windows are too dark

19  and that was about it.

20       Q     That's not why you were there, though?

21       A     No.

22       Q     And could you explain, based on your five years of

23  experience, why were you telling the driver that his windows

24  were too dark to get a license and registration from him?

25       A     Just because the suspect that was involved was

Ammerman – Direct – Glaberson

1   involved in a violent crime.  So to keep it calm and

2   peaceful, without just going in and saying hey, you know,

3   you're wanted for this assault, we let them know it could be

4   something as simple as a ticket so that we can, you know, go

5   through it with it being as peaceful as possible.

6        Q    And so you did inform the passengers that you were

7   approaching them because of the tint?

8        A    Yes.

9        Q    Now, did Officer Giarrano indicate to you or

10  confirm to you that it was, in fact, the suspect that he

11  had --

12       A    He --

13       Q    -- recognized?

14       A    He did.

15       Q    How did he do that?

16       A    He asked for the suspect's ID.  The suspect

17  voluntarily gave it to Jake -- or Officer Giarrano, and he

18  read the name out loud and then looked at me and kind of gave

19  me the head nod over the top of the car that it was who he

20  thought it was.

21       Q    Now, ultimately you filled out a bunch of paperwork

22  related to an arrest with the narcotics that were recovered

23  in this case?

24       A    Yes.

25       Q    And you filled out an official Buffalo police

Ammerman - Direct - Glaberson

1    department police report for that arrest?

2         A    Yes, sir.

3         Q    Okay.  I'm going to show counsel and then hand out

4    what's marked 9A and 9B for identification.  Take a look at

5    those two pages and tell me if you recognize them.

6         A    I do.

7         Q    And what are they?

8         A    It's the Buffalo police report for the narcotic

9    arrest that we made that day.

10        Q    Of Devante Nance?

11        A    Yes, sir.

12        **MR. GLABERSON:**  Your Honor, I would offer Exhibits 9A

13   and 9B into evidence.

14        **MS. MEYERS BUTH:**  I don't have any objection to this

15   one.

16        Q    So I'll put it --

17        **MAGISTRATE JUDGE SCHROEDER:**  Wait a minute.  There being

18   no objection, Government Exhibits 9A and 9B are received in

19   evidence.

20        Q    And just to be clear, 9A and 9B are two pages of

21   the same document?

22        A    Yes.

23        Q    Page 1 and Page 2?

24        A    Yes.

25        Q    So I'll put it on display on the screen.

Ammerman – Direct – Glaberson

1          Do you see that, Officer?

2     A    I do.

3     Q    So, (indiscernible) in the Buffalo Police

4    Department report system, what is the process goes through?

5     A    Yeah.  So, there's two ways.  One which is the

6    more, most of the time is that the police themselves will put

7    this report in their computers.  There are some occasions

8    where the paper copy will be put into a bin and then a report

9    technician will input from the paper copy what the officer

10   wrote.

11    Q    And in this particular case, the offender is listed

12   about three our four lines down?

13    A    Mm-hmm.

14    Q    As Devante Nance?

15    A    Yes.

16    Q    And the offenses for which he was charged were

17   listed about halfway down on the arrest number line?

18    A    Yes.

19    Q    And what are those offenses?

20    A    Possession of -- criminal possession of a narcotic

21   with intent to sell.  I believe that's a weight charge for

22   the drugs.  And obstruction of governmental administration

23   for resisting, and then a discon.

24    Q    And the items, the property that was recovered on

25   the arrest is listed as well?

Ammerman - Cross - Meyers Buth

1    A    Yes, sir.

2    **Q**    And what is that?

3    A    Drugs and money and heroin.

4    **MR. GLABERSON:**  I don't have any more questions for the

5    officer.

6    **MAGISTRATE JUDGE SCHROEDER:**  Ms. Meyers Buth.

7    **CROSS-EXAMINATION BY MS. MEYERS BUTH:**

8    **Q**    Good afternoon, Officer.

9    A    Good afternoon.

10   **Q**    Prior to your testimony, were you in the hall

11   speaking to Officer Giarrano?

12   A    Prior to testimony -- in this hall, I'm sorry?

13   **Q**    Yes.

14   A    I have -- yeah, I did speak to him.

15   **Q**    When Officer Giarrano got done testifying a few

16   minutes ago, he came out into the hall and spoke to you, did

17   he not?

18   A    He did.

19   **Q**    And did he talk to you about his testimony?

20   A    Um, he said it was rough, is really what he said.

21   **Q**    And you saw me sitting on a bench just a little

22   ways away from you, right?

23   A    Yes, ma'am.

24   **Q**    And he told you some of the questions that he was

25   asked and why it was a little rough, did he not?

