1                 **UNITED STATES DISTRICT COURT**
                  **WESTERN DISTRICT OF NEW YORK**
2

UNITED STATES OF AMERICA,        )
3                                )  Case No. 1:20-CR-00029-3
                                 )            (RJA)(HKS)
4                    Plaintiff,  )
                                 )
5    vs.                         )  December 19th, 2022
                                 )  10:30 a.m.
6    DAVID BURGIN,               )
                                 )
7                    Defendant.  )

8

                 **TRANSCRIPT OF EVIDENTIARY HEARING**
9        **BEFORE THE HONORABLE H. KENNETH SCHROEDER, JR.**
                 **UNITED STATES MAGISTRATE JUDGE**
10

11   <u>APPEARANCES</u>:

12   For the Plaintiff:    TRINI E. ROSS, ESQ.
                          UNITED STATES ATTORNEY
13                        BY:  EVAN GLABERSON, ESQ.
                               TIMOTHY LYNCH, ESQ.
14                        ASSISTANT UNITED STATES ATTORNEYS
                          138 Delaware Avenue
15                        Buffalo, NY 14202

16   For the Defendant:    Donald M. Thompson, Esq.
                          16 West Main Street, Suite 243
17                        Rochester, NY 14614

18                        Harrington and Mahoney
                          By:  James P. Harrington, esq.
19                        70 Niagara Streetl
                          Third Floor
20                        Buffalo, NY 14202

21   Audio Recorder:       LLANE GUIDOTTI

22   Transcriber:          MEGAN E. PELKA, RPR
                          Robert H. Jackson US Courthouse
23                        2 Niagara Square
                          Buffalo, NY 14202
24                        (716) 229-0880

25           Proceedings recorded with electronic sound recording,
     transcript prepared with computer-aided transcription.

| | | |
|---|---|---|
| 01:44PM | 1 | THE CLERK:  This is United States v. David Burgin |
| 01:44PM | 2 | number 20-CR-29.  This is an evidentiary hearing.  Assistant |
| 01:44PM | 3 | United States Attorneys Timothy Lynch and Evan Glaberson |
| 01:44PM | 4 | appearing on behalf of the government, and James Harrington |
| 01:44PM | 5 | and Donald Thompson appearing with defendant. |
| 01:44PM | 6 | THE COURT:  Good morning. |
| 01:44PM | 7 | MR. GLABERSON:  Good morning, Judge. |
| 01:44PM | 8 | MR. HARRINGTON:  Good morning, Judge. |
| 01:44PM | 9 | THE COURT:  We're ready for the evidentiary hearing? |
| 01:44PM | 10 | MR. HARRINGTON:  Yes, Judge. |
| 01:44PM | 11 | MR. LYNCH:  Yes, Judge I think we just -- |
| 01:44PM | 12 | Mr. Glaberson's computer has to restart, Judge, because I'm |
| 01:44PM | 13 | going to need the computer system for the exhibits, some of |
| 01:45PM | 14 | them anyway.  Some of them are video exhibits.  Okay.  Looks |
| 01:45PM | 15 | like we're all set, Judge.  When we last left off, Detective |
| 01:45PM | 16 | Daniel Granville was on the stand -- Chief Granville was on |
| 01:46PM | 17 | the stand. |
| 01:46PM | 18 | (The witness was sworn at 10:37 a.m.) |
| 01:46PM | 19 | THE COURT:  Please be seated.  State your last name |
| 01:46PM | 20 | and spell your last name for the record please. |
| 01:46PM | 21 | THE WITNESS:  Daniel Granville, last name is |
| 01:46PM | 22 | G-R-A-N-V-I-L-L-E. |
| 01:46PM | 23 | |
| 01:46PM | 24 | |
| 01:46PM | 25 | |

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

2

| | | |
|---|---|---|
| 01:46PM | 1 | DIRECT EXAMINATION |
| 01:46PM | 2 | |
| 01:46PM | 3 | BY MR. LYNCH: |
| 01:46PM | 4 | Q.  Chief Granville, do you recall the last time you were |
| 01:46PM | 5 | testifying here approximately in August of this year? |
| 01:46PM | 6 | A.  Yes. |
| 01:46PM | 7 | Q.  And when we last left off, we were talking about entry |
| 01:46PM | 8 | into 56 Grimes and a fatal funnel -- you testified about a |
| 01:47PM | 9 | fatal funnel in a stairwell, correct? |
| 01:47PM | 10 | A.  That's correct. |
| 01:47PM | 11 | Q.  All right.  Now, before we get into that, though, I just |
| 01:47PM | 12 | want to show some additional portions of Exhibit 1; the |
| 01:47PM | 13 | surveillance from the surveillance system inside of 56 Grimes |
| 01:47PM | 14 | showing David Burgin arriving and exiting that residence. |
| 01:47PM | 15 | Exhibit 1, slide 8, Mr. Glaberson.  We'll start with 8, |
| 01:47PM | 16 | and then the next slide.  I'll have you stop it right there. |
| 01:47PM | 17 | Is this slide 9? |
| 01:47PM | 18 | MR. GLABERSON:  Yes. |
| 01:47PM | 19 | BY MR. LYNCH: |
| 01:47PM | 20 | Q.  Slide 9, do you see what's depicted on the screen in |
| 01:47PM | 21 | front of you? |
| 01:47PM | 22 | A.  I do. |
| 01:47PM | 23 | MR. LYNCH:  And Exhibit 1, if you recall, Judge, this |
| 01:48PM | 24 | is in evidence. |
| 01:48PM | 25 | |

01:48PM   1   BY MR. LYNCH:

01:48PM   2   Q.  What is the time depicted on this video?

01:48PM   3   A.  Says 16:14 p.m.

01:48PM   4   Q.  And that's February 19th, 2020?

01:48PM   5   A.  Yes, sir.

01:48PM   6   Q.  And what is depicted on the screen at this point?

01:48PM   7   A.  There's a pick-up truck that just drove off Milburn and

01:48PM   8   arrived on Grimes.

01:48PM   9   Q.  And this is surveillance video from the outside of 56

01:48PM   10  Grimes?

01:48PM   11  A.  Yes.

01:48PM   12  Q.  And what direction does the video, I guess, depict?

01:48PM   13  A.  It's pointing in an east direction.

01:48PM   14  Q.  On Grimes?  And it also captures the intersection of

01:48PM   15  Grimes and Milburn?

01:48PM   16  A.  Yes.

01:48PM   17  Q.  All right.  Can you continue to play it?

01:49PM   18      That's the end of that clip, but what did the rest of

01:50PM   19  that clip show?

01:50PM   20  A.  It showed a pick-up truck backing up in a westbound

01:50PM   21  direction down Grimes.

01:50PM   22  Q.  If we can go to slide 10?  Now do you see what's depicted

01:50PM   23  on the screen in front of you?

01:50PM   24  A.  I do.

01:50PM   25  Q.  Can you hit pause?  What -- is this the same angle of the

01:50PM   1   surveillance camera we just saw?

01:51PM   2   A.  No.

01:51PM   3   Q.  Okay.  What is the angle of this surveillance camera?

01:51PM   4   A.  It is pointed in a west direction and it shows Grimes.

01:51PM   5   Q.  Still the front of 56 Grimes also?

01:51PM   6   A.  That's correct.

01:51PM   7   Q.  Okay.  And we've stopped it at 6:16:36.  Do you see that?

01:51PM   8   A.  Yes.

01:51PM   9   Q.  And what is depicted essentially in the screen as we're

01:51PM  10   looking at it right now?

01:51PM  11   A.  The front of 56 Grimes and also there's a pick-up truck

01:51PM  12   located in the street.

01:51PM  13   Q.  Can you continue to play, Mr. Glaberson?  I'm going to

01:52PM  14   have you stop it right there.

01:52PM  15       We stopped at 6:16:49 seconds.  Do you see what's depicted

01:52PM  16   on the screen now?

01:52PM  17   A.  I do.

01:52PM  18   Q.  And what's depicted on the screen?

01:52PM  19   A.  An individual entering the front of 56 Grimes.

01:52PM  20   Q.  Do you recognize the individual from the surveillance

01:52PM  21   video?

01:52PM  22   A.  I do.

01:52PM  23   Q.  And who is that?

01:52PM  24   A.  That's Mr. David Burgin.

01:52PM  25   Q.  If we --

01:52PM  1      MR. HARRINGTON:  Judge, I'll object to this.  There's

01:52PM  2  no basis for him doing that.  He's already testified that

01:52PM  3  while he was on surveillance watching this, he didn't even see

01:52PM  4  this happen.  And how it is that he now can give some opinion

01:52PM  5  as to who the person is?  If he can, he's certainly got to lay

01:52PM  6  the foundation for it.

01:53PM  7      MR. LYNCH:  Well, he already identified Mr. Burgin.

01:53PM  8  He's watching the video.  He recognizes Mr. Burgin in the

01:53PM  9  video, and this exhibit is in evidence.

01:53PM  10      THE COURT:  What's that exhibit number again?

01:53PM  11      MR. LYNCH:  Exhibit 1, slide 10.

01:53PM  12      THE COURT:  I believe the question put to the witness

01:53PM  13  was, do you recognize the individual depicted in the frame on

01:53PM  14  2/19/2020 at 6:16:49 p.m., not whether he was there or not.

01:53PM  15  Overruled.

01:53PM  16      MR. HARRINGTON:  Judge, my objection was the

01:53PM  17  foundation for it.  That's all.

01:53PM  18      THE COURT:  Well -- but, as Mr. Lynch has pointed

01:53PM  19  out, the exhibit is in evidence.

01:53PM  20      MR. HARRINGTON:  The exhibit is.

01:54PM  21      THE COURT:  And so he's asking him about a scene in

01:54PM  22  the exhibit in evidence and if he recognizes the person

01:54PM  23  depicted in the video which is in evidence.

01:54PM  24      MR. HARRINGTON:  Right.  But he has given no basis

01:54PM  25  for how he recognizes him.  That's all.

01:54PM  1          THE COURT:  Well, previously, in August, my notes

01:54PM  2   indicate he testified that he had been working in an

01:54PM  3   investigation involving the defendant allegedly and had had

01:54PM  4   him under surveillance.

01:54PM  5          MR. HARRINGTON:  We'll deal with it on cross-

01:54PM  6   examination, Judge.  That's not accurate.

01:54PM  7          THE COURT:  Well, more specifically, I'm looking at

01:54PM  8   my notes of August 25th, 2022.  He was asked that on and

01:54PM  9   stated that on February 19th, 2020, he was conducting

01:54PM  10  surveillance of drug action and that the person surveilled

01:55PM  11  became a confidential informant.  And then, from there, they

01:55PM  12  went on and continued with the investigation, set up recorded

01:55PM  13  phone calls.

01:55PM  14  BY MR. LYNCH:

01:55PM  15  Q.  And you arrested Mr. Burgin on that date, correct?

01:55PM  16  A.  That's correct.

01:55PM  17         MR. LYNCH:  So, I understand Mr. Harrington's point

01:55PM  18  he's making.  I just want to --

01:55PM  19  BY MR. LYNCH:

01:55PM  20  Q.  Chief Granville, you're making your testimony here today

01:55PM  21  based just on your review of the surveillance video and

01:55PM  22  nothing else?

01:55PM  23  A.  That's correct.

01:55PM  24         THE COURT:  Overruled.

01:55PM  25

| | | |
|---|---|---|
| 01:55PM | 1 | BY MR. LYNCH: |
| 01:55PM | 2 | Q.  Okay.  Is this slide 11?  Do you see what's depicted in |
| 01:56PM | 3 | front of you? |
| 01:56PM | 4 | A.  Yes. |
| 01:56PM | 5 | Q.  And that's just a different angle shooting down Milburn |
| 01:56PM | 6 | and Grimes? |
| 01:56PM | 7 | A.  That's correct. |
| 01:56PM | 8 | Q.  Of the individual you identified as Mr. Burgin entering |
| 01:56PM | 9 | the premises? |
| 01:56PM | 10 | A.  That's correct. |
| 01:56PM | 11 | Q.  Okay.  Now, if we can go to slide 15?  Slide 15.  Okay. |
| 01:56PM | 12 | Slide 16.  Can you see -- you can hit pause. |
| 01:56PM | 13 | Do you see what's depicted on the screen in front of you? |
| 01:56PM | 14 | A.  I do. |
| 01:56PM | 15 | Q.  And what's the time on the video surveillance? |
| 01:56PM | 16 | A.  Six twenty-eight p.m. |
| 01:56PM | 17 | Q.  And 58 seconds? |
| 01:57PM | 18 | A.  Fifty-eight seconds. |
| 01:57PM | 19 | Q.  Did you recognize the individual depicted in that |
| 01:57PM | 20 | surveillance video? |
| 01:57PM | 21 | A.  I do. |
| 01:57PM | 22 | Q.  And who is that? |
| 01:57PM | 23 | A.  That's Mr. Burgin. |
| 01:57PM | 24 | Q.  We can go to the next slide.  Slide 17.  Do you see |
| 01:57PM | 25 | this -- what's depicted on the screen in front of you? |

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

8

| | | |
|---|---|---|
| 01:57PM | 1 | A.  Yes. |
| 01:57PM | 2 | Q.  You can hit pause.  It's -- time on it is 6:29:29.  Do |
| 01:58PM | 3 | you see that? |
| 01:58PM | 4 | A.  I do. |
| 01:58PM | 5 | Q.  Do you recognize the individual depicted in this |
| 01:58PM | 6 | surveillance video? |
| 01:58PM | 7 | A.  I do. |
| 01:58PM | 8 | Q.  And who is that? |
| 01:58PM | 9 | A.  It's Mr. Burgin. |
| 01:58PM | 10 | Q.  If we could just go to slide 23?  Can you go to slide -- |
| 01:59PM | 11 | I don't know, 22, I guess it must be.  There we go. |
| 01:59PM | 12 | Slide 22 in front of you.  Do you see what's depicted on |
| 01:59PM | 13 | the screen in front of you? |
| 01:59PM | 14 | A.  I do. |
| 01:59PM | 15 | Q.  Can you hit pause? |
| 01:59PM | 16 | Stopping at about 6:36:14, do you see that time stamp on |
| 01:59PM | 17 | the video? |
| 01:59PM | 18 | A.  I do. |
| 01:59PM | 19 | Q.  What's depicted in the video? |
| 01:59PM | 20 | A.  It shows Mr. Burgin departing 56 Grimes. |
| 01:59PM | 21 | Q.  And this on February 19th, 2020? |
| 01:59PM | 22 | A.  That's correct. |
| 01:59PM | 23 | Q.  Okay.  I'm now going to show you and ask -- |
| 02:00PM | 24 | THE COURT:  Wait until you get to a mic when you |
| 02:00PM | 25 | start talking. |

| | | |
|---|---|---|
| 02:00PM | 1 | BY MR. LYNCH: |
| 02:00PM | 2 | Q.  Chief Granville, I've just handed up to you an exhibit. |
| 02:00PM | 3 | Do you see that exhibit in front of you? |
| 02:00PM | 4 | A.  I do. |
| 02:00PM | 5 | Q.  And is that photographs? |
| 02:00PM | 6 | A.  They are. |
| 02:00PM | 7 | Q.  What are they photographs of? |
| 02:00PM | 8 | A.  Photographs of keys in a door. |
| 02:01PM | 9 | Q.  Is it a set of exhibits? |
| 02:01PM | 10 | A.  Yes. |
| 02:01PM | 11 | MR. LYNCH:  Judge one second, Judge. |
| 02:01PM | 12 | BY MR. LYNCH: |
| 02:01PM | 13 | Q.  Chief Granville, the Bates numbering on Exhibit 10 down |
| 02:01PM | 14 | in the bottom right-hand corner? |
| 02:01PM | 15 | A.  I do. |
| 02:01PM | 16 | Q.  Okay.  And the first page of that exhibit is -- what |
| 02:02PM | 17 | number is that? |
| 02:02PM | 18 | A.  It's one. |
| 02:02PM | 19 | Q.  And then, if you can go -- turn to the last page of the |
| 02:02PM | 20 | exhibit, there's a two-sided -- what's the last page number? |
| 02:02PM | 21 | A.  One one two. |
| 02:02PM | 22 | Q.  So, is it fair to say that this is an exhibit that |
| 02:02PM | 23 | includes 112 photographs? |
| 02:02PM | 24 | A.  Yes. |
| 02:02PM | 25 | Q.  And what are they photographs of? |

| | | |
|---|---|---|
| 02:02PM | 1 | A.  Appears to be the property located at 56 Grimes. |
| 02:02PM | 2 | Q.  And is it the practice of the Erie County Sheriff's |
| 02:02PM | 3 | Department to take photographs of a search scene? |
| 02:03PM | 4 | A.  Yes. |
| 02:03PM | 5 | Q.  Does this appear to be the photographs of the search at |
| 02:03PM | 6 | 56 Grimes -- the search scene the 56 Grimes? |
| 02:03PM | 7 | A.  Yes. |
| 02:03PM | 8 | Q.  On February 19th, 2020? |
| 02:03PM | 9 | A.  Yes. |
| 02:03PM | 10 | Q.  Do those photographs fairly and accurately depict the way |
| 02:03PM | 11 | 56 Grimes looked on that day? |
| 02:03PM | 12 | A.  Yes. |
| 02:03PM | 13 | MR. LYNCH:  I'd ask that Government Exhibit 1 be |
| 02:03PM | 14 | moved into evidence. |
| 02:03PM | 15 | MR. HARRINGTON:  Judge, can I just have a minute with |
| 02:04PM | 16 | Mr. Lynch, please? |
| 02:04PM | 17 | THE COURT:  Any objection? |
| 02:04PM | 18 | MR. HARRINGTON:  Yes. |
| 02:04PM | 19 | MR. LYNCH:  I think he said any objection. |
| 02:04PM | 20 | MR. HARRINGTON:  No.  I'm sorry. |
| 02:04PM | 21 | THE COURT:  Oh.  So, defendant has no objection? |
| 02:04PM | 22 | MR. HARRINGTON:  No.  I'm sorry. |
| 02:04PM | 23 | THE COURT:  There being no objection, Government |
| 02:04PM | 24 | Exhibit 10 is received in evidence. |
| 02:04PM | 25 | (Government Exhibit 10 was received in evidence.) |

| | | |
|---|---|---|
| 02:04PM | 1 | BY MR. LYNCH: |
| 02:04PM | 2 | Q.  Do you recall testifying about the entry into the |
| 02:04PM | 3 | premises? |
| 02:04PM | 4 | A.  Yes. |
| 02:04PM | 5 | Q.  Okay.  Mr. Glaberson, can you pull up Exhibit Number 10, |
| 02:05PM | 6 | Bates number 11 -- 41, I'm sorry, 41. |
| 02:05PM | 7 | Now, do you see what's depicted on the screen in front of |
| 02:05PM | 8 | you, Chief Granville? |
| 02:05PM | 9 | A.  I do. |
| 02:05PM | 10 | Q.  And what's depicted on the screen? |
| 02:06PM | 11 | A.  It's the side view of 56 Grimes. |
| 02:06PM | 12 | Q.  And from what angle or what is the side street that this |
| 02:06PM | 13 | side of the building is on? |
| 02:06PM | 14 | A.  Milburn. |
| 02:06PM | 15 | Q.  And do you see the door that you entered to make entry |
| 02:06PM | 16 | into 56 Grimes the first time? |
| 02:06PM | 17 | A.  Yes. |
| 02:06PM | 18 | Q.  And where is that door located? |
| 02:06PM | 19 | A.  It's located on the left of the screen. |
| 02:06PM | 20 | Q.  Is it fair to say on the left of the screen there's an |
| 02:06PM | 21 | entryway on the far left with a -- looks like to be, like, a |
| 02:06PM | 22 | metal door, black? |
| 02:06PM | 23 | A.  Yeah.  It's a black gated door. |
| 02:06PM | 24 | Q.  Now, if you could go to Bates stamp page 44? |
| 02:07PM | 25 | Do you see what's depicted on the screen in front of you |

02:07PM  1  now?

02:07PM  2  A.  I do.

02:07PM  3  Q.  And what is this?

02:07PM  4  A.  This would -- the point of view is from -- in the

02:07PM  5  upstairs of 56 Grimes looking into the stairwell of the door

02:07PM  6  that we entered in.

02:07PM  7  Q.  Okay.  So, this is the top view of that same area,

02:07PM  8  correct?

02:07PM  9  A.  That's correct.

02:07PM  10  Q.  Now, is there a window in the stairwell?

02:07PM  11  A.  Yes, there is.

02:07PM  12  Q.  Okay.  And if we can go back to 41, is that window

02:07PM  13  depicted, those -- stairwell window depicted in this

02:07PM  14  photograph?

02:07PM  15  A.  Yes.

02:07PM  16  Q.  And can you point to its location on the photograph?  So,

02:07PM  17  to be clear, you've marked the -- if you're looking at the

02:08PM  18  second floor windows, it's the farthest window to the left

02:08PM  19  that's lighted?

02:08PM  20  A.  That's correct.

02:08PM  21  Q.  And was this stairwell lit when you made entry into the

02:08PM  22  premises?

02:08PM  23  A.  Yes.

02:08PM  24  Q.  Now, if we can go to slide 31 on Exhibit 1?  If you could

02:08PM  25  stop it right there.

02:08PM   1      Chief Granville, do you see what's depicted on the screen

02:08PM   2   in front of you?

02:08PM   3   A.  I do.

02:08PM   4   Q.  This is slide 31 of Exhibit 1.  Is there a date and a

02:09PM   5   timestamp on this surveillance video?

02:09PM   6   A.  Yeah.  It's February 19th, 2020.  And the timestamp is

02:09PM   7   8:40:23 p.m.

02:09PM   8   Q.  And prior to us stopping it, was there at least some

02:09PM   9   movement on the video?

02:09PM  10   A.  Yes.

02:09PM  11   Q.  One second.  And could you explain to the Court what that

02:09PM  12   movement was?

02:09PM  13   A.  This is showing us entering the side of 56 Grimes.

02:09PM  14   Q.  So, that doorway you just previously spoke about in

02:09PM  15   Exhibit 10, Bates stamp number 41?

02:09PM  16   A.  Yes.

02:09PM  17   Q.  And, again, the hallway is lit at the time you entered?

02:09PM  18   A.  That's correct.

02:09PM  19          MR. THOMPSON:  Sorry, Mr. Lynch, what is this

02:10PM  20   exhibit?

02:10PM  21          MR. LYNCH:  This is Exhibit 1, slide 31.

02:10PM  22          MR. THOMPSON:  Thirty-one.  Thank you.

02:10PM  23   BY MR. LYNCH:

02:10PM  24   Q.  Okay.  I'm going to have Mr. Glaberson play this.  We're

02:10PM  25   going to stop it at times.  If you could identify the members

02:10PM   1   of the entry team as we stop the video, I'd appreciate it,

02:10PM   2   okay?

02:10PM   3   A.  Yes.

02:10PM   4   Q.  Stop it right there.

02:10PM   5       Now, several people have walked up the stairs, correct?

02:10PM   6   A.  That's correct.

02:10PM   7   Q.  Who is first in line?

02:10PM   8   A.  Myself.

02:10PM   9   Q.  Okay.  Continue to play it.  Stop it.

02:10PM  10       Do you see the second person now behind you?

02:10PM  11   A.  Yes.

02:10PM  12   Q.  And do you recognize that individual?

02:10PM  13   A.  Yes.  It's Detective Adam Imiolo.

02:11PM  14   Q.  And that's I-M-I-O-L-O?

02:11PM  15   A.  Yes.

02:11PM  16   Q.  And then, do you see the third individual in the line?

02:11PM  17   A.  I do.

02:11PM  18   Q.  And who is that?

02:11PM  19   A.  Detective Dan Milbrandt.

02:11PM  20   Q.  All right, Mr. Glaberson.  Can you play a little bit

02:11PM  21   longer?  Now, stop right there.

02:11PM  22       Do you see the individual behind Dan Milbrandt?

02:11PM  23   A.  I did.  It's Deputy Jim DeLacy.

02:11PM  24   Q.  Is he also with the sheriff's department?

02:11PM  25   A.  Yes.

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

02:11PM 1   Q.  Okay.  If you can continue -- we've stopped it just at

02:12PM 2   8:40:36.  If you can continue it from here?

02:12PM 3       Do you see -- I'm going to stop it right there,

02:12PM 4   approximately 8:40:40.  What's just occurred on the video?

02:12PM 5   A.  A pry bar was handed off.

02:12PM 6   Q.  And do you -- did you see the individual that handed off

02:12PM 7   the pry bar?

02:12PM 8   A.  I did.

02:12PM 9   Q.  Who was that?

02:12PM 10  A.  It was Detective Sergeant Mike Maiola.  He's with the

02:12PM 11  Buffalo Police Department.

02:12PM 12  Q.  And that's Maiola, M-A-I-O-L-A?

02:12PM 13  A.  I think so.

02:12PM 14  Q.  Okay.  And what's the purpose of a pry bar?

02:12PM 15  A.  Oftentimes, entry doors open out, and you need to utilize

02:12PM 16  a pry bar in order to open that door.

02:12PM 17  Q.  Is that what you needed to do here?

02:12PM 18  A.  Yes.

02:13PM 19  Q.  If we can continue it, Mr. Glaberson?  You can stop it

02:13PM 20  right there.

02:13PM 21      Now, there's a person who is just off to the right of the

02:13PM 22  screen, correct?

02:13PM 23  A.  Yes.

02:13PM 24  Q.  Who is that individual?

02:13PM 25  A.  That was detective Tony Fanara.

02:14PM    1    Q.  Is he with Buffalo Police?

02:14PM    2    A.  Yes.

02:14PM    3    Q.  And then, there's now -- right behind him, there's an

02:14PM    4    individual with what appears to be the hoodie on?

02:14PM    5    A.  Yes.  That's Deputy Adam Day.

02:14PM    6    Q.  And he's with the sheriff's department?

02:14PM    7    A.  Yes.

02:14PM    8    Q.  Okay.  You can continue it, Mr. Glaberson.

02:14PM    9        And then, the last two individuals, do you see them?

02:14PM   10        Stop it.

02:14PM   11    A.  Yes.

02:14PM   12    Q.  Who are those individuals?

02:14PM   13    A.  Senior Detective Tim Carney and Deputy Joel Arney

02:14PM   14    (phonetic).

02:14PM   15    Q.  So, you and those eight other individuals then made entry

02:14PM   16    into the second floor area, correct?

02:14PM   17    A.  That's correct.

02:14PM   18    Q.  Now, I just want to -- we may have touched on it last

02:14PM   19    time, but it was several months ago.  Why did you go up the

02:14PM   20    second -- these stairs at this time, even though you had the

02:14PM   21    search warrant for the lower front, I guess?

02:14PM   22    A.  So, once we made entry into the side entrance and

02:15PM   23    realized we were in a stairwell, and we noticed that the side

02:15PM   24    door as well, I noted the side door as well, I had committed

02:15PM   25    to that stairwell, and we were going up into an area.

02:15PM  1    Q.  Now, when you got up to the second floor though, the door

02:15PM  2    was closed, correct?

02:15PM  3    A.  That's correct.

02:15PM  4    Q.  And why did you enter?  Why did you breach that door?

02:15PM  5    Did it provide you some protection?

02:15PM  6    A.  The door?

02:15PM  7    Q.  Yeah.

02:15PM  8    A.  No.

02:15PM  9    Q.  Why not?

02:15PM  10   A.  It was just a normal framed door.  Those don't provide

02:15PM  11   any protection other than of view sight.

02:15PM  12   Q.  What could have harmed you through the door?

02:15PM  13   A.  Somebody could have shot through the door.

02:16PM  14   Q.  Did you have any concerns about your safety at the time

02:16PM  15   you executed the warrant?

02:16PM  16   A.  Yes.

02:16PM  17   Q.  And why is that?

02:16PM  18   A.  It's always safety -- officer safety issues when

02:16PM  19   executing any type of search warrant; specifically on a

02:16PM  20   residence that you don't have any knowledge of the interior

02:16PM  21   of.

02:16PM  22   Q.  And was there any concern particular to this case?

02:16PM  23   A.  Yes.

02:16PM  24   Q.  And what was that?

02:16PM  25   A.  The group that we were dealing with, specifically an

02:16PM   1   associate of Mr. Burgin, David Washington.

02:16PM   2   Q.  And what was your concern about Mr. Washington?

02:16PM   3   A.  Very dangerous and violent individual.

02:16PM   4   Q.  And had you learned that through your investigation?

02:16PM   5   A.  Yes.

02:16PM   6   Q.  What kind of violence was associated with Mr. Washington?

02:17PM   7   A.  Homicides and assaults.

02:17PM   8   Q.  So, you approximately made entry into the second floor

02:17PM   9   area around 8:40:21; is that fair to say?

02:17PM  10   A.  That's correct.

02:17PM  11   Q.  What happened when you made entry into the second floor?

02:17PM  12   A.  We cleared the second floor for -- we did a security

02:17PM  13   sweep of the second floor for bodies.

02:17PM  14   Q.  And so, what -- explain to the Court what a security

02:17PM  15   sweep is.

02:17PM  16   A.  It's just an officer safety sweep for -- in an attempt to

02:17PM  17   locate any individuals that might be up in that residence or

02:17PM  18   hiding.

02:17PM  19   Q.  Did you locate anyone in that foyer area?

02:57PM  20   A.  No.

02:57PM  21   Q.  While you were up there, did you make any observations?

02:57PM  22   A.  Yes.

02:57PM  23   Q.  What observations did you make?

02:57PM  24   A.  I observed a piece of mail in the garbage that beared

02:57PM  25   [sic]  Mr. Burgin's name.

02:57PM 1   Q.  And where was this garbage located?

02:57PM 2   A.  In the kitchen area.

02:57PM 3   Q.  And can you describe what you saw as you saw this garbage

02:57PM 4   area?

02:57PM 5   A.  It was a bill.

02:57PM 6   Q.  And where was it located in the garbage?

02:57PM 7   A.  On the top of the garbage.

02:57PM 8   Q.  Did you have to move anything to see this piece of mail?

02:57PM 9   A.  No.

02:57PM 10  Q.  If you can pull up Exhibit 11?

02:58PM 11      Do you see Exhibit 11 in front of you?

02:58PM 12  A.  I do.

02:58PM 13  Q.  Do you recognize what's depicted in that photograph?

02:58PM 14  A.  I do.

02:58PM 15  Q.  What is it?

02:58PM 16  A.  It's a bill bearing Mr. Burgin's name with the address of

02:58PM 17  79 Brunswick.  It's a National Fuel bill.

02:58PM 18  Q.  Is this the bill you saw during your protective sweep of

02:58PM 19  the second floor area?

02:58PM 20  A.  Yes.

02:58PM 21  Q.  And, again, did you have to manipulate this garbage can

02:58PM 22  in any way to see this?

02:58PM 23  A.  No.

02:58PM 24  Q.  Does this fairly and accurately depict the way the

02:59PM 25  garbage can and bill looked on February 19th, 2020 when you

| 02:59PM | 1 | conducted your protective sweep around 8:40 p.m.? |
| 02:59PM | 2 | A.  Yes. |
| 02:59PM | 3 | MR. LYNCH:  I'd ask that Government Exhibit Number 11 |
| 02:59PM | 4 | be admitted. |
| 02:59PM | 5 | THE COURT:  Mr. Harrington? |
| 02:59PM | 6 | MR. HARRINGTON:  Judge, I'm going to cross-examine |
| 02:59PM | 7 | him on it anyway.  I don't have an objection. |
| 02:59PM | 8 | THE COURT:  All right.  There being no objection, |
| 02:59PM | 9 | Government Exhibit 11 received in evidence. |
| 02:59PM | 10 | (Government Exhibit 11 received in evidence.) |
| 02:59PM | 11 | |
| 02:59PM | 12 | BY MR. LYNCH: |
| 02:59PM | 13 | Q.  Now, how many floors are located at 56 Grimes? |
| 02:59PM | 14 | A.  Three floors. |
| 02:59PM | 15 | Q.  Okay.  So, can you describe the three floors, I guess? |
| 02:59PM | 16 | A.  There's a first floor that contained a bar area, a second |
| 02:59PM | 17 | floor apartment area, and then, there was a third floor |
| 03:00PM | 18 | attic. |
| 03:00PM | 19 | Q.  There was a basement, too, I'd assume, right? |
| 03:00PM | 20 | A.  I don't recall. |
| 03:00PM | 21 | Q.  Okay.  But you know that there was a first floor, second |
| 03:00PM | 22 | floor, and attic? |
| 03:00PM | 23 | A.  Yes. |
| 03:00PM | 24 | Q.  During your protective sweep of the second floor, did you |
| 03:00PM | 25 | go into the attic? |

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

21

| | | |
|---|---|---|
| 03:00PM | 1 | A.  I did not. |
| 03:00PM | 2 | Q.  Do you know if any member of your team did? |
| 03:00PM | 3 | A.  Yes. |
| 03:00PM | 4 | Q.  Now, once you got to the second floor, did you determine |
| 03:00PM | 5 | how many points of entry there were to the second floor area? |
| 03:00PM | 6 | A.  At some point, we did determine that through -- there |
| 03:00PM | 7 | were a couple points of entry. |
| 03:01PM | 8 | Q.  And where were they? |
| 03:01PM | 9 | A.  There was the side door in which we first entered.  There |
| 03:01PM | 10 | was also a rear entrance. |
| 03:01PM | 11 | Q.  And did you learn where that rear entrance, I guess, |
| 03:01PM | 12 | where it comes from? |
| 03:01PM | 13 | A.  Yes. |
| 03:01PM | 14 | Q.  Where did it come from? |
| 03:01PM | 15 | A.  From the back of the building. |
| 03:01PM | 16 | Q.  And did it come from the outside or from the inside? |
| 03:01PM | 17 | A.  From the outside. |
| 03:01PM | 18 | Q.  I'm going to show you what's been marked Exhibit Number |
| 03:01PM | 19 | 1, slide (inaudible).  Do you see what's depicted on the |
| 03:01PM | 20 | screen in front of you? |
| 03:01PM | 21 | A.  I do. |
| 03:01PM | 22 | Q.  Okay.  Can you stop it, Mr. Glaberson? |
| 03:01PM | 23 | What's depicted on the screen in front of you? |
| 03:01PM | 24 | A.  It's the rear entrance of 56 Grimes. |
| 03:01PM | 25 | Q.  Okay.  And the time on this is, again, February 19th, |

03:02PM 1   2020, time 8:42:25; is that right?

