**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

                              **Plaintiff,**

 **v.**

                                                              **20-CR-29A**

**DAVID BURGIN,**

                              **Defendant.**

---

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

        The defendant, David Burgin ("the defendant"), is charged along with seven other co-defendants in a superseding indictment with having violated Title 21 U.S.C. §§ 846 (Count 1, 15-18); 841(a)(1) and 841(b)(1)(B) (Counts 7-10); 841(a)(1) and 841(b)(1)(D) (Count 11); 856(a)(1) (Count 12, 19); Title 18 U.S.C. §§ 924(c)(1)(A)(i) and 2 (Count 13); Title 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count 14).  (Dkt. #24).

He has filed a motion seeking suppression of the use of evidence at his trial seized by law enforcement personnel on February 19, 2020 from 56 Grimes Street, Buffalo, New York pursuant to two separate New York State search warrants.  He also requested a *Franks* hearing in support of his motion to suppress.  Dkt. #282.  The government filed a response in opposition to the defendant's motions.  Dkt. #322.  The defendant filed a Reply to the government's Response (Dkt. #361) and a "Supplement" to his Reply (Dkt. #369). Oral argument on the motions was heard by this Court and it was determined that an evidentiary hearing was necessary in order to resolve the motions.

The initial evidentiary hearing was held by this Court on August 23, 2022 and a transcript of the proceedings was filed on October 14, 2022.  Dkt. #465.  Since the proceeding had not been completed, the motion was adjourned until December 19, 2022 and carried over to December 20 and 21, 2022.  A transcript of the proceedings held on December 19, 2022 was filed on January 13, 2023 (Dkt. #517); a transcript of the proceedings held on December 20, 2022 was filed on January 23, 2023 (Dkt. #519); a transcript of the proceedings held on December 21, 2022 was filed on January 14, 2023 (Dkt. #518).  The evidentiary hearing was completed on January 11, 2023, and a transcript of that proceeding was filed on March 20, 2023 (Dkt. #544).

The government called a total of six witnesses, namely Detective Daniel Granville, Chief of Narcotics in the Erie County Sheriff's Office ("ECSO"), Erie County

2

Detective Adam Day, Erie County Detective Patrick McMahon, Robert Galbraith, Erie County K-9 Officer, Special Agent Francis Zabawa of the Department of Homeland Security ("HSI") and the Hon. Kenneth F. Case, Erie County Court Judge, and submitted a number of exhibits.

The defendant testified in his behalf and also submitted a number of exhibits.

Post-hearing memoranda were submitted by the defendant and the government (Dkt. #s 576, 575) and the matter was taken under advisement.

## **FACTS[1]**

Detective Granville testified that he had information about the defendant prior to February 19, 2020 as a result of working on drug investigations relating to the defendant. Dkt. #465, pp. 144-146. Detective Adam Day testified that he knew that the defendant was a target of a narcotics investigation that was going on for years and that David Washington and Rodney Pierce, co-defendants in this case, were suspected associates of the defendant. Dkt. #465, pp. 11, 74-75. On February 19, 2020, the ECSO was conducting surveillance on an individual involved in narcotics trafficking in and around Buffalo, New York which resulted in the arrest of that individual on February

---

[1] The facts are taken from the transcripts of the aforesaid proceedings and references to such will be designated by the appropriate docket number and page number in each transcript. Reference by incorporation is made by this Court to its Report, Recommendation and Order involving a co-defendant, Rodney Pierce, who has been identified as being a nephew of the defendant herein as to certain events occurring on February 19, 2020. *See* Dkt. #305.

19, 2020.  That same day, this individual agreed to cooperate with law enforcement and became a confidential informant ("CI").  The individual was found to be in possession of "a significant amount of cocaine, firearms and U.S. currency."  Dkt. #465, pp. 12, 69, 147-148.  This CI "identified David Burgin as his/her source of supply and a person he/she identified as a nephew of Burgin," *i.e.*, Rodney Pierce.  Dkt. #465, p. 12.  The CI told Detective Granville that "he/she had a meeting with Burgin to work out an arrangement to purchase cocaine and what the prices were going to be" and that Pierce "would be the one that would be handling the transactions."  Dkt. #465, p. 149.

Recorded phone calls were placed to Pierce by the CI under the control of the officers on February 19, 2020 wherein four conversations between the CI and Pierce were had.  The first conversation occurred at 3:18 p.m. on February 19, 2020.  Dkt. #465, p. 152.  Because the CI had previously purchased a kilogram of cocaine from Pierce, Granville had the CI order a kilogram of cocaine from Pierce on February 19, 2020.  Dkt. #465, pp. 152-153.

Upon completion of additional phone calls between the CI and Pierce, a time and place for meeting was agreed upon for the sale and purchase of a kilogram of cocaine.  Dkt. #465, pp. 160-165.  It was agreed between the CI and Pierce that the meeting would take place in the Autozone parking lot on Broadway in the City of Buffalo.  Surveillance of this area was then established by law enforcement personnel.  Dkt. #465, pp. 13-14,166.  Detective Granville testified that he observed Pierce arrive

4

and park his vehicle in the Autozone parking lot, which observation "corroborated the conversations and text messages between Pierce and the CI." Dkt. #465, p. 171. Detective Day and Special Agent Webb were also in the Granville vehicle during this surveillance. Dkt. #465, pp. 14-15. However, before the law enforcement officers could "be in a position to engage Mr. Pierce, he departed the Autozone" parking lot. Dkt. #465, pp. 15-16, 171. Granville and Detective Day and Special Agent Webb, who were in Granville's vehicle, followed Pierce's vehicle to 56 Grimes Street, Buffalo, New York. Granville observed Pierce's vehicle park in front of 56 Grimes Street and observed Pierce "walking into the building through the front door on Grimes Street" while he was carrying "a dark colored bag." Dkt. #465, pp. 17-18, 21-22, 70, 72, 174-177; #517, p. 93.

He and Detective Day and Special Agent Webb remained in the vicinity of 56 Grimes and kept the building under observation. Granville testified that he knew that 56 Grimes Street had been "identified as an after-hours kind of social club bar that was owned and operated by David Burgin." Dkt. #465, pp. 18, 179. Detective Day testified that 56 Grimes was familiar to him based on prior information that it was used as a "stash house for David Washington." Dkt. #465, p. 17.

Approximately 10-15 minutes later, they observed Pierce exit 56 Grimes Street through the front door of the building carrying a black bag and get into his vehicle. Dkt. #465, pp. 24, 72. They followed Pierce "up to the vicinity of the Autozone

5

on Broadway." Dkt. #465, pp. 24-26, 72-73, 181. Granville observed Pierce in the

Autozone parking lot. He and other police officers pulled into the Autozone parking lot

and "cornered Pierce's vehicle in and then approached the car." Dkt. #465, pp. 26, 183.

Pierce "was taken out of the vehicle and placed in custody and a search was conducted

of [his] vehicle." Dkt. #465, p. 26, 183. The "bag that Pierce was observed carrying

was located in the vehicle and a quantity of cocaine was recovered." Dkt. #465, pp. 26-

27, 73-74, 183.[2]

　　　　　Detective Granville, along with Detective Day and Special Agent Webb,

drove back to 56 Grimes Street and "observed [the defendant's] vehicle parked out

front" and Special Agent Webb told Granville that the vehicle belonged to the defendant.

Dkt. #465, pp. 33-34, 36, 84, 185-186. At approximately 6:35 p.m., they observed an

"individual enter this vehicle and drive away." Granville, Day and Webb followed this

vehicle to "the area of Broadway and Memorial" across "from the Autozone." Dkt. #465,

pp. 36-37, 85-86, 188.

　　　　　The defendant pulled into a gas station and was parked in his vehicle

when Detectives Granville and Day and Special Agent Webb approached the

defendant's vehicle and engaged in a conversation with the defendant. They asked the

defendant "where he was going or coming from" and the defendant responded "from the

gym." The defendant then stated that he wanted an attorney and the conversation

---

[2] *See* this Court's Report, Recommendation and Order in *United States v. Pierce*, 20-CR-29, Dkt. #305, pp. 2-3.

ended.  The defendant's vehicle was taken to 45 Elm Street where it was subjected to a

K-9 search by Erie County Deputy Galbraith and his K-9.  The K-9 was deployed around

the defendant's vehicle and it made a positive hit on the vehicle for the presence of

narcotics.  The K-9 "came to an indication on the driver's door handle of the vehicle."