Ammerman - Cross - Meyers Buth

1      A      Um, yes.

2      Q      Okay.  When, when you left C District on

3    February 5th, 2019, after having reviewed with Officer

4    Giarrano the police report on the assault in which Mr. Nance

5    was a suspect, was it your intention to head from C District

6    to headquarters right over toward Norway?

7      A      I don't recall our intention.

8      Q      In other words, he showed you a report that he

9    found interesting and was there a plan between the two of you

10   that you would ride over and see if you could find the

11   suspect?

12     A      Yes but there was more than one -- I can't remember

13   but I'm assuming there was more than one report that day.  So

14   we ride around the entire district multiple times a day.  I

15   don't know if our direct intention was to go straight to

16   Norway or not.

17     Q      Do you recall where else you would have went after

18   leaving the C District headquarters and prior to arriving on

19   Norway?

20     A      No.

21     Q      So the first thing you recollect is going over to

22   Norway and that's when you saw Mr. Nance, correct?

23     A      Yes.

24     Q      And when you reviewed the report on the computer

25   that Officer Giarrano drew your attention to, that was a

Ammerman – Cross – Meyers Buth

1    report, not a criminal complaint, am I correct?

2         A    Yes.

3         Q    So at the time that you reviewed the report, there

4    were no criminal charges for assault against Mr. Nance that

5    had been filed, true?

6         A    There was criminal charges on the report.

7         Q    Who filed the criminal charges?

8         A    The officer that reported to the call of the

9    assault.

10        Q    And was there a supporting deposition from the

11   purported victim?

12        A    I believe so but I don't recall.

13        Q    Who was the purported victim?

14        A    I don't know.

15        Q    So was there a warrant out for Mr. Nance?

16        A    There was not a warrant, no.

17        Q    So if Mr. Nance had been charged, would he have

18   been charged in Buffalo city court?

19        A    That would be up to who charged him.  He would go

20   to Buffalo city court.  I don't know if he would have been --

21   yes, he would have been charged in the city, yeah.

22        Q    And if Mr. Nance was not present because he hadn't

23   been arrested, a warrant could be issued for his arrest, is

24   that your understanding?

25        A    Yes.

Ammerman – Cross – Meyers Buth

1    **Q**    But did not see a warrant and weren't aware of one

2    at the time that you encountered Mr. Nance?

3    A    Correct.

4    **Q**    Why isn't there?

5    A    Why was there no warrant for his arrest.

6    **Q**    Yes?

7    A    I mean, I would assume -- the process takes longer

8    than the time that the report was in the system.

9    **Q**    Had you talked to anybody before you went looking

10   for Mr. Nance to determine whether there was a warrant?

11   A    No.

12   **Q**    Did you become aware at any point after Mr. Nance's

13   arrest on February 5th that there had been a warrant issued

14   for his arrest prior to February 5th?

15   A    No.

16   **Q**    Nobody ever told you that, correct?

17   A    Correct.

18   **Q**    Who was the assigned detective or a case officer

19   for the felony second?

20   A    I don't recall.  I believe it was Fisher was the

21   last name.

22   **Q**    Did you speak with Detective Fisher to see if he

23   wanted you to go out or needed you to go out to look for

24   Mr. Nance on February 5th?

25   A    I did not.

Ammerman – Cross – Meyers Buth

1     Q     And based on your experience on the force, if a

2     crime victim comes in and is credible and gives a statement,

3     they would fill out a supporting deposition, would they not?

4     A     It all depends on the case.

5     Q     If it was a serious assault with a hammer and the

6     person was injured, you would expect that criminal charges

7     would be filed imminently, right?

8     A     No, I've been to multiple times where there's been

9     worse assaults where they don't file right away.

10    Q     Okay.  But in this case they did file right away is

11    your testimony?

12    A     They filed a report, yes.

13    Q     Filed a report?

14    A     Right.

15    Q     But did not file necessarily criminal charges,

16    right?

17    A     I don't know if they gave a statement to anyone.  I

18    don't remember -- I don't recall that being -- I don't

19    remember.

20    Q     And it would be necessary for a victim to give a

21    statement prior to filing a criminal charge, generally,

22    right?

23    A     Um, all I know is that if the report was in the

24    system that there was charges laid on that report.  I'm not

25    sure if the complainant had signed a deposition or not, if

Ammerman - Cross - Meyers Buth

1  they did or not, I don't know.

2      **Q**    You were involved in the arrest of Mr. Nance, was

3  that for narcotics or was that for an assault?

4      A    Narcotics.

5      **Q**    And you never testified on any assault charge in

6  Buffalo city court or Erie County court, correct?

7      A    No, ma'am.

8      **Q**    Do you know whatever happened to the charges that

9  you say were laid for assault against Mr. Nance?

10      A    I don't know.

11      **Q**    Do you know, from speaking to any of your fellow

12  officers, whether any of them ever went to court on any

13  assault charge against Mr. Nance?