03:02PM 2   A.  That's correct.

03:02PM 3   Q.  Okay.  And what -- I guess, what angle is this

03:02PM 4   surveillance video from?

03:02PM 5   A.  This is shooting down the stairwell to the rear of 56

03:02PM 6   Grimes.

03:02PM 7   Q.  Okay.  So, this is from the second floor down to the --

03:02PM 8   shoots down to the first floor?

03:02PM 9   A.  That's correct.

03:02PM 10  Q.  And this is a rear staircase?

03:02PM 11  A.  That's correct.

03:02PM 12  Q.  And is there an entry point door at the bottom of this

03:02PM 13  stair?

03:02PM 14  A.  Yes.

03:02PM 15  Q.  And where does that entry point come from?

03:02PM 16  A.  From the outside of 56 Grimes.

03:02PM 17  Q.  Okay.  Are you sure it doesn't come from the inside from

03:02PM 18  the back?

03:02PM 19          MR. HARRINGTON:  Objection, Judge.

03:02PM 20          THE COURT:  I'm sorry?

03:02PM 21          MR. HARRINGTON:  I object.  Mr. Lynch is trying to

03:02PM 22  correct his witness because he's in error in his testimony

03:02PM 23  like he did last time.  I object to it.

03:03PM 24          MR. LYNCH:  Okay.  We'll clarify it.  It's fine,

03:03PM 25  Judge.  We'll get to it.

03:03PM    1              THE COURT:  All right.

03:03PM    2    BY MR. LYNCH:

03:03PM    3    Q.  Do you see -- so this is shooting down a stairwell?

03:03PM    4    A.  That's correct.

03:03PM    5    Q.  Okay.  You can continue to play it.

03:03PM    6        Do you see the individual depicted in the video?

03:03PM    7    A.  I do.

03:03PM    8    Q.  Who is that?

03:03PM    9    A.  I believe that's Detective Mike Maiola.

03:03PM   10    Q.  And is there another individual now?

03:03PM   11    A.  Detective Dan Milbrandt.

03:03PM   12    Q.  And you said this is of the back stairwell?

03:03PM   13    A.  That's correct.

03:03PM   14    Q.  Stop it, Mr. Glaberson.

03:04PM   15        So, this is -- and the time now they both walked away from

03:04PM   16    the, I guess, the video coverage?

03:04PM   17    A.  That's correct.

03:04PM   18    Q.  And what time is it now?

03:04PM   19    A.  Eight forty-two fifty-six p.m.

03:04PM   20    Q.  Okay.  If we can go to slide 35?

03:04PM   21        Slide 35, do you see what's depicted in front of you?

03:04PM   22    A.  I do.

03:04PM   23    Q.  Is this a still footage -- still image of the video

03:04PM   24    surveillance?

03:04PM   25    A.  It is.

03:04PM    1    Q.  And, again, who is the individual depicted on slide 35?

03:04PM    2    A.  I believe that's Detective Sergeant Mike Maiola.

03:04PM    3    Q.  And then slide 36?

03:05PM    4        And, again, do you see what's-- the image depicted in

03:05PM    5    front of you?  Do you see it?

03:05PM    6    A.  I do.

03:05PM    7    Q.  Okay.  And what is it?

03:05PM    8    A.  It's the rear stairwell at 56 Grimes.

03:05PM    9    Q.  Now, after you did a protective sweep of the second

03:05PM   10    floor, what happened next?

03:05PM   11    A.  We proceeded down to the first floor of the residence or

03:05PM   12    the property.

03:05PM   13    Q.  Mr. Glaberson, can you pull up slide 38?  Actually, can

03:06PM   14    you go to slide 37?  Okay.

03:06PM   15        Do you see what's depicted on the screen in front of you?

03:06PM   16    A.  I do.

03:06PM   17    Q.  And what is this?

03:06PM   18    A.  That's me in the corner there and that's the stairwell to

03:06PM   19    the -- which we had come in first.

03:06PM   20    Q.  And what's the time depicted on the surveillance video?

03:06PM   21    A.  Eight forty-three seventeen p.m.

03:06PM   22    Q.  If you could it play it?

03:06PM   23        Now, what does this clip depict?

03:06PM   24    A.  It shows us exiting the second floor of 56 Grimes and

03:06PM   25    traveling to the outside of it, and we ultimately entered the

03:07PM  1   front door.

03:07PM  2   Q.  So, the entry team now approximately 8:43:30 exits the

03:07PM  3   second floor?

03:07PM  4   A.  That's correct.

03:07PM  5   Q.  Now, if we can go to slide 38?

03:07PM  6       Do you see the image that's depicted on slide 38?

03:07PM  7   A.  Yes.

03:07PM  8   Q.  And what does this image depict?

03:07PM  9   A.  We're at the front of 56 Grimes.

03:07PM  10  Q.  And this is a still shot from the surveillance video?

03:07PM  11  A.  That's correct.

03:07PM  12  Q.  And this is -- and which direction is this video footage

03:07PM  13  shooting?

03:07PM  14  A.  Shooting eastbound on Grimes.

03:07PM  15  Q.  We can go to slide 39.

03:08PM  16      And do you see the image on the screen in front of you?

03:08PM  17  A.  Yes.

03:08PM  18  Q.  And what's depicted?

03:08PM  19  A.  Showing us making entry into 56 Grimes.

03:08PM  20  Q.  And what's the timestamp on this image?

03:08PM  21  A.  Eight forty-four thirty-five p.m.

03:08PM  22  Q.  So, approximately, a minute after you left the second

03:08PM  23  floor?

03:08PM  24  A.  Approximately, yes.

03:08PM  25  Q.  If we can go to slide 40?

03:08PM   1       And, again, is this -- what's depicted on this slide?

03:08PM   2   A.  It shows us making entry into 56 Grimes in the lower.

03:08PM   3   Q.  And then slide 41?

03:09PM   4           MR. THOMPSON:  What was the slide number?

03:09PM   5           MR. LYNCH:  Slide 41.

03:09PM   6           MR. THOMPSON:  Thank you.

03:09PM   7   BY MR. LYNCH:

03:09PM   8   Q.  And, again, what's depicted on this screen?

03:09PM   9   A.  Shows us making entry into 56 Grimes in the lower half of

03:09PM  10   the property.

03:09PM  11   Q.  Now, if we can go to slide 42?  I'm going to have you

03:09PM  12   stop it for a second.

03:09PM  13       Is slide 42 a surveillance clip?

03:09PM  14   A.  Yes.

03:09PM  15   Q.  And although it's dark here, can you tell what part of 56

03:09PM  16   Grimes this depicts?

03:09PM  17   A.  Having previously viewed it, I could.

03:09PM  18   Q.  Yes.

03:09PM  19   A.  It's the lower, the bar area, of 56 Grimes.

03:10PM  20   Q.  And in which direction is it shooting?

03:10PM  21   A.  I don't recall.

03:10PM  22   Q.  We'll play it a little bit.  Have you stop it right

03:10PM  23   there.

03:10PM  24       Do you see the time depicted on the screen?

03:10PM  25   A.  I do.

03:10PM    1    Q.  And what time is it?

03:10PM    2    A.  It's 8:44:38 p.m.

03:10PM    3    Q.  And what was just shown on the video clip?

03:11PM    4    A.  It shows the -- us making entry into the lower of 56

03:11PM    5    Grimes and the point of view is right at the front door of 56

03:11PM    6    Grimes.

03:11PM    7    Q.  Can you continue, Mr. Glaberson?  Have you stop it right

03:12PM    8    there.

03:12PM    9         Now, have the lights been turned on now inside the

03:12PM   10    premises?

03:12PM   11    A.  Yes.

03:12PM   12    Q.  Can you just describe for the Court what's depicted --

03:12PM   13    well, what time is depicted on the video surveillance and

03:12PM   14    then what's depicted?

03:12PM   15    A.  It's 8:45:44 p.m., and it shows us, after having turned

03:12PM   16    the light on in the lower, just clearing the lower for us,

03:12PM   17    for safety issues.

03:12PM   18    Q.  Now, your search warrant was for the lower front,

03:12PM   19    correct?

03:12PM   20    A.  That's correct.

03:12PM   21    Q.  When you made entry into the lower area, did you

03:12PM   22    determine -- make any determinations about the accuracy of

03:12PM   23    that request or that description?

03:12PM   24    A.  Yes.

03:12PM   25    Q.  What did you determine?

03:13PM  1   A.  We determined that the entire property was connected in

03:13PM  2   some way and that, obviously, listing the 56 Grimes lower was

03:13PM  3   a mistake.  We should have listed the whole property.

03:13PM  4   Q.  Okay.  Was there even a lower front and a lower rear?

03:13PM  5   A.  No.

03:13PM  6   Q.  Okay.  So, there was just a lower?

03:13PM  7   A.  That's correct.

03:13PM  8   Q.  Okay.  And then, did you make a determination about, I

03:13PM  9   guess, the entire premises as it relates to just the lower

03:13PM  10  and the upper?

03:13PM  11  A.  Yes.

03:13PM  12  Q.  And what did you determine?

03:13PM  13  A.  That they were connected; having a side entrance and a

03:13PM  14  rear entrance.

03:13PM  15  Q.  Now, if we can go to slide 43?  We can go to slide 45.

03:14PM  16  Stop it right there.

03:14PM  17      What's depicted on the screen in front of you?

03:14PM  18  A.  Shows us clearing the lower of 56 Grimes.

03:14PM  19  Q.  And it's just from a different vantage point?

03:14PM  20  A.  It is.

03:14PM  21  Q.  What vantage point is this?

03:14PM  22  A.  It's a side view.

03:14PM  23  Q.  Of the front bar area?

03:14PM  24  A.  Yes.

03:14PM  25  Q.  And then, if we can go to slide 47?  Do you see what's

03:14PM    1   depicted on the screen in front of you?

03:14PM    2   A.  I do.

03:14PM    3   Q.  Can you explain what time is indicated on this

03:14PM    4   surveillance clip?

03:14PM    5   A.  It's 8:44:59 p.m.

03:15PM    6   Q.  And what's depicted on the screen in front of you?

03:15PM    7   A.  It shows officers heading to the rear of the lower of 56

03:15PM    8   Grimes towards that door.

03:15PM    9   Q.  Now, what -- can you describe to the Court what this area

03:15PM   10   is inside of 56 Grimes?

03:15PM   11   A.  This is the lower bar area.

03:15PM   12   Q.  So, one -- is it one continuous area?

03:15PM   13   A.  Yes.

03:15PM   14   Q.  And when you said that they're heading back toward the

03:15PM   15   back of the lower area, what is back in that area?

03:15PM   16   A.  There's an entry door.

03:15PM   17   Q.  And where does that entry door go to?

03:15PM   18   A.  It leads up to the second floor of 56 Grimes.

03:15PM   19   Q.  If we can continue to play it, Mr. Glaberson?  I'm going

03:16PM   20   to stop it right there.

03:16PM   21       Within that red box, what is located or what is depicted

03:16PM   22   inside that red box?

03:16PM   23   A.  It shows a couple officers that just made entry into a

03:16PM   24   rear door.

03:16PM   25   Q.  And where does that rear door take you to?

| | | |
|---|---|---|
| 03:16PM | 1 | A.  The second floor of 56 Grimes. |
| 03:16PM | 2 | Q.  Is that a stairwell here? |
| 03:16PM | 3 | A.  Yes. |
| 03:16PM | 4 | Q.  You previously testified that the stairwell to the second |
| 03:16PM | 5 | floor where Mike Maiola and Milbrandt were, you said that |
| 03:16PM | 6 | that entry door was from the outside.  Was that correct? |
| 03:16PM | 7 | A.  It was not. |
| 03:16PM | 8 | Q.  Okay.  Where was that entry?  That back stairwell, where |
| 03:17PM | 9 | did it come from? |
| 03:17PM | 10 | A.  From the interior of the lower 56 Grimes. |
| 03:17PM | 11 | Q.  If you can continue to play it, Mr. Glaberson?  Now, if |
| 03:24PM | 12 | we can go to slide 48? |
| 03:24PM | 13 | Do you see what's depicted in slide 48? |
| 03:24PM | 14 | A.  I do. |
| 03:24PM | 15 | Q.  Do you recognize what's depicted here? |
| 03:24PM | 16 | A.  Yes.  It shows officers in the lower of 56 Grimes. |
| 03:24PM | 17 | Q.  And do you see to -- the area to the right of that red |
| 03:24PM | 18 | box? |
| 03:24PM | 19 | A.  I do. |
| 03:24PM | 20 | Q.  What is depicted to the right of that red box? |
| 03:24PM | 21 | A.  That's the entry door into the second floor of 56 Grimes, |
| 03:24PM | 22 | the stairwell. |
| 03:24PM | 23 | Q.  Hold on.  So, to the right of the -- so, what's depicted |
| 03:25PM | 24 | in the red box? |
| 03:25PM | 25 | A.  The door I just described entering the second floor of 56 |

| | | |
|---|---|---|
| 03:25PM | 1 | Grimes. |
| 03:25PM | 2 | Q.  Okay.  How about to the right of that box? |
| 03:25PM | 3 | A.  That's another door. |
| 03:25PM | 4 | Q.  And where does that door go to? |
| 03:25PM | 5 | A.  To the outside of 56 Grimes. |
| 03:25PM | 6 | THE COURT:  Is that the first or second outside door |
| 03:25PM | 7 | on the side of the building that's depicted in the exhibit? |
| 03:25PM | 8 | MR. LYNCH:  I was just about to get to that, Judge, |
| 03:25PM | 9 | if -- I think I can clarify.  I can answer your question.  If |
| 03:25PM | 10 | we can go to slide number 3? |
| 03:26PM | 11 | BY MR. LYNCH: |
| 03:26PM | 12 | Q.  Do you see what's depicted in slide number 3? |
| 03:26PM | 13 | A.  I do. |
| 03:26PM | 14 | Q.  From this vantage point, can you tell us -- can you see |
| 03:26PM | 15 | that entry door that you were just speaking about? |
| 03:26PM | 16 | A.  I can. |
| 03:26PM | 17 | Q.  Okay.  Where is it depicted in this photograph? |
| 03:26PM | 18 | A.  It's right at the rear of 56 Grimes. |
| 03:26PM | 19 | Q.  Okay.  So, you have marked an area.  It's a second entry |
| 03:26PM | 20 | point on -- at 56 Grimes? |
| 03:26PM | 21 | A.  Yes. |
| 03:26PM | 22 | Q.  Toward the back end of the building? |
| 03:26PM | 23 | A.  Yes. |
| 03:26PM | 24 | MR. LYNCH:  Judge, does that clarify it?  I mean, is |
| 03:26PM | 25 | that the question that you wanted to ask? |

03:26PM   1          THE COURT:  That's one of them.  If you go in the

03:27PM   2   side door on Milburn, in the front of the building, that gave

03:27PM   3   you entry into a stairway that we've seen video on, correct?

03:27PM   4          THE WITNESS:  That's correct.

03:27PM   5          THE COURT:  But you could not get into the first

03:27PM   6   floor bar area through that door?

03:27PM   7          THE WITNESS:  You could.

03:27PM   8          THE COURT:  You could?

03:27PM   9          THE WITNESS:  Yes.

03:27PM  10          THE COURT:  So, is there a door depicted in the bar

03:27PM  11   area showing that door?

03:27PM  12          MR. LYNCH:  We're going to get to that one too.

03:27PM  13          THE COURT:  All right.

03:27PM  14   BY MR. LYNCH:

03:27PM  15   Q.  If we -- why don't we go back to -- I'm going to have

03:28PM  16   pulled up Exhibit 1, slide 31.  Okay.  Stop it right there.

03:28PM  17      DO you see the -- this is a video you previously spoke

03:28PM  18   about, correct?

03:28PM  19   A.  Correct.

03:28PM  20   Q.  Your entry?

03:28PM  21   A.  Yes.

03:28PM  22   Q.  Right before you opened that door --

03:28PM  23      Can you go back right to the beginning, Mr. Glaberson and

03:28PM  24   hit pause?  Right pause right there.

03:28PM  25      -- do you see what's depicted in the screen in front of

| 03:28PM | 1 | you? |
| 03:28PM | 2 | A.   I do. |
| 03:28PM | 3 | Q.   And what's depicted? |
| 03:28PM | 4 | A.   That is a door that -- |
| 03:28PM | 5 | Q.   Well, strike that.  Is this a stairwell that you made |
| 03:29PM | 6 | entry into? |
| 03:29PM | 7 | A.   Yes. |
| 03:29PM | 8 | Q.   And the -- which door did you make entry into the |
| 03:29PM | 9 | stairwell from? |
| 03:29PM | 10 | A.   The side door of 56 Grimes. |
| 03:29PM | 11 | Q.   Is it to the left of the stairwell? |
| 03:29PM | 12 | A.   Yes. |
| 03:29PM | 13 | Q.   Looking down?  Okay.  There's another door depicted at |
| 03:29PM | 14 | the bottom of the stairwell, correct? |
| 03:29PM | 15 | A.   Correct. |
| 03:29PM | 16 | Q.   Do you know where that doorway goes to? |
| 03:29PM | 17 | A.   Into the bar area. |
| 03:29PM | 18 | Q.   Now, if we can go to slide 49?  Do you see what's |
| 03:30PM | 19 | depicted on the screen in front of you? |
| 03:30PM | 20 | A.   I do. |
| 03:30PM | 21 | Q.   Is this a video clip? |
| 03:30PM | 22 | A.   It is. |
| 03:30PM | 23 | Q.   And what's the time on this video clip? |
| 03:30PM | 24 | A.   Eight forty-five oh eight p.m. |
| 03:30PM | 25 | Q.   And what's depicted in this clip? |

03:30PM   1   A.  Showing officers entering the rear door from the lower

03:30PM   2   half of 56 Grimes.  That's the stairwell that leads to the

03:30PM   3   upper.

03:31PM   4   Q.  So, when we looked at that area within that red box on

03:31PM   5   the previous slide?

03:31PM   6   A.  Yes.

03:31PM   7   Q.  That's the entry point from a different vantage point?

03:31PM   8   A.  That's correct.

03:31PM   9   Q.  Now, if we can go to slide -- so, this is approximately

03:31PM  10   8:45:08, correct?

03:31PM  11   A.  That's correct.

03:31PM  12   Q.  Now, what observations did you make of the lower part of

03:31PM  13   56 Grimes, I guess, the first floor?

03:31PM  14   A.  First floor was a bar, like an entertaining area as it

03:31PM  15   appeared to me, and there was also multiple entry points into

03:32PM  16   the second half of or the upper half of 56 Grimes.

03:32PM  17   Q.  What happened after you had conducted your search of the

03:32PM  18   first floor?  What did you do next?

03:32PM  19   A.  I then traveled back up into the second floor.

03:32PM  20   Q.  If we can show slide 53 first?  Now, do you see what's

03:32PM  21   depicted on the screen in front of you?

03:32PM  22   A.  I do.

03:32PM  23   Q.  What's depicted?

03:32PM  24   A.  It's us in the lower of 56 Grimes.  Specifically, in the

03:33PM  25   circle, that's me on the phone.

| | | |
|---|---|---|
| 03:33PM | 1 | Q.  And what's the time on this image? |
| 03:33PM | 2 | A.  Eight forty-six thirty-five p.m. |
| 03:33PM | 3 | Q.  And this is while you're still conducting the search of |
| 03:33PM | 4 | the lower? |
| 03:33PM | 5 | A.  That's correct. |
| 03:33PM | 6 | Q.  Do you recall who you called that time? |
| 03:33PM | 7 | A.  I don't. |
| 03:33PM | 8 | Q.  Do you see this is slide number 564?  It shows records. |
| 03:33PM | 9 | This from Exhibit 14, which is already in evidence.  Do you |
| 03:33PM | 10 | see what's depicted on the screen in front of you? |
| 03:34PM | 11 | A.  I do. |
| 03:34PM | 12 | Q.  And is this -- do you recognize these records? |
| 03:34PM | 13 | A.  I do. |
| 03:34PM | 14 | Q.  And what do you recognize them to be? |
| 03:34PM | 15 | A.  Those are my phone records. |
| 03:34PM | 16 | Q.  And you previously testified -- is the -- did you |
| 03:34PM | 17 | determine that there was a time difference of an hour between |
| 03:34PM | 18 | your records and the actual eastern time? |
| 03:34PM | 19 | A.  Yes. |
| 03:34PM | 20 | Q.  And off by one hour? |
| 03:34PM | 21 | A.  That's correct. |
| 03:34PM | 22 | Q.  Okay.  So, if depicted in this zoomed-out box was a call |
| 03:34PM | 23 | at 7:46, that was actually 8:46? |
| 03:34PM | 24 | A.  That's correct. |
| 03:34PM | 25 | Q.  And at 8:46, who did you call? |

03:34PM      1    A.  Lieutenant Doug Kopp with the Buffalo Police Department.

03:34PM      2    Q.  Do you recall why you called Doug Kopp at 8:46?

03:34PM      3    A.  I don't.

03:34PM      4    Q.  What was -- was Doug Kopp working with you that day?

03:35PM      5    A.  He was.

03:35PM      6    Q.  And what was he doing, as far as you know?

03:35PM      7    A.  At that time, I believe he was back in the downtown area

03:35PM      8    of Buffalo.

03:35PM      9    Q.  Was he part of your investigation team that day?

03:35PM     10    A.  He was.

03:35PM     11    Q.  And you don't recall what his role was that day?

03:35PM     12    A.  No.  He supervised a group of narcotics guys from Buffalo

03:35PM     13    Police Department.

03:35PM     14    Q.  Okay.  Now, the next phone call you made was 8:54,

03:35PM     15    correct?

03:35PM     16    A.  That's correct.

03:35PM     17    Q.  And who did you call?  The last four digits of that are

03:35PM     18    3977.

03:35PM     19    A.  That's Pat McMahon.

03:35PM     20    Q.  Do you recall why you called Pat McMahon?

03:36PM     21    A.  I don't.

03:36PM     22    Q.  And then you called at 8 -- approximately 9 o'clock?

03:36PM     23    A.  Yes.  I called Pat again.

03:36PM     24    Q.  Do you recall why you called Pat at that point?

03:36PM     25    A.  I don't.

03:36PM    1    Q.  Now, what was Pat doing that day?

03:36PM    2    A.  He was drafting search warrants.

03:36PM    3    Q.  And what do you mean drafting search warrants?

03:36PM    4    A.  He was in charge of typing search warrants and --

03:37PM    5    Q.  What time did you obtain the -- how many search warrants

03:37PM    6    did you obtain this day?

03:37PM    7    A.  Several.

03:37PM    8    Q.  Okay.  In the evening hours, how many did you obtain?

03:37PM    9    A.  In the evening hours, at least two.

03:37PM   10    Q.  Do you know what time the first one was?

03:37PM   11    A.  I don't.

03:37PM   12    Q.  Okay.  Showing you what's been marked as Government

03:37PM   13    Exhibit Number 8, do you recognize what Government Exhibit

03:37PM   14    Number 8 is?

03:37PM   15    A.  I do.

03:38PM   16    Q.  What is it?

03:38PM   17    A.  It's a search warrant application for 56 Grimes in the

03:38PM   18    lower front.

03:38PM   19    Q.  And is that a fair and accurate record of the search

03:38PM   20    warrant?

03:38PM   21          THE COURT:  It's already in evidence.

03:38PM   22          MR. LYNCH:  It's already in evidence.  I was just

03:38PM   23    looking for my exhibit list, Judge.  Thank you.

03:38PM   24    BY MR. LYNCH:

03:38PM   25    Q.  So, what time was this search warrant signed?

03:38PM   1   A.  Signed at 8:32 p.m.

03:38PM   2   Q.  Now I'm going to show you Government Exhibit 9 and ask

03:38PM   3   you (inaudible)?

03:38PM   4   A.  This is a search warrant for 56 Grimes, the upper rear,

03:38PM   5   attic, and garage.

03:38PM   6   Q.  And what time was this warrant signed?

03:39PM   7   A.  At 9:48 p.m.

03:39PM   8   Q.  Could your conversation with Pat McMahon have related to

03:39PM   9   that warrant?

03:39PM  10   A.  Yes.

03:39PM  11   Q.  And why would you have had to call Pat McMahon to discuss

03:39PM  12   those warrants -- the second warrant?

03:39PM  13   A.  To give him specific details about what was occurring at

03:39PM  14   56 Grimes, the layout, et cetera.

03:39PM  15   Q.  Because -- was Pat McMahon ever at the scene of 56 Grimes

03:39PM  16   that day?

03:39PM  17   A.  No.

03:39PM  18   Q.  So, any information Detective McMahon would have put in a

03:40PM  19   warrant would have come from somebody else?

03:40PM  20   A.  That's correct.

03:40PM  21   Q.  Now, did you see on the screen in front of you the call

03:40PM  22   at 9:11?  It says 8:11, but at 9:11 p.m., to last four digits

03:40PM  23   are 4308?

03:40PM  24   A.  Yes.

03:40PM  25   Q.  And who was that?

03:40PM   1   A.   That was an evidence tech, Lee Richard, with the

03:40PM   2   sheriff's office.

03:40PM   3   Q.   And what was your purpose for calling Lee Richard?

03:40PM   4   A.   More than likely to come and document the scene or take

03:40PM   5   evidence.

03:40PM   6   Q.   And then, another phone call at 9:16 p.m. to 7192?

03:41PM   7   A.   Yes.

03:41PM   8   Q.   And whose phone is that?

03:41PM   9   A.   That was Deputy Paul McMahon.

03:41PM   10   Q.   And was Paul McMahon working that day?

03:41PM   11   A.   He was.

03:41PM   12   Q.   And what was he doing?

03:41PM   13   A.   He was with Pat McMahon.

03:41PM   14   Q.   So, he was working on the warrants?

03:41PM   15   A.   That's correct.

03:41PM   16   Q.   And then you had an incoming call at approximately 9:57

03:41PM   17   p.m. from a 9611 number?

03:41PM   18   A.   That's correct.

03:41PM   19   Q.   And do you recognize the -- those numbers?

03:41PM   20   A.   That's from Tim Carney.

03:41PM   21   Q.   And this was -- he was at the scene, correct?

03:41PM   22   A.   That's correct.

03:41PM   23   Q.   And 9:57, that was after the second warrant was signed?

03:41PM   24   A.   That's correct.

03:41PM   25   Q.   Now, why did -- so, did you talk to Pat McMahon about

03:42PM  1  getting the second warrant?

03:42PM  2  A.  I did.

03:42PM  3  Q.  So, would that explain, then, your phone calls with him?

03:42PM  4  A.  Yes.

03:42PM  5  Q.  Why did you have Pat McMahon get a second warrant?

03:42PM  6  A.  Because we were -- we had listed -- identified the -- in

03:42PM  7  the first warrant, the lower front of 56 Grimes.  And after

03:42PM  8  making entry, we determined that we needed a warrant for the

03:42PM  9  upstairs based upon our assertion that the entire property

03:42PM  10  was connected.

03:43PM  11  Q.  So, there was no -- this place wasn't divided into lower

03:43PM  12  front or lower rear or anything like that?

03:43PM  13  A.  No.

03:43PM  14  Q.  Did you determine it was one premises?

03:43PM  15  A.  We did.

03:43PM  16        MR. LYNCH:  Just one second, Judge.

03:43PM  17  BY MR. LYNCH:

03:43PM  18  Q.  Now, we can go to slide 61 on Exhibit 1?  You can stop it

03:56PM  19  right there.

03:56PM  20     Do you see the time that's depicted on this video

03:56PM  21  surveillance clip?

03:56PM  22  A.  I do.

03:56PM  23  Q.  What time is that?

03:56PM  24  A.  It's 8:47:27 p.m.

03:56PM  25  Q.  And what's depicted on the screen in front of you?

03:56PM 1  A.  It shows myself travelling to the upstairs second floor

03:56PM 2  of 56 Grimes.

03:56PM 3  Q.  And what doorway have you entered the stairwell from?

03:56PM 4  A.  From the first doorway in the bar area.

03:57PM 5  Q.  Okay.  So, you've entered from the lower --

03:57PM 6  A.  That's correct.

03:57PM 7  Q.  -- bar area?  And where -- when you enter 56 Grimes

03:57PM 8  through the front door, where is this door to the stairwell

03:57PM 9  located?

03:57PM 10  A.  If you're coming through the front door of 56 Grimes,

03:57PM 11  it's on the right-hand side.

03:57PM 12  Q.  Okay.  And when you come in, where is the bar located

03:57PM 13  when you enter in?

03:57PM 14  A.  To your left.

03:57PM 15  Q.  Okay.  So, bar to your left.  Over to your right is this

03:57PM 16  door that takes you to the stairwell?

03:57PM 17  A.  That's correct.

03:57PM 18  Q.  Now, you've already made -- you've already conducted your

03:57PM 19  protective sweep of the second floor, correct?

03:57PM 20  A.  That's correct.

03:57PM 21  Q.  What was your purpose for going back up to the second

03:57PM 22  floor at this point?

03:58PM 23  A.  Mistakes are often made by guys missing something, could

03:58PM 24  be just to get the lay of the land or see what we're dealing

03:58PM 25  with up on the second floor.

03:58PM  1   Q.  Now, did you include -- did you have Pat McMahon include

03:58PM  2   any information that you observed in plain view in that

03:58PM  3   second warrant?

03:58PM  4   A.  Yes.

03:58PM  5   Q.  And, specifically, what did you have him include?

03:58PM  6   A.  The mail located in the garbage.

03:58PM  7          MR. HARRINGTON:  I'm sorry.  I couldn't hear that.

03:58PM  8          THE WITNESS:  The mail located in the garbage.

03:58PM  9   BY MR. LYNCH:

03:58PM  10  Q.  Now, when you had made entry into the first floor area,

03:58PM  11  did you make any observations regarding the surveillance

03:58PM  12  system?

03:58PM  13  A.  Yes.

03:58PM  14  Q.  Okay.  And what you were you able to observe?

03:58PM  15  A.  We observed a very high-tech surveillance system that

03:59PM  16  included a bunch of cameras.

03:59PM  17         THE COURT:  Before you get into that, I need some

03:59PM  18  clarification.  I'm looking at Government Exhibit 8, which is

03:59PM  19  the first search warrant for 56 Grimes.

03:59PM  20         MR. LYNCH:  Judge, may I approach the witness with

03:59PM  21  the exhibit?

03:59PM  22         THE COURT:  And as I read the search warrant, unless

03:59PM  23  there's been some redaction on my copy, that's search warrant

03:59PM  24  says there is -- authorized to search 56 Grimes Street

03:59PM  25  Buffalo, New York, described as a two-and-one-half story,

| | | |
|---|---|---|
| 04:00PM | 1 | multiple-residence building.  It doesn't indicate lower front |
| 04:00PM | 2 | or lower or first or second floor. |
| 04:00PM | 3 | THE WITNESS:  It says lower front right after 56 |
| 04:00PM | 4 | Grimes Street. |
| 04:00PM | 5 | THE COURT:  So, that's been deleted from mine? |
| 04:00PM | 6 | MR. LYNCH:  Are you on page 3? |
| 04:00PM | 7 | THE COURT:  I'm on page 4.  Page 3 is the application |
| 04:00PM | 8 | that references lower front, but the search warrant itself |
| 04:00PM | 9 | does not. |
| 04:00PM | 10 | MR. LYNCH:  I just want to make sure we have the |
| 04:00PM | 11 | right page, Judge. |
| 04:00PM | 12 | THE COURT:  Government Exhibit 8. |
| 04:00PM | 13 | MR. LYNCH:  Correct. |
| 04:00PM | 14 | THE COURT:  Page 4 of the search warrant granted by |
| 04:00PM | 15 | Judge Case on February 19th, 2020 at 8:32 p.m., the third |
| 04:01PM | 16 | paragraph down, starting with 56 Grimes Street. |
| 04:01PM | 17 | MR. LYNCH:  Okay.  So, I just want to make sure -- |
| 04:01PM | 18 | I'm referring to the page of the exhibit.  So, it's one, two, |
| 04:01PM | 19 | three, four, five, page six of the exhibit, but it does say |
| 04:01PM | 20 | page 4 at the top.  That's where I was getting confused, |
| 04:01PM | 21 | Judge. |
| 04:01PM | 22 | THE COURT:  Yeah.  It says search warrant. |
| 04:01PM | 23 | MR. LYNCH:  Yeah.  So, Detective McMahon is going to |
| 04:01PM | 24 | be able to explain the reason why that's whited out. |
| 04:02PM | 25 | THE COURT:  So, it's whited out? |

04:02PM    1                MR. LYNCH:  Yeah.