Dkt. #465, pp. 37-38, 41, 42-43, 66, 89, 91-92, 117, 119, 122-123; 192, 197.  Deputy

Galbraith prepared an affidavit describing this K-9 search which was used to support an

application for a search warrant authorizing the search of the lower front of 56 Grimes

Street.  Dkt. #465, p. 117.

Detective Granville testified that he instructed Deputy Patrick McMahon to

prepare an application for a search warrant for the "lower front" of 56 Grimes Street,

Buffalo, New York since that was "the information [they] had from the CI about the after-

hours night club bar situation at 56 Grimes which led [him] to believe that was the

location that [the defendant] and Pierce were coming from."  Dkt. # 465, pp. 193, 200.

Fifty-Six Grimes Street is a two and one-half story building on the corner of Grimes

Street and Milburn Street, Buffalo, New York.  The front of the building has an entrance

on Grimes Street.  The side of the building facing towards Milburn Street has a side

front door and a side rear door (*see* Government Exhibit 10, photos 11 and 41).

Detective Granville testified that although "there were multiple entrances from what

[they] could see on the exterior," he was "solely focused on the front of the building

because that is where [he] made [his] observations and [he] was unaware where those

two – what those entrances (on the side of the building) led to."  He was relying on

"information based on [their] CI, information that he/she had provided and also on [their] observations."  Dkt. #465, pp. 18, 21-22, 24, 33, 70, 72, 174-175, 201-203, 213; Dkt. #517, p. 174.

Deputy Patrick McMahon testified that Granville assigned the task of getting a search warrant for 56 Grimes Street to him and that members of the Erie County Narcotics Unit supplied information to him for his use in preparing the search warrant application.  He also Googled 56 Grimes Street for a building description. Dkt. #519, pp. 7, 9, 11-12, 45, 58, 84.  Detective Granville told him to "specifically label [the search warrant] 'lower front'" because the information was "based on the location of the front door."  Dkt. #519, pp. 12, 45.

Deputy McMahon prepared the search warrant application and took it to the home of the Hon. Kenneth F. Case, Erie County Court Judge, on the evening of February 19, 2020 for purposes of obtaining a search warrant authorizing the search of the "lower front" of 56 Grimes Street, Buffalo, New York.  After examining Deputy McMahon and the search warrant application and the search warrant, Judge Case signed the search warrant at 8:32 p.m. on February 19, 2020.  Dkt. #519, pp. 11, 19; Dkt. #518, pp. 21, 65 (*see* Government Exhibit 8).

At approximately 8:40 p.m. on February 19, 2929, a large number of law enforcement officers were gathered outside the building at 56 Grimes Street for

8

purposes of executing the search warrant signed by Judge Case at 8:32 p.m. authorizing a search of the "lower front" of 56 Grimes Street. Detective Granville was in charge of the search warrant operation and he "initially was heading towards the actual front door" of 56 Grimes Street when he "was advised" by Special Agent Webb that they "should be going to this first door that faces Milburn." Dkt. #465, p. 213; Dkt. #517, p. 94. According to Detective Granville, Special Agent Webb said "its that door, its that door" which Granville understood to mean the first door on the side of the building facing Milburn Street. Dkt. #517, p. 95. Granville testified that he knew that Special Agent Webb "did have prior knowledge" of 56 Grimes Street and that "it was Special Agent Webb who said entry should be made through that side door." Dkt. #517, pp. 174, 211-213; Dkt. #465, pp. 48-49. When he went through this side door, he "thought [they] were going into the lower front." Dkt. #517, p. 124.

Detective Granville was "the first to go in the door and as [he] entered this side door [he] also observed another door which would have been to [his] left as [he] was going into the side entry door" and he also "observed a flight of stairs leading to the upward portion of the structure."[3] Dkt. #465, pp. 213-214; Dkt. #517, pp. 33-34. Detective Granville testified that "once [they] had made entry into the side entrance and realized [they] were in a stairwell, and [they] noticed that the (sic) side door as well, [he] noted the side door as well, [he] had committed to that stairwell, and [they] were going

---

[3] This Court asked Detective Granville if entry could have been made into the "lower front" area of 56 Grimes Street on February 19, 2020 through the side door that he observed on his left, and he replied that it could. Dkt. #517, p. 33. *See* Government Exhibit 1, Slide #31.

up into that area." Dkt. #517, p. 17. He and the other officers "travelled up those stairs to the upper portion of the residence based on a snap decision of seeing that door to [his] left and also bringing [his] team into that hallway." He testified that he "would not bring [his] team into the hallway and then try to enter that left door." Granville described this as "the fatal fall" so he made a decision "to travel up the stairs and clear the upper portion of the residence." Dkt. #465, pp. 49-51, 215; Dkt. #517, p. 124. He also "made a 'snap decision' not to go out the door they had come in." Dkt. #465, p. 215. "Around 8:40:21," Granville and eight other officers entered the second floor of 56 Grimes Street. One of the police officers used a "pry bar" to force open the door on the second floor. Dkt. #517, pp. 18, 123. The officers conducted "a security sweep of the second floor for bodies" but no one was found there. Dkt. #517, p. 19. Detective Granville testified that while he was engaged in this security sweep on the second floor, "observations" of "a piece of mail in the garbage that beared (sic) [the defendant's] name" and the address of 79 Brunswick were made. It was a garbage can with the top lid open located in the kitchen area on the second floor. This mail was a "National Fuel" bill bearing the defendant's "name and it was resting on top of the garbage in the garbage can." Dkt. #517, pp. 19-20, 55, 102 (*see* Government Exhibit 11). Electronic storage devices were also "found in the protective sweep." Dkt. #517, p. 128.

The security sweep was completed on the second floor at 8:43:17 p.m. and all of the officers went down the stairs they had taken up and exited the stairwell through the side door that they had entered from the outside on Milburn Street.

10

Dkt. #465, pp. 54-55; Dkt. #517, pp. 25-26.

Special Agent Francis Zabawa had been called by Special Agent Webb and told to come to 56 Grimes Street to assist in that investigation.  Dkt. #519, pp. 115-116.  When he arrived at 56 Grimes, the officers had already made their first entry into the building and were outside preparing to make entry through the front door of 56 Grimes Street.  Dkt. #519, pp. 116, 120, 136.

Detective Granville testified that after exiting from the second floor of the building at 56 Grimes Street, he and the officers entered the premises through the front door of the building.  Dkt. #465, pp. 56-57; Dkt. #517, pp. 25-26, 27-28, 95 (*see* Government Exhibit 1, Slides 38, 39, 40, 41, 42).  This entry was made at 8:44:35 p.m.  After entry was made into the "lower front" of 56 Grimes Street, Detective Granville "determined that the entire property was connected in some way and that obviously, listing the 56 Grimes lower was a mistake."  Dkt. #517, pp. 28-29.  As a result, he decided to get a second search warrant for the entire building and a garage "because [they] had listed - - identified the - - in the first warrant, the lower front of 56 Grimes and after making entry, [they] determined that [they] needed a warrant for the upstairs based on [their] assertion that the entire property was connected."  He "determined that it was one premises."  Dkt. #517, p. 41.  However, before a second search warrant was obtained authorizing the entry and search of the upstairs areas of 56 Grimes Street, Buffalo, New York, Detective Granville, at 8:47:27 p.m. on February 19, 2020,

"travel[ed] to the upstairs second floor of 56 Grimes." He did this by entering the

stairwell "from the first doorway in the bar area." Dkt. #517, pp. 41-42. Detective

Granville testified that he went to the second floor at this time because "mistakes are

often made by guys missing something, could be just to get the lay of the land or see

what we're dealing with up on the second floor." Dkt. #517, pp. 42, 45. He remained on

the second floor for "about six minutes" when he left the area at 8:53:24 p.m. Dkt. #517,

pp. 45-46 (*see* Government Exhibit 1, Slide 63). While he was on the second floor

during the period 8:47-8:53 p.m., he "searched through some drawers and some plastic

bags" even though he knew that there was not a search warrant authorizing such

search. When asked why he conducted such a search, Detective Granville replied that

it was "a lapse in judgment on [his] part; it had been a long day; [they] conducted

several searches, was kind of in that mode; and again, it was a mistake on my part."

Dkt. #517, pp. 49-52, 55-56, 171, 177. When the Court asked him as to why he went up

to the second floor knowing that he did not have a proper search warrant, Detective

Granville replied that he "doesn't recall why he went up there." Dkt. #517, p. 53. The

Court then asked him what he was looking for when he went to the second floor this

time, or what did he hope to find, and Detective Granville stated that he "did not know."

Dkt. #517, pp. 53-54.