14      A    I don't recall.

15      **Q**    Do you remember Mr. Nance telling you and Officer

16  Giarrano on February 5th he didn't know anything about the

17  assault charge?

18      A    I remember him not knowing, yes.

19      **Q**    And when, when you first saw Mr. Nance, your

20  vehicle was headed northbound on Norway; is that correct?

21      A    Yes.

22      **Q**    And he was on the west side of the street meaning

23  he was on the other side of the median from you, correct?

24      A    Correct.

25      **Q**    And when you turned around and came back, tell me

Ammerman – Cross – Meyers Buth

1  the manner in which you parked your patrol vehicle.

2      A    Parallel to the car with the tints.

3      Q    In a way that would prevent the car from pulling

4  out on to Norway southbound, correct?

5      A    Negative, no.

6      Q    Okay.  Why wouldn't you have pulled up so that the

7  car you wanted to investigate couldn't pull away?

8      A    Um, we operate different ways at different times.

9  Again it would be something that would make it a lower stress

10  scenario where if he thinks we're boxing the car in, maybe

11  now he feels trapped and needs to run because maybe –– and

12  I don't –– just because he says he doesn't recall the

13  assault, maybe he knew it happened or maybe he thought

14  something else was going on.  It's very common that people

15  react different ways depending how aggressively you approach

16  the situation.

17      Q    So what you're telling us is that you knew that you

18  were going to arrest him for an assault and you pulled in in

19  a manner so as not to alert him to your true intention, fair

20  enough?

21      A    Fair, yeah.

22      Q    You got out of the vehicle and Officer Giarrano got

23  out of the vehicle, he went to the passenger side, you went

24  to the driver, right?

25      A    Correct.

Ammerman – Cross – Meyers Buth

1      **Q**    Approximately how long was Officer Giarrano at the

2  passenger side before he had Mr. Nance exit the vehicle?

3      **A**    Two minutes or less probably.

4      **Q**    In the time that you were standing at the driver's

5  side, could you see into the vehicle?

6      **A**    Yes.

7      **Q**    Could you see Mr. Nance sitting in the passenger

8  seat?

9      **A**    Yes.

10     **Q**    Did you observe Officer Giarrano speak to

11 Mr. Nance?

12     **A**    Yes.

13     **Q**    At any time during that two minutes or less that

14 you observed inside the vehicle, you didn't see any

15 indication of criminal activity, did you?

16     **A**    No.

17     **Q**    And the driver was cooperative and followed your

18 instructions in producing his ID?

19     **A**    Yes.

20     **Q**    Never charged him with any illegal tints on the

21 vehicle, right?

22     **A**    Did not.

23     **Q**    Never had the driver get out of the vehicle, true?

24     **A**    I don't recall.  I don't remember.

25     **Q**    When –– did you hear Officer Giarrano ask Mr. Nance

Ammerman - Cross - Meyers Buth

1    for identification?

2         A    I did.

3         Q    And up until that point, Mr. Nance hadn't said

4    anything to you or Officer Giarrano, had he?

5         A    I don't remember.  I don't think so.

6         Q    Okay.  He, for example, he hadn't been

7    uncooperative or used abusive or profane language, right?

8         A    I don't believe so.

9         Q    And when you or Officer Giarrano asked him for ID,

10   Mr. Nance produced ID, right?

11        A    Yes.

12        Q    And he didn't delay in that, there were no furtive

13   movements that he engaged in, right?

14        A    He didn't give the ID like a normal person would.

15   He bladed himself facing more towards me and covered the

16   satchel that was on him when he gave the ID.

17        Q    And when you say bladed himself, that's a police

18   term meaning that you turn your body, right?

19        A    Correct.

20        Q    But nothing indicative of criminal activity by

21   doing that, correct?

22        A    No criminal activity, just a rise in suspicion is

23   all.

24        Q    And he wasn't -- you wouldn't describe him as being

25   fidgety or overly nervous or any of those types of things,

Ammerman - Cross - Meyers Buth

1  right?

2      A    Nervous for sure.  Not fidgety.

3      Q    What physical -- not fidgety.  What physical

4  observations of Mr. Nance did you make that led you to

5  believe he was nervous?

6      A    The way in which he took the ID out and turned his

7  body and how his eyes were moving, how, how he was acting in

8  the car.

9      Q    How were his eyes moving?

10     A    Just like, kind of like back and forth, you know, I

11 could tell that something was going on rather than someone

12 just being IDed by being a passenger in a vehicle.

13     Q    Okay.  And Officer Giarrano would have seen that,

14 too, correct?

15     A    I have no idea what he saw.  I'm sure he could have

16 seen it.

17     Q    Well, it would be in his field of vision, fair

18 enough?

19     A    Sure.

20     Q    And that's something that would have been important

21 to note in terms of, you know, your police training whether

22 or not somebody was looking back and forth between the two of

23 you, right?