04:02PM    2                THE COURT:  Because I'm looking here and thinking

04:02PM    3      this authorizes the search of the whole building.

04:02PM    4                MR. LYNCH:  Right.  No.  Detective McMahon is going

04:02PM    5      to explain that.  He'll explain what happened with him and

04:02PM    6      Judge Case.

04:02PM    7                THE COURT:  All right.

04:02PM    8                MR. LYNCH:  So, the application had it for the lower

04:02PM    9      front, Judge, if you go back to the first page of the

04:02PM   10      application.  So, it would be page 3 of Government Exhibit

04:02PM   11      Number 8, Judge, but Detective McMahon will explain the

04:02PM   12      discrepancy between the application and the search warrant.

04:03PM   13      He can do that --

04:03PM   14                THE COURT:  I agree it's the search warrant that

04:03PM   15      prevails.

04:03PM   16                MR. LYNCH:  Correct.  But we all agree, Judge, the

04:03PM   17      first warrant said lower front.  We all agree on that.

04:03PM   18                THE COURT:  All right.

04:03PM   19                MR. LYNCH:  Okay.

04:03PM   20      BY MR. LYNCH:

04:03PM   21      Q.  If we can go back to slide 31, Exhibit 1.  And now, you

04:03PM   22      said you were going back up to the second floor to just get

04:04PM   23      the lay of the land you said?

04:04PM   24      A.  That's correct.

04:04PM   25      Q.  Now, approximately how long were you up there, if you

04:04PM   1   recall?

04:04PM   2   A.   I believe it was about six minutes.

04:04PM   3   Q.   I want to have you view -- can we pull up slide 63 from

04:04PM   4   Exhibit 1?  Stop it right there.

04:04PM   5        What time is the video stopped at?

04:04PM   6   A.   Eight fifty-three twenty-four p.m.

04:04PM   7   Q.   So, approximately six minutes after you went up the

04:04PM   8   stairs?

04:04PM   9   A.   That's correct.

04:04PM  10   Q.   And what's depicted in the video at this point?

04:04PM  11   A.   Departing the second floor.

04:04PM  12   Q.   And it was soon after this that you made a call or right

04:05PM  13   around the same time you made a call to Pat McMahon?

04:05PM  14   A.   That's correct.

04:05PM  15   Q.   Now, had you already observed the mail in the garbage

04:05PM  16   before you went up the second time?

04:05PM  17   A.   Yes.

04:05PM  18   Q.   Now, we can go to the next exhibit, slide 64 and then 65,

04:05PM  19   66.  Okay.  Now, stop it right there.

04:05PM  20        Do you see the time depicted in this surveillance video?

04:06PM  21   A.   I do.

04:06PM  22   Q.   This is Exhibit 1, slide 66.  Now, there's been an

04:06PM  23   overlay put on this, correct?

04:06PM  24   A.   Yes.

04:06PM  25   Q.   At the top?

04:06PM   1   A.  Yes.

04:06PM   2   Q.  And it shows some of your phone records?

04:06PM   3   A.  It does.

04:06PM   4   Q.  And what -- at 8:54, who were you calling?

04:06PM   5   A.  It shows an incoming call.

04:06PM   6   Q.  So, an incoming call to what number?

04:06PM   7   A.  To my number.

04:06PM   8   Q.  Okay.  So, these are Pat McMahon's calls?

04:06PM   9   A.  Yes.

04:06PM  10   Q.  And then you continue to play it.  Now, I'm going to have

04:07PM  11   you stop it right there.

04:07PM  12       There's a person to the bottom right of this video.  Who

04:07PM  13   is that?

04:07PM  14   A.  Looks like Special Agent TJ Webb.

04:07PM  15   Q.  So, he was not part of the entry team to the second

04:07PM  16   floor, the original entry, correct?

04:07PM  17   A.  No, he was not.

04:07PM  18   Q.  But he's now entered the first floor at some point?

04:07PM  19   A.  Yes.

04:07PM  20   Q.  Now, if we can go to slide 67?  You can stop it right

04:07PM  21   there.

04:08PM  22       What's the time depicted on this surveillance video?

04:08PM  23   A.  Eight fifty-five sixteen p.m.

04:08PM  24   Q.  And this is -- what's depicted in this -- what area of

04:08PM  25   the premises is depicted?

04:08PM    1    A.  The bar area.

04:08PM    2    Q.  And the overlay at the top, is this, again, just Pat

04:08PM    3    McMahon's records?

04:08PM    4    A.  Yes.

04:08PM    5    Q.  Showing a call to you?

04:08PM    6    A.  That's correct.

04:08PM    7    Q.  At approximately this time?

04:08PM    8    A.  Yes.

04:08PM    9    Q.  And you said that Pat McMahon was the one who was getting

04:08PM   10    the warrants?

04:08PM   11    A.  He was.

04:08PM   12    Q.  And then, slide 68?  And if you could stop it right

04:08PM   13    there, Mr. Glaberson?

04:08PM   14       And, again, is this -- what's depicted in this video clip?

04:08PM   15    A.  It shows me on the phone in the bar area at 56 Grimes.

04:09PM   16    Q.  Now, if we can go to slide 70?  Can you see what's

04:09PM   17    depicted on the screen in front of you?

04:09PM   18    A.  Yes.

04:09PM   19    Q.  Can you hit pause?  Can we go back to that slide 70?

04:09PM   20    Slide 69.  Do you see what's depicted on the screen in front

04:10PM   21    of you?

04:10PM   22    A.  Yes.  It's myself and Special Agent Webb traveling to the

04:10PM   23    second floor of the apartment.

04:10PM   24    Q.  And what time is this?

04:10PM   25    A.  Eight fifty-six forty-five p.m.

04:10PM    1    Q.   So, this is your second time up -- actually, the third

04:10PM    2    time you've been to the second floor, correct?

04:10PM    3    A.   That's correct.

04:10PM    4    Q.   Second time after you completed the protective sweep?

04:10PM    5    A.   That's correct.

04:10PM    6    Q.   And why are you going to second floor again at this

04:10PM    7    point?

04:10PM    8    A.   Probably to show Special Agent Webb, since we were

04:11PM    9    working together, kind of what we were looking at on the

04:11PM   10    second floor as far as a search was concerned.

04:11PM   11    Q.   Now, you didn't have a warrant yet for the second floor?

04:11PM   12    A.   No.

04:11PM   13    Q.   So, this is the second time you've been up here, correct?

04:11PM   14    A.   That's correct.

04:11PM   15    Q.   Did you -- any -- you had already observed the mail in

04:11PM   16    your first protective sweep, correct?

04:12PM   17    A.   Correct.

04:12PM   18    Q.   And that was included in the warrant, correct?

04:12PM   19    A.   It was.

04:12PM   20    Q.   And then, the surveillance equipment you observed during

04:12PM   21    your search?

04:12PM   22    A.   That's correct.

04:12PM   23    Q.   Now, while you were up there for that, the, I guess, the

04:12PM   24    second time you went up, did you conduct any search of the

04:12PM   25    premises?

04:12PM   1    A.  I did.

04:12PM   2    Q.  Okay.  And so, this is when you weren't with Special

04:12PM   3    Agent Webb, it was the time around 8:46?

04:12PM   4    A.  The time --

04:12PM   5    Q.  I'm sorry.  Go ahead.

04:12PM   6    A.  The time that I was up there for approximately six

04:13PM   7    minutes.

04:13PM   8    Q.  So, from about 8:47 to about 8:53 I guess?

04:13PM   9    A.  That's correct.

04:13PM  10    Q.  All right.  And why did you conduct a search of some of

04:13PM  11    the contents of the second floor between 8:47 and 8:53?

04:13PM  12    A.  I would attribute it to a lapse in judgment on my part.

04:13PM  13    It had been a long day.  We conducted several searches, was

04:13PM  14    kind of in that mode.  And, again, it was a mistake on my

04:13PM  15    part.

04:13PM  16    Q.  Did you observe anything during the second search that

04:13PM  17    you put in the search warrant, the second search warrant?

04:13PM  18    A.  No.

04:14PM  19          MR. LYNCH:  If I can have one second, Judge?

04:14PM  20    BY MR. LYNCH:

04:14PM  21    Q.  And when you obtained the second warrant, was that for

04:15PM  22    the -- strike that.  We'll get into that with Pat McMahon.

04:15PM  23          MR. LYNCH:  No other questions, Judge, for Chief

04:15PM  24    Granville.

04:15PM  25          THE COURT:  Chief Granville, you've just testified

04:15PM    1    that you and Special Agent Webb went up to the second floor of

04:15PM    2    56 Grimes Street on February the 19th, 2020, and conducted

04:16PM    3    some kind of search on the second floor or in the second floor

04:16PM    4    at 8:47 through 8:53 p.m., correct?

04:16PM    5              THE WITNESS:  That was myself, Judge.

04:16PM    6              THE COURT:  Webb wasn't with you?

04:16PM    7              THE WITNESS:  No, he was not.

04:16PM    8              THE COURT:  This is after you had talked to McMahon

04:16PM    9    about getting a second warrant, correct, when you were shown

04:16PM   10    the video with you on the phone?

04:16PM   11              THE WITNESS:  I believe I talked to Detective McMahon

04:16PM   12    after the second -- after I went up there a second time.

04:16PM   13              THE COURT:  I thought the video depicted time periods

04:16PM   14    of prior to 9 -- the search warrant is signed by Judge Case at

04:17PM   15    9:48 p.m.  I thought the video showed you talking to McMahon,

04:17PM   16    or you said it was McMahon, while you were down on the first

04:17PM   17    floor somewhere around 8:48 or 8:46?

04:17PM   18              MR. LYNCH:  So, he called -- just so I think the

04:17PM   19    record is clear, Judge, he called Pat McMahon at 8:54 p.m.

04:17PM   20              THE COURT:  Okay, which is still before the 9:48

04:18PM   21    warrant.

04:18PM   22              MR. LYNCH:  Correct.  And -- but if we can go back to

04:18PM   23    slide 61?  Okay, Judge.  This is slide 61, Exhibit Number 1,

04:18PM   24    if we can play this clip.  Stop right there.

04:18PM   25

04:18PM 1    BY MR. LYNCH:

04:18PM 2    Q.  Now, Chief Granville, what -- where have you entered the

04:18PM 3    stairwell from?

04:18PM 4    A.  From the lower bar area.

04:18PM 5    Q.  Okay.  And what time is depicted in this surveillance

04:18PM 6    video?

04:18PM 7    A.  Eight forty-seven twenty-eight p.m.

04:18PM 8    Q.  Okay.  And you're -- is anybody else accompanying you up

04:18PM 9    the stairs?

04:18PM 10   A.  No.

04:18PM 11   Q.  Okay.  So -- and you were -- it's clear that you went up

04:19PM 12   and you were up on the second floor for around six minutes,

04:19PM 13   correct?

04:19PM 14   A.  That's correct.

04:19PM 15   Q.  And you exited around 8:53?

04:19PM 16   A.  That's correct.

04:19PM 17   Q.  And then you called Pat McMahon at 8:54?

04:19PM 18   A.  That's correct.

04:19PM 19   Q.  And while you were up in the second floor of 56 Grimes,

04:19PM 20   did you search through some drawers and some plastic bags?

04:19PM 21   A.  Yes.

04:19PM 22   Q.  And you acknowledge you didn't have a warrant for the

04:19PM 23   second floor at that point?

04:19PM 24   A.  That's correct.

04:19PM 25   Q.  Did you include any information that you observed during

04:19PM   1   this second entry in your warrant for the upper area of 56

04:19PM   2   Grimes?

04:19PM   3   A.   No.

04:19PM   4   Q.   And is the piece of mail you observed you observed during

04:20PM   5   the protective sweep?

04:20PM   6   A.   I did.

04:20PM   7         THE COURT:  Why did you go up there then?

04:20PM   8         THE WITNESS:  Sir, I wish I could explain it.  I'm

04:20PM   9   not sure.  Maybe nervous energy, again, trying to make sure

04:20PM   10  none of my guys made any mistakes as far as bodies contained

04:20PM   11  up there.

04:20PM   12        THE COURT:  Well, you had done a safety sweep up

04:20PM   13  there?

04:20PM   14        THE WITNESS:  That's correct.

04:20PM   15        THE COURT:  Nobody was up there.  Then you're

04:20PM   16  realizing that, oh, this is the second floor, and our search

04:20PM   17  warrant is for the first floor.  So, you're now on notice that

04:20PM   18  you don't have a search warrant for the second floor.  And you

04:20PM   19  know this is all before 8:47 p.m.  You don't recall why you

04:20PM   20  went up there?

04:20PM   21        THE WITNESS:  No, sir.

04:20PM   22        THE COURT:  Okay.

04:21PM   23  BY MR. LYNCH:

04:21PM   24  Q.   Now, once you had executed -- once you had gone down and

04:21PM   25  entered the building through the lower front door and you

04:21PM   1   searched that lower -- that first floor area, what was your

04:21PM   2   determination as to the accuracy of the description of lower

04:21PM   3   front for that warrant?

04:21PM   4   A.  It was very inaccurate.  There wasn't a lower front.

04:21PM   5   There was simply a lower that contained an entry and exit

04:21PM   6   point up that the second floor of 56 Grimes.

04:21PM   7   Q.  So, what did you determine as to the accurate description

04:21PM   8   of the 56 Grimes?

04:21PM   9   A.  We believed it to be all one property.

04:21PM   10          MR. LYNCH:  No other questions.

04:21PM   11          THE COURT:  When you went up there at 8:47 through

04:22PM   12   8:53, even though you don't recall why you went up there, do

04:22PM   13   you know what you were looking for?

04:22PM   14          THE WITNESS:  No.  I had to be walking through the

04:22PM   15   apartment.

04:22PM   16          THE COURT:  But you had to go up a flight of stairs.

04:22PM   17          THE WITNESS:  That's correct.

04:22PM   18          THE COURT:  At that time, while you're walking up the

04:22PM   19   stairs, do you recall what it is you hoped to find or what are

04:22PM   20   you looking for?  Why are you -- I guess he already answered

04:22PM   21   the question why are you going there, but do you know what you

04:22PM   22   were going to be looking for?

04:22PM   23          THE WITNESS:  No, sir.

04:22PM   24          THE COURT:  Okay.  Mr. Harrington or Mr. Thompson?

04:22PM   25

CROSS-EXAMINATION

BY MR. HARRINGTON:

Q.  Chief Granville, I want to clarify something right away
that you just testified about.  You went up to do the
protective sweep, right?

A.  That's correct.

Q.  Somehow or other, you found mail, and you made a note of
whose name was on the mail while you were looking for
individuals upstairs, correct?

A.  That's correct.

Q.  You didn't make a note of anything else that you saw up
there at that time?

A.  I don't recall.

Q.  Okay.  And, at a later point in time, the Judge just
asked you questions about going into the property at 8:47 and
being up there for six minutes.  That was yourself again,
right?

A.  That's correct.

Q.  And you told Mr. Lynch you didn't fine anything else --
anything in there that you used in the search warrant; is
that right?

A.  That's correct.

Q.  But you went through the garbage bag?

A.  That's correct.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

55

| | | |
|---|---|---|
| 02:13PM | 1 | Q.  What were you looking for in a garbage bag? |
| 02:13PM | 2 | A.  I don't recall. |
| 02:13PM | 3 | Q.  What else did you look in? |
| 02:13PM | 4 | A.  I know I looked in a couple of drawers, maybe some |
| 02:13PM | 5 | cabinets. |
| 02:13PM | 6 | Q.  You opened the drawers up, right? |
| 02:13PM | 7 | A.  Yes, sir. |
| 02:13PM | 8 | Q.  Moved things around? |
| 02:13PM | 9 | A.  In the drawers themselves? |
| 02:13PM | 10 | Q.  Yes. |
| 02:13PM | 11 | A.  I don't recall. |
| 02:13PM | 12 | Q.  Right.  Did you know that --  did you realize that there |
| 02:13PM | 13 | were two separate apartments upstairs? |
| 02:13PM | 14 | A.  No, sir. |
| 02:13PM | 15 | Q.  You never knew that there were two separate apartments |
| 02:15PM | 16 | with locked doors? |
| 02:15PM | 17 | A.  No, sir. |
| 02:15PM | 18 | Q.  Was the attic door locked? |
| 02:15PM | 19 | A.  I don't recall. |
| 02:15PM | 20 | Q.  Do you remember using the pry bar or the other bashing |
| 02:15PM | 21 | instrument to get in the attic for the protective sweep? |
| 02:15PM | 22 | A.  I don't recall. |
| 02:15PM | 23 | Q.  You said somebody went up in the attic.  Who went up in |
| 02:15PM | 24 | the attic? |
| 02:15PM | 25 | A.  There were other agents and law enforcement personnel |

02:15PM  1  that went up in the attic.

02:15PM  2  Q.  Did they report to you that they found guns and drugs up

02:15PM  3  there in the attic in the protective sweep?

02:15PM  4  A.  No, sir.

02:15PM  5  Q.  Now, what Mr. Lynch didn't ask you is, after you went up

02:15PM  6  the second time, for reasons that you can't recall, or don't

02:15PM  7  understand, you went back up with Webb, right?

02:16PM  8  A.  That's correct.

02:16PM  9  Q.  How long were you up there with Webb?

02:16PM  10  A.  I don't recall, sir.

02:16PM  11  Q.  What discussion did you have with Webb before you went

02:16PM  12  up?

02:16PM  13  A.  I don't recall the contents of our conversation.

02:16PM  14  Q.  Whose idea was it to go up there the second time?

02:16PM  15  A.  Again, sir, I don't recall.

02:16PM  16  Q.  And how long were you up there with Webb?

02:16PM  17  A.  I don't recall.

02:16PM  18  Q.  Have you watched the video from start to finish?

02:16PM  19  A.  I have.

02:16PM  20  Q.  Did you -- did Webb look around for anything up in the

02:16PM  21  second floor or the attic when you were up there with him?

02:16PM  22  A.  I didn't observe -- I don't recall observing him looking

02:16PM  23  around.

02:16PM  24  Q.  Did you look around some more when you were up there?

02:16PM  25  A.  No, sir.

02:16PM  1    Q.  All right.  What were you doing there with Webb?

02:17PM  2    A.  Like I had said, I believe I was showing him the layout

02:17PM  3    of the second floor apartment and how it, you know, the

02:17PM  4    entire property had connected.

02:17PM  5    Q.  And this search warrant, the first one for 56 Grimes,

02:17PM  6    McMahon applied for that to Judge Case, right?

02:17PM  7    A.  That's correct.

02:17PM  8    Q.  And then, the second search warrant, the amended search

02:17PM  9    warrant, that was made to Judge Case; is that right?

02:17PM  10   A.  That's correct.

02:17PM  11   Q.  And DJ Webb works where?

02:17PM  12   A.  It's TJ Webb.

02:17PM  13   Q.  TJ.  Sorry.  You're DJ.  I'm sorry.

02:17PM  14   A.  It's okay.  He's a special agent with Homeland Security

02:17PM  15   Investigations.

02:17PM  16   Q.  Okay.  And he's filed a number of applications for search

02:17PM  17   warrants in this case, the case of United States v.

02:18PM  18   Washington and Burgin; is that right?

02:18PM  19   A.  Yes, sir.

02:18PM  20   Q.  And he was with you that day on the surveillance, too,

02:18PM  21   correct?

02:18PM  22   A.  Yes, sir.

02:18PM  23   Q.  And did he make any applications to Judge Schroeder or

02:18PM  24   any other federal judge that night for a search of 56 Grimes?

02:18PM  25   A.  Not that I'm aware of, sir.

02:18PM  1   Q.  Did he provide you any information based upon his going

02:18PM  2   upstairs that helped with the second search warrant for 56

02:18PM  3   Grimes?

02:18PM  4   A.  Not that I recall.

02:18PM  5   Q.  Did you discuss with him after you came back downstairs

02:18PM  6   what it is that you saw up there?

02:18PM  7   A.  I don't recall.

02:18PM  8   Q.  And you don't remember how long you were up there; is

02:18PM  9   that right?

02:18PM  10  A.  You are referring to the third time?

02:18PM  11  Q.  I'm sorry.  The second time.  When you went up with Webb,

02:18PM  12  how long were you up there?

02:19PM  13  A.  I don't recall.

02:19PM  14  Q.  Okay.  Do you recall that the surveillance camera was

02:19PM  15  turned off that night?

02:19PM  16  A.  I know at some point it was.

02:19PM  17  Q.  Okay.  Did you turn it off?

02:19PM  18  A.  No, sir.

02:19PM  19  Q.  Did you order somebody to turn it off?

02:19PM  20  A.  I don't recall.

02:19PM  21  Q.  Do you remember an agent or officer alerting that there

02:19PM  22  was a camera upstairs?

02:19PM  23  A.  I remember at some point.

02:19PM  24  Q.  When you saw the video, did you see somebody pointing at

02:19PM  25  it and then turning it to the side and then the filming

59

| | | |
|---|---|---|
| 02:19PM | 1 | stopped? |
| 02:19PM | 2 | A.  Sir, I don't recall that. |
| 02:19PM | 3 | Q.  Okay.  That was right around 9 o'clock, right after you |
| 02:19PM | 4 | and Webb had gone up there; is that right? |
| 02:19PM | 5 | A.  I would have to look at the video, but yes. |
| 02:19PM | 6 | Q.  And why would you turn the video off? |
| 02:19PM | 7 | A.  For the officer safety purposes in case somebody was |
| 02:19PM | 8 | remote monitoring the video. |
| 02:19PM | 9 | Q.  Okay.  But you already -- the officers are -- already |
| 02:20PM | 10 | been on the video in the half hour that you were already |
| 02:20PM | 11 | there executing the warrant; isn't that right? |
| 02:20PM | 12 | A.  They were. |
| 02:20PM | 13 | Q.  In fact, the video showed you go through the garbage bag; |
| 02:20PM | 14 | is that right? |
| 02:20PM | 15 | A.  That's correct. |
| 02:20PM | 16 | Q.  Would you have gone through the garbage bag if you had |
| 02:20PM | 17 | known there was a video? |
| 02:20PM | 18 | A.  I don't believe I would have changed anything I had done |
| 02:20PM | 19 | that night. |
| 02:20PM | 20 | Q.  I'd like to ask you some questions now about your |
| 02:21PM | 21 | involvement in this investigation earlier in the day.  You |
| 02:21PM | 22 | indicated that you had made an arrest of somebody and that |
| 02:21PM | 23 | there were several search warrants for this person, and that |
| 02:21PM | 24 | person was in custody and, apparently, agreed to cooperate |
| 02:21PM | 25 | with you; is that right? |

02:22PM   1   A.   That's correct.

02:22PM   2   Q.   And that led to some context with -- contacts with a

02:22PM   3   person you later determined to be Rodney Pierce; is that

02:22PM   4   right?

02:22PM   5   A.   Yes, sir.

02:22PM   6   Q.   And Rodney is David Burgin's nephew; is that right?

02:22PM   7   A.   That's what was reported to us.  Yes.

02:22PM   8   Q.   You didn't know that beforehand, though, did you?

02:22PM   9   A.   We knew he had a nickname of Nephew, but I didn't know if

02:22PM  10   that was actually, like, a blood relative.

02:22PM  11   Q.   Did you provide to Mr. Lynch the text and the recordings

02:22PM  12   of any phone calls that were made in your investigation of

02:23PM  13   this confidential informant as they related to Rodney Pierce?

02:23PM  14   A.   Yes.

02:23PM  15   Q.   Did you give him all of them?

02:23PM  16   A.   Yes.

02:23PM  17   Q.   And did you have any decision making in turning the

02:23PM  18   recordings over to the defense in this case?

02:23PM  19   A.   No, sir.

02:23PM  20   Q.   That was Mr. Lynch's determination as far as you know?

02:23PM  21   A.   As far as I know, yes.

02:23PM  22   Q.   You provide it to him and what he does with it, he does

02:23PM  23   with it; is that right; would that be fair to say?

02:23PM  24   A.   Yes, sir.

02:23PM  25   Q.   Now, you testified that when these calls were -- and

02:25PM  1   texts were made, you were either observing or participating

02:25PM  2   with the confidential informant; would that be fair to say?

02:25PM  3   A.  Yes, sir.

02:25PM  4   Q.  Okay.  Was there anybody else involved in that, any other

02:25PM  5   agents?

02:25PM  6   A.  I don't recall.

02:25PM  7   Q.  Okay.  At the point in time that was happening, was --

02:25PM  8   did the confidential informant have his lawyer with him?

02:25PM  9   A.  He did not.

02:25PM  10  Q.  Your -- the call logs indicated that some time later that

02:25PM  11  day you got a call from Tom Eoannou; is that right?

02:25PM  12  A.  That's correct.

02:25PM  13  Q.  He's a local criminal defense lawyer.  You know him, do

02:26PM  14  you not?

02:26PM  15  A.  I do.

02:26PM  16  Q.  At some point in time, he became the lawyer for this

02:26PM  17  confidential informant; would that be fair to say as far as

02:26PM  18  you know?

02:26PM  19  A.  That's correct.

02:26PM  20  Q.  Okay.  But he was not present or aware of anything that

02:26PM  21  was going on when you were doing your undercover

02:26PM  22  investigation?

02:26PM  23  A.  He was not present.  No.

02:26PM  24  Q.  What other agents or deputies or detectives were with you

02:26PM  25  while -- during the time that these phone calls are going on

| | | |
|---|---|---|
| 02:26PM | 1 | with Mr. Pierce? |
| 02:26PM | 2 | A.   I don't recall. |
| 02:26PM | 3 | Q.   Were there others?  No?  I'm sorry? |
| 02:27PM | 4 | A.   I'm sorry.  I missed the question. |
| 02:27PM | 5 | Q.   Were there any others there?  Whether you can recall them |
| 02:27PM | 6 | or not, were there any others there? |
| 02:27PM | 7 | A.   They were present in the -- in our office.  I don't |
| 02:27PM | 8 | recall whether they were in the room with us with the |
| 02:27PM | 9 | confidential informant. |
| 02:27PM | 10 | Q.   Were you doing this, like, in a private, separate room or |
| 02:27PM | 11 | office? |
| 02:27PM | 12 | A.   In a, like, an interview room. |
| 02:27PM | 13 | Q.   Now, during the time that these calls were made, did the |
| 02:27PM | 14 | confidential informant agree to do that? |
| 02:27PM | 15 | A.   Yes, sir. |
| 02:27PM | 16 | Q.   And that was probably something related to him that he |
| 02:28PM | 17 | might be able to help himself if he helped you? |
| 02:28PM | 18 | A.   That's correct. |
| 02:28PM | 19 | Q.   That's a common tactic or procedure that you use in your |
| 02:28PM | 20 | business; is that right? |
| 02:28PM | 21 | A.   It is. |
| 02:28PM | 22 | Q.   Now, were you -- how were you recording his conversation? |
| 02:28PM | 23 | A.   On this particular occasion, I don't recall whether it |
| 02:28PM | 24 | was a recording device or maybe an app on a phone.  I don't |
| 02:29PM | 25 | recall. |

02:29PM    1    Q.  And did you keep that device?  How did you store the

02:29PM    2    recording?

02:29PM    3    A.  Depends on how the -- they were actually recorded,

02:29PM    4    whether it was the recording device or an app on a phone,

02:29PM    5    whether we had kept them.

02:29PM    6    Q.  You testified that -- could you put up (inaudible)?  Can

02:30PM    7    you see on the screen Government's Exhibit 3 that's in

02:30PM    8    evidence?  You identified that as a transcript of the first

02:30PM    9    call that confidential informant and Mr. Pierce had; is that

02:30PM   10    right?

02:30PM   11    A.  Yes.

02:30PM   12    Q.  And who is it that translated and transcribed the phone

02:30PM   13    call?

02:30PM   14    A.  I don't know.

02:31PM   15    Q.  You told Judge Schroeder when we were here on August

02:31PM   16    23rd, 2022, that this was a fair and accurate transcription

02:31PM   17    of the phone call; is that right?

02:31PM   18    A.  That's right.

02:31PM   19    Q.  And did you compare the transcript and listen to the

02:31PM   20    recording at the same time?

02:31PM   21    A.  I listened to the recording and then went through the

02:31PM   22    transcript.  Yes.

02:31PM   23    Q.  At the same time?

02:31PM   24    A.  Not at the same time, but in close proximity.

02:31PM   25    Q.  But you don't know who prepared the transcript?

02:31PM   1   A.  No, sir.

02:31PM   2   Q.  Was it you?

02:31PM   3   A.  No.

02:31PM   4   Q.  No?

02:31PM   5   A.  No.

02:31PM   6   Q.  Did Mr. Lynch tell you he did it?

02:31PM   7   A.  No.

02:31PM   8   Q.  Well, when it was given to you, didn't you ask who

02:32PM   9   prepared it?

02:32PM  10   A.  I didn't ask who personally prepared it.  No.

02:32PM  11   Q.  Did you notice any errors in it?

02:32PM  12   A.  I didn't.

02:32PM  13   Q.  Did not?

02:32PM  14   A.  No.

02:32PM  15   Q.  Now, when is the first time that you listened to it and

02:32PM  16   saw the transcript?

02:32PM  17   A.  I don't recall, sir.

02:32PM  18   Q.  Was it right after Mr. Burgin was arrested?

02:32PM  19   A.  No.

02:32PM  20   Q.  Was it within the last few months before the last

02:32PM  21   suppression hearing?

02:32PM  22   A.  Yes.

02:32PM  23   Q.  So, well over two years after this happened; is that

02:32PM  24   right?

02:32PM  25   A.  That's correct.

02:32PM   1   Q.   Okay.  So, did you listen to the recording before you

02:32PM   2   read the transcript?  Whether you did it on the same day or

02:32PM   3   not, did you listen to the recording?

02:32PM   4   A.   The recordings, yes.

02:32PM   5   Q.   How far apart from when it was transcribed?

02:33PM   6   A.   Months apart.

02:33PM   7   Q.   Now, you testified that you made certain assumptions

02:33PM   8   based upon this recording based upon your years of experience

02:33PM   9   and expertise; is that right?

02:33PM  10   A.   That's correct.

02:33PM  11   Q.   And you told us that there was code language in these

02:33PM  12   recordings and this was something that was setting up a deal

02:33PM  13   to buy more cocaine; is that right?

02:33PM  14   A.   That's correct.

02:33PM  15   Q.   And you were able to divine that from what you saw and

02:33PM  16   heard -- saw in the transcript and heard in the -- in

02:33PM  17   listening to the conversation; is that right?

02:34PM  18   A.   Along with the conversation with the confidential

02:34PM  19   informant, yes.

02:34PM  20   Q.   Okay.  Now, in those conversations, are drugs ever

02:34PM  21   mentioned?

02:34PM  22   A.   No, sir.

02:34PM  23   Q.   Is weight ever mentioned, of any kind, of any substance?

02:34PM  24   A.   No, sir.

02:34PM  25   Q.   Is money ever mentioned?

02:34PM   1   A.   No, sir.

02:34PM   2   Q.   And you said that it was accurate and you relied on it in

02:38PM   3   making your expert opinion regarding this particular -- these

02:38PM   4   particular phone calls; that, on the sixth line, on

02:38PM   5   Government Exhibit 3, the first page of recording 6, it says

02:38PM   6   CI.  Okay.  What you hit me something for free.  You see

02:39PM   7   that?

02:39PM   8   A.   I do.

02:39PM   9   Q.   Okay.  That meant something to you that this CI was

02:39PM  10   asking to be fronted some drugs; is that right?

02:39PM  11   A.   That's correct.

02:39PM  12   Q.   And the day that you arrested the CI, you had just seized

02:39PM  13   a large quantity of drugs from his -- some place, his

02:39PM  14   residence or some place else that you had a search warrant

02:39PM  15   that was tied to him; is that right?

02:39PM  16   A.   That's correct.

02:39PM  17   Q.   Now, if the proper translation of this was -- that he

02:39PM  18   said, hit me when you're free, it would be a different

02:40PM  19   context to that, would there not?

02:40PM  20   A.   Yes, sir.

02:40PM  21   Q.   You indicated that the confidential informant told you

02:40PM  22   some information regarding David Burgin; is that right?

02:40PM  23   A.   That's correct.

02:40PM  24   Q.   And he told you some information about Rodney Pierce; is

02:40PM  25   that right?

02:40PM   1    A.   That's correct.

02:41PM   2    Q.   Those related to drug dealings; is that right?

02:41PM   3    A.   Yes.

02:41PM   4    Q.   Was Mr. Pierce ever arrested for any of the things that

02:41PM   5    the confidential informant told you about historically?

02:41PM   6    A.   You're referring to the -- prior to this day?

02:41PM   7    Q.   Yes.

02:41PM   8    A.   Not that I'm aware of.

02:41PM   9    Q.   Okay.  Was Mr. Burgin ever arrested for anything that the

02:41PM   10   confidential informant told you about?

02:41PM   11   A.   Historically?

02:41PM   12   Q.   Right.