       At 8:56:45 p.m., Detective Granville and Special Agent Webb "travel[ed] to

the second floor of the apartment." Dkt. #517, p. 48 (*see* Government Exhibit 1, Slide

69). Detective Granville testified that he took Special Agent Webb to the second floor

"since [they] were working together, kind of what we are looking at on the second floor as far as the search was concerned" even though they did not have a second search warrant authorizing such entry and observation.  Dkt. #517, p. 49, 177.  Sometime "around 9:00 p.m.," while he and Special Agent Webb were on the second floor of 56 Grimes, he recalled that an agent or law enforcement officer alerted him that there was an operating security camera in the second floor which was pointed out to him.  This camera was then turned to the side and stopped operating.  Dkt. #517, pp. 59-60.

Special Agent Zabawa testified that around "8:15-ish" on February 19, 2020, he and other law enforcement officers entered the building at 56 Grimes by going through a rear door on the Milburn side of the building, "the third entrance in the back, and he and the other officers "went up the stairs and went into the kitchen which was on the second floor."  Dkt. #519, pp. 121, 125, 136, 158, 159, 188.  He heard "members of the team say we're going to go up to the second floor, we believe it's one apartment and that's where they went."  When Special Agent Zabawa arrived on the second floor, he observed that there "were other people there."  Dkt. #519, pp. 160-161.  When they "went in through the rear door [it] lead to a hallway" which was "on a landing and then there was another set of stairs that went up to the attic, but there was a door.  You could open the door and go into the kitchen, the back of the apartment is the kitchen."  Dkt. #519, p. 125.  He knew that at the time that this entry was made into the second floor of the building a second search warrant for the premises had not yet been obtained.

Dkt. #519, pp. 122-123, 156-157, 181.  Special Agent Webb told him that "another

warrant was going to be attempted to be obtained for the second floor and for the attic."

Dkt. #519, pp. 122, 158-160.  Special Agent Zabawa testified that he waited on the

second floor of 56 Grimes along with Special Agent Webb and a number of other police

officers "for at least an hour and fifteen minutes" and during that period of time he saw

Detective Granville on the second floor talking to someone on his cellphone while he

was "walking back and forth."  Dkt. #519, p. 123.

Detective Granville called Detective Patrick McMahon and provided

information to him as to what had been observed in the "protective sweep," namely the

National Fuel Bill and address envelope addressed to the defendant at his residence at

79 Brunswick, Buffalo, New York (see Government Exhibit 11) and electronic storage

equipment.  Dkt. #517, pp. 43, 55, 128, 148.  Although the second search warrant

covered the attic in 56 Grimes and a garage located nearby, Detective Granville testified

that the "only basis that [they] had for searching those premises that day was the

information that [he] had obtained that day."  Dkt. #517, p. 125.  He further stated that

"there's no information that he gave McMahon about anything in the attic in the search

warrant application" and "nothing in there about the garage."  DKt. #517, pp. 130-131.

Detective Patrick McMahon testified that after the first search warrant

authorizing a search of the "lower front" of 56 Grimes Street had been executed, he

"was notified by Detective Granville that a door was located that led to the upper and an

14

attic" which "they swept for officer safety and locked down."  He was further told "that some DVR equipment and other things identifying [the defendant] were recovered and [they] were looking to apply for those areas of the building," to wit, "the upstairs and attic area."  Dkt. #519, pp. 21, 24, 29-30, 31, 86-87.

Detective McMahon returned to Judge Case's home for purposes of obtaining a second search warrant authorizing a search of the second floor and attic area of 56 Grimes Street as well as a garage.  Dkt. #519, pp. 24, 80-81, 105.  Detective McMahon "conveyed" the information that he had received from Detective Granville and Officers Carney and Milbrandt to Judge Case in support of his application for the second search warrant.  Dkt. #519, pp. 31-32, 78, 85.  Detective McMahon testified that at first, Judge Case "was going to white out lower front on the [first search] warrant and the application to give [them] access to the whole building.  And then in thinking about it and maybe discussing it, he decided that [they] would apply for a separate warrant to include the upper rear, the attic and the detached garage" notwithstanding that no information had been given to McMahon about the garage other than "it was on the property and accessible."  Dkt. #519, pp. 24, 80-81, 83, 105, 112.  Detective McMahon further testified that it was Judge Case who whited out the words "lower front" on the first search warrant application and wrote "upper rear, attic and detached garage" in the white out area and paragraph "2a)" on the original application used to obtain the first search warrant for 56 Grimes Street, Buffalo, New York.  Dkt. #519, pp. 25, 30 (*see* Government Exhibit 9).

15

Judge Case also took a copy of the first search warrant, which he signed at 8:32 p.m. on February 19, 2020 (Government Exhibit 8), and whited out the words "lower front" and filled in "upper rear, attic and detached garage" and signed this revised search warrant at 9:48 p.m. on February 19, 2020  (*see* Government Exhibit 9). Dkt. #519, pp. 30-33.

Judge Case testified that it is his handwriting on the application for the second search warrant and on the second search warrant that he signed at 9:48 p/m/ on February 19, 2020 authorizing a search of the "upper rear, attic and detached garage" even though there is no recitation in the application referring to the garage or where the other items were seen.  Dkt. #518, pp. 44-45, 48, 50, 73.

Thereafter, a search of the second floor and attic area at 56 Grimes Street was conducted pursuant to the search warrant signed by Judge Case at 9:48 p.m. on February 19, 2020 which resulted in seizures of narcotics, weapons, electronic equipment, narcotic paraphernalia and an undetermined amount of cash.  (*See* Government Exhibit 9).

16

## DISCUSSION AND ANALYSIS

The Fourth Amendment to the United States Constitution expressly states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The operative word as it applies to this case is "unreasonable" as stated in the Fourth Amendment.  The issue to be resolved is whether the actions of law enforcement personnel on February 19, 2020 were **reasonable** and in compliance with the mandate of the Fourth Amendment.  For the reasons hereinafter stated, this Court finds that they were not and therefore recommends that the defendant's motion to suppress the use of evidence seized from 56 Grimes Street, Buffalo, New York on February 19, 2020 be granted.

### A.  The Seizure of the Defendant's Motor Vehicle

After law enforcement officers arrested the co-defendant Rodney Pierce on February 19, 2020, they continued surveilling the premises at 56 Grimes Street where they had first observed Pierce entering and leaving before his arrest and seizure

of contraband from his automobile.[4]  During this surveillance they observed the defendant leave 56 Grimes Street and enter his automobile and drive to a gas station located at Broadway and Memorial Drive, Buffalo, New York.  While the defendant was in his parked vehicle at the gas station, ECSO Granville and Special Agent Webb approached his vehicle and began interrogating the defendant by asking him "where he was coming from" to which the defendant responded, "from the gym."  When the law enforcement officers attempted to further question the defendant, he stated that he wanted his attorney.  Dkt. #465, pp. 185-189.  Although further interrogation of the defendant ceased, the law officers seized and impounded the defendant's vehicle and it was taken to a law enforcement facility at 45 Elm Street, Buffalo, New York where it was subjected to a K9 search.  Allegedly a positive hit was made by the K-9 on a door handle of the defendant's vehicle.  Nevertheless, this Court has not seen any evidence that established probable cause for the seizure of the defendant's vehicle on February 19, 2020 and subjecting it to a K-9 search.  The defendant was not charged with any violation of New York State Vehicle and Traffic Law; nor was he charged with any crime on February 19, 2020 during this encounter with law enforcement officers at the gas station.  As a result, this Court considers the actions of the law officers in seizing the defendant's vehicle and subjecting it to a K-9 search on February 19, 2020 to be unreasonable in violation of the Fourth Amendment since there was no probable cause established at that time for such seizure and K-9 search.

---

[4] *See* This Court's Report, Recommendation and Order, Dkt. #305.

**B. The Execution of the First Search Warrant Authorizing the Search of 56 Grimes Street**

When Detective Granville set up the surveillance of 56 Grimes Street, Buffalo, New York, he did so based on "the information [he] had received from the CI about the after-hours night club bar situation at 56 Grimes which led [him] to believe that was the location that [the defendant] and Pierce were coming from."  Dkt. #465, pp. 193, 200.  Even though there were multiple exterior doorways for this two and one-half story building, *i.e.*, a front entrance on Grimes Street and two side doors on the Milburn Street side of the building, *i.e.*, one on the front side and one on the rear side, Detective Granville testified that "he was **solely** focused on the front of the building because that is where [he] made [his] observations and he was **unaware** where those two – what those entrances (on the side of the building) led to,"  Dkt. #465, pp. 18, 21-22, 24, 33, 70, 72, 174-175, 201-203; Dkt #517, p. 174; *see* Government Exhibit 10, photos 11 and 41.