24     A    Notes like mental note.

25     Q    Noted, yeah?

Ammerman - Cross - Meyers Buth

1      A    Yeah, sure.

2      Q    And you've been involved in many arrests and

3  drivers and passengers often get nervous when they're stopped

4  and approached by police, true?

5      A    True.

6      Q    And he didn't say anything indicating he was

7  nervous?

8      A    I don't recall.  I don't think so.

9      Q    And your primary focus at that time was on the

10  driver, fair enough?

11     A    I'd say so, I guess, pretty much the whole

12  situation, but, yeah, I'm closer to the driver so that's who

13  I see more of.

14     Q    Other than passing Officer Giarrano the

15  identification, he didn't make any other movements at all

16  while he sat in the passenger seat isn't that true?

17     A    Not that I can recall.

18     Q    And he waited For officer Giarrano to look at the

19  identification and then at some point Officer Giarrano asked

20  him to -- told him to step out of the vehicle, right?

21     A    I don't know if he told or asked.

22     Q    Did he indicate to Mr. Nance at that point why he

23  was asking him to step out of the vehicle?

24     A    I don't recall when he told him why he was asking

25  him to do it or not but I know he was told like before he was

Ammerman - Cross - Meyers Buth

1   ever in custody that he is named in a report or named in an

2   assault.

3       **Q**    He's named in an assault.  There was no warrant as

4   far as you were aware, correct?

5       A    No.

6       **Q**    Based on --

7       **MAGISTRATE JUDGE SCHROEDER:**  No, it's not correct or --

8       A    There was no warrant to my knowledge.

9       **MAGISTRATE JUDGE SCHROEDER:**  All right.

10      **Q**    So without a warrant and without any indication of

11  criminal activity, are you allowed to arrest somebody when

12  they're just sitting in a parked car?

13      A    At the time from information and belief and being

14  named in a report, we were allowed to.

15      **Q**    You think you're allowed to arrest somebody without

16  a warrant when there's no indication of present criminal

17  activity based on a police report that was filed six days

18  before, that's your testimony?

19      A    With pending charges on them, yes.

20      **Q**    Is there a document that you reviewed prior to

21  testifying that indicates he had pending charges?

22      A    The report in the system is pending charges.

23      **Q**    Report in the system meaning what we previously

24  marked as government's Exhibit 3 in this case?

25      **MAGISTRATE JUDGE SCHROEDER:**  Put it on the ELMO, please.

Ammerman - Cross - Meyers Buth

1    **Q**    Showing you what's been marked as Government

2    Exhibit 3 in this case.  Where on this document does it say

3    that there were pending criminal charges and in what court?

4    A    It was under offenses and to my knowledge that

5    means that they're being -- the charges are being pressed so

6    it's -- they're pending until they go through the system.

7    **Q**    So I'm looking at this document Exhibit 3, it says

8    offenses?

9    A    Yep.

10   **Q**    Those are the offenses that the person made the

11   report about, are they not?

12   A    I'm sorry, can you repeat that one time.

13   **Q**    Sure.  Those are the offenses that the person, the

14   complainant made the report about --

15   A    Yes, ma'am.

16   **Q**    -- right?

17   A    Yep.

18   **Q**    But that doesn't indicate that charges were filed

19   or in what court they're pending, true?

20   A    True.

21   **Q**    And you'd agree with me, Officer Ammerman, that if

22   there were not criminal charges pending for this assault and

23   there was no warrant, that you would have no legal right to

24   pull somebody out of a vehicle, absent some other evidence of

25   criminal activity?

Ammerman - Cross - Meyers Buth

1      **MR. GLABERSON:**  Objection.

2      **Q**   Correct?

3      **MR. GLABERSON:**  Objection.

4      **MAGISTRATE JUDGE SCHROEDER:**  Basis?

5      **MR. GLABERSON:**  Calls for a legal conclusion.

6      **MAGISTRATE JUDGE SCHROEDER:**  No.  She's asking him about

7   his experience and training as a police officer as to what he

8   could do or not do in making an arrest.  Overruled.

9      A   I would say disagree with you.

10     **Q**   You disagree with me?

11     A   Yes.

12     **Q**   Okay.  In what sense?

13     A   That I know that if there's filed charges on a

14  named suspect in a document at that time based on information

15  and belief, you are able to make an arrest.

16     **Q**   What if the person had already been to court and

17  been arraigned and been released on his own recognizance or

18  on bail?

19     A   Then he'd be released.

20     **Q**   Well, how would you know that just based on

21  Exhibit 3.

22     A   The report would be undated with an arrest.  It

23  would say that he had been arrested.

24     **Q**   Doesn't that say that on Exhibit 3?

25     A   It might say that now because he has been arrested.

Ammerman - Cross - Meyers Buth

1    **Q**    What did it say on February 5th?

2    A    It probably didn't say -- it would have -- the

3    arrest section wouldn't be filled out.