02:41PM   13   A.   Not that I'm aware of.

02:41PM   14   Q.   In fact, you checked Mr. Burgin's record, didn't you?

02:41PM   15   A.   Yes, sir.

02:41PM   16   Q.   He'd never been arrested, had he?

02:41PM   17   A.   No.

02:41PM   18   Q.   Never been charged with anything, right?

02:41PM   19   A.   Not that I'm aware of.

02:41PM   20   Q.   Never convicted of anything; drugs, or anything?

02:42PM   21   A.   Not that I'm aware of.

02:42PM   22   Q.   Now, throughout the transcripts, there's the name or

02:42PM   23   nickname Unc used; is that right?

02:42PM   24   A.   That's correct.

02:42PM   25   Q.   And who is Unc?

02:42PM  1   A.  The Unc was identified as Mr. Burgin.

02:42PM  2   Q.  Who identified him as Mr. Burgin?

02:42PM  3   A.  The confidential informant.

02:42PM  4   Q.  So, every time the name Unc was said, it was Mr. Burgin

02:42PM  5   in these phone calls?

02:42PM  6   A.  In these phone conversations, yes.

02:42PM  7   Q.  And you mentioned before the name uncle came up with the

02:42PM  8   confidential informant; is that right -- nephew.  I'm sorry.

02:42PM  9   Not uncle, nephew; is that right?

02:43PM  10  A.  That's correct.

02:43PM  11  Q.  Isn't it true that if you listen to these phone calls and

02:43PM  12  have an accurate translation of them that Rodney Pierce is

02:43PM  13  calling the CI Unc and the CI calls Rodney nephew?  You don't

02:43PM  14  know?

02:43PM  15  A.  I don't.

02:43PM  16  Q.  And you knew, did you not, that the interpretation that

02:43PM  17  you made with respect to these calls is something that would

02:43PM  18  be relied on by Mr. Lynch in his presentation to the Judge;

02:43PM  19  did you not?

02:43PM  20  A.  I did.

02:43PM  21  Q.  And you knew that the Judge would rely on what you've

02:43PM  22  testified to and what your representations about these calls

02:44PM  23  would be; did you not?

02:44PM  24  A.  Yes.

02:44PM  25  Q.  Now, there's a determination made on the same day that

02:44PM  1   you used the CI to talk with Mr. Pierce, that you just

02:44PM  2   testified about and we have seen videos about, that led to

02:44PM  3   the searches of 56 Grimes Street; is that fair to say?

02:45PM  4   A.  That's correct.

02:45PM  5   Q.  Okay.  Did you ever ask the CI for any information about

02:45PM  6   56 Grimes?

02:45PM  7   A.  I don't recall.

02:45PM  8   Q.  Did you ever ask him have you ever been there?

02:45PM  9   A.  I don't recall.

02:45PM  10  Q.  Ever ask him what it looked like inside?

02:45PM  11  A.  I don't recall.

02:45PM  12  Q.  Ever ask him if he knew anybody that had been there?

02:45PM  13  A.  I don't recall the contents of our conversation, the

02:45PM  14  entire conversation.

02:46PM  15  Q.  Now, at any point in time after this particular day, up

02:46PM  16  until now, did you ever sit down with the CI and review the

02:46PM  17  recordings we've just been talking about with Mr. Pierce?

02:46PM  18  A.  No, sir.

02:46PM  19  Q.  You didn't ask him to translate it, did you?

02:46PM  20  A.  No, sir.

02:46PM  21  Q.  I have a few more questions about that in a few minutes,

02:46PM  22  but I'd like to go through some other things with you right

02:47PM  23  now.  We are now approaching three years from when this

02:47PM  24  particular case started; is that fair to say?

02:47PM  25  A.  Yes, sir.

02:47PM 1    Q.  And what did you review to assist you in testifying back

02:47PM 2    in -- let's start with back in August.  What did you review?

02:47PM 3    A.  The videos and search warrants.

02:47PM 4    Q.  Okay.  Anything else?

02:47PM 5    A.  Nothing that's coming to mind.

02:47PM 6    Q.  Did you meet with anybody, talk with anybody?

02:47PM 7    A.  Yes.

02:47PM 8    Q.  Who did you meet with?

02:47PM 9    A.  Mr. Lynch and Mr. Glaberson.

02:47PM 10   Q.  Anybody else?

02:48PM 11   A.  No.

02:48PM 12   Q.  Did you talk to any of the other detectives, agents,

02:48PM 13   deputies that were involved with you on this particular day

02:48PM 14   regarding this case?

02:48PM 15   A.  Yes, sir.

02:48PM 16   Q.  Who have you talked to?

02:48PM 17   A.  Probably just about everybody involved.

02:48PM 18   Q.  Okay.  And when did that happen?

02:48PM 19   A.  Over the course of the last couple of years.

02:48PM 20   Q.  Did you ever have a joint meeting with people to talk

02:48PM 21   about this case?

02:48PM 22   A.  No, sir.

02:48PM 23   Q.  Now, you were chief back when this investigation

02:48PM 24   happened?

02:48PM 25   A.  Yes, sir.

| | | |
|---|---|---|
| 02:48PM | 1 | Q.  Okay.  And you were in charge of this particular |
| 02:49PM | 2 | investigation, arrest, and directing the search warrants; is |
| 02:49PM | 3 | that right? |
| 02:49PM | 4 | A.  I was. |
| 02:49PM | 5 | Q.  Can you tell me, in the sheriff's department, what |
| 02:49PM | 6 | procedures do you have for keeping records of your |
| 02:49PM | 7 | investigation? |
| 02:49PM | 8 | A.  As far as, like, police reports, et cetera? |
| 02:49PM | 9 | Q.  Anything, Police reports, anything, memoranda. |
| 02:49PM | 10 | A.  It would depend on the investigation itself. |
| 02:49PM | 11 | Q.  Okay.  Well, you're aware of something like an FBI 302. |
| 02:50PM | 12 | You've probably seen those working with the FBI, have you |
| 02:50PM | 13 | not? |
| 02:50PM | 14 | A.  Yes, sir. |
| 02:50PM | 15 | Q.  Those are memos that the agents make on most things that |
| 02:50PM | 16 | they do; is that right? |
| 02:50PM | 17 | A.  Yes, sir. |
| 02:50PM | 18 | Q.  Does the sheriff's department have some set form like |
| 02:50PM | 19 | that that you keep? |
| 02:50PM | 20 | A.  We have what's called a confidential report. |
| 02:50PM | 21 | Q.  What does that mean? |
| 02:50PM | 22 | A.  Just a simple memo. |
| 02:50PM | 23 | Q.  All right.  And was one made in this case? |
| 02:50PM | 24 | A.  I don't believe so. |
| 02:50PM | 25 | Q.  Now, you knew, did you not, that many times, these cases |

02:50PM  1   take a long time before they get to suppression hearings and

02:50PM  2   trial; is that right?

02:50PM  3   A.  Yes, sir.

02:50PM  4   Q.  Would it be fair to say that you have either been

02:50PM  5   involved in or supervised probably hundred of cases since

02:50PM  6   February of 2020?

02:51PM  7   A.  Yes, sir.

02:51PM  8   Q.  In fact, all of the drug cases that come through your

02:51PM  9   department you, at least, have to be made aware of them; is

02:51PM  10  that right?

02:51PM  11  A.  Yes.

02:51PM  12  Q.  Okay.  So, what did you do to prepare yourself to come to

02:51PM  13  testify?  You said that you read the search warrants, right,

02:51PM  14  and you looked at the video from 56 Grimes; is that right?

02:51PM  15  A.  That's correct.

02:51PM  16  Q.  And 56 Grimes only covers certain events that happened

02:51PM  17  right at the place, right?

02:51PM  18  A.  That's correct.

02:51PM  19  Q.  This investigation, as far as Mr. Burgin goes, covers

02:51PM  20  more things.  It covers the Pierce conversation with the

02:52PM  21  confidential informant, it covers going to the Auto Zone, it

02:52PM  22  covers traveling back and forth to 65 Grimes, talk covers

02:52PM  23  arresting Mr. Burgin, arresting Mr. Pierce, many things,

02:52PM  24  right?

02:52PM  25  A.  Yes, sir.

02:52PM   1   Q.  So, are you relying just on your memory of those events?

02:52PM   2   A.  No, just along with meeting with Mr. Lynch and

02:52PM   3   Mr. Glaberson, being refreshed of certain events, yes.

02:52PM   4   Q.  Okay.  What did they refresh your memory with?

02:52PM   5   A.  Certain, like, property receipts and previous testimony,

02:52PM   6   et cetera.

02:52PM   7   Q.  Okay.  Testimony like the Grand Jury; is that right?

02:53PM   8   A.  Yes, sir.

02:53PM   9   Q.  Okay.  Did you testify in the Grand Jury?

02:53PM   10  A.  I did not.

02:53PM   11  Q.  Is Day a detective?

02:53PM   12  A.  Detective.

02:53PM   13  Q.  Detective.  He testified that he never makes notes or

02:53PM   14  memoranda in his cases.  Is that the policy of your office?

02:53PM   15  A.  He's specifically assigned to Homeland Security

02:53PM   16  Investigations as a TFO.

02:53PM   17  Q.  Okay.  Does he make memoranda for them?

02:54PM   18  A.  I don't know.

02:54PM   19  Q.  Do you know if he made a memorandum for them for this

02:54PM   20  investigation?

02:54PM   21  A.  I don't know.

02:54PM   22  Q.  And Agent Webb is with Homeland Security; is that right?

02:54PM   23  A.  That's correct.

02:54PM   24  Q.  Did he ever provide you with any memoranda that he had

02:54PM   25  from his work on this case?

02:54PM    1    A.   No.

02:54PM    2    Q.   Did you ever ask him for it?

02:54PM    3    A.   No, sir.

02:54PM    4    Q.   Do you know if he prepared it?

02:54PM    5    A.   I don't know.

02:54PM    6    Q.   Do you know what his policy -- their policy is?  Is it

02:54PM    7    like the FBI or DEA or other agencies, federal agencies,

02:54PM    8    where they normally make memoranda?

02:54PM    9    A.   I would imagine it is, but I don't know.

02:54PM   10    Q.   Do you know if Agent Day follows those prescriptions

02:54PM   11    while he's assigned to the Homeland Security?

02:54PM   12    A.   I don't know.

02:55PM   13    Q.   Do you direct the detectives and deputies that work for

02:55PM   14    you not to prepare notes or memoranda of what happened on

02:55PM   15    their investigations?

02:55PM   16    A.   No.

02:55PM   17    Q.   And the confidential memo that you mentioned from the

02:55PM   18    sheriff's department, does that have a name or a number or

02:55PM   19    some identifying --

02:55PM   20    A.   It's generally a confidential report associated with a

02:55PM   21    case number.

02:55PM   22    Q.   Okay.  And you said all it is, is a brief summary of the

02:55PM   23    case?

02:55PM   24    A.   That's correct.

02:55PM   25    Q.   What would be contained in that, in one of them?

02:55PM    1    A.  It could be the debrief of the confidential informant,

02:55PM    2    could be an interview, could be a search warrant, could be an

02:55PM    3    operations plan.

02:55PM    4    Q.  Okay.  So, let's hypothetically just say the confidential

02:55PM    5    informant that participated in this case, right, he helped

02:56PM    6    you with this case.  I don't know if he helped you with other

02:56PM    7    cases.  I don't know, maybe yes, maybe no, but with respect

02:56PM    8    to this case, was a memoranda made about his cooperation?

02:56PM    9    A.  I don't know.  And in this particular case, it went from

02:56PM   10    his case to ultimately, you know, there being cases made

02:56PM   11    against other individuals which were ultimately prosecuted

02:56PM   12    federally.  So, the federal government would have been

02:56PM   13    responsible for making those reports.  We would have turned

02:56PM   14    over -- we would have relayed any information to them that we

02:56PM   15    had based upon our investigation, but that would have been

02:56PM   16    it.

02:56PM   17    Q.  How do you relay the information from you now that they

02:56PM   18    can use?

02:56PM   19    A.  Could be an in-person conversation, could be a

02:57PM   20    memorandum, could be a police report, it could be anything.

02:57PM   21    Q.  Okay.  So, in this particular case, this confidential

02:57PM   22    informant's cooperation led to at least charges against other

02:57PM   23    individuals; is that right?

02:57PM   24    A.  That's correct.

02:57PM   25    Q.  And, indirectly, a charge against Mr. Burgin, right?

02:57PM    1    A.   That's correct.

02:57PM    2    Q.   Okay.  And you were aware, are you not, that, just like

02:57PM    3    in the state system, in the federal system, US attorneys or

02:57PM    4    somebody that cooperates who has to plead guilty to a charge,

02:57PM    5    they make a recommendation for a lenient sentence from the

02:57PM    6    judge, do they not?

02:57PM    7    A.   That's correct.

02:57PM    8    Q.   Okay.  And so, they're going to want to reach out to

02:57PM    9    anybody that can tell them how much the confidential

02:57PM   10    informant did, whether they were honest, whether they were

02:57PM   11    helpful, whether cases were made, whole series of things,

02:58PM   12    correct?

02:58PM   13    A.   Yes, sir.

02:58PM   14    Q.   All right.  So, if Mr. Lynch is -- has this confidential

02:58PM   15    informant, he's going to be sentenced by, say, Judge Arcara,

02:58PM   16    right, Mr. Lynch has to file what they call a 5K

02:58PM   17    recommendation to the judge.  He wants to know what DJ

02:58PM   18    Granville has to say about this guy, right?

02:58PM   19    A.   That's correct.

02:58PM   20    Q.   Okay.  And so, how does he get that information from him?

02:58PM   21    A.   Are you referring to this particular case?

02:58PM   22    Q.   Just hypothetical.  I'm just using him as an example.

02:58PM   23    What would you give him?

02:58PM   24    A.   I would give him a -- it could be a simple email in

02:58PM   25    relation to who has been arrested, what's been recovered, the

03:00PM   1   outcomes, et cetera.

03:00PM   2   Q.  All off the top of your head?

03:01PM   3   A.  No.  I have to refer to some reports or talk to some

03:01PM   4   other agents if he cooperated with somebody else.

03:01PM   5   Q.  Okay.  So, we're back here.  What reports are there that

03:01PM   6   you made with respect to this particular confidential

03:01PM   7   informant with respect to the Rodney Pierce transaction that

03:01PM   8   happened on February 19th?

03:01PM   9   A.  I don't know that there are any.

03:01PM  10   Q.  Did you ever talk to Mr. Lynch or any other Assistant

03:01PM  11   United States Attorney and make a statement or provide

03:01PM  12   information regarding this confidential informant and how

03:01PM  13   much they had done for you -- he had done for you?

03:01PM  14   A.  Yes.  The confidential informant met with Mr. Lynch.

03:01PM  15   Q.  That wasn't my question.  My question was, did you ever

03:01PM  16   provide any information to Mr. Lynch or somebody else about

03:02PM  17   what this guy had done for you other than talk to him?

03:02PM  18   A.  I don't recall if I did or didn't.

03:02PM  19   Q.  When you became a detective -- well, let's go back to

03:02PM  20   being a deputy.  When you become a deputy in the sheriff's

03:02PM  21   department, do you receive any training about making notes,

03:02PM  22   memoranda, records of what it is, arrests, and things that

03:02PM  23   you do?

03:02PM  24   A.  Yes.

03:02PM  25   Q.  And what's the policy in the sheriff's department about

03:02PM    1    these?

03:02PM    2    A.   Properly documenting things?

03:02PM    3    Q.   Yeah.

03:02PM    4    A.   I don't know that there is a policy, but police reports

03:26PM    5    are done for every arrest.

03:28PM    6    Q.   What do you mean by a police report?

03:28PM    7    A.   Police report, just a quick summary of events that took

03:28PM    8    place as it relates to a state arrest in this case.

03:28PM    9    Q.   Okay.  Usually like a paragraph, maybe two paragraphs

03:28PM   10    long; is that right?

03:28PM   11    A.   That's correct.

03:28PM   12    Q.   No real specific details of what people did; is that

03:28PM   13    right?

03:28PM   14    A.   Sometimes they're done that way, but, in most cases, no.

03:28PM   15    Q.   In this case, you're not aware of any being done?

03:28PM   16    A.   No, sir.

03:28PM   17    Q.   Did you receive any training with respect to making

03:29PM   18    applications for search warrants?

03:29PM   19    A.   Not at the academy.  Later on.

03:29PM   20    Q.   Okay.  And where did you receive training?

03:29PM   21    A.   We might have went through a class hosted by DCJS in

03:29PM   22    relation to applications and search warrants.

03:29PM   23    Q.   When was that?

03:29PM   24    A.   This would have been maybe in 2003 or '04.

03:29PM   25    Q.   Okay.  And where was that that was done?

03:29PM    1    A.   It would have been at ECC.

03:29PM    2    Q.   And how long did that last?

03:29PM    3    A.   Couple of weeks.

03:29PM    4    Q.   Just on search warrants?

03:29PM    5    A.   Investigative techniques.

03:29PM    6    Q.   Okay.  And how much time was spent in terms of preparing

03:29PM    7    search warrants and applications?

03:29PM    8    A.   I don't recall.

03:30PM    9    Q.   And I take it that you didn't start off as chief, right?

03:30PM   10    You testified before you worked your way up to being chief,

03:30PM   11    right?

03:30PM   12    A.   I did.

03:30PM   13    Q.   When is the first time that you made an application for a

03:30PM   14    search warrant?

03:30PM   15    A.   Probably 20 plus years ago.

03:30PM   16    Q.   And how many applications have you made since then?

03:30PM   17    A.   A lot.

03:30PM   18    Q.   How many?  Hundred?

03:30PM   19    A.   More than a hundred.

03:30PM   20    Q.   Obviously you don't keep track of the number, correct?

03:30PM   21    A.   I don't.

03:30PM   22    Q.   And, in this particular case, there were a number of

03:30PM   23    warrants, for example, on the same day; is that right?

03:30PM   24    A.   There was.

03:30PM   25    Q.   Okay.  So, in addition to preparing them, I take it that

03:30PM   1   you supervised the detectives that work for you as chief; is

03:30PM   2   that right?

03:30PM   3   A.  I do.

03:30PM   4   Q.  Do you review all the search warrant applications that

03:30PM   5   they prepared?

03:31PM   6   A.  I don't.

03:31PM   7   Q.  Do you review any of them?

03:31PM   8   A.  Some.

03:31PM   9   Q.  Okay.  What would cause you to review a search warrant

03:31PM   10   application?

03:31PM   11   A.  It would depend.  If it's a very complex case, that would

03:31PM   12   be something I would take a look at.  If I just have the

03:31PM   13   time, I would try to take a look at them, but if, you know,

03:31PM   14   time doesn't always permit.

03:31PM   15   Q.  Have you trained any detectives or deputies how to

03:31PM   16   prepare a search warrant application and a warrant?

03:31PM   17   A.  I have.

03:31PM   18   Q.  Okay.  And when did you do that?

03:31PM   19   A.  Just over the course of years, new detectives get made

03:32PM   20   and you show them how -- the best way you know how it's done.

03:32PM   21   Q.  Is that a formal process or is that just kind of a *ad hoc*

03:32PM   22   as things come up?

03:32PM   23   A.  It's very informal.

03:32PM   24   Q.  Is there anybody else in your section of the sheriff's

03:32PM   25   department that specializes in search warrants?

03:32PM  1   A.  There's other senior detectives and detectives that have

03:32PM  2   been around for a long time that know what they're doing that

03:32PM  3   guys will attach themselves to to learn the process.

03:32PM  4   Q.  And I take it you did the same thing when you were

03:32PM  5   working your way up; is that right?

03:32PM  6   A.  That's correct.

03:32PM  7   Q.  Is there any training within your department for

03:32PM  8   preparing an inventory of a search?

03:33PM  9   A.  I don't believe so.

03:33PM  10  Q.  No?

03:33PM  11  A.  No.

03:33PM  12  Q.  What is an inventory?

03:33PM  13  A.  The items taken or seized from a property, vehicle, et

03:33PM  14  cetera.

03:33PM  15  Q.  And would that be -- those would happen with search

03:33PM  16  warrants, is that right?

03:33PM  17  A.  Those are often filed with the search warrant returns,

03:33PM  18  but those are placed in a file.

03:33PM  19  Q.  And an inventory would be prepared just on a search

03:33PM  20  incident to an arrest were there's no search warrant; is that

03:34PM  21  right?

03:34PM  22  A.  That's correct.

03:34PM  23  Q.  Now -- so, in this particular case, a search warrant

03:34PM  24  inventory was prepared; is that right?

03:34PM  25  A.  I believe so.

03:34PM   1   Q.  And who did that?

03:34PM   2   A.  I don't recall.

03:34PM   3   Q.  Did you direct somebody to do it?

03:34PM   4   A.  I don't recall if I did or didn't.

03:34PM   5   Q.  Is there a standard form that's used in the sheriff's

03:34PM   6   department for that?

03:34PM   7   A.  There is.

03:34PM   8   Q.  Now, have you read the Criminal Procedure Law, New York

03:34PM   9   State Criminal Procedure Law, Section 690 and all the

03:34PM  10   sections in there about how to go about -- what the law

03:34PM  11   requires for search warrants?

03:35PM  12   A.  I previously have.  Yes.

03:35PM  13   Q.  Right.  I suspect you don't read it every day; would that

03:35PM  14   be fair to say?

03:35PM  15   A.  I don't.

03:35PM  16   Q.  And you're generally familiar with it, though, are you

03:35PM  17   not, given your experience?

03:35PM  18   A.  I think so.  Yes.

03:35PM  19   Q.  And again, the Criminal Procedure Law in New York has

03:35PM  20   some very specific requirements; does it not?

03:35PM  21   A.  It does.

03:35PM  22   Q.  Including one of those is that you have to file a search

03:35PM  23   warrant with the Court; is that right?

03:35PM  24   A.  That's correct.

03:35PM  25   Q.  Does your department file all the search warrants with

03:35PM   1   the court for the clerk's office?

03:35PM   2   A.  Are you referring to the returns?

03:35PM   3   Q.  I'm referring to the search warrant itself and the

03:35PM   4   application.  The original.  Do you file that with the Erie

03:35PM   5   County Clerk's Office or a judge?

03:35PM   6   A.  Not all of them, no.

03:35PM   7   Q.  What -- which did you do and which don't you?

03:36PM   8   A.  We file a return with -- when the original is signed.

03:36PM   9   So, if we were to go see whatever judge, the original is

03:36PM  10   signed.  We burn a copy for the judge themselves.  Once that

03:36PM  11   search warrant is executed and completed, that original

03:36PM  12   search warrant, along with a property receipt, or whatever is

03:36PM  13   of evidentiary value is recovered, is returned to the judge.

03:36PM  14   Q.  Okay.  The return would be another term really for an

03:36PM  15   inventory; would that be fair to say?

03:36PM  16   A.  Yes.

03:36PM  17   Q.  Some say inventory, some say returns, right?

03:36PM  18   A.  That's correct.

03:36PM  19   Q.  And do you file them with the judge or the clerk?

03:36PM  20   A.  We file them with the judge.

03:36PM  21   Q.  And what happens if you don't find anything in the search

03:37PM  22   warrant?  Do you file those?

03:37PM  23   A.  A return?  Yes.

03:37PM  24   Q.  You file a return with judges where you don't find

03:37PM  25   anything?

03:37PM   1    A.   We have.  Yes.

03:37PM   2    Q.   Do you do it all the time?

03:37PM   3    A.   Personally, yes.  I would hope that all my detectives and

03:37PM   4    deputies do too.

03:37PM   5    Q.   Do they file all the warrants where things have been

03:37PM   6    found?

03:37PM   7    A.   Yes.

03:37PM   8    Q.   Do you know what the time requirement is for them to file

03:37PM   9    those?

03:37PM  10    A.   I know it's within a reasonable period of time.

03:37PM  11    Q.   Do you know when this -- when -- if and when the search

03:37PM  12    warrants for 56 Grimes were filed?

03:37PM  13    A.   No, sir.

03:37PM  14    Q.   Do you have anything to do with that process?

03:37PM  15    A.   No, sir.

03:37PM  16    Q.   Did you tell somebody to do that?

03:37PM  17    A.   I don't recall.

03:37PM  18    Q.   Okay.  Now, how do you go about getting a judge to sign a

03:38PM  19    warrant?  You get a case where you believe you got probable

03:38PM  20    cause.  You put together your paperwork, right, and you have

03:38PM  21    to go to a judge to get a search warrant signed?

03:38PM  22    A.   That's correct.

03:38PM  23    Q.   What's your process for that?

03:38PM  24    A.   Oftentimes, if it's after hours, we try to rely on the

03:38PM  25    judges that we know will answer the phone.

03:38PM  1  Q.  And what about during the day?

03:38PM  2  A.  During the day, if were dealing with an ADA that's

03:38PM  3  involved in the case, we'll rely on them to line up the

03:38PM  4  judges, but, oftentimes, we'll just start calling the phones.

03:38PM  5  Q.  Okay.  And what kind of judges do you go to?

03:38PM  6  A.  We go to -- it could be a city court judge, Erie County

03:39PM  7  Court Judge, New York State Supreme Court Judge.

03:39PM  8  Q.  Do you know what the Criminal Procedure Law Section 690

03:39PM  9  says about who the judges are that handle search warrants?

03:39PM  10      MR. LYNCH:  Judge, I'm going to object to relevance

03:39PM  11  on what it relates to this case, what New York law is or isn't

03:39PM  12  doesn't apply.  Federal law does.  So, I'm not sure -- if we

03:39PM  13  want to refer to this case, fine, but all these other cases

03:39PM  14  have no relevance to this suppression hearing.

03:39PM  15      THE COURT:  Yes.  I'm well aware of United States

03:39PM  16  Supreme Court case as well as Second Circuit Court of Appeals

03:40PM  17  cases that say when dealing with the issue of the validity of

03:40PM  18  a search warrant, be it probable cause or staleness,

03:40PM  19  broadness, whatever, under the Fourth Amendment, the federal

03:40PM  20  law applies.

03:40PM  21      MR. HARRINGTON:  Judge, that's not the purpose of

03:40PM  22  asking the question.  The purpose of asking the question is a

03:40PM  23  lead into the behavior that occurred in this particular case

03:40PM  24  with respect to the judge and everybody else.  That's why I'm

03:40PM  25  asking him what he knows.

03:40PM   1          THE COURT:  All right, then.  Let's get to that.

03:40PM   2   BY MR. HARRINGTON:

03:40PM   3   Q.  So, while a local judge is a primary judge, superior

03:40PM   4   judges can act, can they not?  You understand that?

03:40PM   5   A.  Yes.

03:40PM   6   Q.  Is that right?  Okay.  And you go to county courts, Erie

03:40PM   7   County Court Judges, do you not?

03:40PM   8   A.  Yes.

03:40PM   9   Q.  And you go to supreme court judges that handle criminal

03:40PM   10  cases; do you not?

03:41PM   11  A.  Yes.

03:41PM   12  Q.  Now, in this particular case, this case happens in the

03:41PM   13  City of Buffalo, right?

03:41PM   14  A.  That's correct.

03:41PM   15  Q.  And your office is in the City of Buffalo; is that right?

03:41PM   16  A.  That's correct.

03:41PM   17  Q.  And you were getting warrants in the evening after the

03:41PM   18  courts are closed; is that right?

03:41PM   19  A.  That's correct.

03:41PM   20  Q.  You didn't go to any of the 14 city court judges, did

03:41PM   21  you?

03:41PM   22  A.  No, sir.

03:41PM   23  Q.  Okay.  And you went to Judge Case, right?

03:41PM   24  A.  That's correct.

03:41PM   25  Q.  Okay.  And without giving his address, Judge Case lived,

03:41PM    1    at that time, in a suburb outside of the city, did he not?

03:41PM    2    A.  That's correct.

03:41PM    3    Q.  Do you know the procedures within the Eighth Judicial

03:41PM    4    District for superior court judges for who it is that's

03:42PM    5    supposed to handle search warrants at a given time?

03:42PM    6            MR. LYNCH:  Objection, Judge.  Relevance.

03:42PM    7            THE COURT:  Overruled.

03:42PM    8            THE WITNESS:  No, sir.

03:42PM    9    BY MR. HARRINGTON:

03:42PM   10    Q.  You never learned that; is that right?

03:42PM   11    A.  No, sir.

03:42PM   12    Q.  No one ever told you in all your training that within a

03:42PM   13    particular month, there's a judge that's assigned to criminal

03:42PM   14    special term, search warrants are supposed to go to that

03:42PM   15    judge during that month?

03:42PM   16            MR. LYNCH:  Object to the form of the question.

03:42PM   17            MR. HARRINGTON:  He can answer if he knows it.

03:42PM   18            THE COURT:  He can answer it yes or no.  Overruled.

03:42PM   19            THE WITNESS:  I'm aware there are on-call judges.

03:42PM   20    Yes.

03:42PM   21    BY MR. HARRINGTON:

03:42PM   22    Q.  Okay.  And do you get notification of who is on call at a

03:42PM   23    particular time?

03:42PM   24    A.  Sometimes.  Sometimes we do, and sometimes we don't.

03:42PM   25    Q.  Now, there's a procedure in New York where you can bring

03:43PM 1 a confidential informant to the judge and the judge can swear

03:43PM 2 the informant, and the judge records an interview the judge

03:43PM 3 has with the informant.  That can be used as the basis for

03:43PM 4 the facts and the reliability of the information; is that

03:43PM 5 right?

03:43PM 6 A.  Yes, sir.

03:43PM 7 Q.  Okay.  And have you done that before?

03:43PM 8 A.  Yes.

03:43PM 9 Q.  Many times, I assume?

03:43PM 10 A.  Yes.

03:43PM 11 Q.  All right.  And are there occasions where judges actually

03:43PM 12 come to your office to interview informants?

03:43PM 13 A.  Yes.

03:43PM 14 Q.  Judge Case one of those?

03:43PM 15 A.  He has, yes.

03:43PM 16 Q.  Judge Case signed both of the warrants on this case for

03:44PM 17 56 Grimes; did he not?

03:44PM 18 A.  Yes.

03:44PM 19 Q.  When you -- I believe you testified that under

03:44PM 20 Mr. Lynch's questioning that when you go to execute a search

03:44PM 21 warrant, there are a number of things that you may bring with

03:44PM 22 you to assist you in doing that; is that right?

03:45PM 23 A.  Equipment you mean?

03:45PM 24 Q.  Yes.

03:45PM 25 A.  Yes.

03:45PM  1   Q.  Okay.  And you mentioned that the officers probably will

03:45PM  2   wear vests or something to protect themselves; is that right?

03:45PM  3   A.  Yes, sir.

03:45PM  4   Q.  And you bring various devices to either pry open or smash

03:45PM  5   in a door; is that right?

03:45PM  6   A.  Yes, sir.

03:45PM  7   Q.  Okay.  And did you -- do Erie County Sheriffs deputies

03:45PM  8   and detectives wear body cameras?

03:45PM  9   A.  They do now.  Back during this incident, no.  Deputies

03:45PM 10   are assigned body cameras.  The detectives generally don't

03:45PM 11   wear them.

03:45PM 12   Q.  Back in 2019, were they wearing them or did they have

03:46PM 13   them available?

03:46PM 14   A.  I don't recall.

03:46PM 15   Q.  To the best of your knowledge, was anybody wearing one

03:46PM 16   that night?

03:46PM 17   A.  I don't believe so.

03:46PM 18   Q.  Now, in addition to planning the search warrant, you plan

03:46PM 19   the actual search; do you not?

03:46PM 20   A.  The search of the place?

03:46PM 21   Q.  Yes.  Wherever you got the warrant for, you plan how to

03:46PM 22   go about doing it, do you not?

03:46PM 23   A.  We do.

03:46PM 24   Q.  And that's usually called staging, would that be fair to

03:46PM 25   say?

03:46PM   1   A.  Well, that's -- you're referring to the actual execution

03:46PM   2   of the warrant?

03:46PM   3   Q.  Yes.  Right.

03:46PM   4   A.  Yes.

03:46PM   5   Q.  I'm sorry.

03:47PM   6   A.  That's correct.

03:47PM   7   Q.  Okay.  Was the staging done in this particular case?

03:47PM   8   A.  I don't recall.

03:47PM   9   Q.  So, by the way you testified, I infer that you had worked

03:47PM   10  with the other deputies, agents, and detectives that were

03:47PM   11  with you.  You knew them all, correct?

03:47PM   12  A.  That's correct.

03:47PM   13  Q.  Okay.  And had you participated in a search warrant with

03:47PM   14  them before?

03:47PM   15  A.  Yes.

03:47PM   16  Q.  There's a certain amount of knowledge that all of you

03:47PM   17  gain by working with each other; would that be fair to say?

03:47PM   18  A.  Yes, sir.

03:47PM   19  Q.  Now, on this particular case, was there any investigation

03:47PM   20  of 56 Grimes Street Buffalo, New York, done before you went

03:48PM   21  to execute the warrant?

03:48PM   22  A.  There was, but not the day of the event.

03:48PM   23  Q.  Well, you testified before that you were at 56 Grimes

03:48PM   24  Street several times.  Whether you went in there are not, you

03:48PM   25  were there near it, correct?

03:48PM  1   A.  That's correct.