During the initial phase of the surveillance of 56 Grimes Street, Detective Granville and Special Agent Webb and Deputy Day observed the co-defendant Pierce go in and out of the **front door** of 56 Grimes Street prior to the arrest of Pierce.  Dkt. #465, pp. 18, 21-22, 24, 33, 70, 72, 174-175; Dkt. #517, pp. 93, 177 (emphasis added); *see also* Government Exhibit 1, Slide 15 (shows defendant entering **front** door of 56 Grimes.  In response to a question by this Court, Detective Granville admitted that "both

19

Pierce and the defendant were seen going in and out of the building at 56 Grimes Street in the **front entrance** of Grimes."  Dkt. #517, p. 174 (emphasis added).

Once again, Detective Granville testified that "he was solely focused on the front of the building [56 Grimes] because that is where [he] made [his] observations" and therefore, he instructed Deputy McMahon to obtain a search warrant describing the premises to be searched as the "**lower front**" of 56 Grimes Street since he "believe[d] that was the location that [the defendant] and Pierce were coming from."  Dkt. #465, p. 200.

The search warrant application sworn to by Deputy McMahon expressly states that he is seeking a search "WARRANT authorizing the search of:  56 Grimes Street, **lower front**, Buffalo, N.Y. 114212; described as two and one-half story **multiple residence** building" (emphasis added).  *See* Government Exhibit 8.  The search warrant issued by the Hon. Kenneth Case clearly limited the search to the "**lower front**" of 56 Grimes Street which is described as a "two and one-half story, multiple residence building."  *See* Government Exhibit 8 (emphasis added).  This search warrant was signed by Judge Case at 8:32 p.m. on February 19, 2020.

At approximately 8:40 p.m., Detective Granville and Special Agent Webb, along with a large number of law enforcement officers, gathered outside of 56 Grimes Street for purposes of executing the search warrant that had just been granted by Judge

20

Case.  Detective Granville was in charge of this search warrant operation and he
"initially head[ed] toward the actual **front door** on 56 Grimes along with the other
officers when Special Agent Webb "advised" him that they "should be going to this first
door that faced Milburn."  Dkt. #465, p. 213; Dkt. #517, p. 94 (emphasis added).
Detective Granville testified that Special Agent Webb said "it's that door, it's that door"
which Granville understood to mean the first door on the **side** of the building facing
Milburn Street.  Dkt. #517, p. 95 (emphasis added).  Granville further testified that he
knew that Special Agent Webb "did have prior knowledge" of 56 Grimes Street and that
it was Special Agent Webb who said entry should be made through that side door."  Dkt.
#465, pp. 48-49; Dkt. #517, pp. 174, 211-213.  As a result, Detective Granville let the
officers to this side door which he went through because he "thought [they] were going
into the lower front."  Dkt. #517, p. 124.  This Court asked Detective Granville why he
chose to enter the side door of the building when their surveillance observations at 56
Grimes clearly established that the co-defendant Pierce had left and entered the
building by way of the front door on Grimes Street and the defendant had also been
observed using the front door on Grimes Street.  Detective Granville's first answer was
"because it was dark and tough to see which door."  Dkt. #517, p. 174.  This answer is
disproven by the government's own exhibits.  Photograph 11 in Government Exhibit 10
clearly shows the Grimes Street front entrance as being well lighted on February 19,
2020 when the law officers were about to execute the search warrant.  Photograph 41 in
Government Exhibit 10 clearly shows the Milburn side of the building at 56 Grimes with
the two side entrances, and this area of the building appears to be much darker than the

front of the buildings as depicted in Photograph 11.  When this Court pointed out this contradiction to Detective Granville, he tried to explain it away by stating that he was "referring to under cover the cover of darkness, looking out our back, whether it's a rearview mirror, back window that's all steamed up, it was tough to see."  Dkt. #517, pp. 174-175.  However, this explanation was rejected by this Court when it was pointed out to Detective Granville that he and Special Agent Webb and all the other law enforcement officers were "already by the building on foot when Webb says we should go through the side door" and Detective Granville answered "that's correct."  It was also pointed out to him that he and the other officers had flashlights and that there were streetlights around the building.  Dkt. #517, p. 175.

What is most distressing to the Court on this issue of the entrance through the side door instead of the front door since that is where Detective Granville's "sole [ ] focus [ ] " was, is the fact that this Court made known to the government its desire to hear the testimony of Special Agent Webb in explanation of this issue when it asked counsel if any thought had been given to calling Special Agent Webb as a witness, and the attorney for the government responded twice that "this is the case we're presenting." Dkt. #519, p. 190.

Obviously, the government had the right to present its case in a way it saw fit.  Nevertheless, this Court has an obligation to discern the truth as best as can be

obtained reasonably.  This issue is further compounded by what this Court found in the

case of the co-defendant Washington, 20-CR-29, Dkt. #490, pp. 21-18.

Detective Granville was the first officer to enter the building through the

side door, and upon doing so he realized that he was in a stairwell with stairs leading to

the upper floors of the building.  He also observed a smaller door to his left while still in

this stairwell which he later determined could have allowed entry into the **lower front** of

the building.  Dkt. #465, pp. 213-214; Dkt. #517, pp. 33-34.  However, for reasons that

frankly make no sense to this Court, Detective Granville decided to lead a large

contingent of law enforcement officers up the stairs into the **second floor** area of the

building.  He testified as follows when asked why he travelled up the stairs:

> Based on a snap decision of seeing that door to my left and
> also bringing my team into that hallway.  That's not
> something I would do where I would bring them into the
> hallway and then try to enter that left door.  We call it the
> fatal fall.  I made a decision to travel up the stairs and clear
> the upper portion of the residence.

Dkt. #465, p. 214.

When asked what he meant by "the fatal fall," he stated "it's a position –

it's a very vulnerable position law enforcement is put in when you are at the bottom of a

flight of stairs in any situation."  Dkt. #465, pp. 214-215.   When asked why that "position

would make law enforcement vulnerable," he responded "you are very contained.

There's no room to take any cover.  It's just a very, very awful position to be in."

23

Dkt. #465, p. 215.

It appears to this Court that since Detective Granville was the first to enter the stairwell through the side door and realized that he was in a narrow confined area, it would have been more reasonable and prudent for him to back out of that area through this same side door into the outside area of the building before any of the other law enforcement officers entered the building. This would have given him and his men not only safety but also sufficient time to rethink the situation. Instead, he chose to make a "snap decision" to remain in this allegedly dangerously confined area by leading the other law enforcement officers up a lengthy staircase even though the search warrant only authorized entry and search of the "lower front" of the premises. Dkt. #465, p. 215; *see* Government Exhibit 1, Slide 31.

Entry was made into the second floor area of 56 Grimes "around 8:40 p.m. by forcing open a door with a pry bar, and Detective Granville and eight other law enforcement officers entered the **second** floor area of the building and did a security sweep of the area and determined that no one was there. Dkt. #517, pp. 16, 18-19, 123. Detective Granville testified that while doing this security sweep, "observations" were made of "a piece of mail in the garbage that beared (sic) [the defendant's] name." This garbage was located in the second floor kitchen area and the "observed" mail was a bill on top of the garbage" bearing the defendant's "name with address of 79

Brunswick – a National Fuel bill."  Dkt. #517, pp. 19-20, 102.  *See also* Government Exhibit 11.[5]

        Although Detective Granville was concerned about the safety of his officers thereby leading him to cause a security sweep of the **second** floor of the building, he testified that they did not conduct a security sweep of the third floor, which contains an attic, even though he knew the building at 56 Grimes Street was a two and one-half story building as described in the search warrant (Government Exhibit 8). Dkt. #517, pp. 21-22.  Instead, after completing the security sweep of the second floor, Detective Granville and the other officers "went down to the first floor of the residence or property" at 8:43 p.m. and exited the building to the outside through the side door that they had entered the building.  Dkt. #517, pp. 25-26.

        The failure to conduct a security sweep of the attic area of the building by Detective Granville and his fellow officers causes this Court to question the necessity of a so-called security sweep of the second floor as testified to by Detective Granville. This doubt of the Court becomes even greater based on the hereinafter described events on February 19, 2020 at 56 Grimes Street, Buffalo, New York.