4    **Q**    Do you have a specific recollection as to what the

5    report said on February 5th?

6    A    Um, no, I don't.

7    **Q**    In your experience if an assault victim came in and

8    filed a report and had obvious injuries, would pictures be

9    taken at the station or at C District?

10   A    It's on a case-to-case basis.  It depends on what

11   the detective would like to do or if there's officers there

12   that do it.  It's not, it's not every time.

13   **Q**    Now you indicated that when Officer Giarrano showed

14   you the report, you took a look at some mugshots of

15   Mr. Nance, is that true?

16   A    I did take a look at some mugshots, yeah.

17   **Q**    What other background information did you get?  Did

18   you look, for example, at who the complainant was or what his

19   background was?

20   A    The complaint of the assault?

21   **Q**    Yes.

22   A    I don't believe so, no.

23   **Q**    Did you recognize his name as a drug addict from

24   the neighborhood?

25   A    I did not.

Ammerman – Cross – Meyers Buth

1    **Q**    You didn't know the name one way or the other?

2    A    I -- nope.

3    **Q**    Did officer Giarrano at any point when he got

4    Mr. Nance out of the vehicle tell him that he wanted to speak

5    to him about a police report that had been filed?

6    A    I believe so, yes.

7    **Q**    And he could have, he could have spoken to

8    Mr. Nance inside the vehicle or after he decided to get him

9    out of the vehicle, isn't that true?

10   A    Sure.

11   **Q**    He could have clarified whether Mr. Nance knew

12   anything about an alleged assault, right?

13   A    He could have.

14   **Q**    He could have asked him to voluntarily come down to

15   C District so that he could talk to him or he could give his

16   side of the story about the assault, right?

17   A    He could have.

18   **Q**    He didn't have to arrest him, in other words, he

19   had other options, correct?

20   A    He could, yeah, he had other options.

21   **Q**    And when he got him out of the vehicle, did he turn

22   him and pat frisk him right on the -- his own vehicle or was

23   it on the shoulder?

24   A    I think he started to attempt to and then decided

25   not to -- to bring him over towards where I was for safety.

Ammerman - Cross - Meyers Buth

1    **Q**    So, in other words, he gets Mr. Nance out of -- it
2  was a gold Volkswagen, right?

3    A    I think so, yeah.

4    **Q**    So he gets him out of the gold Volkswagen and while
5  he's still on the passenger side of that vehicle, he turns
6  around and starts frisking him there and then makes a
7  decision after he pat frisks him there that he's going to
8  walk him over to the patrol vehicle, true?

9    A    I don't know how far he got with frisking on him.
10 I don't know if he even started or not.  I just remember him
11 turning him towards the Volkswagen and then quickly walking
12 him around the front of the car.

13   **Q**    But your testimony a few minutes ago was that your
14 best recollection is that he had been pat frisked against
15 that vehicle and then stopped and walked him around?

16   A    No, I didn't say that.  I said that he may have.  I
17 don't, I don't know for sure.

18   **Q**    He may have?

19   A    Yeah.

20   **Q**    You're speculating?

21   A    Yeah.

22   **Q**    So when he walked him over to the patrol car, did
23 he tell him he was going to put him in the patrol car and
24 that's why he had to frisk him first?

25   A    I don't think it ever got that far.

Ammerman - Cross - Meyers Buth

1      **Q**      When he walked him over to the patrol car, were you

2   able to observe Officer Giarrano frisk Mr. Nance?

3      A      Yes.

4      **Q**      And did he, in fact, frisk him?

5      A      He searched him, yes, yeah.

6      **Q**      And then at some point did you tell Officer

7   Giarrano "check the bag"?

8      A      I don't believe so.  I don't, I don't -- I don't

9   recall that.  I could have.

10      **Q**      Did you see Officer Giarrano then check the bag by

11   reaching into it?

12      A      No.  He attempted to.

13      **Q**      He did attempt to reach into the bag.  And was it

14   at that point that Mr. Nance then pulled away from him?

15      A      Yes.

16      **Q**      And although he was charged with obstruction and

17   disorderly conduct when he pulled away, he really sort of

18   bumped right into you because you were standing a couple feet

19   from where the pat frisk was going on, right?

20      A      He pushed off, bumped in and ran through --

21      **Q**      And how far did he get?

22      A      -- maybe a yard.

23      **Q**      Like the yard of a house or?

24      A      I'm sorry, like 3 feet.

25      **Q**      3 feet?

Ammerman - Cross - Meyers Buth

1      A     3, 3 or 4 feet maybe.

2      Q     So when you say he fled, he literally went from

3  here to here (indicating)?

4      A     Yes, he attempted to flee.

5      **MAGISTRATE JUDGE SCHROEDER:**  Let the record reflect that

6  counsel moved in a right to left direction of approximately 5

7  feet.