03:48PM  2   Q.  Okay.  And you went back to 56 Grimes after Rodney

03:48PM  3   Pierce -- one of those times after Rodney Pierce was

03:48PM  4   arrested.  You went back there; did you not?

03:48PM  5   A.  That's correct.

03:48PM  6   Q.  And I -- at that point in time, were you thinking about

03:48PM  7   trying to get a search warrant at 56 Grimes when you went

03:48PM  8   back?

03:48PM  9   A.  We weren't thinking about getting a search warrant for

03:48PM  10  Grimes until we actually arrested Mr. Pierce.

03:49PM  11  Q.  Okay.  And after that, you were thinking about it; is

03:49PM  12  that right?

03:49PM  13  A.  That's correct.

03:49PM  14  Q.  And so, you go back to 56 Grimes and you stay there for

03:49PM  15  some period of time; do you not?

03:49PM  16  A.  That's correct.

03:49PM  17  Q.  And then, it takes several hours before mister -- or at

03:49PM  18  least an hour and a half before -- from when Mr. Pierce is

03:49PM  19  arrested until you get the first search warrant; is that

03:49PM  20  right?

03:49PM  21  A.  That's correct.

03:49PM  22  Q.  Okay.  Were you there that whole time from the arrest

03:49PM  23  there?

03:49PM  24  A.  No, sir.

03:49PM  25  Q.  All right.  Did you have anybody watching 56 Grimes?

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

92

03:49PM  1    A.  We did.

03:49PM  2    Q.  And who did you have watching?

03:49PM  3    A.  I don't recall.  I remember we had deputies staged over

03:49PM  4    there until we actually had the warrant signed.

03:49PM  5    Q.  Was any further determination made about 56 Grimes from

03:50PM  6    the time Mr. Pierce was arrested until the time that you

03:50PM  7    executed the warrant?  I'm just talking about the layout of

03:50PM  8    the place, what it was like, anything like that?

03:50PM  9    A.  Not that I recall, sir.

03:50PM  10   Q.  Okay.  And you testified that Mr. Pierce went in the

03:50PM  11   front door, is that right, left by the front door?

03:50PM  12   A.  That's correct.

03:50PM  13   Q.  And that's the door that's right on the sidewalk facing

03:50PM  14   the front of the building, right?

03:50PM  15   A.  That's correct.

03:50PM  16   Q.  And you testified a little while ago that you saw the

03:50PM  17   person you identified as Mr. Burgin, he went in the front

03:50PM  18   door; is that right?

03:50PM  19   A.  That's correct.

03:50PM  20   Q.  And he later left by that same front door; is that right?

03:50PM  21   A.  That's correct.

03:50PM  22   Q.  Okay.  And yet, you did not enter that building when you

03:50PM  23   had a search warrant for the lower front of the building, by

03:51PM  24   going in the main front door; is that right?

03:51PM  25   A.  That's correct.

03:51PM   1   Q.  Now, you went in.  Did somebody suggest to you that you

03:51PM   2   go in the side front door?

03:51PM   3   A.  Yes.

03:51PM   4   Q.  Who?

03:51PM   5   A.  Special Agent Webb.

03:51PM   6   Q.  Why?  What did he say to you?

03:51PM   7   A.  It was his opinion that that's where they had come and

03:51PM   8   gone from.  And, again, it was a dark night, you know, we

03:51PM   9   were unsure of the, you know, the specific door of the

03:51PM  10   comings and goings.

03:51PM  11   Q.  Where who had come and gone?

03:51PM  12   A.  Individuals from that residence.

03:51PM  13   Q.  Who?

03:51PM  14   A.  Mr. Pierce, Mr. Burgin.

03:51PM  15   Q.  You didn't see Mr. Burgin come, did you?

03:51PM  16   A.  No, sir.

03:51PM  17   Q.  And you saw Mr. Pierce go in the front door and come out

03:51PM  18   the front door.  You guys were on surveillance, is that

03:52PM  19   right?

03:52PM  20   A.  That's correct.

03:52PM  21   Q.  While you were on surveillance, you didn't see anybody go

03:52PM  22   in the side door, did you?

03:52PM  23   A.  From my vantage point, no.  I believed them to be coming

03:52PM  24   from the front of the building.

03:52PM  25   Q.  All right.  And you had Webb with you and you had Day

03:52PM  1    with you, didn't you?

03:52PM  2    A.  That's correct.

03:52PM  3    Q.  And who had the best view?

03:52PM  4    A.  I don't know.

03:52PM  5    Q.  Okay.  Now, Webb tells you, go in the side front door.

03:52PM  6    That's where they came from.  Whether he's right or wrong,

03:52PM  7    that's what he said to you; is that right?

03:52PM  8    A.  He said, it's that door.  It's that door.

03:53PM  9    Q.  Yeah.  Okay.  Did he indicate to you in any way that he

03:53PM  10   knew where that door led to?

03:53PM  11   A.  No, sir.

03:53PM  12   Q.  Now, you go off and do your, what you call a, protective

03:53PM  13   sweep.  You come back down and then you and the other

03:53PM  14   officers go in the front door, the main front door; is that

03:53PM  15   right?

03:53PM  16   A.  That's correct.

03:53PM  17   Q.  Okay.  Had anybody else gone in that front door before

03:53PM  18   you?

03:53PM  19   A.  No.

03:53PM  20   Q.  So, nobody did a protective sweep of the lower floor

03:53PM  21   which is where you thought things were; is that right?

03:53PM  22   A.  That's correct.

03:53PM  23   Q.  Before you obtained the search warrant for 56 Grimes, was

03:53PM  24   there any kind of investigation about the done, such as

03:54PM  25   getting records, utility records, city records, building

03:54PM    1    permit records, anything?

03:54PM    2             MR. LYNCH:  Can we take a short break, Judge?

03:54PM    3             THE COURT:  All right.  It's 23 minutes to 1.  We

03:54PM    4    have been going non-stop, probably wise to have a break for

03:54PM    5    personal reasons and purposes.  I would like to finish up with

03:55PM    6    this witness before we take a longer break.  So, we'll be back

03:55PM    7    at 1 o'clock.

03:55PM    8             MR. LYNCH:  Or even shorter, Judge.  I'm talking

03:55PM    9    five, ten minutes maybe.  That's it.

03:55PM   10             THE COURT:  Well, we'll be back at 1 o'clock.

03:55PM   11             MR. LYNCH:  Okay.  All right.

03:55PM   12    (A recess was taken from 12:42 p.m. to 1:00 p.m.)

03:55PM   13             THE CLERK:  We're back on the record.

03:55PM   14             MR. LYNCH:  Thank you, Judge.

03:55PM   15             THE COURT:  Mr. Harrington?

03:56PM   16    BY MR. HARRINGTON:

03:56PM   17    Q.  Chief Granville, you testified that, over the years, you

03:56PM   18    had received information about Mr. Burgin; is that right?

03:56PM   19    A.  That's correct.

03:56PM   20    Q.  And this particular case was, I think you said, a joint

03:56PM   21    investigation of the Erie County Sheriff's Department and

03:56PM   22    Buffalo Police Department, Department of Homeland Security,

03:56PM   23    the FBI, anybody else?  DEA in there too?

03:56PM   24    A.  I don't recall if they were involved, but --

03:56PM   25    Q.  Okay.  And what year did you start investigating

03:56PM   1   Mr. Burgin?

03:56PM   2   A.   The year I first heard about Mr. Burgin would have been

03:57PM   3   15 plus years ago, if not longer.

03:57PM   4   Q.   All right.   And had you heard his name various times over

03:57PM   5   the years in that 15 years?

03:57PM   6   A.   Yes, sir.

03:57PM   7   Q.   Did you participate in any investigations of him during

03:57PM   8   that time?

03:57PM   9   A.   Yes.

03:57PM  10   Q.   Did your investigations ever lead you to 56 Grimes?

03:57PM  11   A.   No.

03:57PM  12   Q.   Until that day, did you have any idea that Mr. Burgin had

04:09PM  13   any relationship whatsoever to 56 Grimes?

04:10PM  14   A.   I had heard it previously from other law enforcement, but

04:10PM  15   never from the confidential informants.

04:10PM  16   Q.   Okay.   And with all of these agencies that are involved,

04:10PM  17   did anybody else investigate 56 Grimes that you're aware of?

04:10PM  18   A.   I don't know.

04:10PM  19   Q.   You said you heard some other things about 56 Grimes of

04:10PM  20   what it was used for; is that right?

04:10PM  21   A.   That's correct.

04:10PM  22   Q.   And what were those uses?

04:10PM  23   A.   That I personally heard, it was an after-hours club.

04:10PM  24   Q.   Anything else?

04:10PM  25   A.   No.

04:10PM    1    Q.  And do you know the history of the building at all?

04:10PM    2    A.  No, sir.

04:10PM    3    Q.  Did you know that it had been a bar; a regular,

04:10PM    4    neighborhood bar?

04:10PM    5    A.  No, sir.

04:11PM    6    Q.  Do you know what business or factory was across the

04:11PM    7    street from 56 Burgin?

04:11PM    8    A.  Fifty-six Grimes?

04:11PM    9            THE COURT:  Fifty-six Grimes?

04:11PM   10            MR. HARRINGTON:  Yes.

04:11PM   11            THE WITNESS:  No, sir.

04:11PM   12    BY MR. HARRINGTON:

04:11PM   13    Q.  Okay.  And the DVR that was taken from 56 Grimes, do you

04:11PM   14    know what the memory cycle was on that?

04:11PM   15    A.  No, sir.

04:12PM   16    Q.  Did anybody ever go through the whole DVR, not just for

04:12PM   17    the day that Mr. Burgin was arrested, but for 10 days, 30

04:12PM   18    days before that it was stored data?

04:12PM   19    A.  I don't know.

04:12PM   20    Q.  Did you do it?

04:12PM   21    A.  No, sir.

04:12PM   22    Q.  Did you direct anybody else to do it?

04:12PM   23    A.  I don't believe so.

04:12PM   24    Q.  Did Webb or anybody else direct anybody to do that?

04:12PM   25    A.  I don't know.

04:12PM    1    Q.   Do you know what happened with the DVR after it was

04:12PM    2    seized?

04:12PM    3    A.   No, sir.

04:12PM    4    Q.   Do you know when it was seized?

04:12PM    5    A.   Believe it was seized that day.

04:12PM    6    Q.   Are you sure about that?

04:12PM    7    A.   I'm not positive.  No.

04:12PM    8    Q.   Now, in Buffalo, New York, what time do bars close?

04:13PM    9    A.   Believe the rule is 4 a.m.

04:13PM   10    Q.   So, an after-hours bar in Buffalo is like, 4 a.m. to 6

04:13PM   11    a.m.; is that right?

04:13PM   12    A.   Yes, but not every bar closes at 4 a.m.

04:13PM   13    Q.   Do you know whether 56 Grimes was ever operated by

04:13PM   14    Mr. Burgin or his family as a bar?

04:13PM   15    A.   I don't know.

04:13PM   16    Q.   Did you ever hear anything about them renting the place

04:13PM   17    out to other people to use for holiday and other important

04:13PM   18    events?

04:13PM   19    A.   I don't recall.

04:13PM   20    Q.   Did you ever hear about them offering it for free to

04:13PM   21    people who couldn't afford to pay for a party?

04:14PM   22    A.   No.

04:14PM   23    Q.   When you went in that night, you got a good look at what

04:14PM   24    this place was like, didn't you?

04:14PM   25    A.   Yes, sir.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

99

| | | |
|---|---|---|
| 04:14PM | 1 | Q.  You were in there a long time, and you went all over the |
| 04:14PM | 2 | place, didn't you? |
| 04:14PM | 3 | A.  That's correct. |
| 04:14PM | 4 | Q.  And based on what's shown on the video, and I take it |
| 04:14PM | 5 | your experience, this was a very, very clean establishment; |
| 04:14PM | 6 | was it not? |
| 04:14PM | 7 | A.  From what I recall, yes. |
| 04:14PM | 8 | Q.  Barstools were upside down on the bar; were they not? |
| 04:15PM | 9 | A.  Yes, sir. |
| 04:15PM | 10 | Q.  Place was all clean, nothing lying around, no garbage, |
| 04:15PM | 11 | nothing downstairs now I'm talking about; is that right? |
| 04:15PM | 12 | A.  Correct. |
| 04:15PM | 13 | Q.  And when you went upstairs, you saw kitchen items; did |
| 04:15PM | 14 | you not? |
| 04:15PM | 15 | A.  Yes, sir. |
| 04:15PM | 16 | Q.  And you were in a kitchen, weren't you? |
| 04:15PM | 17 | A.  Yes, sir. |
| 04:15PM | 18 | Q.  I think you said when you went in the door of the |
| 04:15PM | 19 | upstairs, you walked right into a kitchen; is that right? |
| 04:15PM | 20 | A.  No. |
| 04:15PM | 21 | Q.  No?  Okay.  Where was the kitchen after you went |
| 04:15PM | 22 | upstairs? |
| 04:15PM | 23 | A.  The kitchen was located towards the back of the property. |
| 04:15PM | 24 | Q.  All right.  And what was the room that you walked into |
| 04:16PM | 25 | when you went up the stairs? |

04:16PM 1   A.  I believe it was an open area, but I don't recall

04:16PM 2   exactly.

04:16PM 3   Q.  When you went up the first time to do the protective

04:16PM 4   sweep, did you go to the front or the back; you, yourself?

04:16PM 5   A.  I believe I went to the back.

04:16PM 6   Q.  Did you go to the front at any time?

04:16PM 7   A.  I don't recall.

04:16PM 8   Q.  How did you know there was nobody up there?  Were

04:16PM 9   officers yelling anything to you?

04:16PM 10  A.  Yes.

04:16PM 11  Q.  Did they use the word clear or something else?

04:16PM 12  A.  Yes, sir.

04:16PM 13  Q.  And now the upstairs is not that big a place; isn't that

04:16PM 14  right?

04:16PM 15  A.  It's not huge, no.

04:17PM 16  Q.  Okay.  So, it should take about 30 seconds to a minute to

04:17PM 17  go through the whole place to look for people; should it not?

04:17PM 18  A.  It depends.  You have to clear, you know, every space

04:17PM 19  that someone can hide in.

04:17PM 20  Q.  Were you looking for people?

04:17PM 21  A.  Yes.

04:17PM 22  Q.  Where?

04:17PM 23  A.  In the entire property.

04:17PM 24  Q.  You, yourself, where on the second floor were you looking

04:17PM 25  for people?

04:17PM   1   A.   I believe I went towards the back of the residence, the

04:17PM   2   property.

04:17PM   3   Q.   And you had identified a bill that you said was in the

04:17PM   4   garbage; is that right?

04:17PM   5   A.   That's correct.

04:17PM   6   Q.   You didn't suspect there were any people in that garbage

04:17PM   7   can, did you?

04:17PM   8   A.   No, sir.

04:17PM   9   Q.   So, did you have an intention to look for anything of

04:17PM  10   identification of anybody when you were doing this protective

04:17PM  11   sweep?

04:17PM  12   A.   No.  It was a bill that had caught my eye, and I looked

04:18PM  13   at it.

04:18PM  14   Q.   And you're telling us you did not open that garbage; is

04:18PM  15   that right?

04:18PM  16   A.   No, I didn't.

04:18PM  17   Q.   You didn't move anything around?

04:18PM  18   A.   Ultimately, yes.

04:18PM  19   Q.   When did you move stuff around?

04:18PM  20   A.   I don't recall.

04:18PM  21   Q.   I want to ask you a few questions, if I could, about

04:20PM  22   Judge Case and this particular case.  How many search

04:20PM  23   warrants have you obtained from Judge Case, say, in the last

04:20PM  24   10 years?

04:20PM  25   A.   I don't know.  A lot.

04:26PM    1    Q.  And is he the judge that you go to most often?

04:26PM    2    A.  During certain time periods, he was answering the phone

04:26PM    3    the most so, yes.

04:26PM    4    Q.  And did he ever refuse you to see you?

04:26PM    5    A.  Yes.

04:26PM    6    Q.  Did he ever turn you down for a search warrant?

04:26PM    7    A.  I don't recall.

04:26PM    8    Q.  Now, at one point in time, Judge Case's wife was running

04:31PM    9    for Erie County Sheriff, was she not?

04:31PM   10    A.  That's correct.

04:31PM   11    Q.  Do you know her?

04:31PM   12    A.  I do.

04:31PM   13          MR. LYNCH:  Objection, Judge.  Relevance.

04:31PM   14          THE COURT:  Yeah.  What's the relevance?

04:32PM   15          MR. HARRINGTON:  I'll go on, Judge.

04:32PM   16    BY MR. HARRINGTON:

04:32PM   17    Q.  Has Judge Case ever been to your office on Elm Street?

04:32PM   18    A.  Yes, sir.

04:32PM   19    Q.  How many times?

04:32PM   20    A.  I don't recall.

04:32PM   21    Q.  More than five?

04:32PM   22    A.  Yes.

04:32PM   23    Q.  You had Judge Case's phone number in your phone, did you

04:32PM   24    not?

04:32PM   25    A.  Yes.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

04:32PM    1    Q.  Do you have all the judges' numbers in your phone?

04:32PM    2    A.  I don't know if I have all, but I have a lot.

04:32PM    3    Q.  When you first called Judge Case, what did you say to

04:32PM    4    him?

04:32PM    5    A.  I don't recall the contents of the conversation, but it

04:33PM    6    would have probably been something like, are you available

04:33PM    7    for us.

04:33PM    8    Q.  Did you give him any information, details?

04:33PM    9    A.  I don't recall.

04:33PM   10    Q.  Did you tell him who was coming?

04:33PM   11    A.  Probably.  I don't recall if I did, though.

04:33PM   12    Q.  Did you tell him where the premises was?

04:33PM   13    A.  I don't recall.

04:33PM   14    Q.  Any details about the search?

04:33PM   15    A.  I don't recall.

04:33PM   16    Q.  Did you tell him how long it would take to get there?

04:34PM   17    A.  I don't recall.

04:34PM   18    Q.  Now, that evening, Judge Case signed two warrants,

04:34PM   19    correct?

04:34PM   20    A.  That's correct.

04:34PM   21    Q.  And they related to Mr. Burgin, right?

04:34PM   22    A.  That's correct.

04:34PM   23    Q.  In fact, his name appeared in the search warrant

04:34PM   24    application, did it not?

04:34PM   25    A.  That's correct.

04:34PM   1   Q.  And in the first search warrant, there was also a request

04:34PM   2   to search the Toyota Tundra that Mr. Burgin had been driving

04:35PM   3   that day; is that right?

04:35PM   4   A.  That's correct.

04:35PM   5   Q.  And were you aware that there had been a supposedly a

04:35PM   6   positive dog sniff on the handle of that vehicle?

04:35PM   7   A.  Yes.

04:35PM   8   Q.  And an affidavit was provided by Galbraith to the judge

04:35PM   9   about that; is that right?

04:35PM   10   A.  That's correct.

04:35PM   11   Q.  And no drugs were found in that Tundra, were they?

04:35PM   12   A.  No.

04:35PM   13   Q.  Now, do you recall back on July the 9th of 2019 that

04:35PM   14   Mr. Burgin was stopped right outside this building in the

04:35PM   15   City Hall traffic circle?

04:35PM   16   A.  I do recall that.

04:35PM   17   Q.  You were there, were you not?

04:35PM   18   A.  I was.

04:35PM   19   Q.  You talked to Mr. Burgin, didn't you?

04:35PM   20   A.  I believe I did.

04:35PM   21   Q.  He was taken into custody by Webb, wasn't he?

04:35PM   22   A.  I don't recall who took him into custody.

04:36PM   23   Q.  Do you know how long he was held in custody?

04:36PM   24   A.  I don't recall.

04:36PM   25          MR. LYNCH:  Objection, Judge.  Relevance to this.

04:36PM  1   The hearing that we're here for today, we're here for the 56

04:36PM  2   Grimes warrant.

04:36PM  3              MR. HARRINGTON:  I'll get there.

04:36PM  4              THE COURT:  Overruled.  I want to see just what this

04:36PM  5   is leading to.

04:36PM  6   BY MR. HARRINGTON:

04:36PM  7   Q.  Do you know how long he was held in custody?

04:36PM  8   A.  I don't, sir.

04:36PM  9   Q.  He wasn't arrested that day, was he?

04:36PM  10  A.  No, sir.

04:36PM  11  Q.  He wasn't charged with anything, correct?

04:36PM  12  A.  That's correct.

04:36PM  13  Q.  Do you know if anything was seized from him that day?

04:36PM  14  A.  I don't know.

04:36PM  15  Q.  And do you know whether there was a search warrant

04:36PM  16  applied for for the vehicle he was driving that day?

04:36PM  17  A.  I believe there was.

04:36PM  18  Q.  And who did that?  Do you know?

04:36PM  19  A.  I don't recall.

04:36PM  20  Q.  Do you know Buffalo Police Detective Raymond Krug?

04:37PM  21  A.  I do.

04:37PM  22  Q.  Does he work with you on cases?

04:37PM  23  A.  We've worked together in the past.  Yes.

04:37PM  24  Q.  And he went to Judge Case and got a search warrant for

04:37PM  25  the vehicle that Mr. Burgin was driving that day, did he not?

04:37PM   1    A.  I don't recall.

04:37PM   2    Q.  Do you know whether there was a dog sniff done of the

04:37PM   3    vehicle he was driving that day?

04:37PM   4    A.  I don't recall.

04:37PM   5    Q.  Were you there when the drug sniff was done?

04:37PM   6    A.  I can't remember.

04:37PM   7    Q.  You were standing right there with Mr. Burgin, weren't

04:37PM   8    you?

04:37PM   9    A.  Yeah, but was the dog sniff done right outside here or

04:38PM  10    was it done somewhere else?

04:38PM  11    Q.  Here.

04:38PM  12    A.  I don't recall.

04:38PM  13    Q.  And no drugs were found in that vehicle, were they?

04:38PM  14    A.  No, sir.

04:38PM  15    Q.  And that warrant application went to Judge Case too,

04:38PM  16    didn't it?

04:38PM  17    A.  This is the first I'm hearing of that, but if you're

04:38PM  18    saying so, yes.

04:38PM  19    Q.  Did you have anything to do with selecting Judge Case

04:38PM  20    then?

04:38PM  21    A.  I don't recall if I did or didn't, but this was another

04:39PM  22    agency that was applying for the warrant, so I would --

04:39PM  23    that's not something I would typically get involved with.

04:39PM  24    Q.  Well, would it be fair to say that you can't say I worked

04:39PM  25    with other agencies, but when it's convenient for you, it's

04:39PM   1   their investigation, but when it's not convenient, it's a

04:39PM   2   joint investigation?

04:39PM   3           MR. LYNCH:  Object to the form of that question,

04:39PM   4   Judge.

04:39PM   5           THE COURT:  Sustained.

04:39PM   6   BY MR. HARRINGTON:

04:39PM   7   Q.  You were part of the investigation that day; were you

04:39PM   8   not?

04:39PM   9   A.  I was, yes.

04:39PM  10   Q.  Okay.  And you were working together with Webb and Krug

04:39PM  11   and other law enforcement officers; were you not?

04:39PM  12   A.  That's correct.

04:39PM  13   Q.  There were quite a number of you, weren't there?

04:41PM  14   A.  Yes, there were.

04:41PM  15   Q.  And so, somebody decided that Krug was the one that was

04:41PM  16   going to go try to get the search warrant, right?

04:42PM  17   A.  That's correct.

04:42PM  18   Q.  But it was part of the same investigation that you and

04:42PM  19   Webb were part of; was it not?

04:42PM  20   A.  It is, but what happened here is a Buffalo Police car

04:42PM  21   stopped the vehicle and therefor, a Buffalo Police detective

04:42PM  22   was going to apply for a search warrant.  That circumstance,

04:42PM  23   that's not something we would rely on interagency cooperation

04:42PM  24   for.  That's something that agency is handling.

04:42PM  25   Q.  All right.  Based on that stop, are you aware that an

04:43PM    1    application was made to Judge Schroeder to do a cell --

04:43PM    2    search of cell phones that were taken from Mr. Burgin's

04:43PM    3    vehicle that day, the vehicle he was driving?

04:43PM    4    A.  I don't recall that.

04:43PM    5    Q.  When Mr. Burgin was stopped that day, you didn't know who

04:43PM    6    he was, did you?

04:43PM    7    A.  No.

04:43PM    8    Q.  You said, who the fuck are you, right?

04:43PM    9    A.  I don't recall what I said.

04:43PM   10    Q.  Is that something you might say?

04:43PM   11    A.  In my life?  Yes.

04:43PM   12    Q.  Okay.  And you were expecting somebody else to be driving

04:44PM   13    that car, weren't you?

04:44PM   14         MR. LYNCH:  Judge, I object to this line of

04:44PM   15    questioning.  Again, this is --

04:44PM   16         THE COURT:  Yeah, we're getting kind of far afield

04:44PM   17    from the issue here in this case.

04:44PM   18    BY MR. HARRINGTON:

04:44PM   19    Q.  Now, based on what we read in the search warrants for 56

04:44PM   20    Grimes, Judge Case was never told that nothing was found in

04:44PM   21    the vehicle that Mr. Burgin was stopped in on July the 9th,

04:44PM   22    was he, of 2019?

04:44PM   23    A.  I don't believe so.

04:44PM   24    Q.  Can you tell me when was it decided you were going to

04:45PM   25    seek the search warrant; the actual decision made to get one?

04:45PM   1                THE COURT:  Are we talking about for 56 Grimes?

04:45PM   2                MR. HARRINGTON:  For 56 Grimes.  The first one.

04:45PM   3                THE WITNESS:  It would have been after Rodney Pierce

04:45PM   4      was arrested.

04:45PM   5      BY MR. HARRINGTON:

04:45PM   6      Q.  Okay.  Even before you saw Mr. Burgin?

04:45PM   7      A.  I should say this.  It was decided once we arrested

04:45PM   8      Mr. Pierce that we were going to work our -- try to work --

04:45PM   9      attempt to work our way back to 56 Grimes.

04:45PM  10      Q.  So, let's take a minute.  Mr. Pierce goes to the Auto

04:45PM  11      Zone the first time, right?

04:45PM  12      A.  That's correct.

04:45PM  13      Q.  Are you on surveillance then?

04:45PM  14      A.  Yes, sir.

04:45PM  15      Q.  And where did you come from?

04:45PM  16      A.  We've come from, prior to the Auto Zone, from downtown.

04:46PM  17      Q.  Okay.  Do you know what time that was?

04:46PM  18      A.  Off the top of my head, I don't recall.

04:46PM  19      Q.  Was he supposed to meet the confidential informant at

04:46PM  20      5:30?

04:46PM  21      A.  I don't recall the times.

04:46PM  22      Q.  But, in any event, you go to the Auto Zone or near it,

04:46PM  23      correct?

04:46PM  24      A.  That's correct.

04:46PM  25      Q.  And where do you park?

04:46PM   1    A.  I don't recall.

04:46PM   2    Q.  Were you across the street in the service station, the

04:46PM   3    Valero?

04:46PM   4    A.  I don't recall, sir, exactly where I was parked.

04:46PM   5    Q.  But you were there and you saw this white Caravan which

04:46PM   6    you believed to be Mr. Pierce; is that right?

04:47PM   7    A.  That's correct.

04:47PM   8    Q.  And you knew at that time that Mr. Pierce was driving

04:47PM   9    with a suspended license, didn't you?

04:47PM   10   A.  That's correct.

04:47PM   11   Q.  And, in New York State, that's a misdemeanor, is it not?

04:47PM   12   A.  Yes, sir.

04:47PM   13   Q.  And somebody can be arrested for a misdemeanor and taken

04:47PM   14   into custody, can they not?

04:47PM   15   A.  Yes, sir.

04:47PM   16   Q.  So, he could have been stopped for a traffic violation,

04:47PM   17   his car impounded, and inventory search been done; is that

04:47PM   18   right?

04:47PM   19   A.  That's correct.

04:47PM   20   Q.  That was decided not to be done; is that right?

04:47PM   21   A.  At that very moment?

04:47PM   22   Q.  Yeah.

04:47PM   23   A.  That's correct.

04:47PM   24   Q.  Was that ever discussed that you might do that?

04:47PM   25   A.  I don't recall.

04:47PM   1   Q.   Did -- when you saw Mr. -- who you believed to be

04:48PM   2   Mr. Pierce there, right, he, apparently, according to other

04:48PM   3   testimony, backed into a parking spot at the Auto Zone; is

04:48PM   4   that right?

04:48PM   5   A.   That's correct.

04:48PM   6   Q.   How long was he there?

04:48PM   7   A.   Couple of minutes.

04:48PM   8   Q.   And his purpose in being there, as you understood it, was

04:48PM   9   to make this drug transaction; is that right?

04:48PM   10   A.   That's correct.

04:48PM   11   Q.   And, can you tell me, at any point in time, was it ever

04:48PM   12   considered that the confidential informant was actually going

04:48PM   13   to go there to see Mr. Pierce that day?

04:48PM   14   A.   It was.

04:48PM   15   Q.   Okay.  And when was that?

04:48PM   16   A.   It was considered during the course of these phone calls

04:48PM   17   whether we were going to put the confidential informant on

04:48PM   18   scene and we decided not to.

04:48PM   19   Q.   When did you decide not to?

04:49PM   20   A.   When the informant made it clear that it wasn't going to

04:49PM   21   be a, what we call, dry meet, which means a meet to discuss a

04:49PM   22   drugs transaction or purpose or whatever, when he informed us

04:49PM   23   that, in fact, Mr. Pierce was going to arrive with a large

04:49PM   24   quantity of cocaine, we decided there was no need for -- to

04:49PM   25   enter the informant into the equation.

04:49PM   1   Q.   Okay.  And his telling you this is based upon these

04:49PM   2   recordings that we have; is that right?

04:49PM   3   A.   Based upon the recordings and prior interaction.

04:50PM   4   Q.   How many interactions before?

04:50PM   5   A.   With Mr. Pierce?  It was only once or more.

04:50PM   6   Q.   Just once; is that right?

04:50PM   7   A.   That's correct.

04:50PM   8   Q.   And based upon this once, he's going to front him a large

04:50PM   9   amount of cocaine; is that right?  That's what you believed?

04:50PM   10  A.   That's correct.

04:50PM   11  Q.   Now -- but before you went from Elm Street to the Auto

04:50PM   12  Zone, by then it had been determined that the confidential

04:50PM   13  informant was not going to be on the scene and meet

04:50PM   14  Mr. Pierce, correct?

04:50PM   15  A.   That's correct.

04:50PM   16  Q.   So, you went there for the purpose of arresting

04:50PM   17  Mr. Pierce, right?

04:50PM   18  A.   That's correct.

04:50PM   19  Q.   And whether that was for the traffic violation or the

04:51PM   20  drug investigation, you were going there for the purpose of

04:51PM   21  arresting him, correct?

04:51PM   22  A.   That's correct.

04:51PM   23  Q.   And you believed that he had the drugs with him, based

04:51PM   24  upon whatever the informant told you, your interpretation of

04:51PM   25  these phone calls, you believed that; did you not?

04:51PM    1    A.  That's correct.

04:51PM    2    Q.  Okay.  And so, there comes a time later that Mr. Pierce

04:51PM    3    returns to the Auto Zone and officers and agents arrest him

04:51PM    4    in the parking lot, correct?

04:51PM    5    A.  That's correct.

04:51PM    6    Q.  And you find a black bag, small black bag, that has drugs

04:51PM    7    in it; is that right?

04:51PM    8    A.  That's correct.

04:51PM    9    Q.  Okay.  And other people have testified, and I think you

04:52PM   10    did on your direct testimony, that in between his first

04:52PM   11    appearance at Auto Zone and his arrest, he went to 56 Grimes;

04:52PM   12    is that right?

04:52PM   13    A.  That's correct.

04:52PM   14    Q.  And you and Day and Webb saw him get out of his -- the

04:52PM   15    Caravan and walk into 56 Grimes carrying a small black bag;

04:52PM   16    is that right?

04:52PM   17    A.  That's correct.

04:52PM   18    Q.  And you saw him come out of 56 Grimes carrying the same

04:52PM   19    small bag, correct?

04:52PM   20    A.  That's correct.

04:52PM   21    Q.  And that bag had the drugs in it when he was arrested; is

04:52PM   22    that right?

04:52PM   23    A.  That's correct.

04:52PM   24    Q.  After Pierce was arrested, you determined you were going

04:53PM   25    to try to get a search warrant.  When is the first time you

04:53PM   1   assigned that task to McMahon?

04:53PM   2   A.  It would have probably have been shortly thereafter,

04:53PM   3   after we arrested Pierce.

04:54PM   4   Q.  And how did you tell him to do it?

04:54PM   5   A.  I don't recall.

04:54PM   6   Q.  Does your phone log indicate that you called him?

04:54PM   7   A.  I don't recall if it was a phone conversation or an in-

04:54PM   8   person conversation.

04:54PM   9   Q.  In any event, after Mr. Burgin was arrested, right, you

04:54PM  10   participated in that arrest, too, right?

04:54PM  11   A.  Yes, sir.

04:54PM  12   Q.  Okay.  We'll come back to that in a minute, but he was

04:54PM  13   taken some place in custody.  Where was he taken?

04:54PM  14   A.  Mr. Pierce?

04:54PM  15   Q.  Mr. Burgin, when he was arrested.