        At 8:44 p.m., Detective Granville and the other officers made entry into the **lower front** of 56 Grimes through the **front door** of the building, the same front door

---

[5] It is this Court's opinion that Government Exhibit 11 is a staged photograph because of the way the various papers are juxtaposed and too convenient in the context of the issue at hand.

that they had observed Rodney Pierce and the defendant separately leave and enter on February 19, 2020. Dkt. #517, pp. 27-28. *See also* Government Exhibit 1, Slide #s 39, 41. This entry led Detective Granville to conclude "that the entire property was connected in some way and that obviously, listing the 56 Grimes lower was a mistake." Dkt. #517, pp. 28-29. As a result, he concluded they "needed a warrant for the upstairs based on [his] assertion that the entire property was connected;" that it was one premises." Dkt. #517, p. 41.

Detective Granville testified that the "only basis that [they] had for searching [56 Grimes] that day was the information that [he] had obtained that day." Dkt. #517, p. 125. It was during the so-called "safety sweep" that the National Fuel bill with the defendant's name on it, was observed, as well as a number of "electronic storage devices." Dkt. #317, pp. 43, 128. When he telephone Deputy McMahon for the purpose of having a second search warrant obtained for the search of 56 Grimes Street, he provided information to him as to what was observed during the safety sweep for purposes of establishing probable cause for the issuance of the second search warrant.

Deputy McMahon testified that he was told "that a door had been discovered when they executed the warrant in the lower front that led to the upstairs attic – the upstairs and, ultimately, an attic area; that some DVR equipment and other things identifying [the defendant] were recovered and [they] were looking to apply for

26

those areas of the building." Dkt. #519, p. 24. It was Detective Granville who told him about the door leading to the attic. Dkt. #519, p. 31.

Since Detective Granville testified that the attic was **not** subjected to a safety sweep when they first conducted such a sweep, he had to have learned of the contents in the attic in a second visit to the upper floors of 56 Grimes Street, *i.e.*, when he discovered a door while searching the "lower front" pursuant to the search warrant that led up to the attic of 56 Grimes. This second upper floor visit was **after** the safety sweep and **before** the second search warrant was obtained. Detective Granville had already determined that a "mistake" had been made when they realized the original search warrant for the **lower front** did not authorize a search of the upper floors of the building at 56 Grimes. Dkt. #517, pp. 28-29, 41. Therefore, the information provided by Deputy McMahon to Judge Case for the second search warrant was inaccurate and misleading. Paragraph 2a) on the application (Government Exhibit 9) states: "During the execution of that search warrant [the first search warrant], a door was discovered leading to the upper rear, which leads to the attic. **These areas were cleared for officer safety and documents, electronic storage devices and material identifying David Burgin were seen in plain view as well as a DVR surveillance system for 56 Grimes Street**" (emphasis added). This contradiction and misrepresentation is further compounded by what next happened factually.

### C. Subsequent Entries and Searches of The Second Floor Area Before The Second Search Warrant

As previously stated, Detective Granville realized that the search warrant authorizing a search of the **lower front** of 56 Grimes Street did not authorize a search of any of the upper floor areas of 56 Grimes Street and that it would be necessary to get a search warrant that authorized the entry and search of the upper floors of 56 Grimes Street.  Dkt. #517, p. 41.  However, notwithstanding this acknowledgement by Detective Granville, at approximately 8:47 p.m., approximately one hour **before** the second search warrant was obtained (*see* Government Exhibit 9, p. 7 of the exhibit), he "travel[ed] to the upstairs second floor of 56 Grimes" by entering the stairwell "from the first doorway in the bar area."  Dkt. #517, pp. 41-42.  When this Court asked him why he went up to the second floor knowing that he did not have a search warrant authorizing such entry, he answered that he "doesn't recall why [he] went up there."  This Court further asked Detective Granville what he was looking for when he went to the second floor this time and what did he hope to find there, Detective Granville answered that he did not know.  Dkt. #517, pp. 53-54.  In an attempt to explain why he went up to and into the second floor area of 56 Grimes Street **before** the second search warrant had been obtained, he testified that he did so because "mistakes are often made by guys missing something, could be just to get the lay of the land or see what we're dealing with up on the second floor."  Dkt. #517, pp. 42, 45.  This reasoning of Detective Granville certainly was not in compliance with the requirements of the Fourth Amendment and makes no sense to the Court since Detective Granville claimed that the first entry into the second

28

floor by all of the law enforcement officers was to conduct a **safety or security sweep**, *i.e.*, a search looking for humans who may constitute a safety threat to the law enforcement officers. Detective Granville testified that no persons were found on the second floor after the security sweep had been completed. So what "mistakes" were made or what was "missed" by the law enforcement officers in conducting a **safety or security sweep**? Dkt. #517, pp. 18-19. What is most disconcerting to this Court is that while Detective Granville was on the second floor of 56 Grimes the second time before the second search warrant was issued, he conducted a search in those premises. More specifically, Detective Granville testified that he was on the second floor from 8:47 p.m. to approximately 8:53 p.m., a period of six minutes. Dkt. #517, pp. 45-46; *see* Government Exhibit 1, Slide 63. The second search warrant was not issued until 9:48 p.m. on February 19, 2020. *See* Government Exhibit 9. While on the second floor during this six minute period, Detective Granville conducted a search without an authorized search warrant by "search[ing] through some drawers and some plastic bags" and "maybe some cabinets." Dkt. #517, pp. 50, 52, 55-56, 60, 171, 177.

Detective Granville described his second entry into the second floor and conducting a search of drawers, plastic garbage bags and some cabinets as "a lapse of judgment on [his] part" and "a mistake on [his] part." Dkt. #517, p. 50. This Court finds his conduct in this regard to be an egregious violation of the Fourth Amendment.

Even more astonishing is the fact that Detective Granville went to the second floor of 56 Grimes Street a third time before the second search warrant was obtained at 9:48 p.m. on February 19, 2020.  At 8:56 p.m., Detective Granville escorted Special Agent Webb to the second floor in order "to show Special Agent Webb, since [they] were working together, kind of what [they] are looking at on the second floor as far as the search was concerned."  Dkt. #517, pp. 48-49, 177.

Further damning evidence of this unlawful conduct by law enforcement officers if found in the testimony of Special Agent Zabawa who was called in to help in the search of 56 Grimes Street on February 19, 2020 by Special Agent Webb. Dkt. #519, pp. 115-116.  Special Agent Zabawa testified that he entered 56 Grimes Street and went up to the second floor at approximately 8:30 p.m. and remained on the second Floor until approximately 1:00 a.m., February 20, 2020.  He had heard law enforcement officers, "members of the team," say "[they] were going to go up to the second floor, we believe it's one apartment and that's where [they] went."  Dkt. 519, pp. 158, 160-161.  This entry into the second floor by Special Agent Zabawa and others was made by going through a rear door from the outside, "the third entrance in the back" which was the rear door on the side of the building facing Milburn Street.  (*See* Government Exhibit 10, photo 41).  Dkt. #519, pp. 121, 136, 159, 188.  When Special Agent Zabawa arrived on the second floor, he observed other law enforcement officers who were already there.  Dkt. #519, p. 161.  Special Agent Zabawa admitted that a second search warrant authorizing the entry and search of the upper floors of 56

Grimes Street had not been obtained when he and the other officers entered the second floor. He was eventually joined by "at least 13 people." Dkt. #519, pp. 158, 161, 181. When this Court asked him "what was your purpose in going up onto the second floor since you knew they were in the process of trying to get a warrant," he answered, "I believe they said to hold the premises." This answer caused the Court to respond by asking, "To hold the premises on the second floor?", to which he answered, "Correct." Thereupon, this Court expressed its dismay when it further stated, "But there had been a safety sweep conducted by a number of officers, correct?", to which Special Agent Zabawa answered, "I believe so, yes," which caused the further question, "So why would it be necessary for you to go on the second floor?" Once again, Special Zabawa answered "We were told to hold the premises." This Court then pointed out that the premises could have been "held" or secured from the first floor and the outside area with all of the police officers that were present on the scene, and Special Agent Zabawa admitted that he "guess[ed] it could have been but stuck to his previous answer that they were "holding the premises." This caused the Court to ask him if he was familiar with the phrase "crossing the threshold" and "that in order to do that you need a search warrant, don't you?", and he responded, "Correct." Dkt. #519, pp. 183-184. Special Agent Zabawa and all of the other officers "waited upstairs for at least an hour and 15 minutes or so" before the second search warrant was obtained. Dkt. #519, pp. 123, 157-158.