8      Q     In other words, Officer Ammerman, there was nowhere

9  for him to go because Officer Giarrano was on one side of him

10  and you were on the other side, isn't that true?

11      A     I disagree.

12      Q     And Mr. Nance, your recollection is he's about five

13  six, 140, fair to state?

14      A     Maybe.  Yeah, I don't know -- I don't know how much

15  he weighs.

16      Q     Fair to state that both and you Officer Giarrano

17  were higher than him and outweighed him -- or higher.  Were

18  taller than him and outweighed him?

19      A     I think we're probably similar heights, but, yeah,

20  I probably weigh more than him.

21      Q     How much do you weigh?

22      A     Right now I'm like 195.

23      Q     About the same then, too right?

24      A     I'm sorry.

25      Q     About the same then, too, right?

Ammerman – Cross – Meyers Buth

1   A   No.  My weight fluctuates a lot.

2   **MS. MEYERS BUTH:**  Judge, if I could just have a minute.

3   **MAGISTRATE JUDGE SCHROEDER:**  Certainly.

4   (Pause in proceedings.)

5   **Q**   Officer Ammerman, you're still partners with

6   Officer Giarrano, right?

7   A   Um, it's hard to explain.  We have a location so

8   sometimes I ride with different people but I would say, yes,

9   we still would ride together.

10   **Q**   And I asked Officer Giarrano this –– and it's not

11   intended to embarrass you –– but there was a –– the both of

12   you gave testimony on a vehicle and traffic case in state

13   Supreme Court where Judge Wojtaszek found that your testimony

14   was not credible, do you remember that case?

15   A   Yes, ma'am.

16   **Q**   And you're familiar with Judge Wojtaszek's

17   decision, correct?

18   A   I am.

19   **Q**   And that was a similar scenario where you two had

20   pulled up on a vehicle and there was a black gentleman inside

21   the vehicle that you got out and you said the reason for

22   pulling up on the vehicle has tints, do you recall that case?

23   A   I recall that case but I would argue that it's not

24   that similar.

25   **Q**   It's not.  In what way does it differ?

Ammerman – Examination by Judge Schroeder

1    A    Because our intentions for pulling up on the

2  vehicle that Mr. Nance was in –– was because it was

3  Mr. Nance, not because of the tints.

4    Q    Had nothing to do with the tints really?

5    A    No, ma'am.

6    Q    Did you ever tell the federal prosecutors here that

7  the reason you were suspicious and wanted to approach the

8  vehicle was because of illegal tints?

9    A    No.  I, I –– I don't recall that.

10   Q    Did you tell them that the tints really had nothing

11 to do with this, that it was your plan to arrest Mr. Nance

12 because of a report that had been filed by a complainant for

13 an assault?

14   A    Yes, ma'am.

15   **MR. GLABERSON:**  No redirect.

16 **EXAMINATION BY MAGISTRATE JUDGE SCHROEDER:**

17   Q    Officer.

18   A    Yes, sir.

19   Q    You indicated that when we broke for the break, you

20 were outside the courtroom and Officer Giarrano came to you?

21   A    Yes.

22   Q    And he discussed briefly what his testimony was?

23   A    Um, yes, very briefly.

24   Q    Did he talk about the report of February 5th, 2019?

25   A    Not, not really ––

Ammerman – Examination by Judge Schroeder

1      **Q**     What did --

2      A     -- to be honest.

3      **Q**     What did he talk about?

4      A     He just said that they had brought up the case

5      of -- the prior case.

6      **Q**     The one that you were just asked about on the

7      credibility issue?

8      A     Yes, sir.

9      **Q**     Did he say anything else?

10     A     Not that I could recall, no.

11     **Q**     Okay.  Miss Meyers Buth, would you put Government

12     Exhibit 9A on the ELMO, please?

13     **MS. MEYERS BUTH:**  Thank you.

14     **MAGISTRATE JUDGE SCHROEDER:**  Or Mr. Glaberson.

15     **Q**     Officer, this is a report that you generated

16     somehow.

17     A     Yes, sir.

18     **Q**     I want you to look at the lines under the heading

19     offenses, do you see that?

20     A     Yes.

21     **Q**     And you are saying that the offenses that were

22     involved were criminal possession of narcotic drug with

23     intention to sell, correct?

24     A     Yes, sir.

25     **Q**     And then if you look down under arrest, it

Ammerman - Examination by Judge Schroeder

1    identifies the defendant and then you see the line saying

2    "status"?

3         A    Correct.

4         Q    And then "arrest type"?

5         A    Okay.

6         Q    "Crime in progress".  That meant that you were

7    saying that there was an actual crime going on at the time

8    doesn't it?