04:54PM  16   A.  He was taken back to our office at 45 Elm.

04:54PM  17   Q.  Where was Pierce taken when he was arrested?

04:58PM  18   A.  Same place.

04:58PM  19   Q.  Was the CI there too?

04:58PM  20   A.  No.

04:58PM  21   Q.  So, when Mr. Burgin is taken back to your office, I

04:59PM  22   assume there was some discussion with McMahon then about the

04:59PM  23   search warrant; was there not?

04:59PM  24   A.  I don't recall, but I would imagine so.

04:59PM  25   Q.  Who gave Pat McMahon the details that are in that short

04:59PM    1    paragraph that supposedly is probable cause for this search

04:59PM    2    warrant, do you know?

04:59PM    3             THE COURT:  By this search warrant, we're talking

04:59PM    4    about Government Exhibit --

04:59PM    5             MR. HARRINGTON:  Search warrant number 1 for Grimes.

04:59PM    6             THE COURT:  Government Exhibit 8?

04:59PM    7             MR. HARRINGTON:  Yes.  Excuse me.

04:59PM    8             THE WITNESS:  Is that relating to the arrest of

04:59PM    9    Mr. Pierce?

04:59PM   10             MR. HARRINGTON:  No.

04:59PM   11    BY MR. HARRINGTON:

04:59PM   12    Q.  The first search warrant for Grimes, Government Exhibit

04:59PM   13    8, right, the one with the whited out --

04:59PM   14    A.  Okay.

04:59PM   15    Q.  That's what I'm talking about.  In that search warrant

04:59PM   16    application, we can show it to you if you want, there's a

05:00PM   17    paragraph that has information about the probable cause for

05:00PM   18    the arrest.  Do you want to see that?

05:00PM   19    A.  Sure.

05:00PM   20    Q.  Let me show you.  Can you pull it up?

05:02PM   21    A.  I see it.

05:02PM   22    Q.  Okay.  And I have given you a copy of the Government

05:02PM   23    Exhibit Number 8, correct?  And this is the third page.  And

05:02PM   24    at the bottom of the third page, there's a paragraph with the

05:02PM   25    number 2; is that right?

05:02PM   1   A.   Yes.

05:02PM   2   Q.   Okay.  And that's the -- are they -- that contains the

05:02PM   3   allegations of fact that were made by -- in McMahon's

05:03PM   4   application, correct?

05:03PM   5   A.   That's correct.

05:03PM   6   Q.   Now, do you know who it is that gave -- we can go through

05:03PM   7   it line by line, each of this --

05:03PM   8   A.   I see all the information.  I'm not sure where that would

05:03PM   9   have came from.

05:03PM  10   Q.   Did you give any of this information to him?

05:03PM  11   A.   I don't recall.

05:03PM  12   Q.   Did McMahon show you the search warrant application

05:04PM  13   before it was taken to Judge Case?

05:04PM  14   A.   I don't recall.

05:04PM  15   Q.   In these search warrant applications, I don't mean to

05:05PM  16   diminish the information in them, but they're -- most of the

05:05PM  17   information in these are just standard information that's

05:05PM  18   used in cases; is that right?

05:05PM  19   A.   A lot is boilerplate.

05:05PM  20   Q.   Right.  So, you don't go back and type all that out

05:05PM  21   again.  You use the format.  It doesn't mean that you're not

05:05PM  22   attesting to the accuracy of that, but just -- you don't go

05:05PM  23   back and type individual paragraphs over and over again,

05:05PM  24   correct?

05:05PM  25   A.   That's correct.

05:05PM   1    Q.  And so, the paragraph, like number 2, is the important

05:05PM   2    paragraph in terms of the judge's analysis of whether there's

05:05PM   3    probable cause alleged; is that right?

05:05PM   4    A.  That's correct.

05:05PM   5    Q.  Do you know if anybody else assisted McMahon in preparing

05:05PM   6    this search warrant application?

05:05PM   7    A.  I know Paul McMahon was helping him.

05:06PM   8    Q.  Is Paul related to him?

05:06PM   9    A.  Yes.

05:06PM   10   Q.  What is their relationship?

05:06PM   11   A.  Twin brothers.

05:06PM   12   Q.  Twin brothers?  What's his position?

05:06PM   13   A.  He's a deputy assigned to DEA.

05:06PM   14   Q.  Sheriff's deputy, but assigned to Drug Enforcement

05:06PM   15   Administration?

05:06PM   16   A.  That's correct.

05:06PM   17   Q.  And did anybody else besides the two McMahon brothers go

05:06PM   18   to see Judge Case?

05:06PM   19   A.  I don't believe so.

05:06PM   20   Q.  Did you speak with Paul McMahon about this application?

05:06PM   21   A.  I don't recall.

05:06PM   22   Q.  Do you know who -- which of the two of them or both of

05:06PM   23   them or anybody else actually drafted this?

05:06PM   24   A.  I think Pat McMahon drafted it.

05:07PM   25   Q.  Pat drafted it?

| | | |
|---|---|---|
| 05:07PM | 1 | A.  That's correct. |
| 05:07PM | 2 | Q.  So, do you recall what time you got back to 45 Elm Street |
| 05:07PM | 3 | after Mr. Burgin was arrested? |
| 05:07PM | 4 | A.  I don't, sir. |
| 05:07PM | 5 | Q.  You took a while after you got back before the search |
| 05:07PM | 6 | warrant application was complete, is that right, would that |
| 05:07PM | 7 | be fair to say? |
| 05:07PM | 8 | A.  Yes. |
| 05:07PM | 9 | Q.  And did you have any other phone calls with Judge Case |
| 05:07PM | 10 | that evening before the warrant was signed or the warrant was |
| 05:08PM | 11 | taken to him to be signed? |
| 05:08PM | 12 | A.  I don't recall.  If it's not in my phone records, I |
| 05:08PM | 13 | didn't. |
| 05:08PM | 14 | Q.  On the first page of the warrant itself -- |
| 05:08PM | 15 | THE COURT:  Government Exhibit 8. |
| 05:08PM | 16 | MR. HARRINGTON:  Yes.  I'm getting there, Judge. |
| 05:08PM | 17 | BY MR. HARRINGTON: |
| 05:08PM | 18 | Q.  -- of Exhibit 8, Government Exhibit 8, on the first page |
| 05:09PM | 19 | of the search warrant itself, which would be the -- looks |
| 05:09PM | 20 | like the seventh page back, Judge Case asked you a few |
| 05:09PM | 21 | questions about the missing lower front and there.  Do you |
| 05:09PM | 22 | recall those questions? |
| 05:09PM | 23 | A.  Judge Schroeder? |
| 05:10PM | 24 | Q.  Sorry.  Yes.  Judge Schroeder.  Thank you. |
| 05:10PM | 25 | A.  I do. |

| | | |
|---|---|---|
| 05:10PM | 1 | Q.  Anyway, the -- after that, it says that 56 Grimes Street |
| 05:10PM | 2 | is a two-and-a-half story, multiple-residence building. |
| 05:10PM | 3 | A.  That's correct. |
| 05:10PM | 4 | Q.  Do you know where that information came from that went to |
| 05:10PM | 5 | McMahon for that? |
| 05:10PM | 6 | A.  I don't. |
| 05:10PM | 7 | Q.  You were upstairs on the second floor of this building at |
| 05:10PM | 8 | 56, right, and you at least went into at least one part of it |
| 05:10PM | 9 | where there was a kitchen, which would lead you to believe |
| 05:10PM | 10 | that that was a residence, did it not? |
| 05:10PM | 11 | A.  That's correct. |
| 05:10PM | 12 | Q.  And you can't recall whether there was a second residence |
| 05:10PM | 13 | in the front part of the building? |
| 05:11PM | 14 | A.  No, sir. |
| 05:11PM | 15 | Q.  There was no residence in the attic was area? |
| 05:11PM | 16 | MR. LYNCH:  Judge, I object to the form of the |
| 05:11PM | 17 | question.  He's asking about a warrant that was signed before |
| 05:11PM | 18 | they entered the residence. |
| 05:11PM | 19 | THE COURT:  Signed before what? |
| 05:11PM | 20 | MR. LYNCH:  Before they went in the residence. |
| 05:11PM | 21 | MR. HARRINGTON:  I'm going back to it, Judge. |
| 05:11PM | 22 | THE COURT:  You're asking about Government Exhibit 8? |
| 05:11PM | 23 | MR. HARRINGTON:  Yes, and I'm looking for the source |
| 05:11PM | 24 | of who said this was a multiple-dwelling. |
| 05:11PM | 25 | THE COURT:  Right. |

05:11PM   1              MR. HARRINGTON:  It's in the application.

05:11PM   2              THE COURT:  Yes.

05:11PM   3              MR. HARRINGTON:  I'm asking if he knows, because he

05:11PM   4    testified before it wasn't a multiple-residence building.

05:11PM   5              THE COURT:  Overruled.

05:11PM   6              MR. LYNCH:  That's fine.

05:11PM   7              THE COURT:  You may answer.  If you know.

05:11PM   8              THE WITNESS:  I don't know, sir.

05:11PM   9    BY MR. HARRINGTON:

05:11PM  10    Q.  Now, did you participate in any way of the whiting out of

05:12PM  11    lower front on Government Exhibit 8, the search warrant?

05:12PM  12    A.  No, sir.

05:12PM  13    Q.  When did you first learn of it?

05:12PM  14    A.  Prior to the hearings that were scheduled.

05:12PM  15    Q.  On the evening that the warrants were signed on February

05:12PM  16    the 19th, did you find out about it that night?

05:12PM  17    A.  No, sir.

05:12PM  18    Q.  Did you find out at some point in time before you

05:12PM  19    testified here that there had been a problem with the first

05:12PM  20    warrant and the way that they were trying to amend it?  Did

05:12PM  21    McMahon report that to you?

05:12PM  22    A.  I don't recall.

05:12PM  23    Q.  After Mr. Burgin was arrested, you indicated that you had

05:14PM  24    surveillance on the building until the search warrant was

05:14PM  25    executed, correct?

05:14PM   1   A.   That's correct.

05:14PM   2   Q.   Did you receive any reports of anybody going in and out

05:14PM   3   of the building during that period of time?

05:15PM   4   A.   I don't believe so.

05:15PM   5   Q.   You testified early in your testimony today that when you

05:15PM   6   looked at a photograph of the side of 56 Grimes that there

05:15PM   7   was a light on on the second floor that you identified as the

05:15PM   8   landing, apparently, to the second floor; is that right?

05:15PM   9   A.   That's correct.

05:15PM  10   Q.   Was that light on the whole time that you had surveilled

05:15PM  11   56 Grimes?

05:15PM  12   A.   To the best of my recollection, yes.

05:15PM  13   Q.   Were any other lights on at any time that you were there

05:15PM  14   that you saw?

05:15PM  15   A.   I don't recall.

05:15PM  16   Q.   Did the persons doing surveillance report to you that

05:15PM  17   there was any activity of any kind, lights on and off, people

05:15PM  18   talking, nothing?

05:15PM  19   A.   Nothing.

05:15PM  20   Q.   Did they report anything about any new cars coming or

05:16PM  21   being parked?

05:16PM  22   A.   Not that I recall.

05:16PM  23   Q.   Now, can you tell me when you went upstairs to do this

05:16PM  24   protective sweep, you went into the -- some room on the

05:16PM  25   second floor, and you knew that it was a -- somebody's living

05:16PM   1   quarters; is that right?

05:16PM   2   A.   In the front area of the building?

05:16PM   3   Q.   No.   On the second floor, when you went in the door, got

05:16PM   4   to the top of the stairs, right, you pry open a door, right?

05:16PM   5   A.   That's correct.

05:16PM   6   Q.   And that would lead you to believe the door was locked,

05:16PM   7   right?

05:17PM   8   A.   That's correct.

05:17PM   9   Q.   And you get in there and you see indicia of somebody

05:17PM   10   living there, do you not?

05:17PM   11   A.   I remember the kitchen with some clothing there.

05:17PM   12   Q.   Did you see a TV, go in the bedroom?

05:17PM   13   A.   I believe there was.

05:17PM   14   Q.   Did you see a big screen TV?

05:17PM   15   A.   I don't recall if it was a big screen.   I believe there

05:17PM   16   was a TV, though.

05:17PM   17   Q.   But it clearly appeared to be a residence; is that right?

05:17PM   18   A.   I remember -- yeah.   Somebody had --

05:17PM   19   Q.   And you had no knowledge then that that residence was

05:17PM   20   connected to the bar downstairs, did you, other than being in

05:17PM   21   the same building?

05:17PM   22   A.   No, other than the two access points, no.

05:17PM   23   Q.   And assuming there's a separate apartment in the front of

05:17PM   24   the building, you had no information that that apartment was

05:17PM   25   connected to the bar downstairs; is that right?

05:18PM   1   A.  That's correct.

05:18PM   2   Q.  Okay.  When you do search warrants for buildings that

05:18PM   3   have multiple residences, are you authorized to go into all

05:18PM   4   of the apartments in a building for a protective sweep?

05:18PM   5   A.  I would rely on that based upon officer safety.

05:18PM   6   Q.  You believe that you can?

05:18PM   7   A.  I believe so, yes, if we believe it to be interconnected,

05:18PM   8   yes.

05:18PM   9   Q.  Well, in this particular case, you didn't know one way or

05:18PM  10   the other whether things were interconnected when you went in

05:18PM  11   there, did you?

05:18PM  12   A.  When we made entry in?

05:18PM  13   Q.  Yeah.

05:18PM  14   A.  No.  We knew we were going into a door.  That's all we

05:18PM  15   knew.

05:18PM  16   Q.  Right.  And, in fact, the door you were going into, you

05:18PM  17   thought you were going into the lower, didn't you?

05:18PM  18   A.  That's correct.

05:18PM  19   Q.  You said you made a judgment decision right away that we

05:18PM  20   should go upstairs, right?

05:18PM  21   A.  That's correct.

05:18PM  22   Q.  Even though there's a door to the left of you that led

05:19PM  23   into the lower front, right?

05:19PM  24   A.  That's -- I didn't know that that led to the lower front.

05:19PM  25   There was a door there.  Yes.

| | | |
|---|---|---|
| 05:19PM | 1 | Q.  So, the only basis that you had for searching those |
| 05:19PM | 2 | premises that day was the information that you had obtained |
| 05:20PM | 3 | that day, correct? |
| 05:20PM | 4 | A.  That's correct. |
| 05:20PM | 5 | Q.  And some vague information that you had otherwise that |
| 05:20PM | 6 | the place was used as an after-hours joint, right? |
| 05:20PM | 7 | A.  That's correct. |
| 05:20PM | 8 | Q.  In the search warrant application, again, going back to |
| 05:21PM | 9 | Government Exhibit Number 8, for 56 Grimes, the factual part |
| 05:21PM | 10 | on page 4, Officer McMahon, whichever one who wrote it, |
| 05:21PM | 11 | signed by Patrick, not by Paul, right?  No matter who wrote |
| 05:22PM | 12 | it, anybody can attest to it if they believe the |
| 05:22PM | 13 | truthfulness.  You understand that, correct? |
| 05:22PM | 14 | A.  Correct. |
| 05:22PM | 15 | Q.  But it says that Pierce was observed carrying a black bag |
| 05:22PM | 16 | into the building.  Do you see that? |
| 05:22PM | 17 | A.  That's in the previous page.  Correct. |
| 05:22PM | 18 | Q.  It's on paragraph 2 at the bottom? |
| 05:22PM | 19 | A.  Page 3.  Yes. |
| 05:22PM | 20 | Q.  It doesn't say anything about him carrying anything out |
| 05:22PM | 21 | of the building, does it? |
| 05:22PM | 22 | A.  No. |
| 05:23PM | 23 | Q.  Now, on the Government Exhibit Number 8, again, going to |
| 05:23PM | 24 | the McMahon's application, it says at the top it was an in |
| 05:23PM | 25 | camera hearing.  Do you see that? |

| | | |
|---|---|---|
| 05:23PM | 1 | A.  That's correct. |
| 05:23PM | 2 | Q.  And this was not an in camera warrant, was it? |
| 05:24PM | 3 | A.  There was no informant. |
| 05:24PM | 4 | Q.  Do you know if Judge Case placed either of the McMahons |
| 05:24PM | 5 | under oath and took more information from them? |
| 05:24PM | 6 | A.  I would hope that he did.  I believe he did. |
| 05:24PM | 7 | Q.  How do you know that? |
| 05:24PM | 8 | A.  Because I've testified previously with Judge Case and he |
| 05:24PM | 9 | oftentimes does that. |
| 05:24PM | 10 | Q.  Where he has a question about a warrant or information on |
| 05:24PM | 11 | it and takes more testimony from you; is that right? |
| 05:24PM | 12 | A.  That's correct. |
| 05:24PM | 13 | Q.  And you don't know whether that was done or not done |
| 05:24PM | 14 | here? |
| 05:24PM | 15 | A.  I don't. |
| 05:24PM | 16 | Q.  In the search warrant application, there's nothing in |
| 05:25PM | 17 | there about Mr. Pierce's interaction with the confidential |
| 05:25PM | 18 | informant that day; would that be fair to say? |
| 05:25PM | 19 | A.  I don't see any. |
| 05:25PM | 20 | Q.  When the search warrants themselves are done, I take it |
| 05:25PM | 21 | that the officers that are applying type a proposed search |
| 05:26PM | 22 | warrant to give to the judge, correct? |
| 05:26PM | 23 | A.  That's correct. |
| 05:26PM | 24 | Q.  You fill in the details of who should do it, where you're |
| 05:26PM | 25 | going, that kind of thing, right? |

| | | |
|---|---|---|
| 05:26PM | 1 | A.   That's correct. |
| 05:26PM | 2 | Q.   And if the judge has to change it, the judge would change |
| 05:26PM | 3 | it, presumably in writing, and the affiant, being you or |
| 05:26PM | 4 | other detectives, and the judge would initial it; is that |
| 05:26PM | 5 | right? |
| 05:26PM | 6 | A.   That's correct. |
| 12:30PM | 7 | Q.   There's an application to search the Tundra that |
| 12:30PM | 8 | Mr. Burgin was driving, correct? |
| 12:30PM | 9 | A.   That's correct. |
| 12:30PM | 10 | Q.   And now, an hour and a half or so later, McMahon returns |
| 12:30PM | 11 | to Judge Case and Government Exhibit Number 9 is the second |
| 12:31PM | 12 | search warrant.  That does not tell Judge Case that nothing |
| 12:31PM | 13 | was found in the car of the first search warrant, does it? |
| 12:31PM | 14 | I'll get a copy for you here. |
| 12:31PM | 15 | A.   No.  It would be in the -- that written paragraph. |
| 12:31PM | 16 | Q.   Sorry? |
| 12:31PM | 17 | THE COURT:  I should point out that Government |
| 12:32PM | 18 | Exhibit 9 is not in evidence. |
| 12:32PM | 19 | MR. HARRINGTON:  I offer it in evidence, Judge. |
| 12:32PM | 20 | THE COURT:  Well. |
| 12:32PM | 21 | MR. LYNCH:  Well, if he offers it, that's fine or if |
| 12:32PM | 22 | he offers it, we'll agree to it. |
| 12:32PM | 23 | THE COURT:  There being no objection, Government |
| 12:32PM | 24 | Exhibit Number 9 is now in evidence. |
| 12:32PM | 25 | (Government Exhibit Number 9 was received in evidence.) |

| 12:32PM | 1 | THE WITNESS:  No, sir. |
| 12:32PM | 2 | BY MR. HARRINGTON: |
| 12:32PM | 3 | Q.  And there is, at the bottom of the first page of the |
| 12:32PM | 4 | application, more information that's written there about 56 |
| 12:32PM | 5 | Grimes that at least supplements what was in the first |
| 12:32PM | 6 | application; is that right? |
| 12:32PM | 7 | A.  That's correct. |
| 12:32PM | 8 | Q.  And it relies on things that supposedly were seen in the |
| 12:32PM | 9 | second floor of 56 Grimes, right? |
| 12:32PM | 10 | A.  That's correct. |
| 12:32PM | 11 | Q.  And that was during your protective sweep; is that right? |
| 12:32PM | 12 | A.  That's correct. |
| 12:32PM | 13 | Q.  Now, how did McMahon get that specific information? |
| 12:32PM | 14 | A.  Probably from me. |
| 12:33PM | 15 | Q.  Is this one of the phone calls you said you had with him? |
| 12:33PM | 16 | A.  Yes, sir. |
| 12:33PM | 17 | Q.  Do you remember actually telling him that? |
| 12:33PM | 18 | A.  No.  I don't recall the contents of the conversation. |
| 12:33PM | 19 | Q.  Do you know what time it was that McMahon prepared this? |
| 12:33PM | 20 | A.  No, sir. |
| 12:33PM | 21 | Q.  And the only things that you say that were found in the |
| 12:33PM | 22 | protective sweep are electronic storage devices, right? |
| 12:33PM | 23 | A.  That's correct. |
| 12:33PM | 24 | Q.  Among other things, correct? |
| 12:33PM | 25 | A.  Yes. |

12:33PM  1   Q.  And is it illegal to have electronic storage devices?

12:33PM  2   A.  No, sir.

12:33PM  3   Q.  And material identifying David Burgin in plain view; is

12:33PM  4   that right?

12:33PM  5   A.  That's correct.

12:33PM  6   Q.  That's this envelope you're talking about?

12:33PM  7   A.  That's correct.

12:33PM  8   Q.  Nothing illegal about that envelope, right, or him having

12:33PM  9   mail there?

12:33PM  10  A.  No, sir.

12:34PM  11  Q.  And a DVR surveillance system at 56 Grimes, right?

12:34PM  12  A.  That's correct.

12:34PM  13  Q.  And nothing illegal about that?

12:34PM  14  A.  No, sir.

12:34PM  15  Q.  And the downstairs of 56 Grimes, by experience, looks

12:34PM  16  like people came there and -- to the bar, did it not?

12:34PM  17  A.  It was a bar.  Yes.

12:34PM  18  Q.  Can you tell me, and perhaps you don't know, Exhibit 8

12:34PM  19  you testified to has the -- is a photocopy.  It's not the

12:34PM  20  original.  It has missing lower front on there; is that

12:35PM  21  right?

12:35PM  22  A.  That's correct.

12:35PM  23  Q.  And I think you testified it was whited out, right?  Do

12:35PM  24  you know who whited it out?

12:35PM  25  A.  I don't.

12:35PM   1   Q.  Do you know how that came to happen?

12:35PM   2   A.  I believe it was when we were making the amendment and

12:35PM   3   the additional application and there was a change.

12:35PM   4   Q.  Do you know if you are allowed to change a court order or

12:35PM   5   a search warrant signed by a judge?

12:35PM   6   A.  Well, this would have been in presence -- the judge would

12:35PM   7   have made that change.  It would have been in his presence.

12:35PM   8   Q.  Do you know if he has the authority to do that?

12:36PM   9   A.  I don't.

12:36PM   10  Q.  Now, you included in the search warrant application the

12:36PM   11  attic and the detached garage; is that right?

12:36PM   12       MR. LYNCH:  Objection, Your Honor.  This witness

12:36PM   13  hasn't testified he got the warrant.

12:36PM   14       THE COURT:  No, but he did testify he supplied the

12:36PM   15  information to McMahon for the warrant.

12:36PM   16       MR. LYNCH:  I think he said he thinks he did but,

12:36PM   17  okay.  That's fine.

12:36PM   18       THE COURT:  You were specifically asked on cross-

12:36PM   19  examination how McMahon was able to put in the detail for the

12:36PM   20  second warrant and he said he believed he gave him the

12:36PM   21  information.

12:37PM   22       THE WITNESS:  It includes the upper rear, attic, and

12:37PM   23  detached garage.

12:37PM   24  BY MR. HARRINGTON:

12:37PM   25  Q.  Right.  That's what the search was for.  And that's what

12:37PM   1   you requested, correct?

12:37PM   2   A.   Correct.

12:37PM   3   Q.   But there's no information that you gave to McMahon about

12:37PM   4   anything in the attic in the search warrant application, is

12:37PM   5   there?

12:37PM   6   A.   No, sir.

12:37PM   7   Q.   There's nothing in there about the garage, correct?

12:37PM   8   A.   No, sir.

12:37PM   9   Q.   And, yet, you asked for those to be able to search those,

12:37PM  10   right?

12:37PM  11   A.   That's correct.

12:37PM  12   Q.   And the only way you could access the attic was through

12:37PM  13   the apartment on the second floor; isn't that right?

12:37PM  14   A.   I don't recall if there was access from that stairwell in

12:37PM  15   the back.

12:37PM  16   Q.   But in the either of these search warrants, there's no

12:37PM  17   allegations that there were drugs in the premises, is there?

12:37PM  18   A.   Well, that's what we're looking for, is cocaine.

12:38PM  19   Q.   No.  My question is, there's no allegation saying that

12:38PM  20   there are drugs in the premises.  Based upon your

12:38PM  21   investigation and informant, anything, there's nothing in

12:38PM  22   there that says there are drugs or guns or any illegal

12:38PM  23   contraband in the premises; isn't that correct?

12:38PM  24   A.   That's correct.

12:40PM  25   Q.   Chief Granville, from the time that you first entered 56

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

12:40PM  1  Grimes executing the first search warrant, until the time

12:40PM  2  that you finished your work there, that either you or the

12:40PM  3  other officers (inaudible) did people remain in the premises

12:40PM  4  that whole time?

12:40PM  5  A.  Yes.

12:41PM  6  Q.  And the video shows that there are officers in the middle

12:41PM  7  or front by the bar in there for almost the continuous period

12:41PM  8  of time, at least that the camera was operating; is that

12:41PM  9  right?

12:41PM  10  A.  That's correct.

12:41PM  11  Q.  Chief Granville, I'm showing you Exhibit 10, and that's

12:41PM  12  the first page, Bates number 00001.  That appears to be a

12:42PM  13  door locked with keys in; is that right?

12:42PM  14  A.  That's correct.

12:42PM  15  Q.  You identified that as -- which door is that to the

12:42PM  16  premises; do you know?

12:42PM  17  A.  I don't.

12:42PM  18  Q.  Whose keys are those?

12:42PM  19  A.  I don't recall.

12:42PM  20  Q.  Do you know when the picture was taken?

12:42PM  21  A.  It would have been taken that night.

12:42PM  22  Q.  Who was doing all the photographing that night?

12:42PM  23  A.  Detective Tim Carney.

12:42PM  24  Q.  And the entire time that you were there that night it was

12:42PM  25  dark; isn't that correct?

| | | |
|---|---|---|
| 12:42PM | 1 | A.  That's correct. |
| 12:42PM | 2 | Q.  Even from the first time that you followed Pierce there, |
| 12:43PM | 3 | it was dark, right? |
| 12:43PM | 4 | A.  That's correct. |
| 12:44PM | 5 | Q.  I'm showing you Government Exhibit 1, slide 17. |
| 12:44PM | 6 | MR. LYNCH:  Government Exhibit 10, photo 17. |
| 12:44PM | 7 | BY MR. HARRINGTON: |
| 12:44PM | 8 | Q.  Exhibit 10, photo 17.  Do you see that? |
| 12:44PM | 9 | A.  I do. |
| 12:44PM | 10 | Q.  Do you recognize that? |
| 12:44PM | 11 | A.  I do. |
| 12:44PM | 12 | Q.  What is that? |
| 12:44PM | 13 | A.  That's the bar located at 56 Grimes.  That's, like, a |
| 12:44PM | 14 | rear room. |
| 12:44PM | 15 | Q.  So, you indicated that it was, like, all just one room, |
| 12:44PM | 16 | right, when you testified earlier? |
| 12:44PM | 17 | A.  It's the back of the bar. |
| 12:44PM | 18 | Q.  It's like a dining room or something like that attached |
| 12:44PM | 19 | to the bar; would that be fair to say? |
| 12:44PM | 20 | A.  Yes, sir. |
| 12:44PM | 21 | Q.  It appears to have some musical speakers or something |
| 12:44PM | 22 | there in the corner; is that right? |
| 12:44PM | 23 | A.  Yes. |
| 12:44PM | 24 | Q.  But I just want to be clear, the front room is separated |
| 12:45PM | 25 | by this entryway that's shown in the right to the left part |

12:45PM   1   of the photograph; would that be fair to say?

12:45PM   2   A.   That's correct.

12:45PM   3   Q.   When you first entered to do the protective sweep or

12:45PM   4   decided to do the protective sweep, you said that the place

12:45PM   5   was dark; is that right?

12:45PM   6   A.   The?

12:45PM   7   Q.   The stairway?

12:45PM   8   A.   The stairway?

12:45PM   9   Q.   Yeah.

12:45PM  10   A.   No.

12:45PM  11   Q.   It was lit?

12:45PM  12   A.   Yes.

12:45PM  13   Q.   Okay.  And the film shows the detectives, you, using your

12:45PM  14   flashlights; is that right?

12:45PM  15   A.   Yes.  Some of them had flashlights.  Yes.

12:45PM  16   Q.   They were on, were they not?

12:45PM  17   A.   Some of them, yeah.

12:46PM  18   Q.   I'm showing you Government Exhibit 10, slide 51.  Do you

12:46PM  19   see that?

12:46PM  20   A.   Yes.

12:46PM  21   Q.   Do you recognize that?

12:46PM  22   A.   I do.

12:46PM  23   Q.   Where was that?

12:46PM  24   A.   It's the second floor kitchen of 56 Grimes.

12:46PM  25   Q.   And is that -- that's upstairs; is that right?

| | | |
|---|---|---|
| 12:46PM | 1 | A.  Yes. |
| 12:46PM | 2 | Q.  Is that part of the kitchen? |
| 12:46PM | 3 | A.  It is. |
| 12:46PM | 4 | Q.  Showing you Government Exhibit 10, exhibit -- Bates |
| 12:47PM | 5 | number 57, slide number 57, do you recognize that? |
| 12:47PM | 6 | A.  I do. |
| 12:47PM | 7 | Q.  Is that the envelope that you said that you saw in the |
| 12:47PM | 8 | kitchen? |
| 12:47PM | 9 | A.  Yes. |
| 12:47PM | 10 | Q.  And that was at the top of a trash bag; is that right? |
| 12:47PM | 11 | A.  That's correct. |
| 12:47PM | 12 | Q.  And you looked at that, right? |
| 12:47PM | 13 | A.  That's correct. |
| 12:47PM | 14 | Q.  Did you have to use your flashlight to look at it? |
| 12:47PM | 15 | A.  I don't recall. |
| 12:47PM | 16 | Q.  Did you have the lights on? |
| 12:47PM | 17 | A.  It would have been illuminated somehow, whether by |
| 12:47PM | 18 | flashlight or lights. |
| 12:47PM | 19 | Q.  Okay.  And that has Mr. Burgin's name on it; does it not? |
| 12:47PM | 20 | A.  It does. |
| 12:47PM | 21 | Q.  And what's the address on it? |
| 12:47PM | 22 | A.  Seventy-nine Brunswick Boulevard, Buffalo, New York. |
| 12:48PM | 23 | Q.  Showing you Government Exhibit 10, slide 97.  Do you see |
| 12:48PM | 24 | that? |
| 12:48PM | 25 | A.  I do. |

12:48PM   1   Q.  What is that?

12:48PM   2   A.  It's a Western Union receipt for David Burgin.

12:48PM   3   Q.  And where was that found?

12:48PM   4   A.  I don't recall.

12:49PM   5   Q.  Was that found by you on the protective sweep or on the

12:49PM   6   search warrant?

12:49PM   7   A.  The search warrant.

12:49PM   8   Q.  How do you know?

12:49PM   9   A.  The only thing found with the protective sweep was the

12:49PM  10   National Fuel bill.

12:49PM  11   Q.  Showing you Government Exhibit 8 -- 10, Exhibit 104.  Do

12:49PM  12   you recognize that?

12:49PM  13   A.  It's a piece of mail.

12:49PM  14   Q.  Have you ever seen it before?

12:50PM  15   A.  I don't recall.

12:50PM  16   Q.  Do you know where that would have been if it was at 56

12:50PM  17   Grimes Street?

12:50PM  18   A.  No, sir.

12:50PM  19   Q.  Do you know what it relates to?

12:50PM  20   A.  I just see it has Mr. Burgin's name on it.  It says

12:50PM  21   Fidelis Management with a PO box in Buffalo.

12:50PM  22   Q.  You can tell from that when it was postmarked, if you can

12:50PM  23   see?

12:50PM  24   A.  I can't.  No.

12:50PM  25   Q.  In your investigation of Mr. Burgin, did you ever find

12:50PM    1    out anything out about Fidelis Management and when it

12:50PM    2    existed?

12:50PM    3    A.  I did not.  No.

12:51PM    4    Q.  Chief Granville, showing you up on the screen -- is from

12:51PM    5    Government Exhibit 8, the inventory which purportedly is for

12:51PM    6    the search the 56 Grimes.  Do you see that?

12:52PM    7    A.  I do.

12:52PM    8    Q.  And it says -- it's got up at the top upper right it

12:52PM    9    says, time, date impounded 2/19/20, 9:48 p.m., correct?

12:52PM   10    A.  That's correct.

12:52PM   11    Q.  Where does that date and time come from?

12:52PM   12    A.  More than likely, the time the search warrant was signed

12:52PM   13    or the time of entry.  Sorry.