It is pointed out, with emphasis, that Detective Granville took Special Agent Webb up to the second floor of 56 Grimes Street **before** the second search warrant was obtained, "to show Special Agent Webb, since [they] were working together, **kind of what [they] are looking at on the second floor as far as the search was concerned**."  Dkt. #517, pp. 48-49, 177 (emphasis added).  It was on the second floor area of 56 Grimes Street that the National Fuel bill and the audio equipment wrapped in shrink wrap were located.  Dkt. #519, pp. 128-129; *see* Government Exhibits 11, 10, photo 43.  Not only was Detective Granville interested in showing Special Agent Webb "kind of what [they] were looking at on the second floor," he had, by his own admissions, conducted a search in the second floor area during his second visit to that area **before**  a second search warrant was obtained, by searching drawers, cabinets, and garbage bags.  Dkt. #517, pp. 49-50, 42.  As a result, it is reasonable for this Court to conclude that Detective Granville also made a visual search of the second floor area and saw the audio equipment wrapped in shrink wrap as well as the National Fuel bill, especially since he testified that while he and Special Agent Webb were on the second floor of 56 Grimes, he recalled that an agent or law enforcement officer alerted him that there was an operating security camera on the second floor which was pointed out to him.  **This camera was then turned to the side and stopped operating**.  Dkt. #517, pp. 59-60 (emphasis added).  .

Detective Granville testified that observation of the National Fuel bill and the "electronic storage devices" were made known to Deputy McMahon for the purpose

of using that information as a basis for obtaining a second search warrant from Judge

Case on February 19, 2020.  Dkt. #517, pp. 43, 50-52, 55-56, 60, 102, 128, 148.

Deputy McMahon testified "that a door had been discovered when they executed the

warrant in the lower front that led to the upstairs attic – the upstairs and ultimately the

attic area; that some DVR equipment and other things identifying [the defendant] were

recovered and we were looking to apply for those areas of the building," *i.e.*, a second

search warrant.  Dkt. #519, pp. 24, 29-31, 86-87.


### D.  Invalid Execution of the First Search Warrant of 56 Grimes Street on February 19, 2020

Search warrant procedures are not mere formalities; they protect against "indiscriminate searches and seizures." *Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also McDonald v. United States*, 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948). Indeed, the Fourth Amendment requires that the search warrant describe with particularity the place to be searched and the items to be seized.  *Kentucky v. King*, 563 U.S. 452, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011); *United States v. Clark*, 638 F.3d 89, 102 (2d Cir. 2011).  This particularity requirement protects individuals from "exploratory rummaging" not supported by probable cause. *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *accord United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006).


In determining the permissible scope of a search that has been authorized by a search warrant . . . we must look to the place that the magistrate judge who issued the warrant intended to be searched [and] not to the place that

the police intended to search when they applied for the warrant." *United States v.Voustianiouk*, 685 F.3d 206, 211 (2d Cir. 2012). We look directly to the text of the search warrant to determine the permissible scope of an authorized search. *SeeGroh v. Ramirez*, 540 U.S. 551, 561 (2004) ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope ofthe search should be as broad as the affiant's request.").

*United States v. Bershchansky*, 788 F.3d 102, 110-111 (2d Cir. 2015).


Because the facts in *Voustianiouk, supra*  are similar to the facts of this case, I have deliberately sacrificed brevity by describing those facts in detail.


Federal agents arrived at a small two-story building in New York City one morning in January 2009 with a warrant to search the first-floor apartment. The warrant did not mention the name of the person who lived there and only authorized them to search that single apartment. But on the morning of the search the agents discovered that the suspect they were investigating lived on the second floor, not the first. He also happened to be home. So they decided to search his apartment instead.

The officials could have called a magistrate judge and obtained a new warrant to search the second-floor apartment. The evidence wasn't going anywhere, and neither was their suspect. But the officials took a shortcut. They searched the second floor without first obtaining a warrant from a judge.

The officials in this case did not stray far from their search warrant. **They merely ventured up a flight of stairs**. But the Fourth Amendment does not permit the police to search one apartment simply because they have a warrant to search another that is nearby.

34

> We hold that these agents conducted a warrantless search
> of a person's home in violation of the Fourth Amendment. In
> addition, we conclude that the evidence seized as a result of
> this unconstitutional search should have been suppressed
> because the officials in this case knowingly stepped beyond
> the bounds of the search that the magistrate judge had
> authorized them to conduct.

*Voustianiouk, supra* at 208 (emphasis added).


As previously stated, Detective Granville and Special Agent Webb had observed the defendant and the co-defendant Pierce exit the premises on 56 Grimes Street through the **front door** facing Grimes Street on February 19, 2020.  This observation plus "the information [they] had from the CI about the after hours night club bar situation at 56 Grimes which led [him] to believe that that was the location that the [defendant] and Pierce were coming from."  Dkt. #465, p. 200.  Detective Granville further testified that "there were multiple entrances from what [they] could see on the exterior," but he was "solely focused on the front of the building because that is where [he] made [his] observations and [he] was unaware where those two – what those entrances [on the side of the building] led to."  Dkt. #465, pp. 201-202, 203.


In meeting the Fourth Amendment's requirement that the search warrant "particularly describe the place to be searched," Judge Case limited the first search warrant for 56 Grimes Street on February 19, 2020 (Government Exhibit 8) to the **lower front** of that building.  By going through the **side door** of 56 Grimes Street and up a stairway to the second floor of the building, the law enforcement officers were not in

compliance with the search warrant issued by Judge Case. Detective Granville and his

group of law enforcement officers could have easily backed out of this side entry and

gone to the front door entrance at 56 Grimes in compliance with the particular limitations

of that search warrant. The explanation for not doing so given by Detective Granville is

rejected by this Court.


> As the United States Supreme Court has ruled:
>
> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home - a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 US 505, 511, 5 L Ed 2d 734, 81 S Ct 679, 97 ALR2d 1277. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589-590 (1980); *Kirk v. Louisiana*, 536 U.S. 635, 636

(2002).


The Supreme Court further ruled that "it is a basic principle of Fourth

Amendment Law that searches and seizures inside a home without a warrant are

presumptively unreasonable." *Id*. at 586. This principle has been reiterated numerous

times by various courts as reflected by the Second Circuit Court of Appeals' decision in

*Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) wherein the Court stated:

> Subsequent holdings have reiterated that principle and "made clear that any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much to be tolerated. *Kyllo v. United States*, 533 U.S. 27, 37, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). We believe it is clear that by stepping into the house, Gorman crossed *Payton's* "firm line" and implicated its protections. No invasion of the sanctity of the home can be dismissed as *de minimis*. "'A sane, decent, civilized society must provide some . . . oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.'" *Silverman*, 365 U.S. at 511 n. 4, 81 S.Ct. 679 (quoting *United States v. On Lee*, 193 F.2d 306, 315-16 (2d Cir. 1951) (Frank, *J.*, dissenting)); *see Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038 ("[T]here is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the non-intimate rug on the vestibule floor.").

The fact that the search took place in an apartment located on the second floor of the premises located at 56 Grimes Street does not in any way lessen the Fourth Amendment protection to the inhabitants of that apartment. "In today's society, the protection of the [Fourth] Amendment of course is extended to the equivalent of the traditional single-family house such as an apartment." *Maryland v. Garrison*, 480 U.S. 79, 90 (1987) (dissenting opinion).

Although Judge Case issued a search warrant for the lower front of the premises located at 56 Grimes Street, Buffalo, New York, there can be no doubt that the second floor area was excluded from coverage under that warrant.  (*See* Government Exhibit 8).

In enforcing the requirements of the Fourth Amendment, the United States Supreme Court and the Second Circuit Court of Appeals have ruled that "a search must be confined to the terms and limitations of the warrant authorizing it."  *United States v. Matias*, 836 F.2d 744 (2d Cir. 1988); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 394, n. 7 (1971).

Before the law enforcement officers could invade the private living quarters of the occupants of *the* second floor, they needed to "have some valid bases in law for the intrusion."  *Johnson v. United States*, 333 U.S. 10, 16 (1948).

> In *Gouled v. United States*, 255 U.S. 298, 302, 303, 41 S.Ct. 261, 65 L.Ed 647, this Court said: 'It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A. 1915B, 834, Ann.Cas.1915C, 1177, and *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (24 A.L.R. 1426)) have declared the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two (Fourth and Fifth) Amendments.  The effect of the decisions cited is: That such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty, and private property'; that they are to be

regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen-the right to trial by jury, to the writ of habeas corpus, and to due process of law.  It has been repeatedly decided that these amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned, but mistakenly overzealous, executive officers.'