9         A    Um, yeah, I see it, yes, that means -- yeah.

10        Q    And --

11        A    Those, I'm sorry, sir.

12        Q    Those -- that's your name, Ammerman?

13        A    Yes, sir.  Just so you know, the part after arrest

14   I don't fill out.

15        Q    Well all I'm asking about is what the report says.

16        A    Yes, sir, yep.

17        Q    It talks about a crime in progress and it has your

18   name?

19        A    Yes.

20        Q    And as I look above as to what the crimes

21   apparently were or the offenses or I look below on the

22   description of crime in progress, it was criminal possession

23   of contraband, narcotic, criminal possession of narcotic drug

24   with intent to sell.

25             We've heard testimony about tinted windows, a

Ammerman — Examination by Judge Schroeder

1    parked car, and two people in the car.  When I look at this

2    document about a crime in progress and drugs with intent to

3    sell, that would indicate you thought there was a drug deal

4    going on, would it not?

5         A    No, that's --

6         Q    It wouldn't?

7         A    No, sir.

8         Q    Well, how do you know that there were drugs with

9    intention to sell?

10        A    Based on the amount and the packaging, it's not --

11        Q    But, but we also have a notation:  Crime in

12   progress.  You got two guys sitting in a parked car with

13   tinted windows.  Based on your experience in that district,

14   you're saying that that wouldn't give you some cause to think

15   that wasn't a deal going down?

16        A    It could possibly have been but I don't know if it

17   was or not.

18        Q    Isn't that what that description would cover, crime

19   in progress possession of drugs with intent to sell?

20        A    The crime in progress, like I said, I don't put it

21   there and I don't know what that is referring to because, in

22   my mind, that would make it seem as if the crime is currently

23   going on when this arrest record is made after the fact so

24   I'm not sure why that's like that.

25        Q    Was the driver ever arrested?

Ammerman – Examination by Judge Schroeder

1    A   The driver was not.

2    Q   This is the driver that was in the car with

3 Mr. Nance?

4    A   Yes.

5    Q   Okay.  Thank you.  You're excused.

6    A   Yes, sir.

7   (WHEREUPON, witness was excused.)

8   **MAGISTRATE JUDGE SCHROEDER:**  Mr. Glaberson.

9   **MR. GLABERSON:**  Other than the fact that Ms. Meyers Buth

10 had displayed to the witness exhibits that are marked at

11 least 5A through 5D, we'd offer those into evidence to

12 complete the record.

13   But other than that request, we would rest -- the

14 government would rest.

15   **MAGISTRATE JUDGE SCHROEDER:**  Let me ask you this:  Did

16 you instruct Officers Giarrano and Officer --

17   **MR. GLABERSON:**  Ammerman.

18   **MAGISTRATE JUDGE SCHROEDER:**  -- Ammerman not to talk one

19 another while each was testifying?

20   **MR. GLABERSON:**  In between I did not instruct them that

21 way.

22   **MAGISTRATE JUDGE SCHROEDER:**  All right.  On the

23 exhibits, Ms. Meyers Buth.

24   **MS. MEYERS BUTH:**  I don't have any objection on those

25 exhibits.

Case 1:20-cr-00029-RJA-HKS   Document 293   Filed 11/02/21   Page 122 of 126

1     **MAGISTRATE JUDGE SCHROEDER:**  Okay.  The defendant having

2     no objection, Government exhibits ... which, 5A 5B?

3     **MR. GLABERSON:**  5A through 5D, so 5A, 5B, 5C and 5D.

4     **MAGISTRATE JUDGE SCHROEDER:**  Are now admitted.

5     Does the government rest?

6     **MR. GLABERSON:**  Yes, your Honor.

7     **MAGISTRATE JUDGE SCHROEDER:**  Ms. Meyers Buth.

8     **MS. MEYERS BUTH:**  Judge, I just spoke to Mr. Nance.

9     He's been housed at the Orleans County Correctional Facility

10    and although I did have an opportunity to review all of the

11    government exhibits with him, I did not have an opportunity

12    to adequately talk to him about his right to testify at this

13    hearing.

14    So I would ask for a brief continuance of the hearing so

15    that I could fully apprize him of his right to testify and my

16    recommendation in that regard.

17    And whether the Court, you know, wants to continue later

18    this afternoon or on a different date, you know, as long as I

19    have an adequate opportunity to speak to him and I feel

20    comfortable that he understands his rights, then we can

21    decide.

22    **MAGISTRATE JUDGE SCHROEDER:**  Well, since Mr. Nance is

23    here and because he's housed in, where, Orleans County?

24    **MS. MEYERS BUTH:**  Orleans, yeah.

25    **MAGISTRATE JUDGE SCHROEDER:**  What I would prefer -- and

Case 1:20-cr-00029-RJA-HKS   Document 293   Filed 11/02/21   Page 123 of 126

1    I'll give you sufficient time -- is for you to meet with him

2    and go over what you feel you need to go over with him, as

3    well as advising him about his rights with respect to

4    testifying.  And we can then pick back up it's now

5    approximately 22 minutes to 1.  We could pick back up at

6    2:30.