12:52PM   14    Q.  So, that time and date has -- or the date maybe but not

12:52PM   15    the time, has nothing to do with when items were seized,

12:52PM   16    would that be fair to say?

12:52PM   17    A.  That's correct.

12:52PM   18    Q.  That's the same time that the search warrant was signed;

12:52PM   19    is that right?

12:52PM   20    A.  That's correct.

12:52PM   21    Q.  Okay.  By the way, how did you learn that the first

12:52PM   22    search warrant was signed?

12:52PM   23    A.  I don't recall.

12:52PM   24    Q.  Do you have any -- in your phone records, is there any

12:53PM   25    message from either of the McMahons saying that the search

12:53PM    1    warrant had been signed?

12:53PM    2    A.  I don't know, but I'm sure there would have been.

12:53PM    3    Q.  Would someone else have been notified other than you?

12:53PM    4    A.  It could have happened.  Yes.

12:53PM    5    Q.  You don't have any recollection of that now?

12:53PM    6    A.  I don't.

12:53PM    7    Q.  Were you at the scene ready to go on the search warrant

12:53PM    8    when you found out about it?

12:53PM    9    A.  The first one?

12:53PM   10    Q.  Yeah.

12:53PM   11    A.  No.

12:53PM   12    Q.  No?  Okay.  So, where were you when you found out?

12:53PM   13    A.  I believe we were in our office or in close proximity to

12:53PM   14    Grimes, one or the other.

12:53PM   15    Q.  Well, the warrant was signed at 8:52, right, you guys

12:53PM   16    enter a few minutes later?

12:53PM   17    A.  So, would have been in close proximity.

12:53PM   18        MR. LYNCH:  Judge, I think Mr. Harrington misspoke.

12:53PM   19    He said the warrant was signed at 8:52.

12:53PM   20        MR. HARRINGTON:  Thirty-two.

12:53PM   21    BY MR. HARRINGTON:

12:53PM   22    Q.  Right?  The warrant was signed at 8:32, right, for 56

12:54PM   23    Grimes, Exhibit 8, correct?

12:54PM   24    A.  Eight thirty-two.  Yes.

12:54PM   25    Q.  And the video shows you going in a few minutes later on

12:54PM     1    this protective sweep, right?

12:54PM     2    A.   Yes.

12:54PM     3    Q.   Okay.  So, are you telling us that you weren't right

12:54PM     4    there ready to go in when you found out about this?

12:54PM     5    A.   We might have been down the street or somewhere very

12:54PM     6    close by.

12:54PM     7    Q.   And when did you find out about the second search warrant

12:54PM     8    having been granted?

12:54PM     9    A.   While on scene at 56 Grimes.  How I found out, I don't

12:54PM    10    recall.

12:54PM    11    Q.   Now, on page 9 of Government Exhibit 8 that we just

12:55PM    12    mentioned a minute ago is the property receipt.  That's the

12:55PM    13    same thing as an inventory or a return on the warrant; is

12:55PM    14    that right?

12:55PM    15    A.   That's correct.

12:55PM    16    Q.   And this was filed with the clerk's office, was it not,

12:55PM    17    if you know?

12:55PM    18    A.   I don't know.  It's filed with the judge.

12:55PM    19    Q.   Now, can you tell me, there are some 27 items listed on

12:55PM    20    the inventory.  Who decided what to seize?

12:55PM    21    A.   It would have been -- it was our warrant.  Between myself

12:55PM    22    and Special Agent Webb, we would have probably decided.  And

12:55PM    23    the fact that it was going to ultimately get charged with the

12:56PM    24    Feds, we would have -- HSI would have been determining what

12:56PM    25    was seized and what wasn't.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

12:56PM   1   Q.   So, this had become a federal investigation by that point

12:56PM   2   in time?

12:56PM   3   A.   Yes.

12:56PM   4   Q.   When did that happen?

12:56PM   5   A.   Right after we arrested Rodney Pierce.

12:56PM   6   Q.   But you remained in charge?

12:56PM   7   A.   I was.

12:56PM   8   Q.   Now, are you designated somehow as a federal agent?

12:56PM   9   A.   I am.

12:56PM  10   Q.   How?

12:56PM  11   A.   Deputized with Homeland Security and at that time with

12:56PM  12   the marshals as well.

12:56PM  13   Q.   So, it appears that Adam Day is the one that prepared the

12:56PM  14   inventory; is that right?  His name is at the bottom?

12:56PM  15   A.   That's correct.

12:56PM  16   Q.   And did you designate him to do that?

12:56PM  17   A.   I don't recall if I did.

12:56PM  18   Q.   Do you know where this inventory was prepared?

12:57PM  19   A.   I don't.

12:57PM  20   Q.   Do you have any idea what time you and the other officers

12:57PM  21   left 56 Grimes on February the 19th, 2020?

12:57PM  22   A.   No, sir.

12:57PM  23   Q.   Do you recall agents or officers taking the things that

12:57PM  24   are listed on the inventory and bringing them down to 45 Elm

12:57PM  25   Street in order to prepare the inventory?

12:57PM    1    A.   Yes.

12:57PM    2    Q.   So, the inventory would have been prepared at 45 Elm

12:57PM    3    Street; is that right?

12:57PM    4    A.   That's correct.

12:57PM    5    Q.   And so, do you know how long it took from after the

12:57PM    6    seizure of these items until you left?

12:57PM    7    A.   No, sir.

12:57PM    8    Q.   A number of these -- the items that are taken here come

12:58PM    9    from the attic; do they not?

12:58PM   10    A.   Yes.

12:58PM   11    Q.   And some of them are significant in terms of evidence,

12:58PM   12    including drugs and guns; is that right?

12:58PM   13    A.   That's correct.

12:58PM   14    Q.   You had no knowledge before this warrant was executed

12:58PM   15    that there were drugs and guns in the attic?

12:58PM   16    A.   No, sir.

12:58PM   17    Q.   But you believed that a protective sweep was done of the

12:58PM   18    attic; is that right?

12:58PM   19    A.   I believe so, yes.

12:58PM   20    Q.   Do you know if the attic door --

12:58PM   21              THE COURT:  Let me interrupt you for a moment.  You

12:58PM   22    asked the witness whether a number of the items appearing on

12:58PM   23    the property receipt attached to Government Exhibit 8 --

12:58PM   24              MR. HARRINGTON:  Yes.

12:58PM   25              THE COURT:  -- came from the attic?

| | | |
|---|---|---|
| 12:58PM | 1 | MR. HARRINGTON:  Right. |
| 12:58PM | 2 | THE COURT:  As I understand it, Government Exhibit 8, |
| 12:59PM | 3 | in its original form, pre-Wite Out -- |
| 12:59PM | 4 | MR. HARRINGTON:  Judge, what -- I could -- what |
| 12:59PM | 5 | happened is -- |
| 12:59PM | 6 | THE COURT:  -- for the lower -- |
| 12:59PM | 7 | MR. HARRINGTON:  The inventory was filed for both of |
| 12:59PM | 8 | the warrants.  I -- just for convenient sake -- |
| 12:59PM | 9 | THE COURT:  Okay.  I just wanted to make sure I was |
| 12:59PM | 10 | understanding everything, that this was not a misspoken |
| 12:59PM | 11 | question. |
| 12:59PM | 12 | MR. HARRINGTON:  No.  I should have used mine. |
| 12:59PM | 13 | THE COURT:  That's all right now that you've |
| 12:59PM | 14 | clarified it. |
| 12:59PM | 15 | BY MR. HARRINGTON: |
| 12:59PM | 16 | Q.  But, in any event, a number of the items on here came |
| 12:59PM | 17 | from the attic; is that right? |
| 12:59PM | 18 | A.  That's correct. |
| 01:00PM | 19 | Q.  Do you know how long it took to do the search once you |
| 01:00PM | 20 | found out about the second search warrant having been granted |
| 01:00PM | 21 | for 56 Grimes? |
| 01:00PM | 22 | A.  In terms of time, the length of search? |
| 01:00PM | 23 | Q.  Yeah. |
| 01:00PM | 24 | A.  I don't. |
| 01:00PM | 25 | Q.  Do you know how the items taken were transported to 45 |

01:00PM    1    Elm?

01:00PM    2    A.  I don't.

01:00PM    3    Q.  Were they bagged, just carried hand by hand, put in

01:00PM    4    boxes, any idea?

01:00PM    5    A.  I don't.

01:00PM    6    Q.  It can be important in an investigation where some piece

01:00PM    7    of evidence is found; is that right?

01:00PM    8    A.  Yes.

01:00PM    9    Q.  So, do you know the process for how these places were

01:00PM   10    identified on the property receipt attached to Government

01:00PM   11    Exhibit 8 were made?

01:00PM   12    A.  I don't recall.

01:00PM   13    Q.  How many officers were doing the search then; do you

01:01PM   14    know?

01:01PM   15    A.  A dozen or more.

01:01PM   16    Q.  When officers were seizing items at 56 Grimes that

01:01PM   17    evening, was Carney taking pictures of them?  Say, here, come

01:01PM   18    here, Carney.  I found guns.  Take a picture of it?

01:01PM   19    A.  Yes.

01:01PM   20    Q.  Were all of the items on the inventory photographed at

01:01PM   21    the scene?

01:01PM   22    A.  I don't know.

01:01PM   23    Q.  Do you have a procedure or protocol for doing that?

01:01PM   24    A.  Photographing all items?

01:01PM   25    Q.  Yeah.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

01:01PM  1   A.  Not -- I mean, it's kind of -- it's not totally of the

01:01PM  2   normal for items not to be photographed.

01:01PM  3   Q.  I'd ask you to take a look through the inventory and tell

01:02PM  4   me if you see the DVR recording system in there.

01:02PM  5   A.  I don't see it.

01:02PM  6   Q.  Do you know why?

01:02PM  7   A.  No.

01:02PM  8   Q.  Do you know who it is that recovered it?

01:02PM  9   A.  I don't recall.

01:02PM  10  Q.  Do you recall telling somebody the next day to go back

01:02PM  11  and get it?

01:03PM  12  A.  I don't recall.

01:03PM  13  Q.  At any point in time, did you leave a copy of the first

01:03PM  14  or the second search warrant at the premises?

01:03PM  15  A.  I don't believe we did.

01:03PM  16  Q.  Did anybody?

01:03PM  17  A.  I believe so.

01:03PM  18  Q.  Did you give a copy of either warrant to Mr. Burgin?

01:03PM  19  A.  I don't recall.

01:03PM  20  Q.  Did you give a copy of the warrant to the person who is

01:03PM  21  titled on the property?

01:03PM  22  A.  We normally do, yes.

01:03PM  23  Q.  Did you in this case?

01:03PM  24  A.  I don't recall.

01:03PM  25  Q.  Did you give a copy of the inventory to Mr. Burgin?

01:03PM    1    A.  I don't recall.

01:03PM    2    Q.  Did you give a copy of the inventory to the titled owner

01:03PM    3    of the property?

01:03PM    4    A.  I don't recall.

01:03PM    5    Q.  Can you tell me, when you seize the weapons in the attic,

01:04PM    6    has there been DNA testing done on the weapons?

01:04PM    7    A.  I don't know.

01:04PM    8    Q.  Has there been DNA testing done on the drugs that were

01:04PM    9    found?

01:04PM   10         MR. LYNCH:  Objection, Judge.  Relevance.

01:04PM   11         THE COURT:  Yeah.  We're only concerned with the

01:04PM   12    actual execution, the warrant, and the seizure.  Now you're

01:04PM   13    getting into evidentiary issues for trial.

01:04PM   14    BY MR. HARRINGTON:

01:04PM   15    Q.  How many phone accounts did you have on February 18th,

01:04PM   16    2020?

01:04PM   17    A.  Two.

01:04PM   18    Q.  Okay.  Thank you.  Two?

01:04PM   19    A.  Yes.

01:04PM   20    Q.  Okay.  And then the exhibits that we've seen, you've

01:05PM   21    accounted for those, is that right?  Those are the only two

01:05PM   22    that you have; is that right?

01:05PM   23    A.  That's correct.

01:05PM   24    Q.  No other phones involved, right?  Were they used for a

01:05PM   25    different purpose?  By that I mean, either personal or

01:05PM     1   business or anything?

01:05PM     2   A.  Yes.  But, oftentimes, unfortunately, in my practice,

01:05PM     3   they're intermingled.

01:05PM     4   Q.  Grab the closest one?

01:05PM     5   A.  Normally.

01:05PM     6           MR. HARRINGTON:  Judge, you think we could take a

01:05PM     7   break?  I've got a couple things to organize.

01:06PM     8           THE COURT:  All right.  It's 22 minutes after 2.

01:06PM     9   We'll be back at 20 minutes to 3.

01:06PM    10           MR. LYNCH:  Sounds good.  Thank you, Judge.

01:06PM    11   (A recess was taken from 2:21 p.m. to 2:43 p.m.)

01:06PM    12           THE CLERK:  Back on the record.

01:06PM    13           THE COURT:  Mr. Harrington?

01:06PM    14   BY MR. HARRINGTON:

01:06PM    15   Q.  Chief Granville, I was asking you questions before about

01:06PM    16   the inventory, and you had mentioned early that detective

01:07PM    17   Carney was the photographer that evening; is that right?

01:07PM    18   A.  That's correct.

01:07PM    19   Q.  Can you tell me, did he use a camera that had a date and

01:07PM    20   timestamp on it?

01:07PM    21   A.  I don't know.

01:07PM    22   Q.  Do you have those available?

01:07PM    23   A.  We do now.

01:07PM    24   Q.  Did you have them back then?

01:07PM    25   A.  I don't recall.

01:07PM    1    Q.  Do you know if anybody else took photographs with their

01:07PM    2    cell phone?

01:07PM    3    A.  I don't know.

01:07PM    4    Q.  You indicated that you called Lieutenant Douglas Kopp; is

01:07PM    5    that right?

01:07PM    6    A.  Kopp.

01:07PM    7    Q.  Kopp.  Is he part of this investigation?

01:07PM    8    A.  He was.

01:07PM    9    Q.  And what was his role?

01:07PM   10    A.  He's a lieutenant in narcotics, Buffalo Police.

01:07PM   11    Q.  What was he doing in this?

01:07PM   12    A.  He assisted with, you know, additional manpower.  He

01:08PM   13    assisted with the arrest.

01:08PM   14    Q.  Whose arrest?

01:08PM   15    A.  Pierce.  That's it.

01:08PM   16    Q.  And you called him that night, right?

01:08PM   17    A.  That's correct.

01:08PM   18    Q.  And what was that for; the purpose of that call?

01:08PM   19    A.  I don't recall.  I can surmise that it was for additional

01:08PM   20    bodies.

01:08PM   21    Q.  Now, you said that, according to your phone records, at

01:08PM   22    8:54, you had a phone call with McMahon; is that right?

01:08PM   23    A.  That's correct.

01:08PM   24    Q.  And what was discussed in that call?

01:08PM   25    A.  I don't recall the exact contents, but we would have

01:08PM   1   discussed the second application.

01:08PM   2   Q.   But by 8:54, you had been in the building and you know

01:08PM   3   that the warrant is not for the whole premises, right?

01:09PM   4   A.   That's correct.

01:09PM   5   Q.   Okay.   Do you know where McMahon was?

01:09PM   6   A.   He was in and around Judge Case's house, I believe.

01:09PM   7   Q.   Do you know if he stayed at Judge Case's house while this

01:09PM   8   went on?

01:09PM   9   A.   I don't know.

01:09PM  10   Q.   And then you called him again at 9 o'clock, about 9

01:09PM  11   o'clock, right?

01:09PM  12   A.   That's correct.

01:09PM  13   Q.   And what was that discussion?

01:09PM  14   A.   I don't recall.

01:09PM  15   Q.   Well, you said earlier you gave him some details about

01:09PM  16   what you had seen in the protective sweep; is that right?

01:09PM  17   A.   That's correct.

01:09PM  18   Q.   Was that on the first call or the second call?

01:09PM  19   A.   I don't recall.

01:09PM  20   Q.   Did you tell him about the DVR system?

01:09PM  21   A.   I don't recall.

01:09PM  22   Q.   Well, you identified before it's in the second warrant?

01:09PM  23   A.   It's in the application.   Yeah.

01:10PM  24   Q.   So, were you the only one that told him information that

01:10PM  25   you know of?

01:10PM   1   A.   That I know of, yeah.

01:10PM   2   Q.   And by the time you told him that, the system had already

01:10PM   3   been found; is that right?

01:10PM   4   A.   Yes.

01:10PM   5   Q.   Now, earlier, when you talked about Pierce and the

01:10PM   6   confidential informant, I believe you testified that you left

01:10PM   7   45 Elm and you went to the Auto Zone, right, and there were

01:10PM   8   still some communications going on between the confidential

01:10PM   9   informant and Pierce; is that right?

01:10PM  10   A.   That's correct.

01:10PM  11   Q.   You said somebody was -- the confidential informant is

01:10PM  12   not with you, right?

01:10PM  13   A.   Correct.

01:10PM  14   Q.   He's back at your office, right?

01:10PM  15   A.   That's correct.

01:10PM  16   Q.   Somebody is with him?

01:10PM  17   A.   That's correct.

01:10PM  18   Q.   All right.  So, how are you getting information?

01:10PM  19   A.   Phone calls or on a secure radio channel.

01:11PM  20   Q.   Were you able to hear what the calls were?  Could they

01:11PM  21   forward those to you, what was actually being said?

01:11PM  22   A.   Oh, no.

01:11PM  23   Q.   No?  So, who was providing you with information; one of

01:11PM  24   detectives?

01:11PM  25   A.   Yeah, one of the detectives or deputies.

01:11PM   1   Q.  And what is he telling you, word-for-word what's in the

01:11PM   2   call or just times he?

01:11PM   3   A.  No, just, hey, this is kind of what's going on.  This is

01:11PM   4   what he said, or this is what he didn't say or he answered or

01:11PM   5   he didn't answer and he's going to meet us here, or meet us

01:11PM   6   there, things like that.

01:11PM   7   Q.  So, that's that person's interpretation of what he's

01:11PM   8   hearing?

01:11PM   9   A.  Yes.

01:11PM   10  Q.  When Pierce left the Auto Zone the first time, did you

01:12PM   11  send any information out by phone or any other way to the

01:12PM   12  people back at 45 Elm or any other persons that were working

01:12PM   13  with you on this investigation?

01:12PM   14  A.  Yes.

01:12PM   15  Q.  And who did you -- how did you do that?

01:12PM   16  A.  I would have relayed it both via the radio so other units

01:12PM   17  would know, and by phone, I would imagine.

01:12PM   18  Q.  So, in addition to your phone, you have a separate

01:12PM   19  communication apparatus that you use with the people that you

01:12PM   20  work with; is that right?

01:12PM   21  A.  That's correct.

01:12PM   22  Q.  Just going back to the attic for a minute, there's -- do

01:13PM   23  you know how many doors there were from the second floor at

01:13PM   24  56 Grimes that led to the attic?

01:13PM   25  A.  No, sir.

GRANVILLE -- BY MR. HARRINGTON -- 12/19/2022

01:13PM  1   Q.  Do you know if either one or two or whatever however many

01:13PM  2   were locked?

01:13PM  3   A.  I don't know, sir.

01:13PM  4   Q.  Do you know if -- do you have any photos or anything

01:13PM  5   showing doors being pried open?

01:13PM  6   A.  I know the lower -- that lower door that led from the bar

01:13PM  7   up the back stairwell had to be -- I believe that was

01:13PM  8   breached.

01:13PM  9   Q.  Right.  I'm sorry.  My question wasn't precise enough.

01:13PM  10  I'm talking about the attic.

01:13PM  11  A.  Oh, the attic?

01:13PM  12  Q.  Was there anything?

01:13PM  13  A.  I don't recall.

01:13PM  14  Q.  After the execution of the second search warrant, you had

01:14PM  15  a -- there was a call at 10:21 to McMahon.  Do you know what

01:14PM  16  that was about?

01:14PM  17  A.  I don't know.

01:14PM  18  Q.  I'd like to talk to you a little bit about David Burgin's

01:14PM  19  arrest.  When you arrested Rodney Pierce, right, you returned

01:14PM  20  to 56 Grimes right after that, right?

01:14PM  21  A.  That's correct.

01:14PM  22  Q.  And that was still you, Day and Webb?

01:14PM  23  A.  That's correct.

01:14PM  24  Q.  And when you got there, that's when you saw Burgin's

01:14PM  25  Tundra; is that right?

01:14PM   1   A.   That's -- yes.

01:14PM   2   Q.   And you had not seen it when you were there surveilling

01:14PM   3   Rodney, right?

01:15PM   4   A.   No, sir.

01:15PM   5   Q.   And you went back after Pierce was arrested.  Did you

01:15PM   6   intend to arrest David Burgin then?

01:15PM   7   A.   Like, to go up to the building and arrest him?

01:15PM   8   Q.   Yes.

01:15PM   9   A.   No.  I don't believe so.

01:15PM  10   Q.   Okay.  And when was the decision made to arrest him?

01:15PM  11   A.   Well, he was taken into custody leaving 56 Grimes.  He

01:15PM  12   was then transported back to our office and then the federal

01:15PM  13   prosecutors ultimately made the decision to arrest him.

01:15PM  14   Q.   My question was, when was he -- when was the decision

01:15PM  15   made to take him into custody?

01:15PM  16   A.   He was observed leaving 56 Grimes.

01:15PM  17   Q.   Okay.  And so, when you went there, you didn't see him

01:15PM  18   leaving 56 Grimes, correct?

01:15PM  19   A.   No, sir.

01:15PM  20   Q.   You saw his Tundra outside, right?

01:16PM  21   A.   That's correct.

01:16PM  22   Q.   And Webb had told you that was his vehicle, right?

01:16PM  23   A.   That's correct.

01:16PM  24   Q.   Not in his name, but the vehicle Webb said he used,

01:16PM  25   right?

01:16PM    1    A.  That's correct.

01:16PM    2    Q.  Okay.  So, he comes out of 56 Grimes, and you intend to

01:16PM    3    arrest him then; is that right?

01:16PM    4    A.  We intend to have him pulled over a short time later.

01:18PM    5    Q.  All right.  Well, you keep saying take into custody or

01:19PM    6    have him pulled over.  He was arrested right after he left 56

01:19PM    7    Grimes, was he not?

01:19PM    8    A.  He was placed in handcuffs and transported back to our

01:19PM    9    office.

01:19PM   10    Q.  And he wasn't free to go, was he?

01:19PM   11    A.  No, he was not.

01:19PM   12    Q.  You were not going to let him go that day, right?

01:19PM   13    A.  That's not true at all.  We may have let him go later on

01:19PM   14    in the night.  If --

01:19PM   15    Q.  Well, you prepared charges against him that night, didn't

01:19PM   16    you?

01:19PM   17    A.  We did.  That was after we executed the search warrants

01:19PM   18    and upon our investigation and an additional arrest, yes.

01:41PM   19    Q.  So, when you took him into custody, he wasn't really

01:41PM   20    arrested.  That's what you're trying to say?

01:41PM   21    A.  That's correct.  He wasn't under -- he was taken into

01:41PM   22    custody and transported back to our office to determine

01:41PM   23    whether charges were going to be placed or not.

01:41PM   24    Q.  And if you had found nothing in the building, would you

01:41PM   25    have charged him?

01:41PM   1   A.   Again, I don't know.  That would have been up to the

01:42PM   2   federal government.

01:42PM   3   Q.   Because now it had become a federal case; is that right?

01:42PM   4   A.   That's correct.

01:42PM   5   Q.   But he's taken into custody some time around 6:30, right?

01:42PM   6   A.   Whatever time it was that he --

01:42PM   7   Q.   And the drugs aren't found until 10 o'clock that night,

01:42PM   8   right?

01:42PM   9   A.   That's correct.

01:42PM  10   Q.   So, he's at least held there for four hours awaiting what

01:42PM  11   happens with the search warrant; is that right?

01:42PM  12   A.   That's correct.

01:42PM  13   Q.   Because before that, you didn't have probable cause to

01:42PM  14   arrest him, did you?

01:42PM  15   A.   Well, I wouldn't say that.  Based upon our telephone

01:42PM  16   conversations with Pierce and our debrief of the confidential

01:42PM  17   informant, and the evidence that we recovered, I'm not sure

01:42PM  18   that we wouldn't have had probable cause to arrest him.

01:42PM  19   Q.   What had David Pierce -- David Burgin done that day that

01:42PM  20   would have given you probable cause?

01:42PM  21   A.   Well, that's -- to us, that was -- remained to be seen

01:43PM  22   based upon telephone records, et cetera.  I'm not saying he

01:43PM  23   was going to be arrested that night.

01:43PM  24   Q.   What did you tell him after he was arrested, after he was

01:43PM  25   taken into custody, as you say?

01:43PM    1    A.   Mr. Burgin?

01:43PM    2    Q.   Yeah.

01:43PM    3    A.   Where?

01:43PM    4    Q.   All right.  Mr. Burgin leaves 56 Grimes in the Tundra,

01:43PM    5    right?

01:43PM    6    A.   Correct.

01:43PM    7    Q.   And you follow him?

01:43PM    8    A.   That's correct.

01:43PM    9    Q.   And you follow him around a few blocks over to Broadway;

01:43PM   10    is that right?

01:43PM   11    A.   That's correct.

01:43PM   12    Q.   And where is he stopped?

01:43PM   13    A.   In the vicinity of Broadway and Memorial.

01:43PM   14    Q.   Was he in the Valero station?

01:43PM   15    A.   The gas station is right there.  Yes.

01:43PM   16    Q.   Was he in it when he was stopped?

01:43PM   17    A.   Was he -- he was in his truck.  Yes.

01:43PM   18    Q.   Was he in the gas station, in the gas station property --

01:43PM   19    A.   I just said that.  Yes.

01:44PM   20    Q.   Was he at a gas pump?

01:44PM   21    A.   I don't recall.  He could have been.

01:44PM   22    Q.   Who, besides you, was following him?

01:44PM   23    A.   Myself and additional units.

01:44PM   24    Q.   How many units?

01:44PM   25    A.   I don't recall.

01:44PM    1    Q.  You don't know where his vehicle was stopped?

01:44PM    2    A.  It was at the gas station.  Whether it was at the pumps

01:44PM    3    or not, I don't recall the exact location of his truck at the

01:44PM    4    gas station, but he was at the gas station.

01:44PM    5    Q.  Were any lights put on or anything to pull him over?

01:45PM    6    A.  I don't recall.

01:45PM    7    Q.  So, how is it that he was stopped?  Did people pull in

01:45PM    8    front of him and block him off?

01:45PM    9    A.  I don't recall.  He may have been stopped.

01:45PM   10    Q.  Who put the word out to stop him?

01:45PM   11    A.  I would have.

01:45PM   12    Q.  You did?  What did you tell them to stop him for?

01:46PM   13    A.  He was just observed leaving 56 Grimes.

01:46PM   14    Q.  Right.  And?

01:46PM   15    A.  And he was to be taken into custody.

01:46PM   16    Q.  Now, the only -- at that point in time, the only

01:46PM   17    connection you knew to 56 Grimes was that Rodney Pierce

01:46PM   18    apparently had a black bag that had some narcotics in it when

01:46PM   19    he was arrested, correct, and he was seen coming out of 56

01:46PM   20    Grimes with a similar bag; is that right?

01:46PM   21    A.  That's correct.

01:46PM   22    Q.  But he was also seen going into 56 Grimes with that bag,

01:46PM   23    wasn't he?

01:46PM   24    A.  That's correct.

01:46PM   25    Q.  So, when Mr. Burgin is stopped, where are you when this

01:46PM    1    happens?  Where is your vehicle?

01:46PM    2    A.   Probably in close proximity to his, whether it's right

01:47PM    3    behind it or a second or third car back.

01:47PM    4    Q.   How many other vehicles responded?

01:47PM    5    A.   Several.  I don't recall how many.

01:47PM    6    Q.   One, two, three?

01:47PM    7    A.   More than three.

01:47PM    8    Q.   And was his vehicle surrounded?

01:47PM    9    A.   I'm sure that it would have been.

01:47PM   10    Q.   He clearly was not able to leave if he wanted to, was he?

01:47PM   11    A.   No.

01:47PM   12    Q.   He would have had to hit one of your vehicles to leave,

01:47PM   13    right?

01:47PM   14    A.   That's correct.

01:47PM   15    Q.   And who approaches him?

01:47PM   16    A.   Myself.

01:47PM   17    Q.   And anybody else?

01:47PM   18    A.   I don't recall.

01:47PM   19    Q.   And you remember walking to the front of the car, to the

01:47PM   20    back of the car, do you remember anything about it?

01:47PM   21    A.   I remember walking right up to the driver side of the

01:47PM   22    car.

01:47PM   23    Q.   And what did you do then?

01:47PM   24    A.   I had a conversation with Mr. Burgin.

01:47PM   25    Q.   Through the window?

| | | |
|---|---|---|
| 01:47PM | 1 | A.  No.  I believe he was taken out of the car. |
| 01:48PM | 2 | Q.  By whom? |
| 01:48PM | 3 | A.  I don't recall. |
| 01:48PM | 4 | Q.  Were you the first one there? |
| 01:48PM | 5 | A.  I was one of the first couple there, yeah. |
| 01:48PM | 6 | Q.  Was he handcuffed? |
| 01:48PM | 7 | A.  I don't recall if he was handcuffed or not.  He was |
| 01:49PM | 8 | handcuffed at that location at some point.  Whether it was |
| 01:49PM | 9 | right away or minutes after, I don't recall. |
| 01:49PM | 10 | Q.  You asked him where he was coming from; is that right? |
| 01:49PM | 11 | A.  That's correct. |
| 01:49PM | 12 | Q.  Before you asked him that, did you read him his Miranda |
| 01:49PM | 13 | Warnings? |
| 01:49PM | 14 | A.  No, sir. |
| 01:49PM | 15 | Q.  And he said to you he was coming from the gym; is that |
| 01:49PM | 16 | right? |
| 01:49PM | 17 | A.  That's correct. |
| 01:49PM | 18 | Q.  Okay.  Do you know where Mr. Burgin was in the afternoon |
| 01:49PM | 19 | on that date before you saw him at 56 Grimes? |
| 01:49PM | 20 | A.  No, sir. |
| 01:49PM | 21 | Q.  You don't know whether he was at the gym or not, do you? |
| 01:50PM | 22 | A.  No, sir. |
| 01:50PM | 23 | Q.  So, when he said gym, did that enter into your probable |
| 01:50PM | 24 | cause? |
| 01:50PM | 25 | A.  It raised my suspicion, yes. |

01:50PM 1    Q.  If you had not found drugs at 56 Grimes, were you going

01:50PM 2    to charge Mr. Burgin for the drugs that Rodney Pierce had?

01:50PM 3    A.  I can tell you that, on the state side of things, we

01:50PM 4    would not have charged him.  We were relying on the federal

01:50PM 5    government at this point.

01:50PM 6    Q.  When he was taken into custody, you said that he was

01:50PM 7    taken back to 45 Elm, right?

01:50PM 8    A.  That's correct.

01:50PM 9    Q.  Not taken to Homeland Security, right?

01:50PM 10   A.  No, sir.

01:50PM 11   Q.  Was Webb with you?

01:50PM 12   A.  Yes.

01:50PM 13   Q.  Did Webb remain with you?

01:50PM 14   A.  Yes.

01:50PM 15   Q.  You seized his car that day, right?

01:51PM 16   A.  We did.

01:51PM 17   Q.  What was the basis for the seizure of the car?

01:51PM 18   A.  That was based upon our investigation into Mr. Burgin and

01:51PM 19   the drugs that were recovered at 56 Grimes and, again, that

01:51PM 20   was the federal government that seized his vehicle.

01:51PM 21   Q.  Who ordered the seizure of the vehicle?

01:51PM 22   A.  When you say seizure, are you referring to, like, the

01:51PM 23   actual taking possession or are you referring to the vehicle

01:51PM 24   becoming a government vehicle?

01:51PM 25   Q.  I'm talking about taking possession of it by Officer Day,

| | | |
|---|---|---|
| 01:51PM | 1 | taking the keys to the car, and driving it down to 45 Elm |
| 01:51PM | 2 | Street. |
| 01:51PM | 3 | A.  That would have been -- |
| 01:52PM | 4 | Q.  That's a seizure.  That's the taking of a car. |
| 01:52PM | 5 | A.  I'm aware.  That would have been me. |
| 01:52PM | 6 | Q.  You told them to do it? |
| 01:52PM | 7 | A.  I'm sure I did.  Yeah. |
| 01:52PM | 8 | Q.  Okay.  And that was based upon what; just that he was |
| 01:52PM | 9 | taken into custody? |
| 01:52PM | 10 | A.  That's correct.  There was certainly nobody there to |
| 01:52PM | 11 | drive the vehicle away, and we were going to transport his |
| 01:52PM | 12 | vehicle from that location to a safer location at our office. |
| 01:52PM | 13 | Q.  So, you're saying now it was for protection of his |
| 01:52PM | 14 | vehicle; is that right? |
| 01:52PM | 15 | A.  The vehicle? |
| 01:52PM | 16 | Q.  Yeah. |
| 01:52PM | 17 | A.  Well, yeah.  He certainly wasn't going to drive it away. |
| 01:52PM | 18 | He was in our custody. |
| 01:52PM | 19 | Q.  Do you recall whether you had your gun out when you |
| 01:52PM | 20 | approached him? |
| 01:52PM | 21 | A.  I don't recall. |
| 01:53PM | 22 | Q.  Did you approach Mr. Pierce when he was arrested? |
| 01:53PM | 23 | A.  I wasn't one of the first officers on scene.  No. |
| 01:53PM | 24 | Q.  Did officers at the Pierce arrest have their guns out? |
| 01:53PM | 25 | A.  I don't recall.  I'm sure they did. |

01:53PM  1  Q.  Did anybody have their guns out when Mr. Burgin was

01:53PM  2  arrested?