*Id.* fn. 8.

This basic constitutional principle was reiterated by the United States Supreme Court by stating that "unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the [Fourth] Amendment."  *Payton v. New York, supra* at 585; *Kirk v. Louisiana, supra*.

The United States Supreme Court has admonished that "exceptions to the warrant requirement are few in number and carefully delineated and that the police bear a heavy burden when attempting to demonstrate an urgent need that might satisfy warrantless searches or arrests."  *Welsh v. Wisconsin*, 466 U.S. 740, 749-750 (1984). *See also Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002).

Since it is undisputed that the second floor area of 56 Grimes Street was excluded from coverage under the search warrant at issue herein, the burden is on the government to establish that the law enforcement officers were legally justified in entering the second floor front area on February 19, 2020 without the benefit of either a

search warrant or an arrest warrant.  It is also undisputed that on February 19, 2020, there were no arrest warrants for the arrest of  the defendant.

In its attempt to justify the warrantless entry by the officers into the second floor area on February 19, 2020, the government argues that there were "exigent circumstances" confronting the police officers at the time which justified their invasion of that area, *i.e.*, that their entry into the second floor was based on "police safety" and the justifiable need to conduct a "safety sweep" of that apartment.

It is without question that a "protective" or "safety sweep" is a search under the Fourth Amendment.  *Maryland v. Buie*, 494 U.S. 335, fn. 3, (1990); United States v. Gandia, 424 F.3d 255, 263 (2d Cir. 2005).

### The Issue Of "Exigent Circumstances:"

The Court of Appeals for the Second Circuit has provided the following guidelines in addressing the question of whether "exigent circumstances" exist that would justify an exception to the application of the Fourth Amendment to a warrantless entry into a private residence.

> Exigent circumstances provide an exception to the Fourth Amendment's warrant requirement.  *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).  "A district court's determination as to whether exigent circumstances existed is fact-specific, and will not be reversed unless clearly erroneous."  *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir. 1990) (en banc).

40

\*     \*     \*

> The test to determine whether exigent circumstances exist "is an objective one that turns on . . . the totality of the circumstances confronting law enforcement agents in the particular case." *MacDonald*, 916 F.2d at 769. The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, *see United States v. Zabare*, 871 F.2d. 282, 291, 292 (2d Cir. 1989), to believe that there was an "urgent need to render aid or take action," *MacDonald*, 916 F.2d at 769 (internal quotation marks omitted). . . .

> The presence of exigent circumstances, of course, does not give government officials unfettered license to conduct a generalized search for evidence of criminal activity. Rather, the warrantless search "must be strictly circumscribed by the exigencies which justify its initiation." *Mincy v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal citation and quotation marks omitted).

*United States v. Klump*, 536 F.3d 113, 117-118 (2d Cir. 2008); *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991).

 

The Second Circuit Court of Appeals has adopted "six illustrative guides to aid in determining the need for quick action:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause . . . to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry. *McDonald,* 916 F.2d at 769-70.

*United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997).

Based on the testimony and evidence presented at the evidentiary hearing conducted by this Court, and considering the totality of the circumstances as they existed on February 19, 2020, it is the finding of this Court that the government has failed to establish a sufficient basis to justify the warrantless intrusion by the law enforcement  officers into the second floor area of 56 Grimes Street on February 19, 2020.

The knowledge of Detective Granville about the premises located at  56 Grimes Street and what was covered by the search warrant for those premises was limited to the information supplied by the CI on February 19, 2020.  As a result, it cannot be said that Detective Granville and the other members of his team had a reasonable belief that the second floor front area constituted a danger to them which warranted or justified a warrantless entry into that area

The "mere propinquity" of the second floor front area to the "lower front" does not create a justification for a protective search or sweep of that area.  (*See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  "A person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.").

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which

reasonable men draw from evidence. Its protection consists
in requiring that those inferences be drawn by a neutral and
detached magistrate instead of being judged by the officer
engaged in the often competitive enterprise of ferreting out
crime. Any assumption that evidence sufficient to support a
magistrate's disinterested determination to issue a search
warrant will justify the officers in making a search without a
warrant would reduce the Amendment to a nullity and leave
the people's homes secure only in the discretion of police
officers. Crime, even in the privacy of one's own quarters,
is, of course, of grave concern to society, and the law allows
such crime to be reached on proper showing. The right of
officers to thrust themselves into a home is also a grave
concern, not only to the individual but to a society which
chooses to dwell in reasonable security and freedom from
surveillance. When the right of privacy must reasonably
yield to the right of search is, as a rule, to be decided by a
judicial officer, not by a policeman or government
enforcement agent.

*Johnson v. United* States, 333 U.S. 10, 13-14.

No evidence has been presented to this Court that would establish or
even reasonably imply that there were any other individuals in the second floor area that
would constitute a possible threat to the safety of the officers so as to justify a
"protective sweep" of that area.

At the time of the execution of the search warrant for the lower front
premises at 56 Grimes Street, there were no arrest warrants for any of the suspects in
the investigation, namely, the defendant or the co-defendant Pierce. It is also this
Court's understanding that no arrest was going to be made of the defendant at the time
of the execution of the search warrant. As a result, it is this Court's belief that there was

no legal justification for the officers to conduct a "protective sweep" of the second floor

area of 56 Grimes Street.  As evident from the following language of the United States

Supreme Court, legitimate "protective sweeps" are those "incident to an **arrest**:"[6]

(Emphasis added).

> A 'protective sweep' is a quick and limited search of
> premises, **incident to an arrest** and conducted to protect
> the safety of police officers or others.  It is narrowly confined
> to a cursory visual inspection of those places in which a
> person might be hiding.
>
>          *     *     *
>
> In Terry and Long we were concerned with the immediate
> interest of the police officers in taking steps to assure
> themselves that the persons with whom they were dealing
> were not armed with, or able to gain immediate control, of a
> weapon that could unexpectedly and fatally be used against
> them.  In the instant case, there is an analogous interest of
> the officers in taking steps to assure themselves that the
> house in which a suspect is being, or has just been, arrested
> is not harboring other persons who are dangerous and who
> could unexpectedly launch an attack.  The risk of danger in
> the context of an arrest in the home is as great as, if not
> greater than, it is in an on-the-street or roadside
> investigatory encounter.  A Terry or Long frisk occurs before
> a police-citizen confrontation has escalated to the point of
> arrest.  A protective sweep, in contrast, occurs as an adjunct
> to the serious step of taking a person into custody for the
> purpose of prosecuting him for a crime.  Moreover, unlike an
> encounter on the street or along a highway, an in-home
> arrest puts the officer at the disadvantage of being on his
> adversary's "turf."  An ambush in a confined setting of
> unknown configuration is more to be feared than it is in
> open, more familiar surroundings.

---

[6] The Court is well aware of the Second Circuit Court of Appeals holding that "protective sweeps" may be conducted when officers are lawfully present in a home for a reason other than an in-home execution of an arrest warrant.  *See United States v. Miller*, 430 F.3d 93 (2d Cir. 2005).

* * *

We are quite sure, however, that the arresting officers are permitted in such circumstances to take reasonable steps to ensure their safety after, and **while making, the arrest**. That interest is sufficient to outweigh the intrusion such procedures may entail.

* * *

We also hold that as an **incident to the arrest** the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.

* * *

We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found.

* * *

The type of search we authorize today . . . may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the **arrest scene**.

* * *

The Fourth Amendment permits a properly limited protective sweep in conjunction with an **in-home arrest** when the arresting officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the **arrest scene**.

*Maryland v. Buie*, 494 U.S. 325, 327, 333, 334, 335, 336, 337 (1990) (emphasis added).

The government further attempts to justify the initial entry into the second floor front apartment without a warrant by the officers by citing *United States v. Miller*, 430 F.3d 93, 98-99 (2d Cir. 2005) in support of its position.  My reading of *Miller* causes me to conclude otherwise since the government appears to create a broader application of *Miller* than what that court's decision indicates.  The Second Circuit Court of Appeals expressly stated:

> that an officer **lawfully** present in a **particular area of a home** may conduct a limited protective sweep of another area of **the home** provided the officer has reasonable suspicion that the other area harbors a threat to the safety of those on the scene.

*Id.* at 95 (emphasis added).