7         Do you think that would give you enough time?

8         **MS. MEYERS BUTH:**  Oh, plenty of time, Judge.  I just

9    didn't want to inconvenience the Court but that would be

10   great.

11        **MAGISTRATE JUDGE SCHROEDER:**  No.  That way we can save a

12   trip transporting Mr. Nance from Orleans County.  Before I

13   forget, I was reading a decision of the Supreme Court Justice

14   State of New York and it appears to me -- and maybe it was

15   just in the copying or the cutoff -- that the pages don't

16   seem to follow --

17        **MS. MEYERS BUTH:**  Oh.

18        **MAGISTRATE JUDGE SCHROEDER:**  -- right.  So I was

19   wondering if I could get a better copy.

20        **MS. MEYERS BUTH:**  Yeah, let me check.  They copied

21   funny, judge.  So let me check the two other copies I have

22   here.  One's really super small print.

23        **MAGISTRATE JUDGE SCHROEDER:**  Okay, for example, on

24   Defendant's Exhibit A, at the very last line it says *People*

25   *vs. Huntley* with the citation and then it says on consent of

1    the people and the defendant.  And then when I turn the page,

2    the next thing is Ronald Ammerman's departmental file

3    prepared in connection.

4        **MS. MEYERS BUTH:**  Oh, I see.  I think it was just the

5    way it was copied but I can supply a proper copy of the

6    decision to the Court.

7        **MAGISTRATE JUDGE SCHROEDER:**  Yeah, just so it reads in

8    proper order and a copy to the government, as well --

9        **MS. MEYERS BUTH:**  Yes.

10       **MAGISTRATE JUDGE SCHROEDER:**  -- if they don't already

11   have it.  All right.  We will recess until 2:30.

12       (WHEREUPON, recess was taken.)

13       (Open court, defendant present:)

14       **THE CLERK:**  Back on the record in the United States vs.

15   Devante Nance.

16       **MAGISTRATE JUDGE SCHROEDER:**  Ms. Meyers Buth, have you

17   had an opportunity to confer with Mr. Nance?

18       **MS. MEYERS BUTH:**  I have, Judge.  I spoke with him at

19   length at the Marshal's office and explained his right to

20   testify and everything around that issue.  And its his

21   knowing decision at this point not to take the stand.  So we

22   have no other witnesses.

23       **MAGISTRATE JUDGE SCHROEDER:**  All right.  Am I correct

24   that assuming the parties are going to order a transcript?

25       **MS. MEYERS BUTH:**  Yes.

US v. Nance – 20-CR-29

1      **MR. GLABERSON:**  Yes.

2      **MAGISTRATE JUDGE SCHROEDER:**  All right.  And I'm also

3   assuming that post-hearing memoranda will be submitted.

4      **MS. MEYERS BUTH:**  Yes.

5      **MAGISTRATE JUDGE SCHROEDER:**  What I'm going to do, then,

6   is set a schedule that the post-hearing memoranda be

7   submitted no later than 30 days after the filing of the

8   transcript but I want reasonable prompt effort to be made to

9   order that transcript.

10      **MR. GLABERSON:**  Yes, sir.

11      **MS. MEYERS BUTH:**  Understood.  Thank you, Judge.

12      **MAGISTRATE JUDGE SCHROEDER:**  All right.  Anything else

13   at this time?

14      **MR. GLABERSON:**  No, your Honor, not from the government.

15      **MS. MEYERS BUTH:**  Not from the defense, Judge.

16      **MAGISTRATE JUDGE SCHROEDER:**  And Ms. Meyers Buth, does

17   the defendant understand and agree that the Speedy Trial

18   Clock continues to remain stopped since the motion is

19   considered to still be pending and the clock will continue to

20   be stopped until such time as the motion to suppress has been

21   resolved?

22      **MS. MEYERS BUTH:**  He understands that.  We discussed it

23   today again.

24      **MAGISTRATE JUDGE SCHROEDER:**  All right.  Thank you.

25      All right, everyone, thank you.

125

US v. Nance - 20-CR-29

1      **MR. GLABERSON:**  Thank you, Judge.

2      **MS. MEYERS BUTH:**  Thank you.

3      (WHEREUPON, proceedings were adjourned.)

4

5

6                        *          *          *

7                **CERTIFICATE OF TRANSCRIBER**

8

9          In accordance with 28, U.S.C., 753(b), I

10  certify that this is a true and correct record of proceedings

11  from the official audio recording of the

12  proceedings held in the United States District Court

13  for the Western District of New York before the

14  Honorable H. Kenneth Schroeder, Jr. on August 13, 2021.

15

16

17  S/ Diane S. Martens

18  Diane S. Martens
    Transcriber

19

20

21

22

23

24

25