01:53PM  3  A.  I don't recall.

01:53PM  4  Q.  Well, you testified a lot about officer safety, right?

01:53PM  5  Certainly, you do protective sweeps, and you wear vests, and

01:53PM  6  do all sorts of things to protect yourselves, right?

01:53PM  7  A.  That's correct.

01:53PM  8  Q.  And pulling somebody over, even on a traffic stop, has

01:53PM  9  some risk for officers; is that right?

01:53PM  10  A.  Certainly does.

01:53PM  11  Q.  And the way you're talking about Mr. Burgin, at least

01:53PM  12  what you had in your mind, you thought that he might be

01:53PM  13  somebody that's bad, right?

01:53PM  14  A.  That's correct.

01:53PM  15  Q.  Okay.  So, would you walk up to somebody like that

01:53PM  16  without your gun out?

01:53PM  17  A.  It would depend on the circumstances.

01:54PM  18  Q.  How about the other -- you can't -- you don't remember

01:54PM  19  seeing anybody else with their gun out?

01:54PM  20  A.  I don't recall.  I'm not saying they didn't.  I don't

01:54PM  21  recall if they did or didn't.

01:54PM  22  Q.  Just go back a moment to when Mr. Burgin came to 56

01:54PM  23  Grimes.  Your knowledge of that is based on the -- his

01:54PM  24  arriving there is based upon seeing the video; is that right?

01:55PM  25  A.  That's correct.

01:55PM   1   Q.  So, the video shows him pulling up on from Milburn,

01:55PM   2   turning left, and then backing up toward the front of 56

01:55PM   3   Grimes across the street; is that right?

01:55PM   4   A.  That's correct.

01:55PM   5   Q.  Was Mr. Pierce's Caravan there, do you know?

01:55PM   6   A.  No.

01:55PM   7   Q.  Okay.

01:55PM   8        THE COURT:  No, you don't know; or no, it wasn't

01:55PM   9   there?

01:55PM  10        THE WITNESS:  No, it wasn't there.

01:55PM  11   BY MR. HARRINGTON:

01:55PM  12   Q.  Were you on surveillance then?

01:55PM  13   A.  When he arrived, no.

01:55PM  14   Q.  Had Pierce already left?

01:56PM  15   A.  I don't recall the timing of it.

01:56PM  16   Q.  Are you saying that Pierce came to 56 Grimes after

01:56PM  17   Burgin?

01:56PM  18   A.  I know, at one point, they were there at the same time.

01:56PM  19   I don't recall exactly when and in the exact -- the events.

01:56PM  20   Q.  But you don't know from your own personal knowledge that

01:56PM  21   Mr. Burgin was there, do you, until after Pierce was

01:56PM  22   arrested, right?

01:56PM  23   A.  Other than the video, no.

01:56PM  24   Q.  While you were still at 56 Grimes the night of the

01:57PM  25   execution of the search warrant, and after the searches were

01:57PM    1   conducted, did anybody from Mr. Burgin's family arrive while

01:57PM    2   you were there?

01:57PM    3   A.   I don't recall.

01:57PM    4   Q.   Did you learn that anybody from -- that was working with

01:57PM    5   you that night was there when anybody from Mr. Burgin's

01:57PM    6   family arrived?

01:57PM    7   A.   I don't recall.

01:57PM    8   Q.   When you took Mr. Burgin into custody that night, how

01:58PM    9   long did you think you had the authority to hold him?

01:58PM   10   A.   I don't know.  That had yet to be determined.  The

01:58PM   11   investigation was ongoing.

01:58PM   12   Q.   Who would have made that determination?

01:58PM   13   A.   Either myself or Special Agent Webb.

01:58PM   14   Q.   Okay.  Well, you said it, somehow or another, had become

01:58PM   15   a federal investigation now, right?

01:58PM   16   A.   That's correct.

01:58PM   17   Q.   Could you have made that determination to let him go?

01:58PM   18   A.   For a period, yes.

01:58PM   19   Q.   When did that period end?

01:59PM   20   A.   When -- probably when we found the drugs and guns and --

01:59PM   21   Q.   That's when the determination was to go federal?

01:59PM   22   A.   No.  That determination was made at -- because I believe

01:59PM   23   Mr. Pierce would have been charged federally.  So, they were

01:59PM   24   heavily involved by then already.  So, whether that -- I

01:59PM   25   could have authorized Mr. Burgin to be released.  I don't

01:59PM   1   know.  Maybe I couldn't have.

01:59PM   2   Q.  So, this -- after Pierce is arrested, the decision is

01:59PM   3   made to go federal on it; is that right?  That's what you

01:59PM   4   said?

01:59PM   5   A.  That's correct.

01:59PM   6   Q.  And yet, you persisted in going to get a state search

01:59PM   7   warrant; is that right?

01:59PM   8   A.  That's correct.

01:59PM   9   Q.  You testified earlier Mr. Lynch showed you the video of

02:00PM  10   someone you identified as David Burgin going into and leaving

02:00PM  11   56 Grimes; is that right?

02:00PM  12   A.  That's correct.

02:00PM  13   Q.  Where you were there that evening, right, did you see

02:00PM  14   that go in and out?

02:00PM  15   A.  I did see him depart the location.

02:00PM  16   Q.  Did you see him arrive?

02:00PM  17   A.  No, sir.

02:00PM  18   Q.  But you saw him leave?

02:00PM  19   A.  That's correct.

02:00PM  20   Q.  Right?  And did you know he was David Burgin then?

02:01PM  21   A.  No.

02:01PM  22   Q.  Now, you said that the DVR was taken to the Homeland

02:01PM  23   Security for safekeeping; is that right?

02:01PM  24   A.  What's that?  I didn't say that.

02:01PM  25   Q.  Oh, I thought you did.  I'm sorry.  Where was it -- when

02:01PM   1   it was seized, where it was taken?

02:01PM   2   A.   I don't know.

02:01PM   3   Q.   Okay.  How about the other evidence?  That was taken

02:01PM   4   initially to 45 Elm; is that right?

02:01PM   5   A.   That's correct.

02:01PM   6   Q.   And, at some point in time, was that transferred to

02:02PM   7   Homeland Security?

02:02PM   8   A.   Yes, sir.

02:02PM   9   Q.   All of it?

02:02PM   10  A.   I believe so.

02:02PM   11  Q.   Did you get Judge Case's permission to do that?

02:02PM   12  A.   I don't think so.

02:02PM   13  Q.   You testified earlier that part of the reason for this

02:03PM   14  protective sweep was because of this group, quote unquote,

02:03PM   15  that Mr. Burgin was involved in, and then you testified about

02:03PM   16  Mr. Washington being a violent or dangerous person; is that

02:03PM   17  right?

02:03PM   18  A.   That's correct.

02:03PM   19  Q.   You had no knowledge that Mr. Burgin was, in fact,

02:03PM   20  violent or dangerous, did you?

02:03PM   21  A.   No, sir.

02:03PM   22  Q.   I am correct, right?

02:03PM   23  A.   You are correct.

02:03PM   24  Q.   During the evening what the search warrants were

02:04PM   25  obtained, did you have any communications with Paul McMahon?

02:04PM   1    A.  I did.

02:04PM   2    Q.  And how did you communicate with him?

02:04PM   3    A.  On his phone and in person.

02:04PM   4    Q.  Okay.  So, during the period of time that the search

02:04PM   5    warrants are being obtained, did you talk to Paul on the

02:04PM   6    phone?

02:04PM   7    A.  I talked to him at some point.  I'd have to look at the

02:04PM   8    record to tell you.

02:04PM   9    Q.  Do you know what you talked about?

02:04PM  10    A.  I don't.  It would have been prior to the second warrant,

02:04PM  11    in between the first and the second.

02:05PM  12    Q.  Do you know what role he played in the either the

02:05PM  13    drafting, preparation, or interaction with Judge Case?

02:05PM  14    A.  No, sir.

02:05PM  15    Q.  When you did the protective sweep at 56 Grimes, did

02:05PM  16    anybody have their weapons out?

02:06PM  17    A.  Yes.

02:06PM  18    Q.  Did everybody?

02:06PM  19    A.  I don't know.

02:06PM  20    Q.  That's standard procedure, correct?

02:06PM  21    A.  That's correct.

02:06PM  22    Q.  You testified yesterday about some question Mr. Lynch did

02:07PM  23    about the envelope you claim you saw in the protective sweep?

02:07PM  24    A.  Yes, sir.

02:07PM  25    Q.  That was in a -- looks like a plastic garbage container,

| | | |
|---|---|---|
| 02:07PM | 1 | correct? |
| 02:07PM | 2 | A.  Yes, sir. |
| 02:07PM | 3 | Q.  Do you know where that container was? |
| 02:07PM | 4 | A.  It was in the kitchen, towards the rear of the kitchen. |
| 02:07PM | 5 | Q.  So, you're saying it's in the apartment, what I'm calling |
| 02:07PM | 6 | the apartment in the rear? |
| 02:07PM | 7 | A.  That's correct. |
| 02:07PM | 8 | MR. HARRINGTON:  If I could have just a minute? |
| 02:08PM | 9 | BY MR. HARRINGTON: |
| 02:08PM | 10 | Q.  Chief Granville, when you mentioned before that you had |
| 02:08PM | 11 | communications while doing the Pierce arrest or what led up |
| 02:08PM | 12 | to that, you said that you used the official communications |
| 02:08PM | 13 | within your department correct -- |
| 02:08PM | 14 | A.  No. |
| 02:08PM | 15 | Q.  -- for part of the communications? |
| 02:08PM | 16 | A.  No.  It's a secure repeater channel that we utilize. |
| 02:08PM | 17 | Q.  Are those recorded? |
| 02:08PM | 18 | A.  No.  No, sir. |
| 02:08PM | 19 | Q.  Not recorded? |
| 02:08PM | 20 | A.  No. |
| 02:08PM | 21 | Q.  Obviously, not stored? |
| 02:08PM | 22 | A.  There's no record. |
| 02:08PM | 23 | MR. HARRINGTON:  That's all I have right now, Judge. |
| 02:09PM | 24 | THE COURT:  Mr. Lynch? |
| 02:09PM | 25 | MR. LYNCH:  Can I just have a moment, Judge? |

02:09PM    1    BY MR. LYNCH:

02:09PM    2    Q.  Do you recall when Mr. Harrington was talking to you

02:10PM    3    about the DVR system?

02:10PM    4    A.  Yes.

02:10PM    5    Q.  And do you understand that DVR system is a digital video

02:10PM    6    recorder system?

02:10PM    7    A.  Yes.

02:10PM    8    Q.  All right.  Now, referring you to Government Exhibit

02:10PM    9    number -- if we can pull up 9?

02:10PM   10         THE COURT:  Nine is the second search warrant.

02:10PM   11    BY MR. LYNCH:

02:10PM   12    Q.  Yes.  Now, on the page -- what page is that?

02:10PM   13         On page 8, do you see that there's sort of groups of

02:10PM   14    information that's put on there including, like,

02:10PM   15    miscellaneous paperwork is item number 2?

02:10PM   16    A.  Yes.

02:10PM   17    Q.  Okay.  And then item number 1, there's a list of 11

02:11PM   18    computer hard drives, correct?

02:11PM   19    A.  Correct.

02:11PM   20    Q.  And there's no -- it's not specifically delineated what

02:11PM   21    those hard drives are?

02:11PM   22    A.  No.

02:11PM   23    Q.  So, for all you know, the DVR system is included in that?

02:11PM   24    A.  It could be, yes.

02:11PM   25    Q.  Okay.  Now, going back to the stop with David Burgin, I

02:11PM  1  just want to just clarify what information you had that day.

02:11PM  2  I mean, you had a historical investigation of David Burgin,

02:11PM  3  correct?

02:11PM  4  A.  That's correct.

02:11PM  5  Q.  You spoke with the CI that day, and what did the CI tell

02:11PM  6  you about where he got the cocaine from that he had?

02:12PM  7  A.  From David Burgin.

02:12PM  8  Q.  Okay.  So -- and he said he was dealing with somebody

02:12PM  9  related to David Burgin, correct?

02:12PM  10  A.  That's correct.

02:12PM  11  Q.  And who was that?

02:12PM  12  A.  Mr. Pierce.

02:12PM  13  Q.  And then, you had Mr. -- you had the CI make contact with

02:12PM  14  Mr. Pierce, correct?

02:12PM  15  A.  That's correct.

02:12PM  16  Q.  And what was the purpose of making that contact?

02:12PM  17  A.  To obtain cocaine.

02:12PM  18  Q.  And that cocaine was -- was there cocaine seized from

02:12PM  19  Mr. Pierce?

02:12PM  20  A.  There was.

02:12PM  21  Q.  At the place where the CI was supposed to meet with

02:12PM  22  Pierce?

02:12PM  23  A.  Yes.

02:12PM  24  Q.  And were Burgin and Pierce observed in the same area that

02:12PM  25  evening?

GRANVILLE -- BY MR. LYNCH -- 12/19/2022

02:12PM    1    A.   They were.

02:12PM    2    Q.   Where is that?

02:12PM    3    A.   Fifty-six Grimes.

02:12PM    4    Q.   And, in fact, you stopped Mr. Burgin after he left 56

02:13PM    5    Grimes?

02:13PM    6    A.   That's correct.

02:13PM    7    Q.   And do you also agree that there's a difference between

02:13PM    8    probable cause to arrest and maybe what a prosecutor might

02:13PM    9    decide to go to trial with?

02:13PM   10    A.   Yes.

02:13PM   11    Q.   Okay.  Two different decision-making processes?

02:13PM   12    A.   Yes.

02:13PM   13    Q.   Now, Mr. Harrington also asked you about sometimes

02:13PM   14    Mr. Case -- Judge Case, I'm sorry -- has come to the 45 Elm

02:13PM   15    to interview informants?

02:13PM   16    A.   Yes.

02:13PM   17    Q.   And have other judges done that too?

02:14PM   18    A.   Yes.

02:14PM   19    Q.   And why is that?  Why do they come to 45 Elm sometimes?

02:14PM   20    A.   It's a lot safer than running an informant in and out of

02:14PM   21    a court building or a judge's chambers or some other not-so-

02:14PM   22    discreet location.

02:14PM   23    Q.   So, safety not only to the informant, but maybe to other

02:14PM   24    people who might encounter the informant?

02:14PM   25    A.   That's correct.

02:14PM  1   Q.  I mean, is it a goal of law enforcement to protect the

02:14PM  2   confidential informant's identification?

02:14PM  3   A.  It is.

02:14PM  4   Q.  Now, remember photograph number -- Exhibit Number 11, the

02:14PM  5   bill that was found in the garbage?

02:14PM  6   A.  Yes.

02:14PM  7   Q.  I just want to make sure I'm clear with this.  You didn't

02:14PM  8   move anything in that garbage before you saw that bill,

02:14PM  9   correct?

02:15PM  10  A.  No.

02:15PM  11  Q.  Okay.  Now, you previously testified (inaudible) you did

02:15PM  12  not have to manipulate this garbage in any way to view that

02:15PM  13  bill?

02:15PM  14  A.  No.

02:15PM  15  Q.  Okay.  But you admit there were other garbage bags you

02:15PM  16  went through prior to the second warrant being obtained,

02:15PM  17  correct?

02:15PM  18  A.  That's correct.

02:15PM  19  Q.  But not this -- not before you saw this bill?

02:15PM  20  A.  No.

02:15PM  21  Q.  Now, Mr. Harrington also asked you about how you document

02:15PM  22  information with reports and things, correct?

02:15PM  23  A.  That's correct.

02:15PM  24  Q.  Now, in this case, did you -- he asked you how you

02:16PM  25  document certain things, correct?

02:16PM    1    A.   That's correct.

02:16PM    2    Q.   Now, you documented the search with photographs, correct?

02:16PM    3    A.   We did.

02:16PM    4    Q.   You documented some of the information when you obtained

02:16PM    5    the search warrant from Judge Case, correct?

02:16PM    6    A.   That's correct.

02:16PM    7    Q.   You had a property receipt form, correct?

02:16PM    8    A.   That's correct.

02:17PM    9             MR. LYNCH:   Just one moment.   Judge, I don't have any

02:17PM   10    other questions for Chief Granville.

02:17PM   11             THE COURT:   Anything further, Mr. Harrington?

02:17PM   12             MR. HARRINGTON:   No, Judge.   The other things that we

02:18PM   13    had we will cover through other witnesses.

02:18PM   14             THE COURT:   All right.   Chief Granville, I have a

02:18PM   15    couple of questions that I need some clarification on.

02:18PM   16             MR. HARRINGTON:   Judge, could we just -- can we have

02:18PM   17    a minute?   Let me talk to my client before you -- I just want

02:18PM   18    to --

02:18PM   19    (An off-the-record discussion was held.)

02:18PM   20             MR. HARRINGTON:   We need to resolve an issue, Judge

02:22PM   21    (inaudible).

02:22PM   22             THE COURT:   Okay.   Are you asking for a recess?

02:22PM   23             MR. LYNCH:   Yes.   Can we take a ten-minute recess?

02:23PM   24             THE COURT:   Okay.

02:23PM   25             MR. GLABERSON:   Yes.

02:23PM    1            THE COURT:  All right.  It's 3:30.  We'll return at

02:23PM    2    3:40.

02:23PM    3            MR. LYNCH:  That's fine.

02:23PM    4    (A recess was taken from 3:30 p.m. to 3:41 p.m.)

02:23PM    5            THE CLERK:  Back on the record.

02:23PM    6            THE COURT:  You have resolved whatever you needed to

02:23PM    7    resolve?

02:23PM    8            MR. HARRINGTON:  Well, we reached an accord in trying

02:24PM    9    to resolve it.

02:24PM   10            THE COURT:  All right.

02:24PM   11            MR. HARRINGTON:  Judge, the next thing that we

02:24PM   12    propose to do would involve playing out loud the conversations

02:24PM   13    between the informant and Mr. Pierce.  The problem with that

02:24PM   14    is, it's a confidential informant, and Mr. Lynch advises me he

02:24PM   15    has to get special permission in order to be able to do that.

02:24PM   16    And so, we would ask that -- and my understanding is Chief

02:24PM   17    Granville has other commitments, so that we would ask that we

02:24PM   18    be allowed to recall him if we make that determination some

02:24PM   19    time after this week when he's back.

02:24PM   20            THE COURT:  Certainly, but I do want to ask my

02:24PM   21    questions of Chief Granville this afternoon.

02:24PM   22         Chief Granville, you had indicated that, as I understand

02:25PM   23    it and recall it, that you had previous occasions to be in the

02:25PM   24    vicinity of 56 Grimes before February 19th, 2020; is that

02:25PM   25    correct?

02:25PM    1              THE WITNESS:  That's correct.

02:25PM    2              THE COURT:  Do you know if Special Agent Webb was

02:25PM    3    with you during any of those periods or if he had any prior

02:25PM    4    knowledge of 56 Grimes?

02:25PM    5              THE WITNESS:  I know that he did have prior

02:25PM    6    knowledge.  I don't believe he was with -- I don't think we

02:25PM    7    were personally together, though.

02:25PM    8              THE COURT:  The reason I ask is, the testimony and

02:25PM    9    the exhibits indicate that both Mr. Pierce and Mr. Burgin were

02:25PM   10    allegedly seen going in and out of the building at 56 Grimes

02:25PM   11    in the front entrance on Grimes.

02:25PM   12              THE WITNESS:  That's correct.

02:25PM   13              THE COURT:  You also indicated that it was Special

02:26PM   14    Agent Webb who said entry should be made through that side

02:26PM   15    door.

02:26PM   16              THE WITNESS:  That's correct.

02:26PM   17              THE COURT:  Did he indicate why?

02:26PM   18              THE WITNESS:  I believe that -- and it caused me some

02:26PM   19    hesitation that night because it was dark, and it was tough to

02:26PM   20    see from the view that we were in.  It was tough to see which

02:26PM   21    door.  We just knew it was from, at the very least, at the

02:26PM   22    front of the building.  Whether that was the side front, or

02:26PM   23    the front, it was the front of the building.

02:26PM   24              THE COURT:  But the photograph clearly shows there

02:26PM   25    are two side doors and a front door.

02:26PM    1          THE WITNESS:  That's correct.  I'm referring to,

02:26PM    2    under the cover of darkness, looking out our back, whether

02:26PM    3    it's a rearview mirror, back window that's all steamed up, it

02:26PM    4    was tough to see.

02:26PM    5          THE COURT:  But you're already by the building on

02:26PM    6    foot when Webb says we should go through the side door?

02:26PM    7          THE WITNESS:  That's correct.

02:27PM    8          THE COURT:  And you had flashlights and streetlights.

02:27PM    9    All I'm trying to figure out is why Webb would say go through

02:27PM   10    the side door when, at least, it seems that everybody was

02:27PM   11    talking about the front entrance and Pierce going in the front

02:27PM   12    entrance, Pierce coming out of a front entrance, and

02:27PM   13    Mr. Burgin being seen going in and out of a front entrance.

02:27PM   14    I'm just trying to figure out why Webb would say let's go

02:27PM   15    through the side door if you know or if he indicated anything

02:27PM   16    as to why?

02:27PM   17          THE WITNESS:  I don't.  I believe it was to do our --

02:27PM   18    where we were located and the fact that it was a nighttime

02:27PM   19    event, it was tough to see.  I believe it was tough to tell

02:27PM   20    where they were coming from.  And once we were able to,

02:28PM   21    obviously, recover and review the video, we knew for certain

02:28PM   22    they were coming from the front of the building.

02:28PM   23          THE COURT:  In your conversation with Patrick

02:28PM   24    McMahon, prior to his actually getting the second warrant, did

02:28PM   25    you tell him about the attic and the garage as well as the

02:28PM    1    second floor?

02:28PM    2         THE WITNESS:  I believe we told him that there was a

02:28PM    3    garage, and there was an attic, so we should include all

02:28PM    4    common places within the property to cover ourselves.

02:28PM    5         THE COURT:  But how did you know there was an attic?

02:28PM    6    How did you know there was an attic when you were talking to

02:28PM    7    McMahon?

02:28PM    8         THE WITNESS:  I believe the attic was cleared for

02:28PM    9    security search.

02:29PM   10         THE COURT:  So, entry was made into the attic as well

02:29PM   11    as the second floor?

02:29PM   12         THE WITNESS:  That's correct.

02:29PM   13         THE COURT:  Had entry been made in the garage?

02:29PM   14         THE WITNESS:  No.

02:29PM   15         THE COURT:  You also testified that when you went up

02:29PM   16    to the second floor the second time, you were by yourself

02:29PM   17    personally.

02:29PM   18         THE WITNESS:  That's correct.

02:29PM   19         THE COURT:  There had been a prior visit to the

02:29PM   20    second prior with you and Webb?

02:29PM   21         THE WITNESS:  No.  That --

02:30PM   22         THE COURT:  There were three altogether?

02:30PM   23         THE WITNESS:  There were three altogether, the first

02:30PM   24    one --

02:30PM   25         THE COURT:  The first being with everybody and doing

02:30PM    1    the sweep, then you and Webb went up there.

02:30PM    2            THE WITNESS:  No.  I was the second one.  The third

02:30PM    3    one was myself and Webb.

02:30PM    4            THE COURT:  All right.  So, when you went up the

02:30PM    5    second time, is that when you were looking through drawers?

02:30PM    6            THE WITNESS:  Yes.

02:30PM    7            THE COURT:  Do you recall just how many drawers and

02:30PM    8    what else you might have been rummaging through?

02:30PM    9            THE WITNESS:  It was in the kitchen.  There was a

02:30PM   10    couple of drawers and cabinets that I had looked in, and there

02:30PM   11    was a -- some plastic bags on the floor.

02:30PM   12            THE COURT:  But you found nothing?

02:30PM   13            THE WITNESS:  That's correct.

02:30PM   14            THE COURT:  Did you ever indicate that to McMahon,

02:30PM   15    Patrick McMahon, when he was applying for the second warrant?

02:30PM   16            THE WITNESS:  I don't recall, but I don't believe

02:30PM   17    that I did.

02:30PM   18            THE COURT:  And then, why did you and Webb go up?

02:31PM   19            THE WITNESS:  The third time?

02:31PM   20            THE COURT:  The third time.

02:31PM   21            THE WITNESS:  I believe I was giving him kind of,

02:31PM   22    like, the layout of what we were looking at as far as the

02:31PM   23    search was concerned and kind of what we were looking at as

02:31PM   24    far as bodies go.

02:31PM   25            THE COURT:  But by this time, you said it had become

| | | |
|---|---|---|
| 02:31PM | 1 | a federal investigation because Pierce had already been |
| 02:31PM | 2 | arrested. |
| 02:31PM | 3 | THE WITNESS:  That's correct. |
| 02:31PM | 4 | THE COURT:  So, why would Webb, as a federal officer, |
| 02:31PM | 5 | be going up there without a warrant; do you know? |
| 02:31PM | 6 | THE WITNESS:  I don't.  He was with me. |
| 02:31PM | 7 | THE COURT:  Okay.  That takes care of my questions. |
| 02:32PM | 8 | You are excused. |
| 02:32PM | 9 | THE WITNESS:  Thank you. |
| 02:32PM | 10 | MR. LYNCH:  Thank you, Judge.  So, Judge, tomorrow, |
| 02:32PM | 11 | were prepared to call Patrick McMahon and Frank Zabawa. |
| 02:32PM | 12 | THE COURT:  Okay.  Am I -- we didn't have Deputy |
| 02:32PM | 13 | Robert Galbraith, did we? |
| 02:32PM | 14 | MR. LYNCH:  Yeah.  We had him on the first day. |
| 02:32PM | 15 | THE COURT:  Okay. |
| 02:32PM | 16 | MR. LYNCH:  He had the dog sniff. |
| 02:32PM | 17 | THE COURT:  And we had Deputy Adam Day, right? |
| 02:32PM | 18 | MR. LYNCH:  Correct. |
| 02:32PM | 19 | THE COURT:  So, it's just Detective Patrick McMahon |
| 02:32PM | 20 | and Special Agent Zabawa? |
| 02:32PM | 21 | MR. LYNCH:  Correct. |
| 02:32PM | 22 | THE COURT:  And with the right to defense to recall |
| 02:33PM | 23 | Chief Granville. |
| 02:33PM | 24 | MR. HARRINGTON:  Right.  And, Judge, I have to talk |
| 02:33PM | 25 | to Mr. Lynch about recalling the earlier witnesses based upon |

| | | |
|---|---|---|
| 02:33PM | 1 | what Granville had said, but I'll try to sort that out with |
| 02:33PM | 2 | him. |
| 02:33PM | 3 | THE COURT:  All right. |
| 02:33PM | 4 | MR. LYNCH:  Thank you, Judge. |
| 02:33PM | 5 | THE COURT:  All right.  Anything else at this time? |
| 02:33PM | 6 | MR. LYNCH:  No. |
| 02:33PM | 7 | THE COURT:  All right.  For the record, |
| 02:33PM | 8 | Mr. Harrington, does the defendant, once again, acknowledge |
| 02:33PM | 9 | and agree that there is presently pending a motion on his |
| 02:33PM | 10 | behalf; that is, a motion to suppress the evidence in this |
| 02:33PM | 11 | case, and that by the filing of that motion, that |
| 02:33PM | 12 | automatically caused the Speedy Trial clock to stop and to |
| 02:33PM | 13 | remain stopped pursuant to Title 18 of the United States Code, |
| 02:33PM | 14 | Section 3161(h)(1)(D); and, therefor, the time will not count |
| 02:33PM | 15 | against the government for purposes of the time requirement |
| 02:33PM | 16 | set forth in the Speedy Trial Act and any other statutory time |
| 02:34PM | 17 | requirements that might be applicable? |
| 02:34PM | 18 | MR. HARRINGTON:  Yes, Judge.  Judge, just so -- we |
| 02:34PM | 19 | intend to have some witnesses.  I'm still not sure exactly how |
| 02:34PM | 20 | many, but there will be several, but one of them is Judge |
| 02:34PM | 21 | Case.  And I haven't been in the office today.  I don't know. |
| 02:34PM | 22 | I let him know that this was going on.  I'm hoping to get him |
| 02:34PM | 23 | in there this week so we can take him. |
| 02:34PM | 24 | THE COURT:  Okay.  And I'm not going to tell anybody |
| 02:34PM | 25 | how to do their business, but I know from past experience |

02:34PM   1    there is something that has to be done through the -- I always

02:34PM   2    mix up the Administrative Office and the Office of Court

02:34PM   3    Administration.  New York is the Office of Court

02:34PM   4    Administration.  In order for a judge to testify, I'm assuming

02:34PM   5    that that is not going to present a problem or it's going to

02:35PM   6    be taken care of?

02:35PM   7            MR. HARRINGTON:  Judge, when we started this issue, I

02:35PM   8    heard from at lawyer from the OCA, told him what my position

02:35PM   9    was.  I had you sign a second warrant to address the technical

02:35PM  10    issue that he raised.  So, I served Judge Case again, and I

02:35PM  11    have not heard from him.

02:35PM  12            THE COURT:  Okay.  I'm just putting it out there so

02:35PM  13    we --

02:35PM  14            MR. HARRINGTON:  I know.  I know.

02:35PM  15            THE COURT:  -- know there may be objections filed by

02:35PM  16    somebody from Office of Court Administration.

02:35PM  17            MR. HARRINGTON:  And I asked him what the objections

02:35PM  18    were, and what they were based on, and he wouldn't tell me.

02:35PM  19            THE COURT:  Okay.  We can address that when we need

02:35PM  20    to.

02:35PM  21            MR. LYNCH:  Well, I mean, I'm assuming -- I mean,

02:35PM  22    Mr. Harrington, are we prepared to call those witnesses

02:35PM  23    tomorrow just so we know?

02:35PM  24            MR. HARRINGTON:  Judge Case anyway, yes.  The other

02:35PM  25    ones, probably not.

02:35PM  1              MR. LYNCH:  Okay.

02:35PM  2              THE COURT:  Do you expect Special Agent Zabawa to be

02:35PM  3    long?

02:36PM  4              MR. GLABERSON:  Both of them much shorter than Chief

02:36PM  5    Granville (inaudible).

02:36PM  6              THE COURT:  Oh, all right.  Because I'm starting to

02:36PM  7    run into some scheduling problems for Wednesday and Thursday.

02:36PM  8    All right.

02:36PM  9              MR. LYNCH:  Thank you Judge.

02:36PM  10             THE COURT:  Thank you, everyone.

02:36PM  11             MR. LYNCH:  Judge, your question had to do with the

02:36PM  12   Wite Out that's included on Government Exhibit Number 8?

02:36PM  13             THE COURT:  Yes.

02:36PM  14             MR. LYNCH:  The government did -- as part of its

02:36PM  15   response to Mr. Burgin's pretrial motions, we attached an

02:37PM  16   affidavit from Patrick McMahon explaining what happened.  But,

02:37PM  17   in addition, Detective McMahon, we expect, is going to explain

02:37PM  18   what happened.  When they got the original warrant, he still

02:37PM  19   had the original warrant in his possession.  When they went to

02:37PM  20   go back to get the second warrant, there was -- and I don't

02:37PM  21   want to, you know --

02:37PM  22             THE COURT:  You don't.

02:37PM  23             MR. LYNCH:  Yeah.  He'll testify about what his

02:37PM  24   interaction was with Judge Case that led him to do that and

02:37PM  25   then, how he created a second warrant.

02:37PM   1              THE COURT:  Okay.  Am I going to hear --

02:37PM   2              MR. LYNCH:  You're going to hear who --

02:37PM   3              THE COURT:  -- who actually did the whiting out?

02:37PM   4              MR. LYNCH:  Yes.

02:37PM   5              THE COURT:  And do we know where the whited out

02:37PM   6  warrant is now?

02:37PM   7              MR. LYNCH:  We've seen it.  Mr. Harrington and I went

02:37PM   8  to the clerk's office in Erie County and saw it.

02:37PM   9              THE COURT:  Okay.

02:37PM  10              MR. HARRINGTON:  Judge, that's under subpoena.  I'll

02:37PM  11  have the deputy bring it.

02:37PM  12              THE COURT:  Okay.  I just wanted to know.  That's

02:38PM  13  all.

02:38PM  14              MR. LYNCH:  Yeah.

02:38PM  15              THE COURT:  All right.

02:38PM  16              MR. LYNCH:  Okay.

02:38PM  17              THE COURT:  Thank you, everyone.

02:38PM  18              MR. LYNCH:  Thank you, Judge.

02:38PM  19  (Proceedings concluded at 3:42 p.m.)

         20

         21

         22

         23

         24

         25

1          *    *    *    *    *    *    *

2

3          I certify that the foregoing is a

4     correct transcription of the proceedings

5     recorded by me in this matter.

6

7

8

9                         s/ Megan E. Pelka, RPR

10                        Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25