The *Miller* court found that the officers were lawfully in the home pursuant to a court order of protection issued against the defendant and that the "protective sweep" was limited to following the defendant while he gathered his belongings from his bedroom and that the articulated facts regarding threats and a weapon justified such accompaniment. It was not a "sweep" of the entire apartment looking for unknown individuals.  The crucial fact in *Miller* is that the officers were **lawfully** on the premises pursuant to an order of protection.  No such order or other judicial process existed on February 19, 2020 which authorized any entry by the officers into the second floor area of 56 Grimes Street prior to the issuance of the second search warrant (Government Exhibit 9).

46

In the case at bar, we are dealing with **two separate, distinct areas**, *i.e.*, the "lower front" area which was covered by the search warrant and the second floor area which was not included in the search warrant.

> For purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more completely separate houses. *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1976) (quoting *United States v. Hinton*, 219 F.2d 324, 325-26 (7th Cir. 1955)). As a consequence, "when the structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir.), *cert. denied*, 450 U.S. 1004, 101 S.Ct. 1717, 68 L.Ed.2d 208 (1981).

*United States v. Shamaeizadek*, 80 F.3d 1131, 1137 (6th Cir. 1996).

As the United States Supreme Court has admonished, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. *United States v. U.S. District Court*, 407 U.S. 297, 313 (1972); *Welsh v. Wisconsin, supra* at 748. Once Detective Granville and the other officers of the team crossed the threshold into the second floor area, they made an entry into that area which was not lawfully sanctioned. As a result, their "protective sweep" constituted an illegal entry and search in violation of the Fourth Amendment. A lawful "protective sweep" may only "be conducted when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Maryland v. Buie, supra*.

47

If one accepted the government's logic, the police or agents would be free to enter as many apartments as existed in close proximity to the apartment which had been lawfully entered under the guise of a "protective sweep."  The Fourth Amendment does not tolerate such an invasion whether it be one apartment or multiple apartments.

This Court is cognizant of the various court decisions allowing warrantless entry "onto private property" for the purpose of "assit[ing] persons who are seriously injured or threatened with such injury" (*Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)); "to fight a fire and investigate its cause; *Michigan v. Tyler*, 436 U.S. 499, 509 (1978)); "to prevent the imminent destruction of evidence" (*Ker v. California*, 374 U.S. 23, 40 (1963)); "to engage in hot pursuit of a fleeing suspect" (*United States v. Santana*, 427 U.S. 38, 42-43 (1976)).  This Court is also aware of the Second Circuit Court of Appeals' ruling in *United States v. Miller*, 430 F.3d 93, 102 (2d Cir. 2005) that "the *Buie* protective sweep doctrine may apply in situations other than the in-home execution of an arrest warrant."  However, the Second Circuit also recognized that there is nevertheless a requirement that an officer must first possess "articulable facts which taken together with rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the scene."  *Id*. at 95; *Maryland v. Buie, supra* at 334.

The fact that Detective Granville may have subjectively believed that other people might be hidden somewhere in the second floor area apartment because this

48

was a drug search and that police experience has established that drug dealers often

meet with their contacts and are frequently armed and dangerous was not legally

sufficient to justify the warrantless entry into the second floor area of 56 Grimes on

February 19, 2020.

> [S]uch generalizations, without more, are insufficient to
> justify a protective sweep. *See United States v. Taylor*, 248
> F.3d at 514 (generalized suspicion that defendant was a
> drug dealer was inadequate, standing alone, to justify
> protective sweep); *cf. Buie*, 494 U.S. at 334 n. 2, 110 S.Ct.
> 1093 (noting that "[e]ven in high crime areas, where the
> possibility that any given individual is armed is significant, . .
> . reasonable, individualized suspicion [is required] before a
> [protective sweep] can be conducted").

*United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004).

The burden is on the government "to establish specific and articulable

facts that warranted the detective's belief that there was someone hiding in the second

floor area who posed a danger to them. The government has not provided any

evidence to establish that.

This entry into the second floor area and obtaining an "overall observation

of everything in the apartment" constituted an unlawful entry into and search of the

second floor area by Special Agent Granville and other law enforcement officers. His

decision to seek a second search warrant covering the second floor and attic area of 56

Grimes did not change or correct that unlawful entry and search of the second floor

area.  The government cannot validly claim that the overall observation of everything in

the apartment by Granville and others was allowed under the "plain view" doctrine.

> It is well settled that, under the "plain view" doctrine, law enforcement personnel may seize an item without a warrant provided that it is "immediately apparent that the object is connected with criminal activity," and further provided that the officers viewed the object from a lawful vantage point - i.e., that the officers "have not violated the Fourth Amendment in arriving at the place from where they can see" the object.  *United States v. George*, 975 F.2d 72, 78 (2d Cir. 1992); *see also Horton v. California*, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).  The determination of lawful vantage point must focus on the activity which brought the object into plain view - here, the search of the briefcase by airport security personnel.  As long as the scope of that initial search comported with the Fourth Amendment - i.e., was no more intrusive than necessary to accomplish its purpose of detecting weapons or explosives - then it is of no constitutional moment that the object found was not what was sought.  As the district court correctly noted, "[t]hat lack of relationship *always* exists with regard to action validated under the 'plain view' doctrine."

*United States v. $557,933.89, More Or Less, In U.S. Funds*, 287 F.3d 66, 81-82 (2d Cir.

2002); *see also United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.); *cert. denied*, 513 U.S.

877 (1994).

        The entry into the second floor area of 56 Grimes Street on February 19,

2020 without a search warrant was unlawful and therefore it cannot be validly claimed

that the plain view doctrine applies to the visual search that was made by law

enforcement officers under the guise of doing a "security" or "safety" sweep for the

reasons previously stated.  This Court fails to see how a National Fuel bill with the defendant's name and address on it makes it "immediately apparent that the object is connected with criminal activity" and therefore legally formed a basis for seeking a second search warrant.

### E.  The Invalidity of the Second Search Warrant

Since the multiple entries into the second floor of 56 Grimes Street on February 19, 2020 were in violation of the Fourth Amendment rights of the defendant, any evidence observed during those unauthorized visits became "poisoned" by reason of such violation.  There is no question that the sole basis for the second search warrant on February 19, 2020 authorizing the search of the second floor and attic of the premises at 56 Grimes Street was the information obtained by Detective Granville based on observations made by him and other law enforcement officers while unlawfully present in those areas.  Both Detective Granville and Deputy McMahon admitted such in their testimony.  Dkt. #517, pp. 43, 55, 128, 148; Dkt. #519, pp. 21, 24, 29-30, 31-32, 78, 85-87.  As a result, the "fruit of the poisonous tree" principle applies thereby causing the second search warrant to be invalid along with the entry, search and seizure made pursuant to that search warrant.  *See Wong Sun v. United States*, 371 U.S. 471, 484-485 (1963).

## F.  Application of the Exclusionary Rule

The "exclusionary rule" was created by the United States Supreme Court as a means of safeguarding Fourth Amendment rights by forbidding the use of improperly obtained evidence at trial.  *Herring v. United States*, 555 U.S. 135, 139 (2009); *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015); *United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012).  Admittedly, the fact that a Fourth Amendment violation occurred does not mean that the exclusionary rule automatically applies.  *Illinois v. Gates*, 462 U.S. 213, 223 (1983).  However, when law enforcement officers exhibit "deliberate," "reckless," or "grossly negligent" "disregard" for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs.  *Herring, supra* at 144; *Davis v. United States*, 564 U.S. 229, 238 (2011).

The conduct of the law enforcement authorities on February 19, 2020 at 56 Grimes Street is precisely the type of activity that the exclusionary rule was formed to address and to deter.  The actions of the law enforcement officers in executing the first search warrant at 56 Grimes Street on February 19, 2020 constituted a blatant violation of the Fourth Amendment thereby eliminating the application of the "good faith" principle established in *United States v. Leon*, 468 U.S. 897 (1984).  The law enforcement conduct was "sufficiently deliberate that exclusion can meaningfully deter

it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring, supra* at 144; *Davis, supra* at 240.

## **CONCLUSION**

Because this Court finds that the conduct of law enforcement officers in executing a search warrant for premises located at 56 Grimes Street, Buffalo, New York on February 19, 2020 was sufficiently deliberate and reckless, exclusion of the evidence seized is mandated as a deterrent for the future and sufficiently worth the price paid by the justice system, and it is hereby recommended that the defendant's motion to suppress the use of evidence seized be granted.

It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.</u>**  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **<u>Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.</u>**

DATED:    Buffalo, New York
          October 6, 2023

                              *<u>H. Kenneth Schroeder, Jr.</u>*
                              **H. KENNETH SCHROEDER, JR.**
                              **United States Magistrate Judge**